No. 16-1756

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

Congregation Jeshuat Israel,

*Plaintiff-Appellee,*

v.

Congregation Shearith Israel,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

## BRIEF OF DEFENDANT-APPELLANT
## CONGREGATION SHEARITH ISRAEL

---

Louis M. Solomon
Colin A. Underwood
Nancy L. Savitt
GREENBERG TRAURIG, LLP
The MetLife Building
200 Park Avenue
New York, NY 10166
(212) 801-6500

Deming E. Sherman
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI 02903
(401) 276 6443

John F. Farraher, Jr.
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110
(617) 310-3029

## CONGREGATION SHEARITH ISRAEL'S
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 & 28(a)(1), Defendant-Appellant

Congregation Shearith Israel states that it has no parent corporation and that no

publicly-traded corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... viii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ...............................................................3

    I.        INTRODUCTION.................................................................3

    II.      STATEMENT OF FACTS .......................................................8

          A.    Shearith Israel and Touro Synagogue, Through 1880 ....................8

          B.    Jews Return to Newport, 1881-1892..............................................11

          C.    1893-1903:  Shearith Israel Exercises Ritual Oversight to Ensure that Building and Contents Remain in Active Use at Touro.........................................................................................12

          D.    The Indenture With Lease Remains in Effect................................19

          E.    Shearith Israel Continues to Function as Ritual Overseer or "Trustee" ....................................................................................21

          F.    The Sanctity of the Rimonim .......................................................23

          G.    The Evidence Proved that CJI Satisfies Its Financial Needs.........23

    III.    PROCEDURAL HISTORY.................................................25

    IV.    THE DECISION BELOW ..................................................26

STANDARD OF REVIEW ...................................................................27

SUMMARY OF ARGUMENT ..............................................................28

ARGUMENT ..................................................................................31

I.    CJI CANNOT SELL THE RIMONIM...........................................31

A.   The Governing Instruments Bar Sale of the Rimonim: Shearith Israel's Unrebutted Ritual Practice Prohibits Such a Sale ........................................................................................... 31

B.   The Rimonim Are Encumbered by the Indenture With Lease ...... 34

C.   Shearith Israel Did Not Hold the Rimonim as Bailee ................... 39

D.   Shearith Israel Has a Superior Claim to Possessory Ownership of the Rimonim ........................................................ 43

II.   THE DISTRICT COURT ERRED IN REMOVING SHEARITH ISRAEL AND APPOINTING CJI TRUSTEE OF TOURO SYNAGOGUE ................................................................................ 47

A.   CJI Could Not Prosecute Trustee Removal/Appointment Claims Against Shearith Israel ....................................................... 47

1.   Res Judicata Bars CJI from Raising Trust Issues .................. 48

2.   The 1903 Settlement, CJI's Public Surrender, and CJI's Admitted Lessee Status Bar CJI from Raising Trust Issues .. 52

3.   The Rhode Island Attorney General Was a Necessary Party ................................................................. 53

B.   Shearith Israel Should Remain as Trustee ..................................... 54

C.   The District Court Erroneously Punished Shearith Israel, and Jews in Perpetuity, for Shearith Israel's Colorable, Good-Faith Litigation Positions ............................................................... 56

D.   CJI Should Not Be the Trustee ...................................................... 60

CONCLUSION AND SUGGESTION OF REASSIGNMENT ............................. 61

# TABLE OF AUTHORITIES

## Cases

*In re Albicocco*,
 2006 WL 2376441 (E.D.N.Y. Aug. 16, 2006) .................................................52

*Ayotte v. Johnson*,
 25 R.I. 403, 56 A. 110 (1903)...........................................................44, 52

*Barber v. Watch Hill Fire Dist.*,
 39 R.I. 236, 89 A. 1056 (1914).................................................................31

*Baxter v. Brown*,
 26 R.I. 381, 59 A. 73 (1904)....................................................................46

*Bigelow v. Huntley*,
 8 Vt. 151 (1836)...................................................................................42

*Bradshaw v. Ashley*,
 180 U.S. 59 (1901).................................................................................46

*Brice v. Trs. of All Saints Mem'l Chapel*,
 31 R.I. 183, 76 A. 774 (1910)..................................................................33

*Carney v. Carney*,
 89 A.3d 772 (R.I. 2014) ............................................... 33-34, 36, 41

*Crafts v. Mechanics' Sav. Bank*,
 102 A. 516 (R.I. 1918)............................................................................35

*Cullum v. Bevans*,
 6 H.& J. 469 (Md. 1825).........................................................................44

*Currier v. Gale*,
 91 Mass. 522 (1865) ..............................................................................45

*Darcy v. Brown Univ.*,
 1997 WL 839894 (R.I. Super. Ct. Feb. 20, 1997) ..............................53

*Dennis v. Rhode Island Hosp. Tr. Nat'l Bank*,
 571 F. Supp. 623 (D.R.I. 1983), *aff'd as modified*, 744 F.2d 893
 (1st Cir. 1984), *abrogated by Salve Regina Coll. v. Russell*,
 499 U.S. 225 (1991).................................................................................57

*Doe v. Urohealth Sys., Inc.*,
 216 F.3d 157 (1st Cir. 2000).....................................................................48

*F.D. McKendall Lumber Co. v. Kalian*,
    425 A.2d 515 (R.I. 1981) ................................................................ 36

*Fatulli v. Bowen's Wharf Co.*,
    56 A.3d 436 (R.I. 2012) ................................................................. 42

*FDIC v. Elio*,
    39 F.3d 1239 (1st Cir. 1994) .......................................................... 28

*Ferro v. Ferrante*,
    103 R.I. 680, 240 A.2d 722 (1968) ................................................ 61

*Ferrucci v. Atl. City Showboat, Inc.*,
    51 F.Supp.2d 129 (D. Conn. 1999) ................................................ 42

*García-Monagas v. De Arellano*,
    674 F.3d 45 (1st Cir. 2012) ............................................................ 48

*Goller v. Stubenhaus*,
    77 Misc. 29, 134 N.Y.S. 1043 (N.Y. Sup. Ct. 1912) ..................... 35

*Great Clips, Inc. v. Hair Cuttery of Greater Boston, .L.L.C.*,
    591 F.3d 32 (1st Cir. 2010) ............................................................ 52

*Haffenreffer v. Haffenreffer*,
    994 A.2d 1226 (R.I. 2010) .............................................................. 37

*Hamilton v. Colt*,
    14 R.I. 209 (1883) ........................................................................... 44

*Harrison v. U.S.*,
    284 F.3d 293 (1st Cir. 2002) .......................................................... 27

*Hill v. M.S. Alper & Son, Inc.*,
    106 R.I. 38, 256 A.2d 10 (1969) .................................................... 37

*Hopper v. Callahan*,
    78 Md. 529, 28 A. 385 (1894) ........................................................ 44

*Huntley v. State*,
    63 A.3d 526 (R.I. 2013) ........................................................... 50, 51

 *Lehr v. Brodbeck*,
    192 Pa. 535, 43 A. 1006 (1899) ..................................................... 38

*Leo v. Armington*,
    74 R.I. 124, 59 A.2d 371 (1948) .................................................... 53

*Lucas v. Brooks*,
    85 U.S. 436 (1873) ......................................................................... 52

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
   196 F.3d 409 (2d Cir. 1999) ..............................................................32

*Maulding v. U.S.*,
   257 F.2d 56 (9th Cir. 1958) ..............................................................41

*McCarty v. Cavanaugh*,
   224 Mass. 521, 113 N.E. 271 (1916)...................................................35

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
   312 F.3d 94 (2d Cir. 2002) ................................................................32

*Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.*,
   149 U.S. 436 (1893).........................................................................35

*Meyer v. Jewish Home for the Aged*,
   1994 WL 930887 (R.I. Super. Ct. Jan. 19, 1994)..............................53

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2010)...................................................................28

*In re Newport Reading Room*,
   21 R.I. 440, 44 A. 511 (R.I. 1899)....................................................35

*Northern Pacific Ry. v. Slaght*,
   205 U.S. 122 (1907)....................................................................50, 51

*Nugent ex rel. Lingard v. Harris*,
   95 R.I. 137, 184 A.2d 783 (1962)........................................55, 59, 60

*Nugent ex rel. St. Dunstan's Day Sch. v. St. Dunstan's Coll.*
   *of Sacred Music*,
   113 R.I. 666, 324 A.2d 654 (1974)...................................................43

*Prince v. Charles Ilfeld Co.*,
   72 N.M. 351, 383 P.2d 827 (1963) ...................................................44

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
   161 F.3d 77 (1st Cir.1998).........................................................28, 32

*Russell v. Allen*,
   107 U.S. 163 (1883)..........................................................................54

*Salve Regina Coll. v. Russell*,
   499 U.S. 225 (1991).............................................................27, 53, 57

*State v. Collins*,
   28 R.I. 439, 67 A. 796 (1907).............................................................35

*Stearns v. Newport Hospital*,
  27 R.I. 309, 62 A. 132 (1905)............................................................53

*Systemized of New England, Inc. v. SCM, Inc.*,
  732 F.2d 1030 (1st Cir. 1984)...........................................................33

*Tefft v. Reynolds*,
  43 R.I. 538, 113 A. 787 (1921)..........................................................44

*Texaco Puerto Rico, Inc. v. Dep't Consumer Affairs*,
  60 F.3d 867 (1st Cir. 1995) ...........................................................51-52

*Town of Wakefield v. Att'y Gen.*,
  334 Mass. 632, 138 N.E.2d 197 (1956)...........................................38

*Vineberg v. Bissonnette*,
  548 F.3d 50 (1st Cir. 2008)...............................................................29

*Weiner v. Weiner*,
  113 R.I. 403, 321 A.2d 425 (1974)..............................................38, 52

*Whitney Bros. v. Sprafkin*,
  3 F.3d 530 (1st Cir. 1993).................................................................27

## Statutes

28 U.S.C. § 1295(a)(1).........................................................................1

28 U.S.C. § 1332...................................................................................1

28 U.S.C. § 2107(a) ..............................................................................1

Fed. R. App. P. 4(a)(1)(A) ....................................................................1

R.I. Gen. Laws § 18-2-1......................................................................60

R.I. Gen. Laws § 18-9-9.................................................................55, 57

R.I. Gen. Laws § 18-9-10....................................................................55

R.I. Gen. Laws § 18-9-17(c) ...............................................................55

## Other Authorities

George G. Bogert, et al., *Bogert's Trusts & Trustees* §§ 391, 394
  (2015)................................................................................................57

Restatement (Third) of Trusts §§ 76, 78(1) (Am. Law Inst. 2007) ........58

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

The District Judge is speaking publicly about the decision in this matter.

http://www.jvhri.org/stories/Judge-to-speak-on-recent-Touro-case-at-fall-RIJHA-meeting,5337 (billed as "the recent, historic [Touro Synagogue] court case").  See Conclusion *infra*.  This case raises First Amendment issues concerning the right of religious institutions to enter binding contracts in order to protect sacred ritual objects, including by agreeing to abide by one religious group's ritual practice.  This case also raises issues concerning the propriety of a court's removing the long-standing ritual overseer simultaneously with its imposition of a charitable trust and *sua sponte* appointing as trustee the very litigant seeking to remove ritual objects from the trust premises; and the public policy considerations where the trustee is removed solely for taking good-faith litigation positions.

## <u>JURISDICTIONAL STATEMENT</u>

The District Court had jurisdiction under 28 U.S.C. § 1332 due to diversity of citizenship and the requisite amount in controversy.

This Court has appellate jurisdiction over the District Court's final judgment pursuant to 28 U.S.C. § 1295(a)(1).

The District Court's judgment was entered on May 16, 2016.  Shearith Israel filed its notice of appeal on June 14, 2016.  This appeal is timely pursuant to 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A).  This appeal is from a final judgment disposing of all the parties' claims.

## <u>STATEMENT OF THE ISSUES</u>

(1)    Did the District Court err in ruling that plaintiff Congregation Jeshuat Israel ("CJI"), an entity that did not exist before 1893, owns and can sell ritual Colonial-era silver Torah scroll finials (rimonim) that for over 250 years have been integral parts of Colonial-era Touro Synagogue, where in so ruling the District Court (i) disregarded numerous legal instruments that prohibited sale of the rimonim and required CJI's adherence to defendant Congregation Shearith Israel's ritual practices, which undeniably preclude the sale of the rimonim, and (ii) disregarded Shearith Israel's prior and superior claim to possession, which is supported by specific documentation and a public surrender confirming Shearith Israel's control?

(2)    Did the District Court err in permitting CJI, lessee under an Indenture with Lease, to prosecute trustee removal and appointment proceedings against Shearith Israel, owner and lessor, where the Rhode Island Attorney General was not a party to the proceedings, where there was no compliance with Rhode Island's prior notice statute, and where CJI should have been barred from challenging Shearith Israel's title due to res judicata, prior written settlement and several other written agreements, and public surrender?

(3)    Did the District Court err in removing Shearith Israel as trustee of Touro Synagogue and *sua sponte* appointing CJI as the new trustee, where the sole

bases for removal were good faith and colorable positions that Shearith Israel took in defending litigation initiated by CJI?

## STATEMENT OF THE CASE

### I. INTRODUCTION

This case is about the religious patrimony of American Jews.  It involves this country's oldest existing congregation of Jews (Defendant-Appellant Shearith Israel), its oldest existing synagogue building (the Touro Synagogue in Newport, Rhode Island), and some of its oldest existing ritual Judaica (the colonial-era Myer Myers rimonim (bells) at the heart of the current dispute).  Plaintiff CJI wants to sell the rimonim it possesses to an art museum in exchange for money.  But from the viewpoint of Shearith Israel and many other Jews, CJI is trying to sell the birthright, not just of the Jews of Newport, but the Jews of the United States.

Worse is that CJI has no legal right to sell the rimonim.  The rimonim became part of Touro Synagogue's historic patrimony more than a century before CJI came into existence in 1893.  Shearith Israel has had ownership and control of that patrimony – as well as the religious duty to protect it – for 200 years.  CJI's website admits that "**Legal oversight of the [Touro Synagogue] building, its contents, and its deed was handed to Congregation Shearith Israel in New York**" (Addendum ("AD") 140) (all emphases added herein unless otherwise noted).  Since it was formed in 1893, CJI's only lawful connection to Touro

-3-

Synagogue and the ritual objects used therein has been pursuant to formal writings and a public surrendering of keys, each of which declared that CJI owned neither realty nor ritual objects, and that the owner/lessor of the property and objects is Shearith Israel.  As CJI itself said, **"[c]ertainly we do not claim any ownership in the property" or "appurtenances**" (AD118).  Indeed, the District Court found not even one writing that gave CJI title to synagogue, ritual objects, or the rimonim.

CJI admits that, since 1903, a formal Indenture with Lease with Shearith Israel, encumbering not only the Touro realty but its "appurtenances" and "paraphernalia", remains in effect (Fact §D).  And CJI agreed in that Indenture to abide by Shearith Israel's rituals, including how CJI treats the historic ritual objects it is allowed to possess and care for but not own.  Preserving the sanctity of Jewish religious ritual was not an afterthought then, and should not have been extinguished by the District Court now.

The District Court made a series of serious legal errors, each of which independently requires reversal:

*First*, the District Court ignored the writings between the parties that gave authority over ritual matters to Shearith Israel.  CJI and Shearith Israel explicitly placed in Shearith Israel's hands the decision concerning rites, rituals, and customs of Touro's ritual operation, and there was undeniable proof that those governing

rituals prohibited sale of the rimonim.  Yet fearful of opening "Pandora's box", the District Court disregarded unrebutted evidence of that ritual; disregarded that the parties agreed to bind themselves to it; and refused Shearith Israel's proffer of evidence directly on point.  Religious bodies need not be strangers to civil law, unable to make binding agreements stated in civil law terms concerning religious matters.  Here, there was no reason for the District Court to run away from enforcing the parties' agreement to defer to Shearith Israel's view on ritual matters. But instead of looking to the parties' agreements giving ritual authority to Shearith Israel, the District Court erroneously found that, because an Eighteenth Century Will of one Rivera – a party unrelated to either Shearith Israel or CJI – dedicating the Synagogue to Jewish worship forever did not explicitly mention any specific ritual, the Court was justified in excising from the parties' long-standing, solemn agreements specific limitations on CJI's ability to act.

*Second*, even aside from the express (and definitive) terms of the legal settlement and Indenture, the entire set of agreements and writings between the parties declare Shearith Israel's right to control the ritual objects including specifically rimonim.  Not a single writing ceded title to the rimonim to CJI or recognized anyone in Newport as legitimately entitled to acquire ownership in the rimonim.  There are numerous writings from CJI as well, once it organized in 1893; these, too, uniformly recognize that CJI was neither seeking nor getting title

or any right to control (Facts §C).  The District Court erroneously disregarded these writings.  The District Court even disregarded the phrase "and paraphernalia belonging thereto" expressly inserted by Shearith Israel into the parties' formal 1903 Indenture with Lease – a document CJI agreed to execute *in the form that Shearith Israel wanted* – even though the Court found that Shearith Israel "**used the word 'paraphernalia' to refer to 'personal property**'" (AD42 n.38).  Instead of enforcing the parties' written understandings, the District Court relied on internal Shearith Israel minutes from the 1830s, interpreting it as creating a bailment that the court believed trumped all the clear agreements and writings between the parties 60-70 years later.  This was legal error – as was the Court's reliance on CJI's 100-year possession of the rimonim; the clear writings between the parties made CJI's possession subservient to Shearith Israel's ownership and religious caretaker roles.  Indeed, the District Court's reliance on internal church documents instead of the legal agreement between Shearith Israel and CJI effectively denies religious organizations the capacity to enter into binding contracts, as if they were wards of the state.

*Third*, the District Court misapprehended the legal relationship between Shearith Israel and CJI.  Shearith Israel has had admitted ritual oversight over Touro for 200 years – to support a ritual environment for the religious benefit of Jews past, present, and future to worship at Touro.  Shearith Israel has had no trust

relationship *with CJI* – that relationship is one of owner/lessor and lessee, a relationship CJI has admitted to for over 100 years. Yet the District Court erroneously found that "**Shearith Israel's single obligation is to act *for the benefit of Jeshuat Israel***" (AD96), thereby creating a new and unwritten obligation in Shearith Israel.  It transformed CJI from a lessee caretaker that should have had the same goal of preserving an environment of lasting worship for Jews past, present, *and future* into the supposed beneficiary itself, entitled to remove and sell precious property held in trust for posterity for the use of those Jews.

*Fourth*, the District Court erred in finding a breach of trust.  The Court erroneously ignored the res judicata effect of a binding 1903 judgment that CJI had no claim to argue breach by Shearith Israel of any trust, finding exactly the opposite.  A 1903 settlement (where CJI agreed to "***admit and recognize without qualification***" Shearith Israel's title (AD119)), related written acknowledgements, and CJI's public surrender further barred CJI from challenging Shearith Israel's status as ritual overseer; all of this the District Court disregarded.  It is beyond ironic that Shearith Israel – the party who is trying to preserve Touro's heritage – is the party the District Court removed as trustee of Touro Synagogue, and that CJI – the party bent on selling the rimonim outright – is now the new court-appointed trustee.  The District Court effected this removal and appointment without required

-7-

due process, punishing Shearith Israel based solely on the litigation positions it took to preserve the rimonim at Touro.

Finally, history proves Shearith Israel has ***never*** sought to prevent Jews from praying at Touro Synagogue.  Shearith Israel just wants to stop CJI from selling off the synagogue's patrimony, which would work a profound harm to this honored house of worship, and the Jews of the United States, present and future, forever.

## II. STATEMENT OF FACTS

Shearith Israel restates the facts as found by the District Court or as supported by the record where the District Court made no contrary findings.  The key clearly erroneous factual findings or omissions are noted.

### A. Shearith Israel and Touro Synagogue, Through 1880

Shearith Israel, the United States' oldest Jewish congregation (Appendix ("A") 2371), had a deep and abiding relationship with the sanctuary, ritual, and ritual objects of Touro Synagogue for nearly 140 years before CJI came into existence.  There was "very close kinship" among the Western Sephardic congregations who had sought religious freedom in this country (A2403).  Beginning in 1760, Shearith Israel assisted in funding the construction of Touro, twice making special appeals to Shearith Israel members in New York that enabled its fellow Newport Jews to complete the building project (A1539-46; A2403-15).

-8-

Shearith Israel donated and loaned ritual objects to the nascent synagogue (*id.*; A1379-80; AD140) and just a few decades later became a safe haven for many of the Jews who fled Newport during the Revolution (AD139-40; AD28). Shearith Israel remains home to descendants of some of those Jewish families, still practicing the same Western Sephardic tradition as their colonial forebearers.

The Jewish community left Newport in the early Nineteenth Century. In the ensuing decades Shearith Israel acted as owner and caretaker of Touro and the associated ritual objects. "Shearith Israel took possession of the Rimonim in the 1820s" (AD66), and CJI admits on its website that, in the 1820's, ***"Legal oversight of the [Touro Synagogue] building, <u>its contents</u>, and its deed was handed to Congregation Shearith Israel in New York"*** (AD140; *accord* A1429-30 (CJI's representative admitting Shearith Israel's ownership and control); A1571, A1573 (Newport acknowledging same)). CJI's 30(b)(6) witness admitted that CJI was unaware of any document or "any other fact by which legal oversight was transferred to someone other than Shearith Israel subsequent[ly]" (A1165:4-A1166:2; *see also* A337:6-A339:6).

For the first time in history the District Court found that Shearith Israel's legal oversight took the form of a charitable trust, with Shearith Israel as trustee. The District Court relied primarily on the Will of Yeshuat Israel congregant Jacob Rivera to determine that the synagogue was held "in trust Only, to and for the sole

Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever" (AD50-52; A1401; *but see* A2350-51).

In the decades after the 1820s, Touro Synagogue was opened only occasionally, mainly for funerals, and only with the permission of Shearith Israel, which would send a minister to Newport to conduct services and to bring ritual items to be used during those services at its own expense (A1002:1-A1003:19; A2542). Shearith Israel provided ritual oversight, such as by denying permission for a mutilated scroll to be deposited in Judah Touro's tomb because it was against Shearith Israel's rites, rituals, and customs (A1445, A1451).

The rimonim at issue are the work of Myer Myers, a contemporary of Paul Revere and the first Jew to become a member of Britain's silversmith's guild (A837:21-A838:22). The District Court found that Myers made pairs for Newport and Shearith Israel (*id*.; AD20-22). In 1869, Shearith Israel conducted an inventory establishing that Shearith Israel then held one pair of rimonim marked "Myers" and a second pair marked "Myers NewPort" (A1456, A1491, A1496, A1531). An 1872 inventory of Touro confirms that Touro had no rimonim or other religious articles (A1551-53). When, later in the 19th Century, Shearith Israel sent Myers rimonim to Newport for use at Touro, a mixed pair was sent, one with and one without "Newport" (A2189; A855:3-A856:2).

### B. Jews Return to Newport, 1881-1892

Jews with no cultural, spiritual, legal, or other connection to the colonial Yeshuat Israel congregation began residing in Newport (*see* A1554-68; A2048) and in 1881 sought permission to worship in Touro Synagogue.  The Newport City Council transmitted the application to Shearith Israel, ritual overseer and owner (A1569; A1554-68; A1571, A1573; A1578-81).  Shearith Israel opened Touro for high holiday services in 1881 (A1575-77), and, documenting a loan, Shearith Israel's "Shamas [Sexton] was directed to bring from Newport **the Seferim [Torahs] &c** [etc.] **loaned to the Synagogue** there for service during recent Holy days" (A1583, A1585).

By 1882, a sufficient number of Jews resided in Newport for Shearith Israel to call a rabbi (the father of Shearith Israel's rabbi, H.P. Mendes) to serve at Newport.  Shearith Israel led the reconsecration of Touro Synagogue, a joyous and major milestone that occurred in 1883 – over a decade before CJI existed (A1586-95; A1598, A1601).  In connection with the reconsecration, Shearith Israel authorized its President "to designate two Sepharim [Torah scrolls] to be used by the New Port Congr. *during the pleasure of this Board*" (A1599, A1602), again documenting a loan.

### C. 1893-1903: Shearith Israel Exercises Ritual Oversight to Ensure that Building <u>and</u> Contents Remain in Active Use at Touro

Upon CJI's formation in 1893 (after the death of Newport's Rabbi Mendes), Shearith Israel told the Newport City Council that it supported a new congregation's worshiping at Touro, "as we naturally prefer to have the Synagogue used for worship than having it closed" (A2716). Carrying out its role as ritual overseer, Shearith Israel required compliance with certain conditions before delivering the keys, including that the Synagogue be open to "all the Hebrew residents" for worship; that no "furniture or ornament [be] removed from the Synagogue" without Shearith Israel's "written consent"; and that if the congregation disbanded or had fewer than ten members, "the Synagogue, movables and all property of the Congregation shall be returned to [Shearith Israel] upon our demand" (A2718-2719). Shearith Israel secured these protections for past, present, and future Jews before permitting CJI to act as caretaker lessee of Touro (*infra*).

When CJI came on the scene a decade after Touro's rededication, CJI had nothing, neither building nor appurtenances nor paraphernalia to worship at Touro. Indeed, in recognition that it had nothing, CJI requested of Shearith Israel "**the further assistance which they have in the past rendered in <u>the loan of such property as has formerly been in use in the services</u>**" (AD117). No document from the period or after modifies this acknowledgement.

-12-

Shearith Israel responded to this request by empowering Rev. Baruch, the new minister at Touro, "to use the Sepharim, **Bells**, Books, Shofar and **all other appurtenances for worship** now in Newport Synagogue or in storage at the Newport Bank (Bank of Rhode Island) and the Synagogue building and adjoining buildings" provided that "custody of the buildings and **appurtenances**" be **"return[ed] to" Shearith Israel "[u]pon termination of [the minister's] appointment**" (A1612-13). CJI failed in its attempt to circumvent Shearith Israel's instruction to Rev. Baruch regarding, *e.g.*, the "Silver Bells" (A1620-27; A2582-85); the objects were not released until CJI guaranteed "their safe keeping and their return whenever desired by [Shearith Israel]" (A1638-39). CJI expressly admitted that "**Certainly we do not claim any ownership in the property**" and "**we do not claim ownership in the property or appurtenances**" (AD118). Shearith Israel reaffirmed its role "as the Trustees and owners of the Synagogue **and personal property therein**" (A1632-33). And in response to CJI's request that Shearith Israel prove its title to "the Newport Synagogue Building or **personal property therein**" – CJI again renounced any claim of ownership but wondered if "the City and State" are "the proper guardians" (A1630) – Shearith Israel obtained deeds from the heirs of original Yeshuat Israel congregants in 1894 (A1659-84). The District Court found that these deeds were nullities (AD59). Yet the parties at the time treated them as operative. Thus, for example, in 1897 CJI amended its

-13-

Constitution, taking a governance structure that permitted CJI to make its own decisions (*compare* A1640-52 *with* A1715-27) and altering it (after a year of negotiation (A1694-1712)) expressly to call it "Permanent" and designate four Shearith Israel Trustees as permanent members; barring itself from selling even its own real or personal property except by "unanimous vote of the members" including the Shearith Israel Trustees; and going further to prohibit the amendment of those protective provisions "unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed addition, alteration or amendment" (A1716, A1721, A1724-25, A1727).  No such vote ever occurred (although CJI purported to amend its by-laws (not its Constitution) several times thereafter, beginning in 1945).  By 1898 local press reported that Shearith Israel "is the central body under whose supervision the Newport Congregation is conducted" (A1736).

The death of Rev. Baruch in 1899 precipitated nearly four years of controversy between and among the parties.  CJI split into CJI and "Touro Congregation" (*see* AD39).  Shearith Israel was unwilling to permit either faction to exclude the other from Touro, and to enforce its ritual role locked the doors until civility and peace were regained.  Touro Congregation took possession of the synagogue by force and held services until Shearith Israel prevailed in court on a writ to return the synagogue to itself, the rightful owner and overseer (A1747-64).

Shearith Israel considered not recognizing any congregation, but rather "welcom[ing]" to services "every Newport Hebrew as an individual" (A1755, A1763), as it had stated in its 1893 correspondence to the Newport City Council (A2718).  To cement its oversight role, Shearith Israel insisted that CJI, if it wanted possession, do so only under a lease with appropriate protections in addition to the protections provided by CJI's Permanent Constitution (A1765-66; A1769-75; A1785-86).

In July 1900, Shearith Israel acted again to ensure worship open to all Jews (A1788, A1791, A1799-1801).  Shearith Israel's minister, who had occasionally officiated in Newport, explained in 1901 that, although Shearith Israel was controlling access to the Synagogue, even CJI's president was "welcome" into Touro "to worship as a private individual" (A1807, A1814; A1803-16).  (This mirrors Shearith Israel's recent actions in attempting to remove CJI as lessee while welcoming all congregants to Touro.)  In April 1902, Touro Congregation members again broke into Touro and occupied it for several months (A1912-13; AD40).

In May 1902, CJI and several individuals filed an action in Rhode Island federal court entitled *David v. Levy* against Shearith Israel's trustees, seeking a declaration of trust, ousting Shearith Israel as trustee, and appointing CJI (A1821-46).  In January 1903, the court ruled in Shearith Israel's favor, held there was no

trust, that CJI acted with unclean hands, and dismissed the complaint (A1879-85). This action is discussed in detail *infra* Point II.A.1.

By this time, the warring local factions realized they had lost, as a contemporary article recorded: "**As a result of this adverse decision, the Newport congregation negotiated for a peaceable settlement**. It was finally agreed that <u>**the synagogue and paraphernalia**</u> be rented by the Shearith Israel Congregation to [CJI]", with the lease providing, *inter alia*, for Shearith Israel's approval of any rabbi (A1913; *see also* A2586 (Boston Herald reporting that CJI "agreed to lease [from Shearith Israel] the synagogue and all its paraphernalia")).

The "peaceable settlement" involved submission to Shearith Israel's form of lease (in contrast to CJI's prior attempts to redraft the lease (*see* A1785-86)) and CJI's surrender of Touro's premises and paraphernalia. CJI's formal board resolution declared:

> [CJI representatives] are authorized and directed to <u>surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto</u> at Newport, to the said [Shearith Israel] Trustees, owners of the property, <u>and to agree upon the terms and provisions of a lease</u> from said Trustees to this Congregation ... at the nominal rent of one dollar yearly, <u>in form satisfactory to the landlord</u>. [AD120; *see also* AD119.]

That the press covered the public surrender proceedings was deliberate. Prior to executing the Indenture with Lease, Shearith Israel instructed its representative to "[o]btain surrender of the building and personal property" before

delivering any lease or keys, and to "attract the attention of the Press to the surrender, that the act may obtain some notoriety" (AD122, A1909 (transcription)). The surrender procedure involved a public Ceremony of the Keys, whereby "[t]he keys of the building and gates should be delivered to [Shearith Israel's representative] by an authorized officer of the Congregation [CJI] who shall declare the property is thereby surrendered to you representing the owners of the property…. Whereupon you or [Shearith Israel's representative] will deliver to said officer one of the Leases and return to him the keys" (AD123, A1910).  As the lease was being signed, Shearith Israel and CJI went through a defining moment: CJI publicly and officially handed over to Shearith Israel the keys to the synagogue and the synagogue ark, both of which controlled access to the rimonim (A1011:19-A1012:11; A2507-17).

The District Court's opinion says nothing of this seminal event.  By CJI's own admissions, the very rimonim at issue were in the Touro Synagogue when the litigation ended, the absolute surrender occurred, and the public Ceremony of the Keys made it clear to all that the Synagogue *and its contents* were under Shearith Israel's control (*see* A82, A97 ¶ 29 (admitting that "[a]t the time of the resolution of the litigation between the congregations in 1902, the Rimonim (among other Torah bells) existed in the Touro Synagogue"); *accord* A32; AD37 n.36 (citing evidence the rimonim were at Touro in 1895).

-17-

CJI does not have any document saying it owns the rimonim, including "a deed, or a title, or a bill of sale, or a gift, or receipt, or anything like that" (A365:5-12).  There is no evidence CJI acquired possession of the rimonim other than through loan/lease from Shearith Israel.

The duly recorded February 18, 1903 Indenture with Lease ("Indenture", AD124-28) encumbered the Synagogue building and lands "with the appurtenances" and, specifically handwritten in, "and paraphernalia belonging thereto" (AD125); the signature page recorded that "[t]he words and paraphernalia belonging thereto interlined before signing" (AD127, AD129).  The receipt for the first $1.00 rent check states it is for "Synagogue [on Touro St. Newport R.I.], appurtenances and paraphernalia" (A1911).  The District Court, although declining to interpret the phrase, specifically found that Shearith Israel, as the party with control over the language of the Indenture, "used the word 'paraphernalia' to refer to 'personal property'" (AD42 n.38).

Shearith Israel ensured that the Indenture be made

> upon the express covenant and condition that [CJI] will cause the same to be used and occupied for the maintenance therein of the usual and stated religious services according to the ritual rites and customs of the Orthodox Spanish and Portuguese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel, in the City of New York. [AD126.]

CJI also covenanted that Shearith Israel approve any rabbi (*id*.).  The Indenture

imposed compliance with all lease terms on pain of eviction (AD126-27),

enforcing the importance of Shearith Israel's ritual oversight.

Under the Indenture, Shearith Israel has no obligation to provide, *inter alia*,

maintenance, utilities, and insurance for Touro Synagogue and its contents, making

the Indenture "triple net" in the obligations it requires of CJI, the lessee (AD124-

28; A654:8-22; A775:11-A776:9, A793:19-A775:8).

### D. The Indenture With Lease Remains in Effect

After the 1903 Indenture's initial five-year term expired, the parties executed

a substantively identical five-year Indenture in 1908, with the encumbrance of

paraphernalia being typed in (A1916-20).  The parties did not sign additional

written leases after the 1908 Indenture, electing instead to permit CJI to become a

holdover tenant subject to the existing Indenture terms.  When CJI forgot or failed

to pay rent, Shearith Israel reminded CJI, and CJI paid the rent (A1937, A1942;

A1947, A1949; A1951-52; A2546-47; A2053; A2058; A2073; A2091; A2097;

A2102; A2103; A2105; A1146:11-19).  CJI paid the rent as recently as 2012

(A2275).  CJI's website affirms that the "lease amount of $1 per year is still paid"

(AD140).  A 2013 work by Professor Urofsky, a scholar and consultant to CJI

relied on by the District Court, likewise affirms:

> After a series of conferences [in 1903], the trustees of the two congregations – Shearith Israel in New York and Jeshuat Israel in Newport – signed an agreement, calling for the Newporters to lease the building at an annual rental of one dollar a year.… The contract between Shearith Israel and Jeshuat Israel has held for more than a century.

(A2491; *see* A2490, A2494, A2601).

CJI repeatedly admitted its lessee status, including publicly, as in the 1945 Tri-party Agreement among the Federal Government, CJI, and Shearith Israel designating Touro Synagogue a National Historic Site (A2035-41, A2036, A2038). That agreement reiterates Shearith Israel's title, that CJI is lessee, and that the synagogue "be used for religious purposes" (A2039-40), specifically "the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel" (A2038). That agreement remains in effect. In 2001, another federal agreement, this one with National Trust for Historic Preservation, declares that "Jeshuat Israel ... has possession of the site through a lease with Congregation Shearith Israel as owner" (A2195). *Accord* AD140 (CJI's website reaffirming lease); A2133 (1995); A2070 (1962 letter from CJI president: CJI's "present status" is lessee).

### E. Shearith Israel Continues to Function as Ritual Overseer or "Trustee"

The District Court stated that Shearith Israel's involvement with "public Jewish worship in Newport waned" in the last 100 years, and that "[b]y 1993, there was no longer *any communication* between Shearith Israel and Jeshuat Israel", concluding that "Shearith Israel has long ago ceased functioning as the trustee" (AD102).  These statements are legally irrelevant (see *infra*) and clearly erroneous. E.g.:

- The 1945 federal agreement and the Indenture remain in effect. Performance under the Indenture has been manifest throughout the 20th and 21st Centuries, including in the last 20 years (*e.g.*, payment of rent in the very year CJI sued Shearith Israel and several public rabbinic appointments (*e.g.*, A656:22-657:21; A2136; A2270-71; A2273; A318:21-A319:3; A1232:15-A1233:12; A1886-87; A1921-23; A1925-27; A1988, A1993; A2023, A2026)).

- When CJI needed the property's "owner", it came to Shearith Israel and sought approval – *e.g.*, in 1905 and 1911, when Shearith Israel rejected CJI's requests to alter Touro, stating it "would not consent to any alterations of any description in that historic edifice" (A1914-15; A1929-30); in 1939, when Shearith Israel approved CJI's request to erect a monument and tablet on the Synagogue's lawn (A2009-11; A2013; A2014, A2017; A2020); in

1958-59, for contracts for work on Touro Synagogue or its properties (A2050; A2053-54; A2055); in 1975, as "legal owner of Touro Synagogue" in installing a burglar and fire alarm system (A2085; A2086); in 2001, in CJI's formal application to the National Trust (A2192-A2209).

- CJI knew in 1993 that Shearith Israel remained involved in ritual oversight and "wants Touro to survive" (A2500). CJI consulted with Shearith Israel's rabbi on matters of the ritual, rites, and customs as the Indenture required. For example, in 1996, Shearith Israel's rabbi advised CJI on the permissible ways women could participate in its traditional services (A2136). Similarly, Shearith Israel's rabbi made sure the services at Touro remained orthodox (A1197:3-8). He also answered CJI's rabbis' questions (A1227:5-10).

- Shearith Israel has for "decades and decades" appointed "liaisons" to CJI – including in the last 20 years – to "create an open channel of communication between the two congregations" (A651:5-A653:1; A346:17-22; A1198:15-A1199:18; A2550). Shearith Israel members visited Touro, and in 2010 underwrote some of the costs involved with CJI's activities (A2587; A2528 (1996); A2531 (1994)).

- Shearith Israel assisted CJI's fund-raising arm, called the Touro Synagogue Foundation ("TSF"), with crucially important grant applications for Touro in

1999 and 2003, again declaring Shearith Israel's ownership status (A2155-56, A2157, A2210).

## F.  The Sanctity of the Rimonim

The unrebutted evidence at trial showed that rimonim are ritual objects, and that once they are "used in conjunction with the Torah, it partakes of the holiness of the Torah" (A977:18-A978:6, A981:5-14).

The unrebutted evidence also showed that, as a matter of practice, Shearith Israel's ritual, rites, and customs do not permit selling such ritual objects (A669:22-A670:6, A671:9-25; A2280).  When in 2012 CJI tried to sell the rimonim to a museum, and thus remove them from ritual use forever, Shearith Israel objected to the sale and told CJI, *inter alia*, that "it was a violation of [Shearith Israel's] ritual practice and of our belief as an orthodox synagogue as to what one does with ritual objects.  They're not to be sold."  (A672:10-A673:6).

The rimonim are central parts of the "genus loci" of this National Historic Site (A2113, A2116; A2107-29).

## G. The Evidence Proved that CJI Satisfies Its Financial Needs

CJI has operated in the black for more than five years, after "struggling" in 2008 (along with the rest of the world) "because of the global financial crisis" (AD44; A2352-56 (collectively showing a positive net income since 2010)).  There

is no immediate crisis – just a feeling, common to non-profits, that they were "one sort of large financial responsibility away from insolvency" (AD45).  At the end of June 2014, CJI's total assets were "[a]pproximately 2.3 million dollars", its "investable assets" were "about 1.4 million dollars" (A429:18-430:12, A468:9-17, A469:23-A475:19; A4144).  CJI does not have any long-term financial projections (A444:11-13).  CJI offered no proof of financial insolvency, imminent financial collapse, or dire need.

An endowment is unnecessary to the functioning of a synagogue – Shearith Israel, for example, generally operates at a deficit and does not have an endowment (A660:3-A663:5, A663:22-23).  CJI offered no evidence that it *needed* an endowment; even absent its operating surplus, it has ample available financial resources.  Unlike other religious institutions, Touro is blessed with existing trust funds to pay for most of its expenses, including its rabbi's salary (A4217, A3443; A231:7-15, A282:16-19).  Touro Synagogue Foundation, a dedicated fund-raising entity of which Shearith Israel and its congregants are active participants (AD140, A2061, A2548), has been successful in raising funds for the restoration projects CJI has undertaken (A631:5-7; A1154:8-14, A1155:23-A1156:5 (building has financial support and is in no danger)).  TSF, not CJI, carried and then successfully raised funds to pay off a $1 million bank loan for Touro (A348:7-23; A463:7-21; A3926).  TSF underwrites half of all maintenance costs of Touro Synagogue

(A2569). CJI also receives a portion of the net income earned through the nearby Loeb Visitors Center, without bearing any expenses (A477:24-A479:13, A481:23-A482:1). Nor has CJI explored, let alone exhausted, readily available means of fundraising, such as by contacting Touro Synagogue's many visitors (A345:5-25).

## III.    PROCEDURAL HISTORY

CJI filed its complaint in Rhode Island Superior Court on November 8, 2012 (see Dkt. 1; A32-45). Shearith Israel removed the action to federal court on November 14, 2012 (Dkt. 1). Shearith Israel answered and counterclaimed on December 4, 2012 (A46-68; December 6, 2012 amendment A69-92). CJI replied on December 20, 2012 (A93-101). The matter was briefly stayed due to the pendency of a related action, later discontinued, that Shearith Israel filed in New York federal court.

After discovery and motion practice, Hon. John J. McConnell held an eight-day bench trial in June 2015 (Transcripts at Dkt. 104-111). Following post-trial submissions (Dkt. 90-91, 93-98), closing arguments were heard on September 18, 2015 (Dkt. 112). The District Court rendered its decision and judgment on May 16, 2016 (Dkt. 118, AD1-106; Dkt. 119, AD107). In that decision, the District Court granted Shearith Israel's June 29, 2015 motion to amend its answer and counterclaims to conform to the trial evidence (Dkt. 92; AD66 n.52; Amended Pleading at A167-89).

After discovery was closed and just before trial, the Rhode Island Attorney General moved to intervene as *amicus curiae*, which was granted in April 2015 (Dkt. 61; A18, Dkt. entry 4/22/2015). The Attorney General advised the Court that it did not learn "until trial ... that CJI sought [its] assistance" on trustee removal/appointment; the Attorney General therefore told the Court that it could not participate on any such issue because it "is not a full party" and "did not have the right to engage in discovery, examine witnesses or call his own witnesses at trial" (A190 nn.1-2).

## IV.    THE DECISION BELOW

The District Court ruled that Touro Synagogue and its lands are the corpus of a charitable trust and that Shearith Israel is the trustee (AD46-65). Although the charitable purpose is public Jewish worship, the District Court held that the form of that worship is not a trust requirement (AD7, 54 n.44). Having found in 2016 that a trust had been created over 250 years earlier, the District Court ruled that deeds from the original landowners' heirs to Shearith Israel in 1894 were legal nullities (AD59). The District Court ruled that the *David v. Levy* case, which found there was no trust in 1903, did not have res judicata effect (AD60-61).

The District Court held that, unlike the realty, the rimonim were not held in trust or owned by Shearith Israel, but rather that CJI owned them outright (AD65-89). First, the District Court found that, when Shearith Israel had possession of the

rimonim, it was a bailee of the then-disbanded Yeshuat Israel, and the moment it sent the rimonim to Newport, CJI obtained full ownership rights (AD68, 80-82, 88-89). Second, the District Court found that, even without a bailment, CJI owned the rimonim outright because it possessed them for the past 100 years (AD69-89). The District Court did not discuss how that possession began and rejected arguments showing that possession by a lessee cannot ripen into ownership as against the landlord (AD86 & n.68). The District Court did <u>not</u> find that CJI was the legal successor to Yeshuat Israel (AD89 n.69).

The District Court held that CJI had standing to bring a proceeding to remove a charitable trustee, even without the Rhode Island Attorney General (AD90-95). The District Court then removed Shearith Israel as trustee (AD95-103) and appointed CJI as the new trustee (AD103-104).

## STANDARD OF REVIEW

This Court reviews the following *de novo*: legal issues, including state law issues, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231-33 (1991); the interpretation of an unambiguous legal instrument, including the meaning of unambiguous language, *Whitney Bros. v. Sprafkin*, 3 F.3d 530, 534 (1st Cir. 1993); and factual findings "premised on an incorrect interpretation of the relevant legal principles", *Harrison v. U.S.*, 284 F.3d 293, 297-98, 300 (1st Cir. 2002). Other factual findings are reviewed for clear error. *Id.* "Review of mixed questions of

law and fact varies from non-deferential review for law-dominated issues to deferential clear-error review for fact-dominated ones". *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2010). Abuse of discretion – which occurs "when a court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them", *id*. – is the standard for trustee removal and appointment issues when the ruling is not infected with legal error, *see FDIC v. Elio*, 39 F.3d 1239, 1247 (1st Cir. 1994), as well as for evidentiary matters, *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 84 (1st Cir.1998).

## SUMMARY OF ARGUMENT

Since the Nineteenth Century Shearith Israel protected future generations of Touro worshipers from the sale of ritual property, including the rimonim, in multiple ways. It did so by word, by deed, by conduct. Every time it sent ritual objects to Newport, it did so pursuant to written limited use authorizations. CJI fully understood that it was seeking the loan of the objects and exclaimed repeatedly that it did not have or seek ownership. CJI agreed to create a modified, Permanent Constitution in 1897 to provide Shearith Israel with veto power over CJI's sale even of CJI's own property, should it ever have any, and agreed never to eliminate Shearith Israel's veto power without Shearith Israel's approval (which

has never been given).  (The Court's erroneous laches finding (AD88) – without even finding detrimental reliance, *see Vineberg v. Bissonnette,* 548 F.3d 50, 56 (1st Cir. 2008) – would at most be a defense to retrospective enforcement, would not extinguish Shearith Israel's entitlement to rely on the Permanent Constitution's explicit language prospectively, and in all events is inapposite to proving the parties' state of mind when CJI gave up any claim to the rimonim in privately and publicly surrendering them and in encumbering them in 1903.)

When CJI would not sign a lease and tried to act as owner, attempting to shut out other Jews, Shearith Israel stepped in and prevailed in litigation.  CJI in writing and publicly "surrendered" the premises and "paraphernalia" to Shearith Israel's trustees, as "owners", and signed Shearith Israel's form of Indenture with Lease, which expressly encumbered Touro's "paraphernalia" and which required CJI to abide by Shearith Israel's ritual, rites, and customs on pain of eviction.  The 1945 Tri-Party Agreement with the Government has the same governing ritual requirement.  The District Court ignored all these protections and repeatedly reduced meaningful language to surplusage.

Because CJI was bound to follow Shearith Israel's practice, which forbids selling the rimonim, this Court can reverse without reaching the ownership issues.  Independently, because the Indenture covers personalty – for example the "paraphernalia" that CJI surrendered and then encumbered – the rimonim are

subject to the Indenture and cannot be sold by CJI, the lessee. Finally, the District Court erred on ownership: CJI is not free to do with the rimonim as it pleases; there was no bailment, and Shearith Israel's prior possessory ownership of the rimonim trumps CJI's later possession, which from inception was subject to the loan/Indenture documents and thus legally never ripened into ownership.

This Court can reverse the District Court's trustee determinations without reaching the merits; both because res judicata and the 1903 settlement ("admit[ting] and recogniz[ing] without qualification" Shearith Israel's title and the public "surrender" ceremony) bar CJI from challenging Shearith Israel's status and because the Rhode Island Attorney General was not a party. Further, the District Court did not comply with Rhode Island notice provisions for appointing a new trustee.

On the merits, the District Court legally erred, abused its discretion, and violated public policy by punishing Shearith Israel for litigation positions it took as a defendant attempting to preserve the rimonim for use at Touro. Shearith Israel should not be faulted for failing to anticipate that after 250 years – including a prior court case finding no trust – a court would declare a charitable trust, that that trust would be gerrymandered to include real property but not the personalty that made the realty a "synagogue", and that salient contract language would be disregarded. Similarly, the District Court erred in appointing CJI as the new

trustee – the party that wants to remove the rimonim from their colonial home forever.

## ARGUMENT

## I.  CJI CANNOT SELL THE RIMONIM

CJI is not the absolute owner of the rimonim (§§C, D, *infra*).  But even were it, CJI committed to following Shearith Israel's practices, which bar any sale of the rimonim (§A).  The explicit agreements between the parties further prohibit their sale (§B).

### A. The Governing Instruments Bar Sale of the Rimonim: Shearith Israel's Unrebutted Ritual Practice Prohibits Such a Sale

CJI, lessee, and as party to the 1945 Tri-Party Agreement, bound itself to follow Shearith Israel's ritual, rites, and customs (AD126; A2038).  This governing practice bars sale of the rimonim, even if CJI owned the rimonim and even were the rimonim not paraphernalia or appurtenances under the Indenture with Lease.

CJI was a holdover tenant under the Indenture with Lease (Facts §D).  Accordingly, the terms of the Indenture continue to govern the relationship between the parties.  *Barber v. Watch Hill Fire Dist.*, 89 A. 1056, 1057 (R.I. 1914) (a holdover year to year "'tenancy is subject to all the covenants and stipulations contained in the original lease'").

The unrebutted evidence proved as a matter of fact that Shearith Israel's

practice prohibits CJI from selling the rimonim (Facts §F).  The District Court

barred additional evidence on this issue, preventing Shearith Israel from presenting

expert and/or factual evidence from its rabbi, Dr. Meir Soloveichik, explaining the

actual practice of Shearith Israel against selling such sacred religious objects

(A152-54, AD113:14-AD114:7; *see also* A130-35, AD110-11).  *Ruiz-Troche*, 161

F.3d at 88.  The District Court erroneously ruled that permitting the testimony

would "open a Pandora's box" (AD114:3-7) – an unfortunate description for

respecting the balance struck by the First Amendment.  The First Amendment

would be upheld, not undermined, by respecting the parties' binding agreements,

rather than ignoring the explicit standard of conduct agreed to by the parties.  The

simple issues to be decided were (1) was CJI bound by the governing documents;

and (2) was there evidence of Shearith Israel's governing ritual regarding sale of

the rimonim.  There was no religious entanglement in ruling on these issues.

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d

Cir. 1999) ("The First Amendment does not prevent courts from deciding secular

civil disputes involving religious institutions when and for the reason that they

require reference to religious matters."); *Merkos L'Inyonei Chinuch, Inc. v. Otsar

Sifrei Lubavitch, Inc.,* 312 F.3d 94, 99 (2d Cir. 2002) ("Courts may decide disputes

that implicate religious interests as long as they can do so based on 'neutral

principles' of secular law without undue entanglement in issues of religious doctrine.").

The District Court erroneously said that ritual practice was not a condition of the Rivera Will (AD36). This was error in itself; the Will didn't need to specify a specific type of Jewish worship – at the time there was only one type, traditional, and CJI's own counsel advised in 1945 that the ritual agreed to by CJI was simply an "amplification" of the Will (A2030, A2027-31). The District Court compounded this error by disregarding the fact that ritual was a central part of the parties' relationship. It went so far as to comment that Shearith Israel's insistence on the ritual practice that the parties specifically agreed to "posed legal problems that linger to this day" (AD7; AD36, 54 n.44). This hostility to the parties' *agreed upon* ritual practices derides freedom of religion, treats religious organizations as lacking capacity to contract, and deprived Shearith Israel of the contractual protections it procured for future generations of congregants. *Brice v. Trs. of All Saints Mem'l Chapel*, 76 A. 774, 782 (R.I. 1910) (religious trustee has leeway to effectuate donor's intention); A2027-31.

Neutral principles of secular law require that "a court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage". *Systemized of New England, Inc. v. SCM, Inc*., 732 F.2d 1030, 1034 (1st Cir. 1984) (N.Y. law); *accord Carney v.*

*Carney*, 89 A.3d 772, 778 (R.I. 2014). The District Court committed legal error by disregarding Shearith Israel's governing ritual and the unrebutted evidence that selling the rimonim would violate that ritual.

The glory of American religious freedom that Touro Synagogue epitomizes is celebrated when religious objects such as the rimonim are ***used*** as part of religious services. The rimonim have been and should remain part of the genus loci of Touro and should be ***used*** there – there are enough dead, moribund ritual objects in museums abandoned due to Jewish persecution and exile (A977:18-A979:15; A2113, A2116; A3622-23; A2198-99 (federal government recognizing that Touro's "collections" are used in "active synagogue").

## B. The Rimonim Are Encumbered by the Indenture With Lease

The Indenture specifically covers the use of Touro Synagogue together "[w]ith the appurtenances and paraphernalia belonging thereto" (AD125; A1916). The District Court did not interpret "appurtenances" as used in the Indenture, even though both parties used that term to refer to ritual objects (A1612-13, AD118). This omission is enough to warrant reversal.

More important, the unambiguous phrase "and paraphernalia belonging thereto" was handwritten in the original Indenture, and expressly called to the attention of all before signing (AD125, AD127, AD129). Dispositively, but ignored by the District Court, Shearith Israel and CJI had been discussing

ownership of Touro's "contents" and "personal property" for ten *years* and used "paraphernalia", as well as "appurtenances", to refer to ritual objects including rimonim (Facts §C).

This was common parlance.  An 1883 article, for example, equated "paraphernalia" with "silver bells" and other Torah adornments (A1596).  The newspaper articles about the Indenture signing used the word "paraphernalia", demonstrating the word had meaning to lay readers (A1913, A2586).  Case law, too, used "paraphernalia" to refer to personal property, including ritual objects.  *In re Newport Reading Room*, 44 A. 511, 512 (R.I. 1899) (corporation owned land, buildings, and "it also owns furniture, a library, billiard tables, and various paraphernalia for the amusement of its members and subscribers"); *Goller v. Stubenhaus*, 134 N.Y.S. 1043, 1045 (N.Y. Sup. Ct. 1912) ("congregation is the owner of certain personal property consisting of scrolls, prayer books, prayer shawls, a congregation seal and other paraphernalia"); *State v. Collins*, 67 A. 796, 801 (R.I. 1907) (pharmacy back room contained "liquor glasses, a sink, an ice-box, and paraphernalia appropriate to a barroom"); *Crafts v. Mechanics' Sav. Bank*, 102 A. 516 (R.I. 1918) (suit to compel delivery of "the books and paraphernalia of the company"); *Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.*, 149 U.S. 436, 445 (1893) (referring to "original presses, type, and paraphernalia for printing a newspaper"); *McCarty v. Cavanaugh*, 113 N.E. 271, 272 (Mass. 1916) (fraternal

organization laws provide "charter, rituals and paraphernalia shall be surrendered" upon disbanding).

The District Court found that in the Indenture Shearith Israel "used the word 'paraphernalia' to refer to 'personal property'" (AD42 n.38), yet treated this crucial and specifically included phrase as mere surplusage. This was legal error. *Carney*, 89 A.3d at 778. The District Court stated, "[t]here is no evidence that Jeshuat Israel understood the term to have that meaning" (AD42 n.38), disregarding that CJI had less than a fortnight before signing the Indenture stated that in order to obtain access to Touro, it would "surrender" the "paraphernalia belonging thereto" and agree to be bound by Shearith Israel's form of lease:

> [CJI representatives are] directed to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said [Shearith Israel] Trustees, owners of the property, and to agree upon the terms and provisions of a lease from said Trustees to [CJI] ... in form satisfactory to the landlord. [AD120.]

Moreover, even were CJI ignorant that "paraphernalia" commonly referred to personal property, it was incumbent on CJI to say so prior to signing the Indenture. A "party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I. 1981). The Indenture with Lease covers personalty as well as realty as a matter of law.

This interpretation is confirmed by the surrounding circumstances.  The Supreme Court of Rhode Island has made clear that "*although there is no ambiguity, we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into,* not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning." *Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010) (original emphasis) (quoting *Hill v. M.S. Alper & Son, Inc.*, 256 A.2d 10, 15 (R.I. 1969)).

Here, the accompanying circumstances reveal that the parties had been discussing personal property, including "bells" (Facts §C).  Shearith Israel had taken every possible step to protect the disposition by others of any personal property used in the service at Touro.  *First*, every document shows Shearith Israel limiting the use and possession of the personalty (*id.*).  *Second*, Shearith Israel sent a mixed pair of rimonim to Newport, thus indicating its interest was the use in worship of the religious objects.  *Third*, Shearith Israel informed Newport's City Council that it would give CJI the keys to Touro only if CJI agreed to admit all Jews, remove no "ornament" without consent, and be bound to return the "movables" (A2718-19).  *Fourth*, CJI took the affirmative step of creating a materially altered, Permanent Constitution that gave Shearith Israel veto power over the sale of even CJI's own personal property, if any (A1716, A1721, A1724,

A1727).  ***Fifth***, the parties had litigated their rights to Touro and perceived that Shearith Israel prevailed (A1913).  ***Sixth***, CJI agreed in settlement to subject itself to Shearith Israel's form of lease, and to "surrender" all the "paraphernalia belonging" to Touro synagogue to Shearith Israel, as owners (AD120, AD119), including the rimonim, which were then at Touro (*see* A82, A97 ¶ 29).  ***Seventh***, Shearith Israel insisted that the surrender include the very public Ceremony of the Keys to make clear to all CJI's acknowledgement of Shearith Israel's superior rights (AD121-23, A1908-10).  The surrender and Indenture were the culmination of Shearith Israel's successful assertion of ownership in all of Touro's property as against CJI, complete with right of eviction (AD126-27).

The District Court's disregard of the public surrender and Ceremony of the Keys and its unsupported statement that the Indenture and settlement "could not alter [CJI's] title to the Rimonim" (AD86) are error.  Public surrenders were and remain powerful, defining moments.  *E.g.*, *Town of Wakefield v. Att'y Gen.*, 138 N.E.2d 197, 198 (Mass. 1956) (recounting 1871 "public exercise" including surrender of keys transferring ownership); *Lehr v. Brodbeck*, 43 A. 1006, 1007 (Pa. 1899) (to show "change of ownership", party could have "surrendered the keys" "in some public manner").  And parties frequently compromise property rights in settlements that are respected by courts.  *E.g., Weiner v. Weiner*, 321 A.2d 425,

426 (R.I. 1974) ("plaintiff relinquished" in settlement "all property rights in defendant's estate").

Even if, contrary to all the evidence, CJI owned the rimonim in 1902, CJI relinquished its right to transfer them in its Permanent Constitution and had been locked out of Touro – both involuntarily, when the courts upheld Shearith Israel's right to control, and voluntarily, as part of the Ceremony of the Keys – and had no access to the rimonim other than by agreeing to the Indenture, which encumbered them and tied them to Touro. CJI admits that the rimonim were in Touro when CJI "surrender[ed]" possession to the "owners" (Fact §C). CJI re-took possession of the premises and "paraphernalia" only after the public surrender and pursuant to the Indenture, as lessee only.

### C. Shearith Israel Did Not Hold the Rimonim as Bailee

The Court based its bailment ruling on its interpretation of 1832-33 Shearith Israel minutes recording Yeshuat Israel's delivery to Shearith Israel of Torah scrolls. Those minutes state that Newport's Torahs were deposited with Shearith Israel "to be redelivered when duly <u>required for the use</u> of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island" (A1436-38, A1439-41; AD80-81; AD28, A1432-33, A1435 (Torahs will remain at Shearith Israel "until they should be <u>required for the use</u> of the New Port Shool [shul]"). This "for the use" language is virtually identical to the language in the

Rivera Will, which the District Court interpreted as creating a charitable trust for the premises "for the sole Use, benefit and behoof of the Jewish Society in Newport, to be for them reserved as a Place of Public Worship forever" (A1401, AD50-51). "[T]he elements of a charitable trust in Rhode Island are a settlor, a trustee, some trust property, and a duty imposed by the settlor on the trustee *to use* that property for a charitable, educational, or religious purpose" (AD48). The language in the minutes meets this standard.

The Court inferred that the minutes implicitly included the rimonim, because "'[t]heir job is to stay with the Torah'" (AD81). This finding, that the rimonim's essence is to be used during worship at Touro, is the basis for the Court's ruling that CJI became the new owner because CJI was "the congregation then *worshiping* in Newport" (AD89). Yet having made this integral connection between rimonim and their use in worship at Touro, the Court proceeded to sever the rimonim not only from Touro's Torahs but from Touro completely. Were the District Court right that the internal Shearith Israel minutes include the rimonim, then the rimonim must remain for the use (and not the sale) of those worshiping at Touro.

The Court limited its trust inference to realty, giving CJI carte blanche to sell the rimonim. Yet the Court's own findings demonstrate that any charitable trust was not so limited but also encompassed historic ritual objects, including the

-40-

rimonim, that Yeshuat Israel used in worship and entrusted to Shearith Israel

(AD89; AD3 n.3).  The charitable trust "was established to ensure a permanent

place for public Jewish worship in Newport" (AD49), but the District Court held

that Jewish worship requires more than a place:

> [A] building alone does not a synagogue make.  It needed
> furnishings and articles of worship essential to the
> religious ceremonies for which it was meant.... [M]ost of
> these necessities were gifted to the Synagogue and
> became part of the **heritage of the Jews of Newport**.

(AD19).  Specifically, the Court found that, by 1769, the rimonim were in Touro's

Ark adorning the Torah scrolls (AD20).  Because these "necessities" fulfill

Touro's charitable purpose, they also are part of any trust.  Indeed, "the heritage of

the Jews of Newport" (AD19) would be destroyed if those who happened to be

worshiping in Newport over 100 years later became the absolute owners, able to

take that heritage out of Newport forever whenever they wanted.

The bailment ruling is legally unsupportable as well as being

gerrymandered:

 *First*, the Court disregarded the "for the use" language, instead interpreting

the minutes as merely identifying the rimonim's recipient (AD68, 88-89), again

improperly treating written language as surplusage.  *Carney*, 89 A.3d at 778.

**Second**, no bailor/owner retained general title.  *Maulding v. U.S.*, 257 F.2d

56, 60 (9th Cir. 1958) ("personal property can become the subject of a bailment

only if the owner, while retaining general title thereto, delivers it to another for some particular purpose"); *accord Ferrucci v. Atl. City Showboat, Inc.*, 51 F.Supp.2d 129, 134 (D. Conn. 1999). The Court found that "Yeshuat Israel disbanded" when "it left the Rimonim in the care of Shearith Israel" (AD88-89). The only possible bailor/owner for the decades thereafter is Shearith Israel. Even assuming a bailment, it ended when Shearith Israel became both the bailor and the bailee. *Bigelow v. Huntley*, 8 Vt. 151, 154 (1836) (bailment ended when bailor took possession).

**Third**, the Rule Against Perpetuities voids any bailment, as there was no guarantee at its inception that there would ever be any new Jewish occupant of Touro, let alone within 21 years of a life in being. *Fatulli v. Bowen's Wharf Co.*, 56 A.3d 436, 442 (R.I. 2012).

**Fourth**, all the evidence points to Shearith Israel **_loaning_** ritual objects for the use of Jewish worship at Touro Synagogue (Facts §C), not delivering the rimonim for CJI to own outright.

**Fifth**, no evidence supports that CJI was the "congregation hereafter worshipping at Newport Synagogue" when Shearith Israel redelivered the rimonim (AD68). CJI did not even exist until 12 years after services resumed at Touro Synagogue in 1881 and 10 years after Touro's official reconsecration in 1883, during which ritual objects were used (Facts §§B-C).

-42-

*Sixth*, even had the rimonim been delivered to CJI, CJI understood it had at most "possession of the property belonging in the Synagogue" for "safe keeping" (A1620-27), and "[c]ertainly" not "ownership in the property or appurtenances" (AD118). This is consistent with the rimonim being part of a charitable trust for the use of Jewish worship at Touro Synagogue. As such, CJI is not "free to do with them as it wishes" (AD65) but must meet exacting standards before selling them. *See Nugent ex rel. St. Dunstan's Day Sch. v. St. Dunstan's Coll. of Sacred Music*, 324 A.2d 654, 656 (R.I. 1974).

### D. Shearith Israel Has a Superior Claim to Possessory Ownership of the Rimonim

CJI's permissive possession of rimonim received from Shearith Israel could not ripen into ownership sufficient to overcome Shearith Israel's prior possessory ownership.

After Yeshuat Israel disbanded and long before CJI existed, Shearith Israel possessed the rimonim for over 60 years (AD66; A1456, A1491, A1496, A1531). Under the District Court's analysis, no one held title during this time. This cannot be. Even if Yeshuat Israel hadn't passed title to Shearith Israel, Shearith Israel obtained title from possession.

Decades later, when Shearith Israel sent the rimonim to Touro, every piece of evidence confirms that Shearith Israel permitted use of ritual objects only upon

expressly limited authorizations, reserving title to itself (Facts §C), and CJI's correspondence expressly disclaims any ownership interest in "the appurtenances" or "personal property" (*see* AD118, A1629-31). CJI's possession never ripened into ownership, particularly as to Shearith Israel, whether CJI possessed the rimonim under the limited use authorizations or under the Indenture with Lease. *Tefft v. Reynolds*, 113 A. 787, 789 (R.I. 1921) ("When a party enters into possession of land under permission or license from the owner, the presumption is that his possession is in subordination to the true owner"; "use by expressed or implied permission or license, no matter how long continued" remains "permissive"); *Ayotte v. Johnson*, 56 A. 110, 111 (R.I. 1903) ("so long as a tenant retains possession given him by a landlord, he cannot deny the landlord's title"); *accord Prince v. Charles Ilfeld Co.,* 383 P.2d 827, 832 (N.M. 1963) ("possession originating in tenancy is presumably permissive, not hostile"); *Hopper v. Callahan*, 28 A. 385, 386 (Md. 1894) (possession of farming chattel with owner's consent does not imply right to sell). The District Court cited no case where the possessing party received the property under license from the other party. *See Hamilton v. Colt*, 14 R.I. 209, 212 (1883) (AD69), citing *Cullum v. Bevans*, 6 H.&J. 469, 471 (Md. 1825) (presumption of ownership does not arise where "the possession, being first in the plaintiff, was got or retained by the defendant, without proper authority or right derived from the plaintiff").

The District Court dismissed Shearith Israel's prior possessory ownership arguments as "giv[ing] short shrift to Shearith Israel's obligations as bailee" (AD86 & n.68, 80-83).  The District Court's need to rely on its bailment discussion (refuted *supra*) shows that its possessory ownership ruling was not an independent ground for decision (AD65, 69, 89).  Shearith Israel's possessory interest is prior and superior to CJI's.  *Currier v. Gale*, 91 Mass. 522, 525 (1865) ("title by prior possession need not have been of such a character as would disseise the true owner, in order to give the superior right, as against one subsequently entering and claiming by no higher title than that by possession under such entry").

The District Court noted that CJI "has used [the rimonim] in public worship, insured and repaired them, and sent them on various exhibitions all across the country" (AD89).  Nothing in that litany undid the public surrender by CJI in 1903 or breached the Indenture or impinged on Shearith Israel's superior possessory rights.  Indeed, the same litany applies to CJI's use of the Synagogue building (which is open for exhibition/tours), and yet that did not change CJI's status from occupant to owner.  Using the rimonim in public worship was the precise reason Shearith Israel loaned and then leased the rimonim to CJI.  CJI was required to insure and maintain the rimonim, just as it insured and maintained the Synagogue – and in both cases, Shearith Israel was an additional insured on the insurance policies (*e.g.*, A2282; A2308; A2141-54; A2161-63, A2174-81; *see* A2219, 2240).

-45-

Shearith Israel was "very comfortable" with the rimonim repair, because CJI was using a restorer recommended and paid for by an honorary trustee of *Shearith Israel* (A665:12-25; A2189, A2191).  The exhibition loans are consistent with Shearith Israel's ownership rights and its own loan of similar rimonim (A664:1-A665:11; A980:23-A981:4).  As to any claim CJI might make that certain exhibition catalogues or labels attributed the rimonim to Touro Synagogue, the only art historian to give evidence testified that such credit lines indicate only the lender of the objects or the place from which the objects were loaned, not the legal owner (A852:18-A853:18 ("general policy … is to accept what is written on the loan form by the lender as being true"), A854:2-10, A975:14-A976:4; A2518-27).  Shearith Israel would have had no reason to object to loans by CJI until Shearith Israel's ownership rights were jeopardized when CJI attempted to sell the rimonim in 2012 (A664:6-A667:23).

The District Court affirmatively did not find that CJI was the successor to Yeshuat Israel (AD89 n.69).  Therefore, CJI had no imprimatur of ownership.  The standard in *Baxter v. Brown* (AD69) is inapposite, as it required a showing of "good title from some unimpeachable source" where the party in possession also had "paper title" to the property, 59 A. 73, 74 (R.I. 1904), which CJI here does not (A365:5-12).  Shearith Israel's superior possessory interest thus defeats any possessory interest in CJI.  *Bradshaw v. Ashley*, 180 U.S. 59, 63 (1901) ("prior

possession of the plaintiff was sufficient" where "defendant, being himself without title, and not connecting himself with any title, cannot justify an ouster of the plaintiff").

## II.  THE DISTRICT COURT ERRED IN REMOVING SHEARITH ISRAEL AND APPOINTING CJI TRUSTEE OF TOURO SYNAGOGUE

### A. CJI Could Not Prosecute Trustee Removal/Appointment Claims Against Shearith Israel

Since the opening at the trial below, Shearith Israel acknowledged its ritual oversight role, describing itself as trustee with a lower case "t" to worshiping Jews past, present, and future but rejecting any trust relationship <u>directed to CJI</u>.  That was precisely the holding of the *David v. Levy* decision, on which the parties relied for over 100 years.  Shearith Israel does not challenge having that ritual oversight role defined as "charitable trustee".  It does challenge CJI's right to raise trust issues, in particular the removal and appointment of trustees.  The District Court's signal error was confusing the party that is Shearith Israel's lessee, CJI, with the true beneficiaries of the found trust:  Newport's Jews past, present, and future.  Res judicata and CJI's 1903 settlement – reaffirmed in the public surrender Ceremony of the Keys and each time CJI admitted it was Shearith Israel's lessee – preclude CJI from challenging Shearith Israel's ownership of Touro Synagogue by characterizing that ownership as a trusteeship.  The District Court committed

independent error by acting without the Attorney General and without notice before appointing CJI. The District Court's decisions on removal/appointment of trustees are suffused with legal and discretionary error (§§B-C, *infra*).

### 1. Res Judicata Bars CJI from Raising Trust Issues

In *David v. Levy*, CJI sued the Trustees of Shearith Israel, claiming that the Rivera Will and other documents relied on here created a trust. The *David* court dismissed the action, finding the allegations were not sufficient to create a trust and that CJI acted with unclean hands. The District Court committed legal error in holding that the *David v. Levy* action did not have res judicata effect (AD60-61). *García-Monagas v. De Arellano*, 674 F.3d 45, 50 (1st Cir. 2012) ("The applicability of the doctrine of res judicata involves a question of law that we review de novo.").

Res judicata requires a final judgment between the parties or their privies, which will preclude litigation of the issues that were tried or might have been tried in the original suit. *See Doe v. Urohealth Sys., Inc.*, 216 F.3d 157, 161-62 (1st Cir. 2000). All requirements are met here: there is a final judgment (A1884) between the parties (CJI and the trustees of Shearith Israel (A1821)), regarding the existence of a trust for Touro Synagogue.

In May 1902 CJI sought a declaration that "said lands are charged with a trust in favor of and ought to be held for the use and *benefit of your Complainants*

-48-

and all other, the Jewish residents of said City of Newport" (A1830).  To support

this pleading, CJI cited the original deed, the Rivera Will and conveyance of Hart

to Rivera mentioned therein, the will of Moses Levy, the Touro trusts, and the

1894 deeds (A1821-23 ¶¶ 1-4, 8-9) – the very same documents cited by CJI and

the District Court here (A32-38, Complaint ¶¶ 7, 10, 12, 16; AD24-25, 31-33, 49-

54).  Similarly here, CJI alleged that Shearith Israel and its trustees "holds the fee

simple title of the synagogue in Newport and the land upon which it is built, but

holds that title in trust *for [CJI]* and for the Jewish community of Newport" (A43,

Complaint ¶ 32).

In *David*, CJI sought to remove the trustees of Shearith Israel as owners and

trustees of Touro Synagogue and to have "legal title" conveyed "*unto the*

*Congregation Jeshuat Israel*" as trustees (A1830-31).  CJI sought that identical

relief here, seeking "to remove [Shearith Israel] as trustee" and appoint CJI

"successor trustee" with "fee simple" title (A44, Complaint ¶ 37, Wherefore ¶ 2).

In response to CJI's May 1902 pleading, Shearith Israel filed a demurrer

stating that CJI's bill failed to state a claim, and further alleging CJI's occupation

of the synagogue as a bar to the equitable action (A1873-78).  CJI then amended its

pleading in November 1902 (A1829).  Thereafter, Shearith Israel filed its brief in

support of demurrer (A1867-72).  The 1903 Court dismissed CJI's action,

sustaining Shearith Israel's arguments (A1879-85).  Accordingly, res judicata bars

CJI from raising any trust issues or challenging Shearith Israel's title to Touro Synagogue. *See Huntley v. State*, 63 A.3d 526, 532-33 (R.I. 2013) (dismissal for failure to state a claim is res judicata).

The District Court refused to apply res judicata, holding that such dismissals were not considered to be on the merits before 1938 (AD61). Even were such retrospective analysis appropriate, in 1907, the Supreme Court stated that "[i]t is well established that a judgment on demurrer is as conclusive as one rendered upon proof". *Northern Pacific Ry. v. Slaght*, 205 U.S. 122, 130 (1907). In *Slaght*, the Railway had alleged in a prior litigation that Slaght held the subject property in trust and the Railway was the fee simple owner. Slaght's demurrer was sustained, the case dismissed. *Id*. 128-29. The Supreme Court held that res judicata reached "what could have been pleaded or litigated". *Id*. 131. The Court relied on a treatise:

> "when a cause of action has resulted in favor of the defendant, when the plaintiff claims the property of a certain thing there can be no other action maintained against the same party for the same property, for that would be to renew the question already decided; for the single question in litigation was whether the property belonged to the plaintiff or not; and it is of no importance that the plaintiff failed to set up all his rights upon which his cause of action could have been maintained; it is sufficient that it might have been litigated". [*Id*.]

In *Slaght*, the Railway was precluded when it tried to assert "title to the very property that was the subject of the other suit, the source of title, only, being

-50-

different." *Id*. 133.  Here, CJI is relying on the very same sources that were ruled on previously.  Accordingly, CJI is barred from raising issues as to Shearith Israel's status and rights in the real property.

The District Court stated that the *David* judgment was not on the merits because three of the bases for dismissal could have been addressed in an amended pleading, and the fourth basis, unclean hands, "does not go to the merits" (AD61 n.48).  This was legal error.  ***First***, res judicata does not require the merits to be reached.  *Huntley*, 63 A.3d at 532.  ***Second***, CJI in fact amended its pleading (A1829), and then telegraphed the Court that it consented to the dismissal order's entry, without requesting leave to replead (A1883; *cf. Slaght*, 205 U.S. at 127 (in prior case, Railway "declin[ed] to plead further")).  ***Third***, the issues before the *David* court were more than pleading issues.  The *David* court specifically held that there was no "trust for the Jews of Newport" (A1881) – the very trust the District Court here found, based on the very same documents:  The District Court here analyzed the will of Moses Levy, which had been attached to the *David* complaint (*see* A1823 ¶ 4, A1842-47), and held that it "implicitly recognizes the Jews of Newport as the beneficial owners of the Synagogue" (AD63).  The District Court here further found that "Jeshuat Israel is the representative of the Jews of Newport" (AD96), a holding expressly rejected in *David* (A1880).  ***Fourth***, unclean hands, which "directly relate[s] to the merits of the controversy", *Texaco*

*Puerto Rico, Inc. v. Dep't Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995), is entitled to res judicata effect.  *In re Albicocco*, 2006 WL 2376441, *9 & n.12 (E.D.N.Y. Aug. 16, 2006) (applying res judicata to dismissal for unclean hands; such ruling was "on the merits").

### 2. The 1903 Settlement, CJI's Public Surrender, and CJI's Admitted Lessee Status Bar CJI from Raising Trust Issues

In the 1903 settlement – signed the very day CJI telegraphed the *David* court its consent to the entry of the dismissal judgment (A1883) – CJI "agree[d] to ***admit and recognize <u>without qualification</u>*** the title and ownership of L. Napoleon Levy and acting Trustees [of Shearith Israel] to the synagogue building, premises and fixtures", and agreed to "***the <u>absolute surrender</u> of said premises***" to Shearith Israel and to become Shearith Israel's lessee (AD119; AD120 (Shearith Israel trustees are "owners of the Synagogue building at Newport", "owners of the property"); Facts §D).  CJI followed this pellucid acknowledgment by an equally public surrender ceremony.

Courts routinely enforce private settlements between parties.  *Weiner*, 321 A.2d at 428; *Great Clips, Inc. v. Hair Cuttery of Greater Boston, L.L.C.*, 591 F.3d 32, 34-35 (1st Cir. 2010).  CJI gave up any right to challenge Shearith Israel's outright ownership and became Shearith Israel's lessee.  CJI thus could not prosecute trusteeship claims.  *See Ayotte*, 56 A. at 111; *Lucas v. Brooks*, 85 U.S. 436, 451 (1873) (lessee cannot assert landlord holds property in trust).

### 3. The Rhode Island Attorney General Was a Necessary Party

The District Court erred under Rhode Island law in removing and appointing trustees of a charitable trust without the Rhode Island Attorney General's participating as a party. This error is subject to *de novo* review. *Salve Regina*, 499 U.S. at 231.

Under Rhode Island law, where "[t]he trust is a public one … the Attorney General is the proper person to represent the public in any judicial inquiry into the conduct of the trustee in administering it". *Stearns v. Newport Hospital*, 62 A. 132, 135 (R.I. 1905). The Attorney General "should be made a party" whenever "the administration of [a charitable] trust is involved". *Leo v. Armington*, 59 A.2d 371, 371 (R.I. 1948) (ordering attorney general made "party respondent").

The District Court erroneously focused on whether the law required "the attorney general joining as a plaintiff" (*see* AD92-93), ignoring that the Attorney General was a party (defendant) in the very Rhode Island cases the District Court cited (AD93, citing *Darcy v. Brown Univ.*, 1997 WL 839894, *1, *3-4 (R.I. Super. Ct. Feb. 20, 1997) ("Jeffery Pine, Attorney General of the State of Rhode Island" named defendant) & *Meyer v. Jewish Home for the Aged*, 1994 WL 930887, *1 (R.I. Super. Ct. Jan. 19, 1994) ("defendants are … the Attorney-General, in his capacity as common law and statutory administrator of charitable trusts")).

In the instant case, the public had no representative concerning the removal or appointment of the trustee of the charitable trust. The Attorney General took no position on removal/appointment because it "is not a full party"; "did not have the right to engage in discovery, examine witnesses or call his own witnesses at trial"; and did not learn "until trial ... that CJI sought [its] assistance" on these issues (A190 nn.1-2). The District Court's unprecedented act is particularly egregious given that the Attorney General stated that Shearith Israel "has complied with the purpose of the trust by leasing Touro to" CJI (A199), and that Shearith Israel "has continued to act as Trustee, like it did in the 19th Century" (A201).

## B. Shearith Israel Should Remain as Trustee

The District Court was wrong in ruling that Shearith Israel, as a charitable trustee, can be removed because it "strayed from" its "single obligation … to act *for the benefit of Jeshuat Israel*" (AD96). There is no such duty. Shearith Israel has no *trust* duty to CJI rather than to religionists wishing to worship at Touro, past, present, and future. Nor did Shearith Israel breach any duty to CJI by acting in accordance with the rituals and other protections specifically set forth in the governing documents between the parties.

Moreover, a charitable trust by its nature has no identifiable beneficiary. *Russell v. Allen*, 107 U.S. 163, 167 (1883). The Rhode Island Supreme Court permits removal of a charitable trustee where it shows "a marked lack of sympathy

amounting to hostility <u>toward the expressed purposes of the trust or charter</u>".
*Nugent ex rel. Lingard v. Harris*, 184 A.2d 783, 785 (R.I. 1962).  Here, the trust's
purpose is to maintain Touro as a place of public worship for all Jews, past, present
and future.  Shearith Israel embraces that purpose, including keeping the rimonim
available for such worship.  Shearith Israel attempted to resolve the matter
confidentially and cooperatively (A2281; A673:10-A674:12) – only to be sued
without warning.

No Rhode Island case has removed a charitable trustee in the very opinion
that determined that a charitable trust existed.  The inherent unfairness in finding
and removing Shearith Israel as trustee can be seen when compared with the
Attorney General's investigative process.  There, a trustee has notice and an
opportunity to be heard.  Enforcement proceedings take place in court, with further
opportunity for due process (R.I. Gen. Laws §§ 18-9-9, 18-9-10, 18-9-17(c)).
Here, Shearith Israel had no opportunity to defend itself under the new trust regime
the District Court established.

Rhode Island courts "intervene only upon a finding of fraud,
mismanagement akin to fraud, diversion of assets from trust or corporate purposes
or a marked lack of sympathy amounting to hostility toward the expressed
purposes of the trust or charter".  *Nugent (Lingard)*, 184 A.2d at 785 (affirming
denial of removal of charitable trustees).  No such showing was made here.  On the

contrary, the District Court made no findings of self-dealing, and during closing arguments stated specifically:

> THE COURT: [T]here's nothing in this record that this Court could say that CSI has attempted to act in its own personal interest. It has been clear from the get-go, at least to this Court, that CSI is motivated by their firmly-held belief that they owe an obligation to ensure that the Touro Synagogue remains a public [place of] worship consistent with the traditions of the Spanish and Portuguese traditions as they practice, and there's no evidence before the Court that they have done anything to feather their own cap or to inure to it…. [D]on't let anyone think that there's anything in this record that would show that they acted in their own self-interest in that regard that I've seen.  [A1092:2-17.]

There was no predicate for Shearith Israel's removal.

## C.      The District Court Erroneously Punished Shearith Israel, and Jews in Perpetuity, for Shearith Israel's Colorable, Good-Faith Litigation Positions

In justifying the draconian remedy of removal, the District Court relied solely on three of Shearith Israel's litigation positions:  an alleged breach of trust because "[i]n this action, Shearith Israel claims to own the trust property" outright (AD97); lack of cooperation due to "Shearith Israel's positions in the current litigation" (AD99); and change of circumstances where Shearith Israel purportedly sought to evict CJI "in this legal action" (AD102).  This was error.  We have found no case upholding the removal of a charitable trustee for taking litigation positions that uphold its view of the trust.  The District Court cited an inapposite private trust

case, where the trustee had no interest in remaining trustee (AD101); moreover, the Supreme Court abrogated this Court's affirmance for deferring to the lower court on matters of state law. *See Dennis v. Rhode Island Hosp. Tr. Nat'l Bank*, 571 F. Supp. 623, 639 (D.R.I. 1983), *aff'd as modified*, 744 F.2d 893, 896 (1st Cir. 1984), *abrogated by Salve Regina*, 499 U.S. at 230. The District Court also improperly excluded Rabbi Soloveichik's testimony attesting to the "reasonable[ness]" and "good faith" of Shearith Israel's position (A152-54; *supra* p. 32).

Charitable trustees have the duty "to administer the trust according to its terms; uphold and defend the trust; [and] take steps to collect, protect and preserve the trust property". *Bogert's Trusts & Trustees* § 394 (2015) (footnotes omitted); *see also id*. § 391 ("The trustee for charity has powers to sue to recover possession of trust property, to set aside a wrongful conveyance of it, … and in other ways to preserve and protect the res and defend the trust against attack.") (footnotes omitted); R.I. Gen. Laws § 18-9-9 (Attorney General may investigate charitable trustees who are violating "the terms and purposes of the trust").

That is all Shearith Israel did. The Rivera Will called for preserving public Jewish worship forever. CJI's own charter, constitution, and by-laws require it to observe specific rituals (A1691; A1724 (Art. XIX, §2); A3948, A3950 (Art. I, §B), A3969 (Art. IX, §A)), and the Indenture with Lease and 1945 agreement additionally require CJI to act in accordance with the rituals practiced by Shearith

Israel (AD126, A2038). Shearith Israel believed CJI was violating these requirements when it attempted to sell the rimonim. In acting to preserve its understanding of the trust to keep the rimonim available for public Jewish worship at Touro, Shearith Israel was carrying out its duties to "diligently" administer the trust "in accordance with the terms of the trust" and "in furtherance of [the trust's] charitable purpose". Restatement (Third) of Trusts §§ 76, 78(1).

Disqualifying Shearith Israel for its litigation positions is grossly unfair. The District Court said that Shearith Israel committed a "serious breach of trust" by "claiming to own the Synagogue outright" in this action, thereby renouncing its role as trustee (AD98). Shearith Israel was relying on, *inter alia*, the decision in the *David* case and the settlement, public surrender, and Indenture that confirmed Shearith Israel's ownership interest as against CJI, plus 100 years of the parties treating each other as landlord/lessee. How could Shearith Israel have anticipated the District Court's new rulings? As the very language quoted by the District Court shows, Shearith Israel recognized that its title to Touro was "subject to a condition ... that there was going to be a public place of Jewish worship in accordance with the specific kind of ritual forever" (AD98). (The District Court was confused in stating that Shearith Israel "doubled down" by pointing out that trustees of Shearith Israel hold property for the benefit of Shearith Israel (*see*

AD98; Dkt. 97 at 60-61).  This is plain fact, as Shearith Israel could not hold property on its own; its trustees held it (A1404-05, A1411).)

The District Court's holding that Shearith Israel should be removed as trustee due to "lack of cooperation" between Shearith Israel and CJI (AD98-101) is not supported by Rhode Island charitable trust law.  That law looks not at the charitable trustee's relationship with any identifiable entity, but whether the trustee is "hostil[e] toward the expressed purposes of the trust or charter".  *Nugent (Lingard)*, 184 A.2d at 785.  Shearith Israel honored these purposes.  Similarly inapposite – as well as being clearly erroneous (Facts §E) – is the District Court's reliance on changed conditions (AD101-02 ("By 1993, there was no longer any communication between Shearith Israel and Jeshuat Israel.")).

Nor did Shearith Israel seek to evict the Jews of Newport from Touro, as it unequivocally stated in early 2014:  "[W]e are not seeking eviction of the congregants.  In fact, we see no present dispute with the congregants at all…. [O]ur dispute is with CJI and CJI's conduct" (A2495 (original emphasis)).  Shearith Israel's amended counterclaim (*see* AD66 n.52) reiterates this explicitly:

> **Shearith Israel does not and will not seek eviction of the individual congregants of Jeshuat Israel who seek to worship at the Touro Synagogue in accordance with the stipulations contained in the Indenture with Lease.** [A186 ¶ 63.]

Here, too, Shearith Israel was upholding its understanding of the trust and the use of Touro.  *See Nugent (Lingard)*, 184 A.2d at 786 (charitable trustees correctly retained after closing school, because purposes of trust were broader than school).

### D. CJI Should Not Be the Trustee

The District Court committed legal error in appointing a new charitable trustee in violation of the statute requiring the Court to give "due notice to the parties in interest" before appointing a new trustee.  R.I. Gen. Laws § 18-2-1 (AD115).  In addition to the lack of notice to the parties or Rhode Island Attorney General prior to CJI's *sua sponte* appointment, numerous governmental agencies (federal, state, and local) have real interests.  For example, the Federal Government clearly has an interest, due to its 1945 and 2001 agreements concerning the ownership and operation of Touro, which acknowledge Shearith Israel as owner and CJI as lessee (*accord* A2716-19).  Left to its own devices, CJI violated its Federal contracts by installing an impermissible plaque on the historic site (A2332-35; A2037(c); A321:9-A322:5) and (glaringly) failing to notify the National Trust that it planned to sell the rimonim from its "collection" (A2197-99; A330:22-A331:9, A332:9-12).  These agencies and the relevant public were entitled to be heard on who was going to oversee Touro in the future.  Even CJI expected additional proceedings (Dkt. 96 (CJI Post-trial Brief) at 62 (CJI requesting court appoint "new trustee in consultation with the Attorney General")).

On the merits, there is serious question whether CJI would be a suitable trustee over, *e.g.*, the ritual aspects of Touro.  The District Court credited CJI with "executing all of the duties of a trustee for many years", including making Touro available for public Jewish worship, taking care of the building and grounds, paying for utilities and making repairs (AD104).  Yet these are indicia of a lessee, not a trustee.  It is the Indenture from Shearith Israel that permits CJI to worship in Touro and that requires CJI to maintain the premises.  *Ferro v. Ferrante*, 240 A.2d 722, 726 (R.I. 1968) ("in the absence of a controlling covenant, a lessor is not under a duty to maintain leased premises in a state of repair").

## **CONCLUSION AND SUGGESTION OF REASSIGNMENT**

This Court should reverse the District Court's decision holding that CJI owns and/or can sell the rimonim, removing Shearith Israel as trustee, and appointing CJI as trustee of Touro Synagogue and enter judgment that Shearith Israel, as charitable trustee, owns Touro Synagogue and its ritual contents. Furthermore, in light of the District Court's public speaking about this case (*see supra*, p.viii) and the dictates of the Code of Conduct for U.S. Judges Canon 3A(6), should this Court remand for any further proceedings, we respectfully request that this Court consider directing that the matter be assigned to another District Judge.

Date:  September 30, 2016         Respectfully submitted,

**DEFENDANT-APPELLANT,**

By its attorneys,

/s/ Louis M. Solomon
      Louis M. Solomon
      lsolomon@gtlaw.com
      Colin A. Underwood
      underwoodc@gtlaw.com
      Nancy L. Savitt
      savittn@gtlaw.com

GREENBERG TRAURIG, LLP
The MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-6500
Facsimile:  (212) 801-6400

John F. Farraher, Jr.
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Telephone: (617) 310-3029
Facsimile: (617) 279-8429
farraherj@gtlaw.com

Deming E. Sherman
LOCKE LORD LLP
One Financial Plaza, Suite 2800
Providence, RI 02903
Telephone: (401) 276-6443
Facsimile: (401) 276-6611
deming.sherman@lockelord.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point typeface.

Dated: September 30, 2016

/s/ Louis M. Solomon
GREENBERG TRAURIG, LLP
*Attorneys for Defendant-Appellant*
*Congregation Shearith Israel*


## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2016, I electronically filed the foregoing Brief of Appellant with the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the appeal are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Louis M. Solomon
GREENBERG TRAURIG, LLP
*Attorneys for Defendant-Appellant*
*Congregation Shearith Israel*

# ADDENDUM TABLE OF CONTENTS

**Page**

May 16, 2016 Decision (Dkt. 118) ...................................................... AD1

May 16, 2016 Judgment (Dkt. 119) ........................................................ AD107

May 24, 2016 Errata Sheet to May 16, 2016 Decision (Dkt. 120) .............. AD109

May 22, 2015 Order (Dkt. 77)................................................................. AD110

June 5, 2015 Trial Tr. 142:14-143:7 (Decision and Transcript order re Dkt. 86, June 3, 2016 Offer of Proof re testimony of Rabbi Dr. Meir Y. Soloveichik, found in Appendix at A152-54) (Dkt. 107)................... AD112

R.I. Gen. Laws § 18-2-1 ........................................................................ AD115

Defendant's Exhibit 58 (May 28, 1893 CJI Board Minutes) (excerpt, pages 1-2; marking added on page 2) (Full Exhibit in Appendix at A1609) ................................................................................AD116

Defendant's Exhibit 65 (June 25, 1893 Correspondence from Max Levy to Isaac Brandon) (marking added) (Exhibit also in Appendix at A1628) ...............................................................................AD118

Defendant's Exhibit 146/Plaintiff's Exhibit 68 (January 30, 1903 Settlement Agreement) (Exhibit also in Appendix at A1888) ..............AD119

Defendant's Exhibit 147/Plaintiff's Exhibit 69 (February 2, 1903 CJI Board Minutes) (Exhibit also in Appendix at A1889) ..........................AD120

Defendant's Exhibit 151 (February 10, 1903 Correspondence from L. Napoleon Levy to Rev. H.P. Mendes) (Exhibit also in Appendix at A1905; Transcription (Exhibit 151A) in Appendix at A1908) .........AD121

Defendant's Exhibit 148/Plaintiff's Exhibit 71 (February 10, 1903 Indenture with Lease) (markings added on pages 2, 3 and 4) (Exhibit also in Appendix at A1890)..................................................AD124

Defendant's Exhibit 150A (Transcription of February 10, 1903 Indenture
      with Lease) (excerpt, 150A-3) (Full Exhibit in Appendix at
      A1900) ................................................................................................AD129

Defendant's Exhibit 364 (October 17, 2001 Historic Site
      Operating Agreement re Touro Synagogue, between CJI,TSF and
      National Trust for Historic Preservation in the United States, with
      November 5, 2001 cover letter from Andrew M. Teitz to Alvin
      Deutsch) (excerpt, pages 1-8, 17; markings added on pages 001,
      004, 006, 007, 008) (Full Exhibit in Appendix at A2192) ....................AD130

Defendant's Exhibit 549 (May 22, 2015 CJI Website) (excerpt, pages 1-2;
      markings added on page 2) (Full Exhibit in Appendix at A2589) .......AD139

**AD1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CONGREGATION JESHUAT ISRAEL,<br>　　　Plaintiff,<br><br>　　　v.<br><br>CONGREGATION SHEARITH ISRAEL,<br>　　　Defendant. | )<br>)<br>)<br>)　　C.A. No. 12-CV-822-M-LDA<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Bricks and mortar of a temple, and silver and gold of religious ornaments, may appear to be at the center of the dispute between the two parties in this case, but such a conclusion would be myopic. The central issue here is the legacy of some of the earliest Jewish settlers in North America, who desired to make Newport a permanent haven for public Jewish worship. Fidelity to their purpose guides the Court in resolving the matters now before it.

After a thorough and exhaustive review of the evidence, determination of the disputed facts, and application of the relevant law, this Court concludes that 1) Touro Synagogue is owned in charitable trust for the purpose of preserving a permanent place of public Jewish worship; 2) the pair of Myer Myers Rimonim previously owned by Newport's earliest Jews is now owned by Congregation Jeshuat Israel, which is free to do with its property as it wishes; 3) Congregation Shearith

Israel of New York should be removed as trustee of Touro Synagogue; and 4) Congregation Jeshuat Israel of Newport should be appointed as the new trustee.

## I.    PROCEDURAL BACKGROUND

On November 8, 2012, Congregation Jeshuat Israel brought an action in Rhode Island Superior Court (Newport County) against Congregation Shearith Israel over the ownership of a set of colonial-era finial bells (the Rimonim)[1] crafted by the silversmith Myer Myers, and the control of Touro Synagogue, the oldest active synagogue in the United States. Compl., ECF No. 1-2. Jeshuat Israel seeks an order: 1) pursuant to the Uniform Declaratory Judgments Act, R.I. Gen. Laws §§ 9-30-1, *et seq*, declaring that it is the true and lawful owner of the Rimonim with full power to sell and convey them and to deposit the proceeds of such sale into an irrevocable endowment fund; 2) restraining Shearith Israel from interfering with Jeshuat Israel's planned sale of the Rimonim to the Museum of Fine Arts in Boston (MFA) for $7 million in net proceeds;[2] 3) or in the alternative, declaring that Shearith Israel only owns the Rimonim in trust for the benefit of Jeshuat Israel,

---

[1] "Torah's importance was emphasized from ancient times by covering the scroll with silk mantles and ornamenting the staves with silver and gold decorations. . . . After removing the mantle and before reading the Torah, the reader raised the scroll with the finials still on the staves [ ] and an accompanying ringing of the bells would have focused the congregation's attention." David L. Barquist, *Myer Myers: Jewish Silversmith in Colonial New York* 154 (Yale University Press, 2001) (Exhibit P150 at 3248).

The Court uses the words rimonim, (which means pomegranates in Hebrew), finial bells, and finials, interchangeably in this opinion to refer to Torah ornaments that decorate the scroll's staves or handles. When capitalized, the word "Rimonim" refers to the finials at issue in this case.

[2] The Museum of Fine Arts has since withdrawn its offer to purchase the Rimonim. Trial Tr. vol. 3, 56, ECF No. 106 (Testimony of David Bazarsky).

Case: Case: 15-1756 16-1756 Document: 00117206587 Page: Page: 7 Date Date: Filed: Filed: 05/05/2016 16/2016 Entry Entry ID: 6037960 6039138

**AD3**

Case 1:12-cv-00822-M-LDA   Document 118   Filed 05/16/16   Page 3 of 106 PageID #: 6335

and authorizing the sale of the Rimonim as in Jeshuat Israel's best interests; 4) removing Shearith Israel as trustee for Touro Synagogue and land, and declaring Jeshuat Israel's Board of Trustees as replacement trustee; and 5) declaring that Jeshuat Israel is the true and lawful owner of unspecified other personal property in its possession, besides the Rimonim, with full power to use, sell and convey the same.[3] *Id.* at 12-16.

Shearith Israel removed the action to the United States District Court for the District of Rhode Island, based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). Pet. for Removal, Nov. 14, 2012, ECF No. 1 at 1-2. Shearith Israel then filed an amended answer and six counterclaims against Jeshuat Israel, asking the Court 1) to find that Jeshuat Israel breached an agreement with Shearith Israel by filing a lawsuit;[4] 2) to declare that Shearith Israel owns the Rimonim; 3) to enjoin the sale of the Rimonim, transfer the possession and control of the Rimonim to Shearith Israel, and for damages; 4) to declare that Shearith Israel owns and has all legal and equitable rights to the Touro Synagogue, its lands, and any and all historic personalty used by or for Touro Synagogue; 5) to terminate Jeshuat Israel's lease of Touro Synagogue; and 6) to enforce Jeshuat Israel's contractual obligations

---

[3] Jeshuat Israel's request that the Court declare its rights to all personal property in its possession is not justiciable because it is overly broad. Jeshuat Israel has not demonstrated the existence of some present danger to its rights with respect to any other personal property, besides the Rimonim, sufficient for this Court to grant declaratory relief on this count. *See Berberian v. Travisono*, 332 A.2d 121, 124 (R.I. 1975) ("Section 9-30-1 is not intended to serve as a forum for the determination of abstract questions or the rendering of advisory opinions.")

[4] The Court considers this count waived because Shearith Israel did not argue it at trial. *See Cookish v. Cunningham*, 787 F.2d 1, 6 (1st Cir. 1986) ("an issue raised in the pleadings only was not 'presented' to the trial court").

to Shearith Israel. Am. Answer and Countercl., Dec. 6, 2012, ECF No. 8 at 17-23.[5]

The parties zealously litigated this suit for over three years.[6] Beginning on June 1, 2015, the Court conducted a nine-day bench trial that generated a 1,850-page transcript and approximately 900 admitted exhibits consisting of thousands of pages.[7] The Court heard from seven live witnesses and admitted 12 depositions consisting of 1,990 pages of transcripts. Post-trial, the parties submitted 895 pages of briefing and proposed findings of fact. The Court heard closing arguments on September 18, 2015.

## II.   FINDINGS OF FACT

After an extensive and lengthy study and review of the voluminous record in this case, the Court issues these findings of fact. Following the numbered summary of the facts is a narrative elaborating on the Court's findings.

1.   Jews first came to Newport, Rhode Island in the mid-17th century, fleeing religious persecution in Europe.

2.   The Newport Jewish community formed a collective for worship that became known as Congregation Yeshuat Israel.

---

[5] On November 16, 2012, Shearith Israel filed a six-count complaint against Jeshuat Israel about the same issues in United States District Court for the Southern District of New York. Compl., *Shearith Israel v. Jeshuat Israel*, No. 12-CV-8406 (S.D.N.Y.), ECF No. 1. That court dismissed Shearith Israel's complaint in favor of the first-filed Rhode Island action. Op., *Id.* (Jan. 30, 2014), ECF No. 47.

[6] The Court also gratefully acknowledges the herculean efforts of Chief Judge William E. Smith in attempting to mediate an amicable resolution of this dispute.

[7] The parties entered into a stipulation (ECF No. 82) that "all documents . . . shall be deemed admitted, except to the extent that a party . . . provides . . . the Court with specific objections to specific exhibits . . . ." No party filed an objection to any of the exhibits upon which the Court relied in this Order.

**AD5**

3.      In the mid-18th century, members of the Newport Jewish community were taxed for the purchase of land for a Synagogue, and raised additional funds for building the edifice.

4.      The land and Synagogue were acquired and owned in trust for the purpose of public Jewish worship.

5.      The Newport Jewish community picked three leaders to serve as trustees for the Synagogue and lands, because at that time in Rhode Island, religious institutions could not incorporate, own land, or serve as trustees.

6.      The three original trustees were Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart.  Although their names appeared on the deed to the Synagogue land, they did not own the land or Synagogue outright.  They were only the legal owners and trustees, with a duty to preserve the property for public Jewish worship.

7.      The construction of the Synagogue (now called Touro Synagogue) began in 1759 and ended by 1762.  The Synagogue was consecrated in 1763.

8.      The famous colonial-era silversmith Myer Myers made a pair of silver Rimonim for the Newport Jewish Community around the time when Touro Synagogue was built.  These Rimonim originally belonged to Congregation Yeshuat Israel.

9.      The majority of Jews left Newport in 1776 because of the Revolutionary War.  Regular religious services at the Synagogue ended around 1793, only 30 years after the Synagogue's consecration.  The last Jew left Newport in 1822.

10.     Some members of Yeshuat Israel who left Newport joined the New York Congregation Shearith Israel.   They brought with them Yeshuat Israel's religious articles, including the Rimonim, which they deposited for safekeeping with Shearith Israel.   They instructed Shearith Israel to return the Rimonim to the Jewish congregation thereafter worshiping in Newport.

11.     Shearith Israel branded Yeshuat Israel's Rimonim with the word "Newport" on their bases, to distinguish them from Shearith Israel's own similar pair.

12.     After the deaths of the three original trustees — Messrs. Rivera, Hart, and Levy — the duties of trustee were passed on informally.   Several individuals, including Moses Seixas, Moses Lopez, Abraham Touro, Judah Touro, and Stephen Gould acted as trustees for the Touro Synagogue and lands.   Shearith Israel also took on trustee duties.

13.     Shearith Israel helped care for the Synagogue during the period when there were no Jews in Newport.   It held the keys to the building and made it available for occasional funerals.   Shearith Israel became the trustee for the Touro Synagogue.

14.     Shearith Israel never owned the Synagogue outright or the Rimonim at all.   It only held legal title to the Synagogue as trustee, and served as bailee for the Rimonim.

15.     After a sixty-year absence of Jews from Newport, a Jewish community began to return in the 1870s.   The new community began to worship at Touro

6

Synagogue under the guidance of a rabbi selected by Shearith Israel.

16.   In 1894, the new Jewish community received articles of incorporation from the Rhode Island Legislature under the name Jeshuat Israel. Since that time, Jeshuat Israel has worshiped at Touro Synagogue under that name. It is currently the only established Jewish congregation in Newport, Rhode Island.

17.   Shearith Israel returned the Rimonim to Newport's new Jewish community, which became Jeshuat Israel, sometime in the late 1800s or early 1900s, as Yeshuat Israel instructed it to do. Since that time, Jeshuat Israel has owned, controlled, and maintained the Rimonim without challenge, until this lawsuit over 100 years later. There is no impediment to Jeshuat Israel's desire to sell the Rimonim in order to establish an endowment to ensure permanent public Jewish worship at the Touro Synagogue.

18.   A series of legal conflicts flared up between Shearith Israel and the Jews of Newport at the turn of the 20th century. These disputes were motivated by Shearith Israel's concern that Newport's new Jewish community would not conform to the Sephardic (Spanish and Portuguese) religious traditions previously observed by Yeshuat Israel and still practiced by Shearith Israel. Shearith Israel's concern about the form of Jewish worship was never a requirement of the original trust.

19.   The disputes were mutually resolved in the early 20th century, when Shearith Israel, as trustee of the Synagogue, entered into a lease to allow Jeshuat Israel, as tenant, to worship at the Synagogue.

20.   Jeshuat Israel has continually worshiped at Touro Synagogue since at

least the beginning of the 20th century.  It has maintained, preserved, and protected the Synagogue as a place for public Jewish worship for over 100 years.

21.     As Jeshuat Israel's responsibilities for Touro Synagogue have expanded, Shearith Israel's have receded.  For at least the past 20 years, Shearith Israel has not taken any meaningful action in its capacity as trustee for the Touro Synagogue and lands.

22.     In this litigation, Shearith Israel denies the existence of a trust, and attempts to evict Jeshuat Israel from Touro Synagogue.  These actions, and the friction they have engendered, hinder and undermine the charitable trust, requiring removal of Shearith Israel as trustee.

23.     Jeshuat Israel has been discharging all of the responsibilities of a trustee for the past century, and is the most appropriate new trustee over the Touro Synagogue and lands.  It is the party most capable of continuing to preserve Touro Synagogue as a place of public Jewish worship.

The Court now sets forth it findings of fact in narrative form.

## NARRATIVE

The history of the ancient Synagogue in Rhode Island, now known as Touro Synagogue, begins with some of the first Jews who settled in pre-Revolutionary America.  Many came to Newport in the late 1600s and early 1700s to escape the dire horrors of the Iberian Inquisition, while others sought to leave behind rampant anti-Semitism pervading the rest of the Old World.  Regardless of their background, their overriding desire was to find a community where they could practice Judaism

freely and publicly. Just as Roger Williams shaped Rhode Island, the colonial Jews made Newport known as a place of free and open public Jewish worship — memorialized more than anything else by the oldest surviving Jewish temple in America. At stake in this case is the legacy left behind by those early pioneers of Rhode Island's ocean shores.

### Before Arriving in Newport, Rhode Island

Spain and Portugal in the 17th and 18th centuries was not a place where Jews could practice their religion legally, much less publicly. Morris A. Gutstein, *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908* 58-65 (1936) (Exhibits P81 and D448).[8] At that time, those two countries were in the midst of the Inquisition — a brutal institution within the judicial systems of the royal Christian authorities and the Catholic Church, whose stated aim was to combat heresy. The Inquisition forbade Judaism and singled out its adherents for exploitation and torture. The royal authorities and the Catholic Church started by confiscating the property of anyone accused of "Judaizing"[9] and filling its coffers

---

[8] Morris Gutstein, who served as the Rabbi for Jeshuat Israel in the 1930s, wrote a comprehensive history of the Jews of Newport. In the preface to the book, Rabbi Gutstein thanked "the spiritual leader of the Spanish-Portuguese Synagogue in New York [Rabbi De Sola Pool], for his kind assistance in reading the manuscript and offering many constructive suggestions, and for writing the Introduction." Morris A. Gutstein, *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908* 11 (1936). Jeshuat Israel and Shearith Israel separately offered Rabbi Gutstein's immensely helpful book as an exhibit (Exhibits P81 and D448) (page references to this source are to the book's page numbers) [hereinafter *Gutstein*]. The Court relied on Rabbi Gutstein's thorough and credible factual narrative, not his legal conclusions, in reaching its own conclusions in this case.

[9] "Judaizing" refers to the continuing observance of the Torah by Jews who had been coerced into Christianity. *See* Seymour B. Liebman, *The Inquisitors & the*

with the ill-gotten loot. *Id.* at 63. Next came the autos-da-fé,[10] burnings at the stake, and other horrors. The Inquisition "claimed the lives of thousands of Jews, yielding up their souls, with the martyr's exclamation, 'Hear O Israel the Lord our God, the Lord is One.'" *Id.* at 63.

Some Jews were tortured and burned alive, others were expelled from the lands, and yet others were forced into compulsory baptisms. "Before long, a very large number of the population of the Iberian peninsula consisted of Crypto-Jews, who had been forced into baptism by persecution," and were referred to as "Neo-Christians" or "Marranos." *Id.* at 60.

> Many of the Marranos cherished their love for the Jewish faith in which they had been reared. As much as possible they secretly observed the traditions of their fathers in spite of the high positions they held. Some attended synagogue under the most dangerous circumstances. Others assembled in underground hiding places to carry out the tenets of Jewish religion, though openly they lived in beautiful homes religiously decorated according to the custom of the date, giving no cause for suspicion.

*Id.* at 61.

Official conversion did not immunize Iberian Jews from persecution. The inquisitors persisted in their charge, turning their victims against each other by undermining the persecuted group from within:

> The Inquisitors promised absolution to all Marranos guilty of observing Jewish customs, if they would appear before the tribunal and recant. Many fell victims to this snare, for no absolution was granted them, unless under the seal of secrecy and under oath

---

*Jews in the New World: Summaries of Procesos 1500-1810* 29 (Univ. of Miami Press 1973).

[10] *Auto-de-fé*, which translates to "act of faith," was the public penance required of persons the inquisitors condemned as heretics.

extracted by torture in the Inquisition chambers, they betrayed the name of others whom they knew to be Judaizers and who on their testimony would become prey for the flames.

*Id.* at 63-64.

Escape from their homeland was often the only way to stay alive. This was the traumatic background of many Jews who found their way to Newport, Rhode Island in the late 17th and early 18th centuries.[11]

### Arrival in Newport, Rhode Island

Arriving in Newport in 1658, the first Jewish families — approximately fifteen in number — were said to have "immediately set out to organize their public worship." *Id.* at 30; *see also* Melvin I. Urofsky, *A Genesis of Religious Freedom: The Story of the Jews of Newport, RI and Touro Synagogue* 20 (George Washington Institute for Religious Freedom, 2013) (Exhibit D451 at 37) [hereinafter *Urofsky*]. They met to worship at private dwelling houses and formed a collective that was first known as Nefutsé Israel — the Scattered of Israel — and later became Congregation Yeshuat Israel. *Gutstein* at 31 and 343 n. 9; *Urofsky* at 54. In 1677, presumably when death came for one of their own, they purchased a plot of land for a Jewish cemetery. *Gutstein* at 36-38. This act was an important milestone for the

---

[11] For many of the survivors, the psychological scars of the Inquisition never completely healed. Many Jewish women in the colonies, who in Spain "seemingly told their [rosary] beads in public [to disarm suspicion], though their hearts formed not the Ave Maria and the Pater Noster, but the Shemang," continued the deception in their new world. *Gutstein* at 351 n. 17 (quoting Thomas Bicknell, *The History of the State of Rhode Island*, Vol. II at 626 (1920)) "[T]hese women were so much slaves of habit and fear that even here, [in Rhode Island,] far from their bloodthirsty oppressors they still fingered their beads as they repeated their Hebrew prayers, though their one desire was to throw off all memory of their days of persecution." *Id.*

burgeoning community, as a symbol that its families were permitted to live and die according to their true identities. *Id.* at 39.

The Riveras were one such family that populated Newport at the beginning of the 18th century. Abraham Rodrigues Rivera was the first of his family to arrive in North America in the early 1700s.[12] Typical of many North American Jews at the time, he was born and married in Seville, Spain, where he was forced to live as a Marrano in full accordance with the Catholic rites and under a different name. Upon coming to the British Colonies, he underwent all the religious rituals required by Jewish tradition, changing his name to Abraham, his sons' names to Isaac and Jacob, and his daughter's name to Rebecca. Young Jacob Rodrigues Rivera,[13] also born in Seville, would eventually grow up to become a respected Newport businessperson and the author of a key testamentary document at issue in this case.

Along with the exiles from Spain and Portugal, Jews from other European countries also populated Newport. *Id.* at 76-77. The Hart and Levy families are of

---

[12] Abraham Rodrigues Rivera landed in New York City, but later relocated his family to Newport. He was president of Shearith Israel in 1729 and one of the contributors to the building of its first Mill Street Synagogue in 1730. *Gutstein* at 70-71.

[13] Jacob Rodrigues Rivera lived for some time in the Caribbean island country of Curaçao, where he married, before moving to New York. He was naturalized as a U.S. citizen in 1746 and moved his family to Newport in 1748. In his new home, he introduced the community to the manufacture of spermaceti candles, (wax extracted from whale oil), which became "one of the most important sources of Newport's prosperity" in the coming years. *Gutstein* at 71.

special importance to this case.   Isaac Hart[14] hailed from a London family of
Ashkenazic origin.[15]   He settled in Newport around 1750 and soon became a
successful merchant.  *Id.* at 77.  Moses Levy's family was also from London.[16]  *Id.* at
75.  They arrived in New York in 1705 and eventually settled in Newport.  *Id.* at 53.
Like Jacob Rodrigues Rivera and Isaac Hart, Moses Levy also became a prominent
businessperson,  and  was  closely  associated  with  the  commercial,  social,  and
spiritual life of Newport's Jewish community.[17]  *Id.* at 53-54.

---

[14] Isaac Hart's relative, Aaron Hart, was the first Chief Rabbi of the Ashkenazic
Jews in England.  *Gutstein* at 77.  As late as in 1763, Jews in London were facing
indictments for holding public services.  *Id.* at 342, n. 7.  For them too, the hope of
public worship in North America was a great draw.

[15] Ashkenazic Jews generally hail from Germany, Russia, Poland, Hungary,
Romania, Lithuania, Latvia and other places in Central and Eastern Europe.
Sephardic Jews trace their roots back to Spain and Portugal.  The two groups differ
in their rituals and pronunciations.  Bernard Kusinitz, *The 1902 Sit-In at Touro
Synagogue* 44-45 (Rhode Island Jewish Historical Notes Vol. 7, No. 1 Nov. 1975)
(Exhibit D445 at 5-6) [hereinafter *Kusinitz*]; *see also Gutstein* at 114-17; 268-70.

[16] There is no evidence before the Court about whether Levy's family was of
Sephardic or Ashkenazic origin.

[17] The Court would be remiss here not to acknowledge a shameful chapter in the
colonies' history, in which one prominent member of the Jewish community, Aaron
Lopez, (*Gutstein* at 66-69), had a role.   "[D]uring the eighteenth century Jews
participated in the 'triangular trade' that brought slaves from Africa to the West
Indies and there exchanged them for molasses, which in turn was taken to New
England and converted into rum for sale in Africa. . . .  Aaron Lopez of Newport in
the late 1760's and early 1770's [participated in] slave trading on the American
continent."  Rabbi Marc Lee Raphael, *Jews and Judaism in the United States: A
Documentary History* 14, 23-25 (Behrman House, 1983); *see also* Eli Faber, *Jews,
Slaves, and the Slave Trade: Setting the Record Straight* 136-37, 143 (New York
University Press, 1998) (concluding that Mr. Lopez underwrote 21 slave ships to
Africa between 1761 and 1774); Trial Tr. vol. 7, 201, ECF No. 110 (Testimony of Dr.
Mann) ("[Aaron Lopez was] a slave trader").

*Building the Synagogue*

By the mid-18th century, the Jewish community of Newport was becoming sufficiently numerous and prosperous to plan building a synagogue. *Id.* at 82. They "desire[d] to build a synagogue that should equal in grandeur any other contemporary colonial structure." *Id.* at 87. The project required two rounds of fundraising, first to buy the land, and second to build the temple. *Id.* at 87-88. For the first round, the local Jewish community was taxed and the necessary funds gathered to make the purchase. *Id.*

A problem arose though, because in those days "patents of incorporation were not granted to religious institutions," meaning that the Congregation "could not purchase [or] hold real estate in its own name." *Id.* at 82; *see also Kusinitz* at 42 (Exhibit D445 at 3). Yeshuat Israel solved this problem by designating three of its leaders as title-holders and trustees on behalf of the Congregation:

> The procedure was this: at a public meeting of the Congregation, or of all the Jews of the community, trustworthy individuals were appointed to purchase whatever property might be necessary for building the synagogue and for whatever other use the Congregation might need. These members of the community thus became the trustees of the land, buildings and other property belonging to the Congregation. In reality the land and property belonged to the entire Jewish community; legally the title to the land and to everything with it, rested with the appointed trustees who purchased the plot as individuals.
>
> *****
>
> The Jewish Community of Newport found these trustworthy individuals in three noteworthy and respectable members of the Congregation, Jacob Rodrigues Rivera, Moses Levy and Isaac Hart. They were not only appointed to purchase the land, but also as "trustees for building the Synagogue."

*Gutstein* at 82-83; *see also Urofsky* at 54. After raising the funds from the Newport Jewish community, the Congregation purchased the necessary land from Ebenezer Allen of Sandwich of the Massachusetts Bay Colony sometime in 1759. *Gutstein* at 85; *see also* 1759 Deed (Exhibits D424 and D424A).

The second step, building the Synagogue, required raising additional capital. For this task, the Jews of Newport began at home, raising "a small fund by subscription" despite being strapped for funds after "having been taxed for the purchase of the land." *Gutstein* at 87-88. Next, they greatly expanded their fundraising sites. *Id.* at 88. Nine representatives of the Newport Jewish community — Jacob Rodrigues Rivera, Jacob Isaacs, Isaac Hart, Aaron Lopez, Abraham Rodrigues Rivera, Isaac Pollock, Moses Lopez, Isaac Elizer, and Moses Levy — penned letters to congregations near and far appealing for assistance in their goal of building a synagogue and school where they could "[i]nstruct [their] [c]hildren in the [p]ath of [v]irtuous [r]eligion." *Id.* at 88 and 117. Congregations in New York, Jamaica, Curacao, Surinam, and London all answered the call and donated. *Id.* at 88.

In a constructive chapter of history between Jews in Newport and New York, Shearith Israel "reserved the seventh day of Passover to appeal for contributions for the building of Newport's Synagogue."[18] *Id.* at 90. Newport's Naphtali Hart traveled to New York to collect the donation, and left a receipt stating, "Recd. of

---

[18] Shearith Israel likely contributed even more funding later on toward the building and furnishing of the Synagogue. *Gutstein* at 95-97.

**AD16**

Myer Myers [an official of Shearith Israel at the time] One Hundred and Forty nine Pounds and six pence which at my arrival at Newport, Rhode Island, I promise to deliver to Messrs. Jacob Rivera, Moses Levy and Isaac Hart, *trustees for building the Synagogue.*" *Id.* at 92 (emphasis added).

The construction of the Synagogue lasted from August 1, 1759 until 1762, and the dedication ceremony took place on December 2, 1763.[19]  *Id.* at 92, 98.  The dedication was a public celebration of the magnificent final product, and highlighted the stature and acceptance of Jews in Newport.  "The invited audience consisted of Jews and non-Jews, including a great number of notables of the city and guests from other localities." *Id.* at 98.  At this time, there were 60 to 70 Jewish families living in Newport.  *Id.* at 113-14.  The *Newport Mercury*[20] offered the following report: "The Order and Decorum, the Harmony and Solemnity of the Music, together with a handsome Assembly of People, in an Edifice the most perfect of the Temple kind perhaps in America, and splendidly illuminated, could not but raise in the Mind a faint Idea of the Majesty and Grandeur of the Ancient Jewish Worship mentioned in Scripture." *Id.* at 100-01.  The dedication also marked a name change

---

[19] The Synagogue — "an architectural jewel" — was designed by Peter Harrison, a British-born colonial architect who immigrated to Rhode Island in the 1740s. *Urofsky* at 55-57.  He likely drew inspiration for Newport's Synagogue from the designs of the Bevis Marks Synagogue in London and the Great Portuguese Synagogue of Amsterdam.  *Id.* at 56.  Mr. Harrison's other works include the Redwood Library and Athenaeum in Newport, and other buildings in Newport, Boston, Cambridge, and England. *Id.* at 55-56; *Gutstein* at 93.

[20] The *Newport Mercury* is one of the oldest newspapers in the country still in existence, dating back to 1758.  Newport Public Library, *Local History: Rhode Island Newspapers* (2016), http://www.newportlibraryri.org/e-resources/local-history/.

for Newport's Jewish community.  No longer would they be known as Nefutsé Israel — the Scattered of Israel, but instead as Yeshuat Israel — the Salvation of Israel. *Urofsky* at 62.  At its very beginning, the Newport Synagogue was publically dedicated to the proposition that in Newport, Jews could worship freely and proudly, as their storied ancestors had done in the long ago past.

In sum, the Synagogue's trustees, Jacob Rodrigues Rivera, Isaac Hart, and Moses Levy were part of the community of Sephardic and Ashkenazic Jews that came to Newport in pursuit of religious freedom, economic prosperity, and happiness.[21]  They helped form a Jewish society that prospered in business but stayed grounded in religion.  It is heartening to imagine, as one of the trial witnesses described, the newly liberated European Jews finding a welcome place in Newport to build their Synagogue after years of furtiveness and torment:

---

[21] By the time the Synagogue was built, the Jewish population of Newport was composed of Jews from a variety of backgrounds:

> The majority of the Jewish population in [Newport before the American Revolution] were of *Sephardic* origin [from Spain and Portugal], but a considerable number taking an active interest in the affairs of the Jewish community were of *Ashkenazic* stock.  The *Ashkenazic* element came principally from Germany, though . . . the Harts came from England, the Pollocks from Poland, while the Myers came from Austria and Hungary.

> In affairs of the synagogue, the *Sephardic* element dominated because of their greater number and importance.  The A*shkenazic* members cooperated fully, so that harmony and accord existed at all times.  The synagogue was deeded to Jacob Rodrigues Rivera the *Sephardi* and Isaac Hart the *Ashkenazi*.  While Moses Lopez, a *Sephardi*, was President of the Congregation one year, Naphtaly Hart, an *Ashkenazi*, occupied the position another year.

*Gutstein* at 115.

[T]hey found this religious tolerance.  And then they built this wonderful synagogue.  And they built it high up on a hill overlooking the city.  And it showed how comfortable they were, and how well accepted they were.  And that's particularly important, when you look at other synagogues built in the same era. . . . [S]ynagogues were built in Europe behind other buildings, in alleyways so that they don't draw attention to them.  And here, here in Rhode Island, they were able to build in such an open location.

Trial Tr. vol. 3, 177, ECF No. 106 (Testimony of Bertha Ross).  Far from the fires of the Inquisition, the Jews of Newport were able to build a Synagogue that would serve always as a house of public worship and a beacon of religious freedom.



Exterior of the Synagogue in 2013.  *Urofsky* back cover (Exhibit D451 at 2).



Interior of the Synagogue in 2008. *Urofsky* at 59 (Exhibit D451 at 76).

### The Rimonim

Although the Touro edifice was completed by 1762, a building alone does not a synagogue make. It needed furnishings and articles of worship essential to the religious ceremonies for which it was meant. By dedication day, through the generosity of patrons from Newport and abroad, most of these necessities were gifted to the Synagogue and became part of the heritage of the Jews of Newport. *Gutstein* at 96-97, 103-06. The Synagogue was adorned with brass candlesticks from Enoch Lyon, a perpetual lamp donated by Samuel Judah, wax from Hayim Myers, a *Hechal* (Ark where the Torah scrolls are kept) and *Tebah* (reading desk at the center of the synagogue) gifted by Jacob Pollock, and three Torah scrolls, including a 200-year old scroll presented by a Congregation from Amsterdam. *Id.* at

97, 104-05.   Soon, five beautiful candelabra were installed courtesy of Abraham Rodrigues Rivera, Naphtali Hart Myers, Aaron Lopez, and one unknown donor.  *Id.* at 104 and 354-55 n. 45.

The riches of the Synagogue kept growing.  "[B]y 1769 there were six Scrolls of the Holy Law deposited in the Ark of the Newport synagogue . . . all adorned with tops and bells made of silver and washed with gold."  *Id.* at 105.  These "tops and bells" that adorn the Torah are called "rimonim," and are placed on the top of the two handles of the Torah scroll when the Torah is not in use.  Gutstein described two of those pairs from 1769 this way:

> One pair, having crown and bells is decorated with closed aca[n]thus leaves, open flowers, strap ornaments, and heading.  They were made by Myer Myers, freeman of New York, president of the Silversmith's Society, 1776.

> Another pair, by the same maker are engraved and embellished with flowers and foliage.  Gilt bells are suspended from brackets.  They were probably the gift of members of the Hays and Myers family as the inscription indicates.

*Id.* at 108.

Because the ownership of one of these pairs of Myer Myers' Rimonim is at issue in this case, a discussion of the maker and the contested pair is fitting.  Myer Myers, the son of a Jewish shopkeeper, was New York's foremost silversmith during the late colonial period.  David L. Barquist, *Myer Myers: Jewish Silversmith in Colonial New York* 25 (Yale University Press, 2001) (Exhibit P150 at 3234 and

D356 at 5) [hereinafter *Barquist*].[22]  An accomplished artisan and a successful merchant, his workshop was likely the largest in New York from the mid-eighteenth century until the outbreak of the Revolutionary War.[23]  *Id.*  Approximately 380 works bearing his mark survive to this day, including only six objects of Judaica: five pairs of rimonim and one circumcision shield.  *Id.* at 48 (Exhibit D356 at 28), 152, 154, 162, and 198 (Exhibit P150 at 3246, 3248, 3255, and 3259).  His exquisite rimonim have likely played the biggest role in establishing Mr. Myers' reputation as a great silversmith.  *Id.* at 60 (Exhibit D356 at 40).

Although born in New York and deeply involved with the Jewish community there, Mr. Myers' personal and professional life also connected him to Jewish communities in other cities, especially Newport.  *Id.* at 27 (Exhibit P150 at 3235). As president of Shearith Israel, he facilitated his Congregation's donations for the construction of Newport's beautiful new Synagogue.  *Gutstein* at 92.  Then around the year 1770, his sister Rachel and her husband Moses Michael Hays moved to Newport, which opened up further avenues for his business interactions there.[24] *Barquist* at 27, 98 (Exhibit P150 at 3235, 3259).  Mr. Myers made a circumcision shield for Yeshuat Israel's *mohel* (circumciser), Moses Seixas, who in the 1770s served as Yeshuat Israel's president and custodian.  *Barquist* at 152 (Exhibit P150

---

[22] The parties submitted partly overlapping excerpts from the Barquist catalogue.  The Court's citations to Barquist include the actual pages in the catalogue, as well as the exhibit and page numbers for the cited information.

[23] Mr. Myers was born in 1723, and by the age of 23, he became the first Jew to join the British Guild of Silversmiths since its founding in 1327.  *Barquist* at 8 (Exhibit P150 at 3230).

[24] The Hays family is related by marriage to the Touro family, which is closely associated with Newport's Synagogue.  *Barquist* at 98 (Exhibit P150 at 3259).

AD22

at 3246); *Exhibition of Works in Silver and Gold by Myer Myers*, Brooklyn Museum, 1954 (Exhibit P101 at 3720). And most importantly, for our purposes, in 1787 Mr. Myers was commissioned to mend a pair of Yeshuat Israel's Rimonim, and was paid 12 shillings for his services. Yeshuat Israel ledger (Exhibit P30). He was likely repairing the Rimonim at issue in this case, which he had made for use in Newport's new Synagogue.



The Rimonim (Exhibit D562).

**AD23**

### Late 18th Century Newport, Rhode Island

The years immediately after the Synagogue was built coincided with the "Golden Era of Newport." The city, known as the "Garden of America," was a commercial rival of New York and Boston. *Gutstein* at 157-58, 174.[25] The Jewish community in Newport was the largest and most prosperous in North America, even compared to the other major Jewish communities in New York, Philadelphia, Savannah, Richmond, and Charleston. *Id.* at 176. Alas, the golden era was short-lived.

As fate would have it, the Jews who built the Newport Synagogue would worship there for only 30 years. The majority of Jewish families left Newport in the year 1776, some at the outbreak of the Revolution, and others immediately after the British captured the city:

> The conflict with Great Britain was a death blow to the prosperity of the city of Newport, and in particular to the Jewish community of the town. The factories gradually closed down; the extensive commerce and foreign trade slowly died out; many people threatened by the impending invasion of the British left the city, and by December 8, 1776, when the city of Newport was actually occupied by the British, there was but a handful of people left in the town.

*Id.* at 181-82; *see also id.* at 185.

The Revolutionary War and then the War of 1812 devastated the shipping and trading industries on which Newport's Jews depended, and drove the Jewish community to other locales. *Id.* at 190, 225. Services ceased in the Synagogue

---

[25] In his book, Gutstein refers to a letter from that time that was addressed, without irony, to "New York near Newport, Rhode Island." *Gutstein* at 158.

sometime around the year 1793, and by 1822, it appears that no Jews remained in Newport. *Id.* at 216, 225.

The wars also affected the leadership of Yeshuat Israel, including its three trustees. In 1780, one of the trustees, Isaac Hart, was killed in the midst of Revolutionary violence, and left no surviving will. *Id.* at 184, 365 n. 33. Another trustee, Jacob Rodrigues Rivera, waited out the Revolutionary War in Leicester, Massachusetts, and returned to Newport an old man. *Id.* at 185. He "was gathered to his fathers" on February 18, 1789 at age 72. *Id.* at 200. The third trustee, Moses Levy, passed away three years later in 1792. *Id.* at 216. Both Mr. Rivera and Mr. Levy left behind wills that are instructive for this case, and supportive of the finding that Touro Synagogue is owned in trust.

- ***The Rivera Will***

In his will, Jacob Rodrigues Rivera acknowledged that he had no equitable ownership interest in Touro Synagogue, and that his only personal interest was as the Synagogue's trustee. His will stated:

> Also I do hereby declare and make known unto All People, that I have no exclusive Right, or Title, Of, in, or to the Jewish Public Synagogue, in Newport, on Account of the Deed thereof, being made to Myself, Moses Levy & Isaac Harte, which Isaac Harte, thereafter Conveyed his One third Part thereof to me, but that the same was so done, meant and intended, in trust Only, to and for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever, THEREFORE, I do for myself and my Heirs hereby remise, release, and forever quit Claim to all exclusive right, title, or Interest therein or thereto and to every part and parcel thereof, Always saving and excepting such right as I have by being A Single Member of that Society.

Rivera Will at 19 (Exhibit D16 at 2). The will, which will be discussed in more detail *infra*, is incontrovertible evidence that Touro Synagogue was owned in trust.

- *The Levy Will*

In his will, Moses Levy stated:

> I do hereby release and discharge all such ballances, as shall at the time of my Decease be due and unpaid of monies by me heretofore advanced towards building the Synagogue, in Newport, on condition that there shall be a solemn prayer said for me in the said Synagogue, Yearly and every Year; on the Evening or day of Kipne, or atonement.

Levy Will (Exhibit D18 at 1).

Mr. Levy's will, probated three years after Mr. Rivera's, is consistent with the finding that Messrs. Rivera, Hart, and Levy were trustees for the Synagogue. *See infra*.

### Moses Seixas Becomes Acting Trustee

While the Revolutionary War raged, Moses Seixas, who married into the family of one of the trustee's (Moses Levy),[26] took responsibility for the Synagogue and became the "lay leader of the Remnant of Israel in Newport." *Gutstein* at 188-89. He "was the warden of the [S]ynagogue, and carried out the functions that had been previously vested in Jacob Rodrigues Rivera." *Id.* at 189, 201. In other words, Moses Seixas acted as the Synagogue's successor trustee.

---

[26] Moses Seixas married Jochebed Levy, the daughter of Benjamin and Judith Levy. *Gutstein* at 189. Benjamin Levy was Moses Levy's brother. *Id.* at 76. Mr. Levy and Mr. Seixas were likely close, because Mr. Levy devised a large portion of his estate to Mr. Seixas, and appointed him as an executor of his will. Levy Will (Exhibit D18 at 2-4).

Moses Seixas also played the central role in the most celebrated instance in the Synagogue's history: the correspondence with George Washington. President Washington visited Newport on August 17, 1790. *Id.* at 207. The following morning, Mr. Seixas presented to the President a letter on behalf of the Hebrew Congregation, extolling his new government, "which gives to bigotry no sanction to persecution no assistance; but generously affording to all liberty of conscience and immunities of citizenship, deeming everyone, of whatever nation, tongue, or language, equal parts of the great Government machine." *Id.* at 210 (reproducing Mr. Seixas' letter to President Washington).

The President responded in kind, writing:

To the Hebrew Congregation in Newport, Rhode Island.

Gentlemen.

\*\*\*\*\*

The Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy: a policy worthy of imitation. All possess alike liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of as if it was by the indulgence of one class of people that another enjoyed the exercise of their inherent natural rights. For happily the Government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection, should demean themselves as good citizens, in giving it on all occasions their effectual support.

\*\*\*\*\*

May the Children of the Stock of Abraham, who dwell in this land, continue to merit and enjoy the good will of the other Inhabitants, while every one shall sit in safety under his own Vine and Figtree, and there shall be none to make him afraid. May the father of all mercies scatter light and not darkness in our paths, and make us all in our

several vocations useful here, and in his own due time and way everlastingly happy.

Go. Washington

*Id.* at 212-13.

This touching and lofty correspondence is celebrated by a public reading of the Seixas and Washington letters at the Touro Synagogue every year.   Trial Tr. vol. 2, 8-13, ECF No. 105 (Testimony of David Bazarsky).   It is a fitting tribute to Newport's original Jewish community, which had suffered through the indignities of the Inquisition, to find in Newport a safe haven for public worship.

### Jews Leave Newport, Rhode Island

The correspondence with President Washington was the last hurrah of Newport's original Jewish community.  Around 1793, "the services at the synagogue completely ceased . . . [and] the building was left to the bats and moles, and to the occasional invasion, through its porches and windows, of boys who took great pleasure in examining the furniture scattered about."  *Gutstein* at 216.  "By 1800, the 'Jewish Society' of Newport contained no one outside the families of Rivera and Seixas, and some of their relatives, Lopez and Levy respectively."  *Id.* at 217.   In 1809, Moses Seixas died, and was put to rest in his family's plot in the Newport Jewish Cemetery.  *Id.* at 219.  The informal role of trustee thereafter likely passed down to Moses Lopez, who was the last Jew to leave Newport on October 5, 1822. *Id.* at 225-26.

After services at the Synagogue stopped, the few remaining members of the Jewish community of Newport began to relocate its articles of worship and other

treasures to safer locations. Many of Yeshuat Israel's congregants moved to New York and joined Congregation Shearith Israel. *Id.* at 226. They brought with them several Torah scrolls and the rimonim adorning them, which Shearith Israel agreed to keep safe, until Jews were once again worshiping in Newport's Synagogue. *Id.* at 216, 263; see also 1901 Letter from Shearith Israel's Rabbi to Mayor of Newport (Exhibit D133 and D133A at 3) ("This original congregation dwindled away through the Revolutionary war, and in 1818, the last residents sent to the New York Congregation the sacred movables."). The Rimonim were sent to Shearith Israel for safekeeping during the period when there were no Jews in Newport. Shearith Israel's minutes from December 3, 1832 state:

> [T]he Sepharim belonging to the New Port Shool [shul][27] & which was in the possession of the family of the late Mr. Moses Seixas and have been for about 40 years, could be obtained to be placed for safe keeping in our place of Worship until they should be required for the use of the New Port Shool [shul].

Shearith Israel's minutes (Exhibits D25 and D25A at 2).

Shearith Israel also memorialized receiving the Torah scrolls. Shearith Israel's minutes from February 10, 1833 state:

> The Committee appointed to receive the Sepharim [Torahs] belonging to the New Port Synagogue Report that they have received the same and deposited them in our Hachal [Ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate.

Shearith Israel's minutes (Exhibits D26 and D26A at 1, and P38 at 5257).

Shearith Israel's representatives testified that the Rimonim were also transferred to Shearith Israel for safekeeping around this time. Shearith Israel's

---

[27] "Shul" means synagogue. Merriam-Webster Dictionary; *see also Kusinitz* at 43 (Exhibit D445 at 4).

ritual director Zachary Edinger[28] stated, "it is likely that the [R]imonim were brought to New York for safekeeping sometime" in "[e]ither the 1820s or the 1830s." Edinger Dep. 92:25–93:5 (May 1, 2014). Shearith Israel's vice president also testified, "the Torahs and rimonim and other ritual objects, which had been in the Touro Synagogue, we [Shearith Israel] took them for safekeeping; and that continued until the early 1880s . . . ." Trial Tr. vol. 6 at 61, ECF No. 109 (Testimony of Michael I. Katz).

It is likely that four pairs of rimonim traveled with the Torah scrolls from Newport to New York. *See Barquist* at 160 (Exhibit P150 at 3254) ("it was not until 1833 that the four Torahs (and presumably their ornaments) were transferred to Shearith Israel 'for safekeeping . . . .'").[29]   Whether they traveled with those four Torah scrolls, or with a different scroll, or arrived separately, the Court finds that the Rimonim at issue in this case were transported to New York and held for safekeeping by Shearith Israel after services stopped at Newport's Synagogue.[30] With no Jews remaining in Newport, Shearith Israel became the custodian for

---

[28] Zachary Edinger is Shearith Israel's ritual director. Edinger Dep. 9:10–10:7 (May 1, 2014). Portions of his deposition transcript were admitted by the Court in lieu of trial testimony. Shearith Israel's objections the portions of his testimony relied upon by this Court are overruled.

[29] As counsel for Shearith Israel acknowledged during opening arguments about rimonim, "[t]heir job is to stay with the Torah." Trial Tr. vol. 1 at 69, ECF No. 104.

[30] When Shearith Israel returned the Rimonim to Newport in the late 1800s, it returned one finial marked "Newport" on the base, and one finial not so marked. Jeshuat Israel alleges that the Rimonim are a true pair with switched bases, while Shearith Israel alleges that they are not a true pair. The Court need not decide this issue. Shearith Israel has not asked the Court to exchange its single finial or its base, which is marked "Newport" for Jeshuat Israel's single finial that is not marked "Newport," and even if it did, both parties would retain the same number of finials.

Yeshuat Israel's religious artifacts, including the Rimonim, and the spiritual link to Jewish worship at the abandoned Newport Synagogue.[31]

### Touro Brothers Save Newport's Synagogue

By the time Moses Lopez left Newport in 1822, the Synagogue was in a dilapidated condition. There were no congregants to worship there, and no funds to preserve it. Mr. Lopez moved to New York and entrusted the keys and care of the Synagogue and cemetery to Stephen Gould, a non-Jew who did his best in this role without any remuneration. *Gutstein* at 238. In 1826, Mr. Lopez wrote to Mr. Gould about the Synagogue, stating that "th[e] building is now considered as own'd at present by the Hebrew Society [Shearith Israel] in this city." *Id.* at 239.

At this juncture, Shearith Israel assumed trustee responsibilities for the Newport Synagogue, most likely because so many members of the disbanded Yeshuat Israel moved to New York and joined Shearith Israel. By 1826, the keys to Touro Synagogue were transferred to Shearith Israel. *See* Newport Council Records Apr. 17, 1826 (Exhibit D23) (noting that keys to Synagogue resided with Shearith Israel). However, Shearith Israel could not be expected to "invest thousands and thousands of dollars to restore and maintain [a] building, which was in a state of ruinous disrepair when they first took possession of it, for the possible use of co-religionists who might or might not one day in the distant indefinite future come back to that city and ask for the use of the facility." Bernard Kusinitz, *How Touro*

---

[31] The Rimonim were certainly in the care of Shearith Israel by 1869, because they appear in the Congregation's inventory for that year. Shearith Israel's Inventory at 36 (Exhibits D34 and D34A).

*Synagogue Got Its Name* 93 n. 7 (Rhode Island Jewish Historical Notes Vol. 9, No. 1 Nov. 1983) (Exhibit D446 at 12) [hereinafter *Touro's Name*]. The future of public Jewish worship in Newport was in grave danger of crumbling alongside the building.

Newport's Synagogue was rescued from the brink by the progeny of its first Rabbi. Abraham and Judah Touro, sons of the Synagogue's first minister, Isaac Touro, devoted their resources to ensuring that the Synagogue survived through the lean decades to come. The brothers were born in Newport, but raised in Boston by their uncle, (and Myer Myers' brother-in-law), Moses Michael Hays, who prepared them for careers in business. *Gutstein* at 229-30. Both attained considerable financial success, Abraham Touro in Boston, and Judah Touro after he moved to New Orleans. *Id.* at 230. Both also "always remained faithful to the traditions of their father, and to their Jewish heritage," and "never forgot their cemetery and their synagogue." *Id.* at 229-30.

In 1822, the same year that Moses Lopez had left Newport, Abraham Touro took on the duty of maintaining Newport's Synagogue. He corresponded with Stephen Gould, whom Moses Lopez left in charge of the grounds, and sent him a sum of one thousand dollars to build a brick wall to replace the remnants of the wooden fence that enclosed the Jewish cemetery. *Id.* at 230-31. Unfortunately, Abraham Touro did not live to see the fence completed. He died on October 18, 1822, at age 48, when his horse bolted at the firing of artillery during a Boston military parade. *Id.* at 233.

Abraham Touro left a will, which accomplished what he had started a few months before — the preservation of Newport's Synagogue.  He left $10,000[32] "for the purpose of supporting the Jewish Synagogue in that State, in Special Trust to be appropriated to that object, in such man[n]er as the [Rhode Island] Legislature together with the Municipal Authority of the Town of Newport may from time to time direct and appoint."  *Id.* at 232.  He also left $5,000 to the Town of Newport for the repair and preservation of the street leading out of the Jewish Cemetery, which was later renamed Touro Street.  *Id.* at 232.[33]

With these gifts, Abraham Touro stepped into the shoes of the colonial Newport Jews and echoed their wish to preserve the Synagogue for the Jewish Society of Newport as a place of public worship forever.  The wish was granted: "[n]ot long after [the General Assembly approved the Touro Jewish Synagogue

---

[32] This was a large sum of money at the time.  For reference, the Bureau of Labor Statistics provides a consumer price index inflation calculator.  In 1913, the earliest year that this calculator makes available, $10,000 had the same purchasing power as $240,537 has in 2016.  U.S. Department of Labor, *CPI Inflation Calculator* (2016), http://www.bls.gov/data/inflation_calculator.htm.

[33] As Abraham Touro's charitable gift was being processed by the authorities, Titus Welles, the executor of Abraham Touro's estate and the donor's "close and intimate friend" wrote the following to the Rhode Island General Assembly:

It may be timely for me to remark on the subject of this Bequest regarding what I suppose to have been the intention of the Donor.  From the decayed state of the Synagogue in Newport, and the want of any family or persons of the Jewish persuasion there, the deceased with some others seriously resolved to look into the situation of the property and devise some plan to revive the Jewish religion there; and in such way and manner as to induce some of that nation to settle and keep up a worship at least in such a degree that the building enclosures and the Institution itself should not go entirely to ruin and decay.

*Gutstein* at 236.

Fund], the synagogue was repaired properly, and once again appeared as in the days before the Revolution." *Id.* 238. Stephen Gould continued to guard the shrine, as he had done before, and only after the Touro Fund appropriated some money was he "partly repaid for his faithful services." *Id.* at 238-39.

Judah Touro picked up where his brother Abraham left off. In 1842, when the brick wall around the cemetery commissioned by Abraham began to show signs of decay, Judah paid for a beautiful Quincy granite wall to replace it. *Id.* at 244. He contributed about $12,000 that year to completely restore the cemetery, repair the monuments, and beautify the grounds. *Id.* Upon Judah Touro's death in 1854, he also requested, like his brother before him, to be buried in the Jewish Cemetery in Newport. In his will, he gave the following bequest:

> [T]en thousand dollars for the purpose of paying the salary of a Reader or Minister to officiate in the Jewish Synagogue of Newport, Rhode Island, and to endow the Ministry of the same, as well as to keep in repair and embellish the Jewish Cemetery in Newport aforesaid; the said amount to be appropriated and paid, or invested for that purpose in such manner as my executors may determine concurrently with the corporation of Newport aforesaid, if necessary.

*Id.* at 246.

On January 11, 1855, the City Council approved Judah Touro's bequest, with $200 to be expended annually for the upkeep of the cemetery, "subject to the control of David J. Gould and Nathan H. Gould," descendants of Stephen Gould. *Id.* at 248-49. Thereafter, "[t]he Judah Touro Ministerial and Cemetery Fund . . . grew steadily with the accumulation of interest, so that in later years an adequate amount was available for the salary of the minister." *Id.* at 249. Between the two

of them, the Touro brothers provided for the upkeep of the Synagogue, the cemetery, the connecting street, and for the eventual retainer of a Jewish minister in their ancestral prayer house.  But for their "foresight, one doubts whether the synagogue would have survived to the time when Jews again began to settle in Newport towards the end of the nineteenth century."  *Id.* at 234.

Between 1822 and the 1870s, the Synagogue remained in good repair, but infrequently used.  It was opened for the funeral services of Moses Lopez, who died in New York in 1830 at the age of 86, and again for the funeral services of Rebecca Lopez, Reverend Isaac Touro's only daughter, who died in 1831.  *Id.* at 240.  In 1832, the Synagogue was opened for the funeral of Judah Hays, then in 1836 for the interment of Slowey Hays, and for other burials in 1842, 1866, and in the 1870s.  *Id.* at 241, 251.  In the summer of 1850, the Synagogue was reopened briefly — "after an interruption of about sixty years" — for regular services.  *Id.* at 245.  These moments, which kept the candle of public worship flickering in Newport, were facilitated by personnel from Shearith Israel, and made possible with funds from the Touro brothers.  *Id.*

Despite these moments of worship and remembrance, Jewish life in Newport was in hibernation during the early and mid-1800s.  In 1858, Henry Wadsworth Longfellow published a poem, *The Jewish Cemetery at Newport*, about the ancient Synagogue and cemetery, which reflected its state of dignified disuse:

> Closed are the portals of their Synagogue,
> No Psalms of David now the silence break,
> No Rabbi reads the ancient Decalogue
> In the grand dialect the Prophets spake.

**AD35**

Case 1:12-cv-00822-M-LDA   Document 118   Filed 05/16/16   Page 35 of 106 PageID #: 6367

> Gone are the living, but the dead remain,
> And not neglected; for a hand unseen,
> Scattering its bounty, like a summer rain,
> Still keeps their graves and their remembrance green.

*Id.* at 251-54 (excerpt); 241-42.

The Touro brothers — as well as the Gould family — were the unseen hand discerned by Longfellow. Without them, "almost certainly there would be no Touro Synagogue as we see it today," and perhaps it would no longer still be standing at all. *Touro Name* at 88 (Exhibit D446 at 7). It is no accident that the Synagogue has since taken the Touro name as its own.[34]  *Id.*

### The New Jewish Settlement in Newport – Synagogue Reopens

In the 1870s, Newport was blessed with new Jewish immigrants arriving from Germany, Austria, Italy, Russia, Romania, and other parts of Eastern Europe, many likely drawn to the city by the preservation of its beautiful Synagogue. *Gutstein* at 256; *Touro Name* at 92 n. 5 (Exhibit D446 at 11) (stating that the "world-famous Touro Synagogue" was a draw for "Jews from small European *shtetls* (villages)"). Once again, Newport beckoned as a haven for public worship, which "the Colonial Jews had willed to posterity." *Touro Name* at 92 n. 5 (Exhibit D446 at 11). The newly arriving families offered the elusive promise of a new Jewish

---

[34] Touro Synagogue was referred to as the "Jews' Synagogue," the "Jewish Synagogue," the "Newport Synagogue," or just "The Synagogue" until the latter part of the nineteenth century. *Touro Name* at 84-85 (Exhibit D446 at 3-4). In 1834, the Newport Town Council renamed the street where the Synagogue stands, "Touro Street," in honor of Abraham Touro, who donated funds for its maintenance. *Id.* at 86. Around the time of the Synagogue's reconsecration in 1893, Rabbi Abraham Pereira Mendes likely renamed the Synagogue "Touro Synagogue" after that street. *Id.* at 88-89.

community worshiping in the same place as the ancient Congregation Yeshuat Israel.  Through the foresight of the Touro brothers, a majestic and sparkling Synagogue awaited their ready prayers, and a generous fund was in place to support their minister.  The new Jewish community, which became Congregation Jeshuat Israel, soon applied for the use of these blessings.

Shearith Israel held the keys to Touro Synagogue during the decades when there were no Jews in Newport.  *Gutstein* at 257-58.  It was concerned that the new Ashkenazic population (those Jews mostly from Eastern Europe that recently immigrated to Newport) seeking to worship there would not use it according to Sephardic tradition.  *Id.* at 271, 275 ("The attitude of the New York Congregation was motivated by the determination to preserve the ancient traditions . . . .")  *See also Kusinitz* at 45 ("[T]he newcomers to town, who were Ashkenazic, found alien the traditional Sephardic *minhag*, or ritual in use in Touro Synagogue.").  Although not a condition of Mr. Rivera's Will, or either of the Touro brothers' Wills, this one issue dominated Shearith Israel's approach to the future of Touro Synagogue, and posed legal problems that linger to this day.[35]

At first, Shearith Israel's concerns did not present any problems.  Shearith Israel commissioned Rabbi Abraham Pereira Mendes, the father of its own Congregation's rabbi, to leave London for Newport, and become Touro Synagogue's official rabbi.  Rabbi Mendes was embraced by Newport's Jewish community, and

---

[35] "So real and passionate were such feelings [about Sephardic traditions] that they account in part for some of the bitterness that was engendered in the sequence of events that followed." *Kusinitz* at 45 (Exhibit D445 at 6).

36

on May 25, 1883, he presided over the reconsecration of the Synagogue in a beautiful ceremony reminiscent of the original 1763 dedication. *Gutstein* at 261-65. The reconsecration symbolized that Newport's most recent Jewish arrivals would be planting permanent roots in the city.

The reconsecration also signaled the return of Yeshuat Israel's articles of worship from New York back to Newport. Shearith Israel returned "the scrolls of the Law, which had been kept in New York . . . to be permanently deposited in the Ark of the Newport Synagogue." *Id.* at 263. "In 1887, an additional *Sefer Torah*, which had belonged to Newport, was brought back from New York and deposited in the Ark." *Id.* at 266. It is undisputed that around this time, though the exact date is unknown, Shearith Israel sent the Rimonim to Newport.[36] Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 56 ¶ 263. The Rimonim have remained in Jeshuat Israel's possession and control ever since. *See supra*; Edinger Dep. 106:20–109:13.

Rabbi Mendes passed away in 1893, which precipitated the first conflict between Shearith Israel and Newport's resurgent Jewish community. *See Gutstein* at 270-74; *Kusinitz* at 44 (Exhibit D445 at 5). The Newporters worshiping at Touro Synagogue applied for a charter from the Rhode Island legislature under the same name as the old Newport Congregation Yeshuat Israel, except spelling "Jeshuat"

---

[36] There is photographic evidence that the Rimonim were back at Touro Synagogue by the year 1913, and they may have been back as early as 1895. *Id.*; E. Alfred Jones, *The Old Silver of American Churches* (National Society of Colonial Dames of America, 1913) (Exhibit P77) (containing description and photograph of Rimonim in Newport); Touro Monthly, *Congregation Jeshuat Israel* 3 (Vol. 11, No. 6 Feb. 1975) (Exhibit P124 at 4111) (reproducing photograph of Rimonim dated 1895).

**AD38**

with a "J" instead of a "Y."[37]  *Gutstein* at 271.  Shearith Israel opposed the Congregation's incorporation under this name, fearing that it would amount to recognizing that the new Congregation was the successor to Yeshuat Israel.  It even submitted a petition to the Rhode Island State Assembly objecting to the name on account of the backgrounds of the new immigrants:

> [N]one of them belong to the Sephardic or Spanish and Portuguese section of the Jewish nation . . . they being of the German or Polish contingent . . . and by their action in endeavoring to adopt this name, are manifestly perpetrating an injury upon the citizens of Newport in attempting to establish a relation between the ancient Congregation and themselves, while as a matter of fact they are totally different in form of worship, and in social standing, as well among the Israelites as Gentiles . . . ."

Shearith Israel Petition at 3 (Exhibit P48 at 4057).

Shearith Israel worried that if Jeshuat Israel were recognized as the successor to Yeshuat Israel, then Shearith Israel would no longer be able to enforce Sephardic worship at Touro Synagogue.  *Gutstein* at 272.  To stave off this threat, Shearith Israel endeavored to formalize its legal relationship to Touro Synagogue. In April 1894, Shearith Israel drafted "Deeds of Trust," and obtained signatures from several alleged descendants of the Newport Synagogue's original three trustees, which purported to convey the descendants' interests in the Synagogue to Shearith Israel.  *Id.* at 272-73.  These deeds, for the first time, contained the condition that Jews practicing in the Touro Synagogue must observe the same rituals, rites, and customs of the Orthodox Spanish and Portuguese Jews as

---

[37] Whether spelled with a "J" or "Y," the name of the Congregation is the transliteration of the same Hebrew words, meaning "Salvation of Israel." *Gutstein* at 378.

practiced and observed by Shearith Israel. *Id.*; *see, e.g.,* 1894 Deeds (Exhibit D78 at 3, 9, 18, 21, 22, 23, and 26). In the meantime, Congregation Jeshuat Israel successfully received its charter from the Rhode Island Legislature on June 13, 1894. *See* State Charter (Exhibit P284). With both sides now armed with documents allegedly supporting their claims to the Synagogue, the conflict continued to simmer below the surface.

Shearith Israel next appointed Rabbi David Baruch to serve as the minister at Touro Synagogue. For the six years that he served in that post, Rabbi Baruch was also successful at keeping at bay the more serious problems between the Newport and New York congregations. The death of Rabbi Baruch on March 30, 1899 precipitated a formal split in Newport's Jewish community, multiple rounds of litigation, and the temporary closing of the Synagogue. *Gutstein* at 274-75; *Kusinitz* at 47 (Exhibit D445 at 8). On April 10, 1899, a group split off from Jeshuat Israel, and incorporated under the name of "Touro Congregation." *Kusinitz* at 47 (Exhibit D445 at 8). This group attempted to hold its own services at Touro Synagogue, but was removed from the Synagogue pursuant to an 1899 court order, and eventually rejoined with Congregation Jeshuat Israel. *Id.* at 47-50 (Exhibit D445 at 8-11).

Although the two Newport congregations prayed together for some time, friction between them continued, while the discord between Newport's Jewish community and Shearith Israel had never completely died down. *Id.* at 51 (Exhibit D445 at 8-11). The main point of contention was likely the Newport congregations'

efforts to appoint their own minister, rather than accepting a minister selected by Shearith Israel. *Id.* at 54-56 (Exhibit D445 at 15-17). In the midst of this hostility, Shearith Israel and their representatives in Newport chose to close Touro Synagogue on January 1, 1901. *Id.* at 53 (Exhibit D445 at 14); *see also* Shearith Israel's minutes from July 2, 1900 authorizing closure (Exhibits D128 and D128A at 2). The Synagogue was shuttered for over a year, until a Newport group consisting mostly of members from Touro Congregation, broke into the Synagogue to pray on April 21, 1902. *Id.* at 53 (Exhibit D445 at 14). Relying on a state law that forbade interference with an ongoing religious gathering, the Newport group conducted a sit-in and held continuous services at Touro Synagogue for almost a year, until early 1903. *Id.* at 57 (Exhibit D445 at 18).

While the Newport group was occupying the Synagogue, lawyers from Newport and New York sought to resolve the issue in the courts. Shearith Israel prevailed in the Rhode Island Superior Court in May 1902, only to have the decision reversed on procedural grounds by the Rhode Island Supreme Court on June 11, 1902. *Id.* at 66-67 (Exhibit D445 at 27-28). Parallel to the state litigation, the Newport group was pressing its case in equity, which Shearith Israel removed to the United States District Court for the District of Rhode Island. On January 10, 1903, Judge Arthur L. Brown of this court sustained Shearith Israel's demurrer and dismissed the Newport group's case in a cryptic opinion, *David v. Levy*, which brought the parties back to the position they were in before litigation began. Opinion on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit

D143); *Kusinitz* at 68 (Exhibit D445 at 29). The Newport group could continue in its occupation, while Shearith Israel could continue to assert its title.

Fortunately, by this point in the dispute, "attitudes softened and a spirit of conciliation once again permeated the air" both as between the two Newport congregations, which had coalesced under the banner of Jeshuat Israel, and between Newport's Jews and Shearith Israel. *Kusinitz* at 69 (Exhibit D445 at 30). After Judge Brown's decision, "[l]awyers for the New York trustees of Congregation Shearith Israel . . . approached [Newport's attorney] and posed the question of reconciliation so that the controversy could be settled once and for all." *Id.* Newport's attorney "indicated that if the New York group would be reasonable, [reconciliation] could be accomplished." *Id.* By January 30, 1903, the parties reached a compromise that resolved the conflict for the next 100 years. Settlement Agreement (Exhibit D146).

### 1903 and 1908 Leases

The compromise was that Shearith Israel, which held the keys to Touro Synagogue as its trustee from the time when no Jews were in Newport, agreed to lease the Synagogue to Jeshuat Israel for five years at the nominal price of $1 per year. 1903 Lease (Exhibit D148 at 2). As part of the agreement, Jeshuat Israel could select its own minister, subject to Shearith Israel's approval, rather than Shearith Israel unilaterally appointing a minister for Jeshuat Israel. *Kusinitz* at 70 (Exhibit D445 at 31). That same year, Jeshuat Israel selected Touro Synagogue's first Ashkenazic rabbi, Jacob M. Seidel. *Gutstein* at 277. Jeshuat Israel also

agreed in the lease to use the Synagogue according to Sephardic ritual as practiced by Shearith Israel. 1903 Lease (Exhibit 148 at 3). On February 2, 1903, Jeshuat Israel passed a resolution, directing its trustees "to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the [Shearith Israel] Trustees, owners of the property," which formally ended the sit-in. Jeshuat Israel Resolution (Exhibit D147). On February 18, 1903, the parties signed the lease.[38] 1903 Lease (Exhibit D148). The lease[39] was renewed for another five years in 1908, and never again.

The lease was a compromise that again permitted Newport's Jews to use Touro Synagogue for public worship, while maintaining Shearith Israel in its role as trustee for the building. From that point forward, Jeshuat Israel continued to use Touro Synagogue as its own with no interference from Shearith Israel. After this brief flurry of litigation at the turn of the 20th century, Jeshuat Israel and Shearith Israel did not have any major conflicts of relevance until the present.

---

[38] Around this time, Shearith Israel endeavored to include "personal property" into the terms of the lease, in an apparent effort to shore up its rights to Yeshuat Israel's articles of worship. On February 10, 1903, Shearith Israel's trustee L. Napoleon Levy instructed Dr. H. P. Mendes to insert the words "with the paraphernalia" into the lease, which would echo Jeshuat Israel's February 2 resolution. In the same letter, Levy gave Mendes a seven-point list of conditions to check off before Shearith Israel would hand the keys to Jeshuat Israel. February 10, 1903 Correspondence from Levy to Mendes (Exhibit D151). From this correspondence, it appears that Shearith Israel used the word "paraphernalia" to refer to "personal property." There is no evidence that Jeshuat Israel understood the term to have that meaning. Moreover, the inclusion of the term "paraphernalia" in the lease had no operative effect over the Rimonim because Shearith Israel did not own the Rimonim. *See infra.*

[39] In its briefing, Shearith Israel refers to the 1903 and 1908 Leases as "Indentures with Lease."

### 1945 Tri-Party Agreement

One noteworthy event involving both Congregations was a November 7, 1945 agreement among Jeshuat Israel, Shearith Israel, and the United States Government to protect and preserve Touro Synagogue, and to establish it as a national historic site. Tri-Party Agreement (Exhibit D240). The Agreement named "Shearith Israel Trustees" as "holders of the fee simple title *upon certain trusts* in the Touro Synagogue. . . ." *Id.* at 1 (emphasis added). Echoing the 1787 will of Mr. Rivera, the 1945 Agreement obligated Shearith Israel to ensure:

> [t]hat the public shall be admitted to all parts of the said Touro Synagogue . . . so far as consistent with *the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever* and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel . . . .

*Id.* at 4 (emphasis added).

The parties settled on this language after amending an earlier draft, with the understanding that "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport." Letter from William MacLeod to Jeshuat Israel dated September 25, 1945 at 4 (Exhibit P86 at 507); *see also* Shearith Israel Letters (Exhibits P87 and P88) (discussing MacLeod letter).

### Modern Day History – To the Present

Over time, the interactions between Jeshuat Israel and Shearith Israel decreased. Each Congregation attended to its own business affairs, with little cause

for communication.  At some point, the parties reached an agreement that Jeshuat Israel could hire any rabbi from Yeshiva University, without seeking Shearith Israel's approval.   Trial Tr. vol. 2, 55-56, ECF No. 105 (Testimony of David Bazarsky).    Jeshuat Israel had also several times amended its governing documents, and by 1983, those documents no longer even mentioned Shearith Israel.  Jeshuat Israel By-Laws as amended in 1969, 1983, 1987, 1994, 1999, and 2011 (Exhibits P116, P129, P132, P137, P146, and P216).  Jeshuat Israel paid its symbolic dollar rent payment sporadically, and only once during the period from 1987 to the present.   Trial Tr. vol. 3, 12-13, ECF No. 106 (Testimony of David Bazarsky).  By 1993, when David Bazarsky became president of Jeshuat Israel, there was no communication between Jeshuat Israel and Shearith Israel.  Trial Tr. vol. 1, 162, ECF No. 104 (Testimony of David Bazarsky) ("[W]hen I became president in 1992, nobody knew anything about Shearith Israel.  We heard about Shearith Israel.  We didn't know, we didn't know anything about them.").

This litigation came about when Shearith Israel objected to Jeshuat Israel's proposed sale of the Rimonim to the Boston Museum of Fine Arts.  In 2008, Jeshuat Israel was struggling because of the global financial crisis.  Trial Tr. vol. 4, 29, ECF No. 107 (Testimony of Bertha Ross).  The Congregation adopted a series of cost cutting measures, including eliminating its part-time administrator, closing down its community center in the winter months, bidding out its insurance programs, and even scrapping its stamp machine.  Trial Tr. vol. 3, 68-70, ECF No. 106 (Testimony of Michael Pimental).  The only paid employee remaining at Jeshuat Israel was its

rabbi. Trial Tr. vol. 1, 177, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel also attempted to raise income through a one-time assessment on its members, and other fund raising programs. Trial Tr. vol. 3, 70-77, ECF No. 106 (Testimony of Michael Pimental). Nonetheless, the Congregation was "one sort of large financial responsibility away from insolvency." *Id.* at 78.

To solve its financial difficulties, Jeshuat Israel formed a committee to examine its assets and determine whether it could sell any of them to fund an endowment to ensure continued public Jewish worship in Newport. Trial Tr. vol. 1, 179, ECF No. 104 (Testimony of David Bazarsky) and Trial Tr. vol. 4, 29-30, ECF No. 107 (Testimony of Bertha Ross). Jeshuat Israel owned two pairs of Myer Myers rimonim, which it asserts were the only asset whose sale could protect Jeshuat Israel's financial future. Trial Tr. vol. 1, 182-83, ECF No. 104 (Testimony of David Bazarsky) and Trial Tr. vol. 4, 36, ECF No. 107 (Testimony of Bertha Ross). Around October 2, 2009, Jeshuat Israel engaged Christie's, an auction house and private sales broker, to seek a buyer for one pair of its rimonim. Agreement between Jeshuat Israel and Christie's Inc. (Exhibit P195); Trial Tr. vol. 4, 42-43, ECF No. 107 (Testimony of Bertha Ross). In 2011, Christie's negotiated an offer of $7.4 million from the Boston Museum of Fine Arts for the one pair of the Rimonim, which was formalized in a January 31, 2012 letter. Trial Tr. vol. 1, 188, ECF No. 104 (Testimony of David Bazarsky); Trial Tr. vol. 4, 52-53, ECF No. 107 (Testimony of Bertha Ross); Preliminary Sale Agreement (Exhibit P223). Jeshuat Israel's committee concluded that selling the Rimonim at that price would secure the

financial future of Touro Synagogue, the Congregation, and ensure the preservation of public Jewish worship in Newport.   Jeshuat Israel therefore decided to proceed with the sale.   Trial Tr. vol. 4, 53, ECF No. 107 (Testimony of Bertha Ross).   On June 29, 2012, Shearith Israel issued a letter demanding that Jeshuat Israel cease and desist from selling the Rimonim, and this litigation followed.   Trial Tr. vol. 5, 156-57, ECF No. 108 (Testimony of Michael I. Katz); Shearith Israel Letter (Exhibit P231).

## III.   CONCLUSIONS OF LAW

The Court has jurisdiction over this dispute based on the parties' diversity of citizenship and the requisite amount in controversy.   28 U.S.C. § 1332(a) (2012). When sitting in diversity, a federal court must abide by state substantive law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).   The Court therefore turns to Rhode Island law to resolve the issues presented.

### A.   TOURO SYNAGOGUE AND LANDS ARE THE CORPUS OF A CHARITABLE TRUST

The first issue before the Court is ownership of Touro Synagogue.   As explained below, the evidence is clear and convincing that Touro Synagogue is owned in trust for the purpose of public Jewish worship.   *Desnoyers v. Metropolitan Life Ins. Co.*, 272 A.2d 683, 688-91 (R.I. 1971) (holding that certain types of trusts must be proved by clear and convincing evidence).   The charitable trust — established for public Jewish worship over 250 years ago — lives on to this day.

46

1. *Legal Standard*

A "trust" is a term that describes a web of legal relationships among parties and property.  The four basic elements needed to create a trust are a settlor, a trustee, a beneficiary, and some trust property.  A. Hess, G. Bogert, & G. Bogert, *The Law of Trusts and Trustees* § 1 at 5-8 (3d ed. 2007) [hereinafter *Bogert*].  Most often, a settlor creates a trust by giving legal title over trust property to a trustee, while imposing on the trustee a duty to use that property solely for the benefit of a third party, the beneficiary.  *Id.* § 1 at 7.  When the trust is a charitable one, "the beneficiary . . . is the public, or a substantial class thereof, and not the institutions or individuals who obtain and administer benefits from the trust."  *Id.* §1 at 8.

Unlike private trusts, which must have specified beneficiaries, charitable trusts must have a public purpose:

> A fundamental distinction between private and charitable trusts lies in the character of the benefits to flow from their administration.  In private trusts money or money's worth is to be distributed by way of gift to the beneficiaries or in satisfaction of an obligation of the settlor.  In charitable trusts the benefits to be provided through the trust are to be intangible advantages to the public or to some significant class thereof which improve its condition mentally, morally, physically or in some similar manner.  The trustees pay out money and other property not for the personal benefit of the donees, but rather to secure for society certain advantages.

*Bogert* § 362 at 19-20.

Rhode Island defines a charitable trust as "any fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it and subjecting the person by whom the property is held to equitable duties to deal with the property for charitable, educational, or religious purposes."  R.I. Gen. Laws

47

§ 18-9-4.  Therefore, the elements of a charitable trust in Rhode Island are a settlor, a trustee, some trust property, and a duty imposed by the settlor on the trustee to use that property for a charitable, educational, or religious purpose.

Creation of a trust simply requires "a present intent to make a trust or gift at the time . . . [plus] an execution of the intent by some act, [which] . . . must be such as to give a present right or benefit to the donee."  *Desnoyers*, 272 A.2d at 688 (quoting *People's Savings Bank v. Webb*, 42 A. 874 (R.I. 1899)); *see* Br. of Att'y General at 6, July 10, 2015, ECF No. 95.  Creating a trust does not require the settlor to use any special words or perform any particular ceremony.  *Ray v. Simmons*, 11 R.I. 266, 268 (1875).  "The intention to create a trust is the essential thing; this intention must be expressed and must be clearly established by proof, the nature of which naturally varies in different cases."  *Knagenhjelm v. Rhode Island Hosp. Trust Co.*, 114 A. 5, 9 (R.I. 1921).  The court's inquiry into determining whether the intention to create a charitable trust exists should not be derailed by formalism.  *See City of Providence v. Payne*, 134 A. 276, 280 (R.I. 1926) (counseling that equity favors charitable trusts).

The Court must rely on the totality of the "circumstances which appear in evidence" to determine whether property was "intended" to be devoted to a "charitable object."  *Tillinghast v. Council at Narragansett Pier, R.I., of Boy Scouts of Am.*, 133 A. 662, 663 (R.I. 1926).  Even when title to land is "absolute in form," the courts will find "a charitable trust if . . . such appears to have been the [settlor's] intention."  *Town of S. Kingstown v. Wakefield Trust Co.*, 134 A. 815, 816 (R.I.

1926).  Furthermore, "trusts which cannot be upheld in ordinary cases . . . will be established and carried into effect when created to support a gift to a charitable use." *Payne*, 134 A. at 280 (citing *Jackson v. Phillips*, 96 Mass. (14 Allen) 539, 550 (1867)).

Jeshuat Israel argues Shearith Israel is only the legal owner and trustee for Touro Synagogue, which is dedicated to public Jewish worship.  Shearith Israel argues that that it owns Touro Synagogue outright, rather than in trust.  The Court finds for Jeshuat Israel.

### 2.  *Establishing the Trust*

The evidence in this case is clear and convincing: the Touro Synagogue and lands have been the corpus of a charitable trust since the lands were acquired and the Synagogue built.  This charitable trust was established to ensure a permanent place for public Jewish worship in Newport.

The factual circumstances around the purchase of the land and the construction of the Synagogue support the recognition of a trust.  We know that the Newport Jewish community was first "taxed for the purchase of the land," and that the greater Jewish community was later solicited for funds toward the building of a temple. *Gutstein* at 87.  It would defy common sense to think that these funds were gathered so three individuals could enrich their own stock.  Primary documents from the time belie such an implausible assertion. *See, e.g.,* July 13, 1759 receipt for contribution to building the Synagogue (Exhibit P20) (referring to Messrs. Rivera, Hart, and Levy as "trustees for building the Synagogue").  The three men

whose names are on the deed did not own this property outright. Rather, the Jewish community of Newport, organized as Congregation Yeshuat Israel, settled the trust and selected these three men to serve as trustees.

The legal circumstances of the time explain why the deed to the property listed Messrs. Rivera, Hart, and Levy, rather than Congregation Yeshuat Israel, as the grantees. Prevailing law forbade a religious "association . . . in its aggregate name as an organization, [from] hold[ing] real estate or act[ing] as trustee." *Guild v. Allen*, 67 A. 855, 857 (R.I. 1907). Therefore, Yeshuat Israel itself could not own the property. As a workaround, it singled out three leaders to take title to the real estate in its stead. *See Gutstein* at 82-83; *Kusinitz* at 42 (Exhibit D445 at 3). In light of this context, the lack of trust language on the face of the original deed is not indicative of the absence of a trust. *See Malley's Estate v. Malley*, 34 A.2d 761 (R.I. 1943) (disregarding ownership attribution on the face of a document because of circumstantial evidence); *Blackstone Canal Nat. Bank v. Oast*, 121 A. 223, 225 (R.I. 1923) (relying on circumstances of transaction and the relationship between the relevant parties to find existence of a trust).

One need not look far beyond the Last Will and Testament of a revered leader of Congregation Yeshuat Israel, Jacob Rodrigues Rivera, to reach the conclusion that the Jews of Newport intended to establish a trust. In his January 9, 1787 Will, Mr. Rivera stated:

> Also I do hereby declare and make known unto All People, that I have no exclusive Right, or Title, Of, in, or to the Jewish Public Synagogue, in Newport, on Account of the Deed thereof, being made to Myself, Moses Levy & Isaac Harte, which Isaac Harte, thereafter Conveyed his

> One third Part thereof to me, but that the same was so done, meant and intended, in trust Only, to and for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever, THEREFORE, I do for myself and my Heirs hereby remise, release, and forever quit Claim to all exclusive right, title, or Interest therein or thereto and to every part and parcel thereof, Always saving and excepting such right as I have by being A Single Member of that Society.

Rivera Will at 19 (Exhibit D16 at 2).[40]

Mr. Rivera's will recited that the three named purchasers — Messrs. Levy, Hart, and he — had always held legal title only,[41] for the purpose of preserving public Jewish worship. The history of the Jews who built the Synagogue reveals the significance of that purpose. In Newport, Jews no longer had to hide their identities and pretend to believe what others forced upon them. They no longer had to fear persecution and burnings at the stake. Instead, they could gather at a beautiful temple, and say their prayers openly and proudly. Public worship was the embodiment of their freedom from oppression, and they dedicated their Synagogue to that purpose.

In his will, Mr. Rivera does not devise his interest in the Synagogue or declare that he is therein forming a trust. What he does is "declare" that he never

---

[40] The Rivera Will is not a newly discovered archival relic. It is a much-quoted founding document in Touro Synagogue's lore, long familiar to both parties in this dispute. The existence of the trust, apparent from the face of that document, could not come as a surprise to Shearith Israel. It has been reaffirmed many times over by various documents from later in the Synagogue's history, many of which Shearith Israel signed on to. *See infra.*

[41] "Legal title refers to that which 'evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest.' Equitable title, on the other hand, pertains to that which 'indicates a beneficial interest in property.'" *Bucci v. Lehman Bros. Bank, FSB,* 68 A.3d 1069, 1088 (R.I. 2013) (citing *Black's Law Dictionary* 1622 (9th ed. 2009)).

had any "exclusive right or title" to the "Synagogue." He explains that although the deed to the Synagogue named Messrs. Levy, Hart, and him as owners, that this "was so done, meant, and intended, in trust only," for the benefit of "the Jewish Society, in Newport, to be for them reserved as a place of public worship forever." Then, out of an abundance of caution, Mr. Rivera "quit claim[s]" any right to the Synagogue that a court might mistakenly attribute to him because of the language in the deed. Mr. Rivera's will is not a conveyance, but rather it is persuasive evidence that the Synagogue was always the object of a charitable trust from the time it was built to the present.

Tracing the legal ownership of the Synagogue only confirms that position. From a legal standpoint, Moses Levy was the sole trustee for the Synagogue when he died in 1792, because he was the last surviving original trustee. *See Bogert* § 530 at 109 (co-trusteeship usually considered a joint tenancy under the common law). Mr. Levy did not name a successor trustee at his death, likely because his relative Moses Seixas was already taking care of the Synagogue. *See supra*. There are several terms that might describe Moses Seixas' role at that point — de facto trustee, constructive trustee, or trustee de son tort[42] — but suffice it to say that he was subject to the same obligations as the original trustees, and carried out those obligations. *Bogert* § 529 at 104-06; *see also Jones v. Katz*, 325 Ill. App. 65, 80 (Ill. App. Ct. 1945) (holding that an individual who "treated the trust as an obligation to

---

[42] "[T]rustees de son tort are not expressly declared by the settlor to be trustees but rather are deemed to be constructive trustees by operation of law, due to their meddling with trust affairs . . . ." Thomas and Hudson, *The Law of Trusts* ¶ 30.03 (2d ed. 2010).

which he had succeeded . . . and exercised the same duties and responsibilities toward the beneficiaries of the trust as though he were the original trustee" therefore "became successor trustee . . .  either by construction, implication or operation of law . . . .").

After Mr. Seixas' death, Moses Lopez likely took over the role of acting trustee.  When Mr. Lopez left Newport in 1822, the Gould family took over on the ground, the Touro brothers contributed the necessary funding to preserve the Synagogue, and Shearith Israel provided religious oversight from New York.  All those parties — the Gould family, the Touro brothers, and Shearith Israel — served a role in helping the Synagogue survive until Jews were once again practicing within its walls.  By the time that Jews returned to Newport in the late 1800s, Shearith Israel was the lone surviving acting trustee for the Touro Synagogue and lands.

Numerous documents spanning centuries support the conclusion of a trust drawn from Mr. Rivera's Will.  These documents include the 1894 deeds executed by several descendants of the original trustees, the 1903 and 1908 leases, a 1932 enactment by the Rhode Island legislature, the 1945 tri-party agreement, and numerous other references to Touro Synagogue trust throughout history.

The Court next turns to these documents:

- In 1894, in the face of a new Jewish settlement in Newport, Shearith Israel attempted to shore up its legal relationship to Touro Synagogue by drafting deeds and obtaining signatures from the descendants of the

Synagogue's original trustees.   *See supra*.   Several of these deeds explicitly stated that the Synagogue is subject to a trust.   1894 Deeds (Exhibits P50 at 4506, P51 at 4545, and P53 at 84) ("To have and to hold, the above granted premises . . . IN TRUST . . . .").   It is telling that even when Shearith Israel was drafting documents that purported to give it a legal stake in the Synagogue, it acknowledged the existence of a trust.

- Recurring legal disputes between the Newport Jewish community and Shearith Israel about control of Touro Synagogue marked the period at the tail end of the 19th and the beginning of the 20th century.   *See supra*. The culmination of this discord resulted in a lease of the Synagogue by Shearith Israel to Jeshuat Israel for the symbolic price of $1 per year.[43] In that lease, signed in 1903 and renewed in 1908, the representatives of Shearith Israel identified themselves as "Trustees."   1903 Lease (Exhibits P71 at 473 and D150 at 2) and 1908 Leases (Exhibit P76 at 1).   The lease was consistent with the terms of the trust because Shearith Israel obligated Jeshuat Israel to use the Synagogue "for the maintenance of . . . religious services."[44]   *Id.*   These leases show Shearith Israel acting as trustee for Touro Synagogue.

---

[43] As trustee, Shearith Israel had the right and obligation to make the Synagogue available for Jewish worship.   The nominal price of $1 reflected the lessee's equitable right to worship there.

[44] Shearith Israel specifies that the religious services must be conducted in the same manner as those practiced in its own Congregation, which this Court finds is not a requirement of the charitable trust. *See infra*.

- In 1932, the Rhode Island General Assembly enacted legislation exempting from taxation "[t]he property located on the corner of Touro and Division streets in the city of Newport," because the property was "held in trust" and used by Congregation Jeshuat Israel "for religious and educational purposes." Rhode Island Acts and Resolves 427, Jan. 1932 (Exhibit P287 at 3076). This declaration by the Rhode Island Legislature served as a public affirmation of the trust's existence and purpose.

- In 1945, Jeshuat Israel, Shearith Israel, and the United States Government entered into a tri-party agreement about the maintenance of the Synagogue. The agreement recognized that "the Shearith Israel Trustees [are] holders of fee simple title *upon certain trusts* in the Touro Synagogue." Tri-Party Agreement at 1 (Exhibit D240 at 1) (emphasis added). By this recognition, Shearith Israel again acknowledged that its legal title to Touro Synagogue is subject to obligations under "certain trusts." The remainder of the document reveals that Mr. Rivera's 1759 Will dictated the substance of those obligations. In the agreement, Shearith Israel Trustees covenanted to ensure:

> [t]hat the public shall be admitted to all parts of the said Touro Synagogue . . . so far as consistent with *the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever* and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel . . . .

*Id.* at 4 (emphasis added).  While the second part of the duty, (to worship according to certain "rituals, rites and customs"), is self-imposed by the 1894 deeds Shearith Israel drafted, the emphasized portion comes directly from Mr. Rivera's Will.  The Tri-Party Agreement is effectively an admission by Shearith Israel that it is obligated by the terms of Mr. Rivera's Will.[45]

- As recently as 1996, Shearith Israel's vice president Alvin Deutsch (who later became president) reaffirmed that his Congregation is bound by the trust when he referred to Shearith Israel as "trustee of the building" in conversation with Jeshuat Israel's then-president.  Trial Tr. vol. 1, 157, 160, ECF No. 104 (Testimony of David Bazarsky).  Mr. Bazarsky's testimony is uncontroverted on that point.

\* \* \*

Taking all the evidence together, the "proof of an intention" on the part of the Newport Jewish community "to establish a trust" for public worship is "clear and satisfactory." *Blackstone Canal*, 121 A. at 225.  The history, the documents, and the actions of the parties involved with Touro Synagogue confirm that it was built by the community to provide a permanent place for public Jewish worship in Newport,

---

[45] Jeshuat Israel's minutes from the time of the agreement evidence that incorporating language from Rivera's will and "[s]ubstituting the word trustees for ownership" were thoughtful revisions to an earlier draft, and that "the revised agreement was accepted by the C[ongregation] S[hearith] I[srael]."  Jeshuat Israel's minutes (Exhibit P89 at 2).  Shearith Israel's minutes note that Shearith Israel's Trustees and Clerk signed the agreement, "who hold the property in trust . . . ."  Shearith Israel's minutes (Exhibit P91).

**AD57**

and is held in trust for that purpose. Certainly, Shearith Israel has helped the Synagogue remain dedicated to that purpose during the time when there was no permanent Jewish settlement in the city. By its actions, Shearith Israel assumed the role of trustee over the Synagogue, and continued in its role when Jews returned to Newport. However, Shearith Israel never did, nor could it, convert its role as trustee into an equitable title to the Synagogue. Shearith Israel is obligated — just as Messrs. Rivera, Levy, and Hart once were — to preserve the Synagogue for the benefit of public Jewish worship in Newport. The Synagogue itself is the corpus of a charitable trust dedicated to that venerable purpose.

### 3.    *The Trust is for a Valid Charitable Purpose*

The foregoing section sets forth the facts and law establishing that the Touro Synagogue and lands are the corpus of a trust; that the settlor was Congregation Yeshuat Israel; and that the original trustees were Messrs. Rivera, Hart, and Levy. The final element to finding this trust valid is that it must have a charitable purpose. This one clearly does. "It is well established that a trust creating a place for public worship for the benefit of an indefinite number of persons is a good and valid trust to a charitable use." *Buchanan v. McLyman*, 153 A. 304, 305 (R.I. 1931); *see also Brown v. Meeting St. Baptist Soc'y*, 9 R.I. 177 (1869); *Guild v. Allen*, 67 A. 855, 857 (R.I. 1907); *Brice v. All Saints Mem'l Chapel*, 76 A. 774, 781 (R.I. 1910); *Todd v. St. Mary's Church*, 120 A. 577, 578 (R.I. 1923).[46]

---

[46] Dedicating property for a charitable religious purpose was recognized under Rhode Island's common law, and is explicitly permitted under the state's current statutory law. R.I. Gen. Laws § 18-9-4 ("'Charitable trusts' . . . means any fiduciary relationship . . . subjecting the person by whom the property is held . . . to deal with

**AD58**

The best evidence about the purpose of this trust comes from the time closest to its creation, which in this case is Mr. Rivera's Will. The will recited that the property is "reserved as a Place of [Jewish] Public Worship forever." Rivera Will (Exhibit D16 at 2). Because the trust created a place for public worship for an indefinite number of persons, the Court concludes it has a valid charitable purpose.

### 4. Shearith Israel's Arguments against the Trust Are Unpersuasive

Shearith Israel has taken the position that no trust exists and that it alone owns the legal and equitable title to the Synagogue. Am. Answer and Countercl., Dec. 6, 2012, ECF No. 8 at 7, 9; Shearith Israel's Post-Trial Mem., ECF No. 90 at 60-68; Trial Tr. vol. 9 at 156-57, ECF No. 112 (Shearith Israel's Closing Argument). It poses five arguments against the existence of a trust. None is persuasive.

---

the property for . . . *religious* purposes.") (emphasis added). This purpose would also likely have been recognized as valid in the Colony of Rhode Island and Providence Plantations at the time of the trust's formation. *See The Queen, the Attorney General, and the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform*, 11 U. Fla. J.L. & Pub. Pol'y 131, 139 (2000) (characterizing religious charities as predating even the Statute of Elizabeth of 1601); 43 Eliz. c. 4, 1601 (liberalizing charitable trust law); *Comm'rs of Income Tax v. Pemsel*, (1891) A.C. 531; David Villar Patton (listing the advancement of religion as a valid charitable purpose under the Statute of Elizabeth); *Derby v. Derby*, 4 R.I. 414, 437-39 (1856) (reciting the history of Rhode Island's "Act to Redress the Misemployment of Lands, Goods, and Stocks of Money, heretofore given to certain Charitable Uses" (1721)); Howard S. Miller, *The Legal Foundations of American Philanthropy 1776-1844*, The State Historical Society of Wisconsin Madison, 1961, 17 (describing Rhode Island's 1721 Act as "even more permissive" than the Statute of Elizabeth). *But see Bogert* § 376 at 153 (questioning whether Statute of Elizabeth permitted charitable trusts for general religious uses and citing Gray, J., in *Jackson v. Phillips*, 96 Mass. (14 Allen) 539 (1867)). Even if the colonial courts would not have recognized the trust in 1759, the trust persisted and is valid under Rhode Island's current common and statutory laws.

First, Shearith Israel argues that it became the owner of Touro Synagogue when the Jewish community left Newport in the 1820s, and confirmed its exclusive ownership via the 1894 deeds. Shearith Israel's Proposed Findings of Fact and Conclusions of Law, June 29, 2015, ECF No. 91 at 35-40, 43-46. That argument does not bear out in law or fact. Touro Synagogue was the corpus of a charitable trust from its inception, and nothing that Shearith Israel did or the trustees' descendants signed, altered that trust. *See Wakefield Trust Co.*, 134 A. at 817 (holding that passage of time, period of disuse, and even statutory enactments do not alter title of property owned in a charitable trust.)

Shearith Israel asserts that the 1894 deeds conveyed full title and ownership of the Synagogue to it. However, because the Synagogue and lands were always owned in trust, neither the original trustees nor their descendants ever held equitable title, and so did not have full title to convey. Moreover, because the descendants had never exercised the responsibilities of a trustee, they could not transfer that role. Shearith Israel assumed legal title and the role of trustee not because of the 1894 deeds, but because of its active involvement in the affairs of the Touro Synagogue when no Jews remained in Newport. The deeds are legal nullities with absolutely no effect on the rights adjudicated in this litigation.[47]

---

[47] Even if the 1894 deeds had some legal significance, they would not alter the outcome of this suit. Contrary to Shearith Israel's assertion that they confirmed its legal and equitable ownership, several of the deeds only purported to give Shearith Israel ownership "in trust." Furthermore, Shearith Israel has not produced evidence that it has collected signatures from all of Moses Levy's descendants. These shortcomings alone would have precluded the deeds from giving Shearith Israel equitable ownership of the Synagogue.

Shearith Israel's second argument is that two court decisions from the early 1900s preempted several of the claims and issues in this case. Shearith Israel's Post-Trial Mem., ECF No. 90 at 77-84. The Court disagrees. The first suit was a 1901 replevin action over a single Torah for which no primary documents survive. *Kusinitz* at 53 (Exhibit D445 at 14). The second was a 1903 federal action, which was dismissed on demurrer. Op. on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit D143).

No claim or issue preclusion can apply to the 1901 replevin action because the Court does not have sufficient information about the issues in dispute or the legal reasoning used to decide that case. The case appears to have concerned a single, recently purchased Torah scroll, and the outcome appears to have permitted the scroll to remain in Touro Synagogue. *Kusinitz* at 53 (Exhibit D445 at 14). The outcome of that case does not bar the Court from finding the existence of a charitable trust or deciding the ownership of the Rimonim.

*David v. Levy*, which the court dismissed on demurrer in 1903, also does not result in claim or issue preclusion. As Shearith Israel correctly identified, a dismissal on demurrer is "the equivalent today of a motion to dismiss for failure to state a claim." Shearith Israel's Post-Trial Mem., ECF No. 90 at 79; *see also* 5 B C. Wright & A. Miller, *Federal Practice and Procedure* § 1355 at 351 (3d ed. 2004). For claim preclusion to apply, a court's judgment must be "upon the merits." *Cromwell v. Sac Cty.*, 94 U.S. 351, 352 (1876). While today, dismissals for failure to state a claim are considered on the merits, this is largely the result of the liberalized

**AD61**

pleading requirements and the right of amendment afforded by the Federal Rules of Civil Procedure established in 1938.  18 J. Moore, *Moore's Federal Practice – Civil* § 131.30[3][e] at 108.1, 109 (Matthew Bender 3d ed. 2016).  *David v. Levy* was decided well before that, when such dismissals were not generally considered upon the merits.  *See Gould v. Evansville & C. R.R. Co.*, 91 U.S. 526, 533-34 (1875).  Therefore, it would not be equitable to apply preclusive effect to a decision that did not carry such effect when it was made, and the Court declines to do so now.[48]  18 *Moore's Federal Practice – Civil* § 131.30[3][e] at 108.1, 109.

In its third argument against the existence of a trust, Shearith Israel challenges the veracity of Mr. Rivera's claim in his will that Mr. Hart earlier conveyed his one-third interest to Mr. Rivera.  Shearith Israel's Post-Trial Mem., ECF No. 90 at 62 ("[b]ut no independent evidence of [Mr.] Hart's will exists – no evidence of the alleged conveyance.").  At the outset, the Court notes that this point

---

[48] The court in *David v. Levy* appears to grant the demurrer for four reasons, none of which goes to the merits.  The reasons are 1) none of the plaintiffs claimed to be a Jew, 2) the plaintiffs did not allege sufficient facts that would give them an equitable or legal interest in the Synagogue or lands, 3) the plaintiffs claimed to be the Jews of Newport rather than members of the Jewish Society in Newport, and 4) the plaintiffs proceeded with unclean hands (they had broken into the Synagogue).  Op. on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit D143).  The first three reasons for dismissal do not go to the merits because an amended complaint could have easily addressed them.  The last reason — unclean hands — also does not go to the merits or result in claim preclusion.  *See Keystone Driller Co. v. Nw. Eng'g Corp.*, 294 U.S. 42, 44 n.2 (1935); *see also Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1377 (Fed. Cir. 2001).  Finally, to the extent that *David v. Levy* bases the demurrer on other grounds, those grounds are not decipherable to this Court and are too ambiguous to bar the current litigation.  *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 380 (D.C. Cir. 1987) (affirming refusal to apply res judicata because decision "was ambiguous on its face").

is not relevant to the outcome of this case. The only interest that Mr. Hart ever owned was his legal interest as trustee, and nothing in this case turns on whether Mr. Hart conveyed this interest to Mr. Rivera. Furthermore, there is absolutely no evidence suggesting that Jacob Rodrigues Rivera mischaracterized the original transaction or fraudulently conveyed property that belonged to Mr. Hart and Mr. Levy. *See Blackstone Canal*, 121 A. at 225 (noting that preference is to be given an interpretation "which assumes that [an] act was performed with a right rather than a wrong intention."). It appears much more likely that Mr. Hart conveyed his legal interest to Mr. Rivera, than that Mr. Rivera fabricated this conveyance in a will that was then publicly probated.[49] Accordingly, the Court finds that Mr. Hart did convey his legal interest to Mr. Rivera.

Fourth, Shearith Israel protests that the will of Moses Levy "makes absolutely no mention of any trust," which "makes patently clear that at least 1/3 of the Touro land cannot possibly be held in trust." Shearith Israel's Post-Trial Mem., ECF No. 90 at 62. This Court finds more persuasive, given all the circumstances in this case, the explanation that Mr. Levy's will did not mention the Touro land

---

[49] Mr. Rivera was a man who occupied one of the "highest position[s] in the commercial, social, and religious life of the growing and prospering Jewish community of Newport before the American Revolution," and was eulogized as a man "very much respected for his integrity and benevolence." *Gutstein* at 71, 166 (quoting a contemporaneous obituary in a Newport newspaper). Gutstein recounts an anecdote about Mr. Rivera's famed scrupulousness. Mr. Rivera's business had failed and he needed recourse to the bankrupt act, which eliminated his debts. When Mr. Rivera again entered into business and regained his wealth, "he arranged a banquet to which he invited all his former creditors. When all were seated at the banquet table and had removed the napkins from the plates, they found a check for the amount of their debts, together with interest on the money for the entire time." *Id.* at 166.

because Mr. Levy never believed that he had any equitable ownership interest in it, and therefore had nothing to convey.  That explains why Mr. Levy did not devise his purported one-third interest to anyone, despite devising his other real property interests.  *See* Levy Will (Exhibit D18 at 2-3) (devising interests in Newport dwelling house, spermacetae factory, and adjoining lands).  When Mr. Levy's will is read in light of Mr. Rivera's, which three years earlier explained the nature of the legal relationship between the original trustees and the Synagogue, it is clear that Mr. Levy also viewed himself as only a trustee.  Before he died, his duties in that capacity had already passed into the able hands of his relative, Moses Seixas.  *See supra.*

Mr. Levy did mention the Synagogue in his will once, forgiving all debts owed to him for the construction of the Synagogue, on condition that prayers are said in his name.  Levy Will (Exhibit D18 at 1).  This statement is further proof that the Synagogue was owned in trust, and that Messrs. Rivera, Hart, and Levy were its trustees.  There are two reasons for this.  First, this statement shows that Mr. Levy viewed his contributions to the Synagogue's construction as a loan to be repaid, rather than as an investment in its property value, as would have been expected if he owned an equitable interest in the Synagogue.  Second, the condition requires the Jews of Newport to pray in Mr. Levy's name, in exchange for the discharge of the debt, which implicitly recognizes the Jews of Newport as the beneficial owners of the Synagogue.  This condition is consistent with the finding that Touro Synagogue is the corpus of a charitable trust.

Fifth, Shearith Israel argues that the 1903 and 1908 leases, which identified Shearith Israel as the landlord and Jeshuat Israel as the tenant, preclude finding the existence of a charitable trust.  That is not so.  There is nothing incompatible about Shearith Israel's role as a charitable trustee and its decision to lease the Synagogue to Jeshuat Israel for the nominal price of $1 per year.  *See In re Ryan's Estate*, 294 N.Y. 85, 91 (1945) (referencing an arrangement where the beneficiary renting the trust's property reduced his rent from approximately $10,000 per year to a symbolic $10).  On the contrary, by leasing the Synagogue at no profit to a group that uses it for public Jewish worship, Shearith Israel was executing its duties as the charitable trustee.  *Cf. Ahuna v. Dep't of Hawaiian Home Lands*, 64 Haw. 327, 338 (1982) (requiring the state to lease land to eligible native Hawaiian trust beneficiaries).

Shearith Israel has pointed to no evidence, direct or circumstantial, that would lead this Court as fact finder to conclude that Shearith Israel possesses legal and equitable title to Touro Synagogue.  The Court concludes, as a matter of fact and law, that the Touro Synagogue and lands are the corpus of a charitable trust, and that the original trustees were Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart.  Neither the Synagogue nor the lands ever belonged to Messrs. Rivera, Levy, and Hart alone — each had only an equitable interest equal to that of any other single member of their community.  Shearith Israel has only ever served as trustee for that charitable trust, which has operated continuously in fact and law for over

250 years, and whose valid purpose is best enunciated in Mr. Rivera's Will: "to be . . . reserved as a Place of [Jewish] Public Worship forever." Rivera Will (Exhibit D16).

### B.  JESHUAT ISRAEL OWNS THE RIMONIM

#### 1.  *Summary*

Jeshuat Israel proved by a preponderance of the evidence that it is the owner of the Rimonim. The Court finds that Myer Myers made the Rimonim for Yeshuat Israel; that Yeshuat Israel transferred the Rimonim to Shearith Israel for safekeeping, with instructions to return them to the Jewish congregation thereafter worshiping in Newport; and that Shearith Israel complied with those instructions. As the Congregation worshiping in Newport, Jeshuat Israel became the owner of the Rimonim. Moreover, even absent the proof of Jeshuat Israel's ownership, its continuous possession of the Rimonim for the past century entitles it to a strong presumption of ownership, which Shearith Israel did not come close to overcoming. The Court concludes that Jeshuat Israel owns the Rimonim and is free to do with them as it wishes.

#### 2.  *Proof of Ownership*

Myer Myers made the Rimonim between the years 1766 and 1776 for use by Yeshuat Israel.[50]  While there is no direct evidence about the provenance of the Rimonim, the Court concludes that Yeshuat Israel originally owned them for three reasons. First, Yeshuat Israel's payment to Mr. Myers for "mending rimonim," at a time when there were several practicing silversmiths in Newport and Boston,

---

[50] The maker's mark on the Rimonim dates their creation to that year interval. *Barquist* at 154, 160, and 257 (Exhibit 150 at 3248, 3254, and 3265).

suggests that the Congregation was employing the Rimonim's original maker to make the repair. Yeshuat Israel ledger (Exhibit P30).[51] Second, as discussed *supra*, Shearith Israel took possession of the Rimonim in the 1820s for safekeeping, and sometime between then and 1869, engraved the words "Newport" on them, to differentiate them from a similar pair that it owned. *Barquist* at 160 (Exhibit P150 at 3254). The most natural interpretation of this act is that Shearith Israel regarded the Rimonim as belonging to Newport's congregation. This interpretation is consistent with Shearith Israel's return of the Rimonim to Newport sometime after 1869. *See supra*. Finally, there is a unanimous scholarly consensus, apart from Shearith Israel's trial experts, that the Rimonim originally belonged to Congregation Yeshuat Israel.[52] Trial Tr. vol. 7, 45, 53-76, ECF No. 110 (Testimony of Vivian Mann) (admitting scholarly consensus against her); *see, e.g., Barquist* at 154 and 160 (Exhibit 150 at 3248 and 3254) (attributing the Rimonim to "Yeshuat (now Jeshuat) Israel"); Guido Schoenberger, *The Ritual Silver Made by Myer Myers* 5 (1953) (Exhibit P99) (discussing "pair of [Myer Myers'] rimonim made circa 1770

---

[51] There were practicing silversmiths at that time in Newport and Boston. Trial Tr. vol. 7, 109, ECF No. 110 (Testimony of Dr. Mann).

[52] The consensus is so unanimous that when Shearith Israel filed its first pleadings in this case, it referred to Yeshuat Israel as the "original possessor of the Rimonim." Answer and Countercl. at 10, Dec. 4, 2012, ECF No. 6; Am. Answer and Countercl. at 11, Dec. 6, 2012, ECF No. 8. It made the same statement in the later-filed and since-dismissed Southern District of New York action. Compl. at 6, *Shearith Israel v. Jeshuat Israel*, No. 12-CV-8406 (S.D.N.Y.), ECF No. 1.

Shearith Israel has since moved to excise these statements from its pleadings in this case by moving to amend its complaint. Defendant's Motion to Amend (ECF No. 92) is GRANTED. The amendment does not alter that Shearith Israel previously acknowledged Yeshuat Israel's original possession of the Rimonim in this action. In addition, Shearith Israel never amended this statement in its pleadings filed in the New York action.

for the new Synagogue at Newport"); Jeanette W. Rosenbaum, *Myer Myers, Goldsmith 1723-1795* 24, 33, 36 and 67 (Philadelphia, The Jewish Publication Society of America, 1954) (Exhibit P100) (attributing the Rimonim to Touro Synagogue since 1765); Tom L. Freudenheim, *Myer Myers: American Silversmith* (The Jewish Museum, 1965) (Exhibit P114 at 1577) (explaining connection between Mr. Myers and Touro Synagogue); Library of Congress Exhibition: From Haven to Home: 350 Years of Jewish Life in America 2 (Exhibit P172 at 3226) (stating that the Myers rimonim belong to Newport's Touro Synagogue); Rabbi Marc D. Angel,[53] *Remnant of Israel* 63 (Riverside Book Company, 2004) (Exhibit P162) (stating that Mr. Myers made rimonim for Newport); Rabbi Marc D. Angel, *The Torah Bells of Myer Myers: Ancient Traditions in a New Land* 1, 3 (Lecture at Yale University Art Museum, 2001) (Exhibit P158) (same); Angel Dep. 41:9–42:13 (July 17, 2014)[54] (same); Edinger Dep. 91:23–92:19 (naming Yeshuat Israel as Rimonim's original possessor).

Furthermore, there is simply no persuasive evidence in the record that these Rimonim belonged to any person or entity except Yeshuat Israel during the early colonial period.[55]   The Court concludes by a preponderance of the evidence that

---

[53] Rabbi Marc D. Angel has served as Congregation Shearith Israel's rabbi since 1969.  Angel Dep. 5:25–7:9 (July 17, 2014).

[54] Shearith Israel's objections to the portions of Rabbi Angel's testimony relied upon by this Court are overruled.

[55] Dr. Mann, Shearith Israel's expert, differentiated between original possession of the Rimonim, which she conceded might have been with Yeshuat Israel, and ownership, which she testified was with Shearith Israel.  Trial Tr. vol. 7, 158-60, ECF No. 110 (Testimony of Vivian Mann).  The Court finds this difference is pure

Myer Myers made the Rimonim for Newport's Synagogue. Yeshuat Israel used the Rimonim before regular services there ended in 1793. Sometime after 1793, the Rimonim were transported to New York, where Shearith Israel took possession of them for safekeeping. Shearith Israel agreed to store Yeshuat Israel's religious items, including the Rimonim, which were "to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue [a]t New Port Rhode Island." Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3, and Exhibit P38) (discussing the four Torah scrolls that Yeshuat Israel deposited with Shearith Israel in 1833).

By accepting Yeshuat Israel's religious items under these conditions, Shearith Israel assumed the obligations of a gratuitous bailee. *See Don-Lin Jewelry Co. v. The Westin Hotel Co.*, 877 A.2d 621, 624 (R.I. 2005) (describing gratuitous bailee as possessor of personalty subject to instructions for dealing with it without remuneration). The terms of bailment instructed Shearith Israel to deal with the Rimonim according to Yeshuat Israel's directions, which it did by redelivering them to the congregation thereafter worshiping at Newport Synagogue. *Id.* This action terminated Shearith Israel's obligations as bailee, and terminated any relationship it had to the Rimonim. Jeshuat Israel has proven that it is the owner of the Rimonim.

---

speculation, and the record is devoid of any support for it. The Court finds that Yeshuat Israel was the original owner and possessor of the Rimonim.

### 3. *Presumption of Ownership*

One of the few undisputed facts in this litigation is that for over 100 years, the Rimonim have been in the possession of Congregation Jeshuat Israel. Jeshuat Israel's Prop. Findings of Fact, June 29, 2015, ECF No. 94 at 25 and Shearith Israel's Prop. Findings of Fact, June 29, 2015, ECF No. 91 at 72.[56]  Even without the Court's findings about the provenance of the Rimonim, possession alone, especially of that length, entitles Congregation Jeshuat Israel to a strong presumption of ownership. *Hamilton v. Colt*, 14 R.I. 209, 212 (1883) ("the introduction of any proof . . . by the defendant, under his plea of property, to the action of replevin, is entirely unnecessary, his title by possession being sufficient until the plaintiff can show a better title . . . ."); *see also Baxter v. Brown*, 59 A. 73, 74 (1904) (requiring plaintiff to show "good title from some unimpeachable source in order to overcome the presumption of ownership which arises from occupation" in

---

[56]  Over this entire time, Jeshuat Israel not only used the Rimonim in its services, but also exercised various other responsibilities of ownership with respect to them.  In 2001, Jeshuat Israel paid $25,000 for the restoration of the Rimonim. Trial Tr. vol. 1 at 147, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel also paid the insurance premiums for the Rimonim, and conducted appraisals to ensure that they had adequate insurance. *Id.* at 155. Jeshuat Israel also facilitated displays of the Rimonim by loaning them to various museums and exhibitions, where the Rimonim were always attributed to Touro Synagogue or Congregation Jeshuat Israel. *See, e.g.,* 1953 Boston MFA catalogue (Exhibit P97 at 1961); 1954 Brooklyn Museum catalogue (Exhibit P101 at 3720); 1955 Rhode Island School of Design catalogue (Exhibit P103 at 1390); 1965 Jewish Museum in New York catalogue (Exhibit P114 at 1581); 2001 Yale catalogue (Exhibit P150 at 3248).  The Rimonim are currently on loan at the Boston Museum of Fine Arts.  Trial Tr. vol. 3 at 203-04, ECF No. 106 (Testimony of Bertha Ross); MFA Display (Exhibit D564). When not on display, Jeshuat Israel now stores the Rimonim in a safety deposit box.  Trial Tr. vol. 1, 133, ECF No. 104 (Testimony of David Bazarsky); Trial Tr. vol. 3, 63-66, ECF No. 106 (Testimony of Michael Pimental).

**AD70**

an ejectment action); *In re J. K. Chemicals, Inc.*, 7 B.R. 897, 898 (Bankr. D.R.I. 1981) ("the general rule [is] that possession of property raises a presumption of ownership").   Shearith Israel is unable to overcome the presumption in favor of Jeshuat Israel.

The purpose, pedigree, and good sense of this presumption of ownership were discussed at length in a Fourth Circuit case that bears key similarities to our own. *Willcox v. Stroup*, 467 F.3d 409 (4th Cir. 2006).   In that case, the plaintiff filed for a declaratory judgment that certain historic documents, which were valued at $2.4 million and had been in his family's possession for over 140 years, were part of his estate.   The State of South Carolina contended that these documents, concerning two of its Civil War-era governors, constituted public property and therefore belonged to the State.   The Fourth Circuit could have been writing about the Rimonim when it observed:

> The exceptional nature of the [items] in dispute — their early vintage, their unknown history — presents issues distinct from those of the typical personal property case.   Without the benefit of clear chain of title, evidence of original ownership, eyewitness testimony, and any number of documentary aids usually helpful in the determination of ownership, the court must utilize the legal tools that remain at its disposal.   In this situation, tenets of the common law that usually remain in the background of ownership determinations come to the forefront, their logic and utility revealed anew.

*Id.* at 412.

Those common law tenets dictated that long-standing "possession . . . trigger[ed] the presumption [ ] of ownership." *Id.* at 413.   The court in *Willcox* noted that this presumption, often stated as the "truism" that "possession is nine-tenths of

the law" is nearly as old as the common law itself. *Id.* at 412 (citing a collection of adages from 1616 and other sources); *see also McFarland v. Brier*, 850 A.2d 965, 968 (R.I. 2004) (citing approvingly "the old saw that 'possession is nine-tenths of the law'"). The Fourth Circuit summarized that "the presumption of ownership in the possessor[ ] resolves otherwise insoluble historical puzzles in favor of longstanding distributions and long-held expectations. Such a rule both protects the private interests of longtime possessors and increases social utility." *Willcox*, 467 F.3d at 414. The court then ruled in favor of the plaintiff, finding that the State had adduced insufficient evidence "to rebut the strong presumption of possession." *Id.* at 417. Faced with the same burden to overcome over 100 years of uncontested possession, Shearith Israel has also failed to meet the mark.

### 4.    *Shearith Israel's Arguments for Ownership*

To overcome Jeshuat Israel's presumption of ownership, Shearith Israel mounts an effort to prove better title to the Rimonim. Shearith Israel introduced testimony from two experts in support of its position.[57] Relying on the experts' testimony, Shearith Israel cited "three junctures during which Shearith Israel would have obtained ownership rights to the [R]imonim." Shearith Israel's Post-Trial Mem., ECF No. 90 at 53. These three junctures are: 1) "Shearith Israel paid for the [R]imonim in 1765," 2) "title to the Touro Synagogue and its contents passed

---

[57] Shearith Israel's experts were Dr. Vivian Mann and Dr. Linford Fisher. Dr. Mann is a professor of Jewish Art at the Jewish Theological Seminary in New York. Trial Tr. vol. 6, 97-98, ECF No. 109 (Testimony of Dr. Mann). Dr. Fisher is an assistant professor of history, with a focus on religious history, at Brown University. Trial Tr. vol. 8, 11, ECF No. 111 (Testimony of Dr. Fisher).

to Shearith Israel in the 1820s," and 3) "Shearith Israel reinforced its title to the Touro Synagogue . . . and its contents [including the Rimonim], in 1894 by obtaining Deeds of Conveyance." *Id.* Reviewing each juncture in turn, the Court determines that Shearith Israel failed to prove better title to the Rimonim.

> a.   *Failure to Prove that the Rimonim Were Made for Shearith Israel*

Before this lawsuit, every scholar who had ever studied the Rimonim had concluded that the Rimonim originally belonged to the ancient Newport Congregation Yeshuat Israel. Trial Tr. vol. 7, 45, 53-76, ECF No. 110 (Testimony of Dr. Mann); *see supra.* Litigation has altered Shearith Israel's view of this settled historical opinion.[58] Based on its experts' testimony, Shearith Israel now maintains that Myer Myers made the Rimonim for its own Congregation and denies that Congregation Yeshuat Israel ever owned or even possessed the Rimonim.

The lynchpin of Shearith Israel's novel theory is a record in its 1765 accounting ledger, which reads, "Cash paid Myer Myers Balla. of his accot. passed £36[.]4[.]1~." Shearith Israel ledger (Exhibits D9 and D9A). Dr. Mann singled out this record to argue that it must have been a payment for the Rimonim. Dr. Mann pointed to the notation, timing, amount, wording, and circumstances of this notation as evidence for her position. On cross-examination, Dr. Mann's position crumbled as Jeshuat Israel demonstrated that this record was actually a repayment

---

[58] "And, on information and belief, Shearith Israel did say that it believed at the beginning of the lawsuit, before we *spent countless amounts finding the evidence and paying the experts to tell us what we think* — what the facts are, that Yeshuat Israel was the original possessor." Trial Tr. vol. 1, 61, ECF No. 104 (Shearith Israel's Opening Argument) (emphasis added).

of Myer Myer's advance to the Congregation in his capacity as president, to cover Shearith Israel's cash shortfall from the previous year.  This payment had nothing to do with the Rimonim.  The Court is persuaded that Jeshuat Israel's position is factually correct.

Dr. Mann acknowledged that Myer Myers was the parnas (president) of Shearith Israel in 1764.  Trial Tr. vol. 7, 101, 105, ECF No. 110 (Testimony of Dr. Mann); David and Tamar De Sola Pool, *An Old Faith in the New World: Portrait of Shearith Israel 1654-1954* 502-03 (Columbia University Press 1955) (Exhibit P102 at 3193-94).  She also acknowledged the practice at Shearith Israel that whenever the Congregation's debits exceeded its credits at the end of a year, the sitting President would cover that difference, and the Congregation would repay that same amount in the next year.  Trial Tr. vol. 7, 106, ECF No. 110 (Testimony of Dr. Mann).

In 1764, the difference between Shearith Israel's credits and debits was exactly £36.4.1.  Shearith Israel ledger (Exhibit P23).  Shearith Israel's debits, which appeared on the left side of its ledger, included such expenses as cleaning the Synagogue and purchasing wood and a ladder.[59]  *Id.*  They totaled £246.2.2.  *Id.*  On the right side of the ledger are Shearith Israel's credits from various sources of

---

[59] The first expense on the debit side is actually a payment to the previous year's president, with the notation, "To Cash Paid Mr. Jacob Franks his Ballance 59.12.4." Shearith Israel ledger (Exhibit P23); David and Tamar De Sola Pool, *An Old Faith in the New World: Portrait of Shearith Israel 1654-1954* 502 (1955) (Exhibit P102 at 3193) (listing Jacob Franks as the president in 1763-64, immediately before Myer Myers); Trial Tr. vol. 7, 102-03, ECF No. 110 (Testimony of Dr. Mann).  The notation for this payment to Jacob Franks is similar to the notation for the payment to Myer Myers in 1765.

income.  *Id.*   These credits include cash received for rent, payments from outstanding debts, cash from the charity box, and the year's offerings from the congregants.  *Id.*  The total credits in 1764 were £209.18.1.  *Id.*  Below that amount, still on the credit side of the ledger, which tallies up the Congregation's sources of income, is the notation "Ballance Due to Myer Myers [£]36.4.1."  *Id.*  When the ledger pages are viewed side-by-side, the conclusion is inescapable that Myer Myers contributed £36.4.1 in 1764 to cover the Congregation's deficit, as was expected of him in his role as President of Shearith Israel.



Shearith Israel ledger (Exhibit P23) (left side) (boxes added).



Shearith Israel ledger (Exhibit P23) (right side) (boxes added).

Confirmation of this conclusion, if any is needed, appears in Shearith Israel's minutes and ledger for the next year. At the beginning of the next Hebrew year, Shearith Israel's minutes contain the following notation: "At a meeting of the assistants with the Parnassim [presidents] the following articles were agreed to, and resolved— 1st That Mr Myer Myers may be paid the Ballance of his Sedakah accot: £ 36.4.1."[60] The Lyons Collection 88 (American Jewish Historical Society No. 21 Vol. 1, 1913) (Exhibit P78 at 3391). And in turn, the first expense tallied on the debit side of Shearith Israel's ledger for the next year is "Cash paid Myer Myers Balla. of his accot. passed £36[.]4[.]1~." Shearith Israel ledger (Exhibits D9 and D9A). Given this trail of documents, it is incredible that Dr. Mann concluded that

---

[60] While sedakah usually means "charity" in Hebrew, the "Holy Sedakah" was also "the name given to all the incoming disbursements of [Shearith Israel]." Trial Tr. vol. 6, 136, ECF No. 109 (Testimony of Dr. Mann). The Court concludes that in the quotation above, the word "Sedakah" refers to the debt owed Myer Myers for covering the Congregation's budget shortfall.

this payment is anything but a reimbursement of Myer Myers' previous year's advance for the Congregation's deficit. The Court finds Dr. Mann's testimony and opinions on this topic not credible.[61]



Shearith Israel ledger (Exhibit D9) (left side) (boxes added).

---

[61] Although clearly a learned scholar, the Court discounts Dr. Mann's opinions because at trial she was a zealot rather than an objective expert witness. She was often blind to the many contrary facts. Moreover, her trial testimony differed from her prior testimony in important respects. *See id.* at 39-40 (changing her position about existence of a record dated 1910 or before that attributed the Rimonim to Shearith Israel), 60 (denying that Dr. Barquist is a recognized authority on Myer Myers after naming him as an authority), 129-31 (changing her position on the significance of the Rimonim's "Newport" inscription), 141 (refusing to answer a question she had previously answered in the affirmative), 143-44 (same), 152-53 (same), 203-04 (stating that it is inappropriate for a historian to ignore contrary evidence or only look at part of the available evidence, after saying the opposite at deposition). When quoting primary documents in her report, Dr. Mann simply excised portions not helpful to her position. *Id.* at 32, 115-16. She admitted to speculating in her explanations for parties' actions. *Id.* at 139. She also admitted that she is not an expert on accounting ledgers, and that she did not know which side of a ledger debits and credits generally occupy. *Id.* at 30-31. For all these reasons, the Court found her testimony not credible.

Dr. Mann also found persuasive the timing of the 1765 payment to Myer Myers, which occurred within the 11-year period between 1764 and 1775, when Mr. Myers used the particular maker's mark that appears on the Rimonim at issue. Trial Tr. vol. 6, 110-11, 128, 132, and 143-44, ECF No. 109 (Testimony of Dr. Mann). More persuasive to the Court is that Mr. Myers was Shearith Israel's president in 1764, and was responsible for covering the Congregation's budget shortfall, which equaled exactly the amount that he was paid in 1765.

Dr. Mann also supported her theory about the 1765 payment with some back-of-the-envelope calculations suggesting that £36.4.1 would have been a fair price for Rimonim. *Id.* at 135-38, 143-44. Jeshuat Israel pointed to significant flaws in her analysis, including problems with the price of silver and the weight of the Rimonim used in her calculations, all of which the Court finds further discredited her analysis. Trial Tr. vol. 7, 77-85, ECF No. 110 (Testimony of Dr. Mann); *see also* John J. McCusker, *Money and Exchange in Europe and America 1600-1775* (1978) (Exhibit P135) (listing silver prices for relevant years).

Dr. Mann also opined that the £36.4.1 payment to Myer Myers in 1765 was not consistent with other reimbursements made to him previously, but was similar to a different payment to another person, which was for a specific item. Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 28-30. Specifically, she testified that the payment could not be a reimbursement to a past president because it did not have the notation "late parnas" next to it. Trial Tr. vol. 6, 141-42, ECF No. 109 and Trial Tr. vol. 7, 106-07, ECF No. 110 (Testimony of Dr.

**AD78**

Mann); Shearith Israel ledger (Exhibits D10 and D10A) (containing notation "late Parnas"). She then concluded that it must be for an item, because she thought it similar to the following payment, which was for an item: "For balance due me per agreement ('consiertto') of the holy synagogue, on account of another item which is charged here." Trial Tr. vol. 6, 142-43, ECF No. 109 (Testimony of Dr. Mann); The Lyons Collection at 40 (Exhibit P78 at 3378).

Dr. Mann's opinion on this issue does not persuade the Court that the 1765 payment was for the Rimonim. First, when Shearith Israel paid Myer Myers for a different pair of Rimonim in 1774 and for a silver plate in 1759, it specified exactly which items it was paying for in its ledger. Trial Tr. vol. 7, 88-92, ECF No. 110 and Trial Tr. vol. 6, 146, ECF No. 109 (Testimony of Dr. Mann); Shearith Israel ledgers (Exhibits P16 and P29) (paying Mr. Myers £20.0.0 "for a piece of plate" and £10.15 for "rimonim"). Unlike those two examples, the 1765 payment does not say that it is for rimonim. Second, the presence of the words "late parnas" next to payments that all turn out to be reimbursements does not convert those words into a necessary condition for a reimbursement. All that Dr. Mann has proved is that the notation "late parnas" signals reimbursement, not that its absence signals non-reimbursement.[62] Finally, the logical leap from discovering another payment for an unspecified item in the Shearith Israel ledgers, to concluding that the payment to

---

[62] In fact, a substantial payment to Shearith Israel's president from the year before Myer Myers became president also lacks the notation "late parnas," which Dr. Mann apparently dealt with by asserting that it must not be a reimbursement. Trial Tr. vol. 7, 102-03, ECF No. 110 (Testimony of Dr. Mann). This type of "heads I win, tails you lose" reasoning does not persuade the Court.

78

Mr. Myers must also be for an unspecified item is astronomical.  The wording of this payment in Shearith Israel's ledger does not persuade the Court it was for the Rimonim.

Turning to circumstantial evidence, Dr. Mann opined that Yeshuat Israel could not have obtained the Rimonim through purchase or gift.  She pointed to Yeshuat Israel's financial difficulties in building the Synagogue as evidence that it could not have afforded the Rimonim.  *Id.* at 117, 144.  She also opined that it was unlikely that anybody gifted the Rimonim to Yeshuat Israel, because the Rimonim did not have a donor's name inscribed on them.  *Id.* at 144-45.  She specifically ruled out Shearith Israel and Myer Myers as potential donors because Shearith Israel did not have a record of the gift and Mr. Myers was allegedly frugal.  Trial Tr. vol. 6, 117-18, 129, ECF No. 109 (Testimony of Dr. Mann).  This evidence is speculative and insubstantial.  Having discarded Dr. Mann's theory about the 1765 ledger, the Court finds her remaining arguments not credible and insufficient to prove that Shearith Israel has better title.

b.    *Failure to Prove Shearith Israel Acquired Title Around 1820*

In the absence of any documents contemporaneous with the making of the Rimonim that clearly established their original owner, Shearith Israel turned to some later documents in attempting to prove its ownership stake.  Shearith Israel argued that by returning the Rimonim to New York around the 1820s, Yeshuat Israel conceded that it originally only held the Rimonim on loan from Shearith Israel.  In the alternative, Shearith Israel argued that Yeshuat Israel gifted the

Rimonim to Shearith Israel when the Jewish community of Newport disbanded. The Court does not find either theory persuasive or supported by the credible evidence. Instead, the Court concludes that Yeshuat Israel brought the Rimonim to New York for safekeeping, with the instruction that Shearith Israel return them to the congregation thereafter worshiping in the Newport Synagogue. The evidence shows that Shearith Israel complied with that instruction when they returned them to Newport. *See supra.*

There is no extant record of the Rimonim leaving Newport or arriving in New York. One surviving record is Shearith Israel's minutes from February 10, 1833, which states:

> Received from the family of the late Mr. Moses Seixas of New Port Rhode Island, Four Sepharim Belonging to the Congregation of that place, and Which are now to be deposited in the Synagogue In New York of the Congregation "Shearith Israel" Under the charge of the Trustees of said Congregation to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island casualties excepted New York 19 Kislev 5593 – 11th December 1832; In behalf and by resolve of the Trustees of the Congregation Shearith Israel Signed by N. Phillips; Isaac B Seixas.

Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3, and Exhibit P38).[63]

The parties drew vastly different conclusions from this record. Shearith Israel argued that this record proves that Yeshuat Israel used sepharim (Torah books) and other items that belonged to Shearith Israel, and that this record memorialized their return to New York. Shearith Israel's expert, Dr. Mann,

---

[63] "Sepharim," which is a word that can be spelled in various ways, is the plural for books of Torah. *See* Trial Tr. vol. 7, 121, ECF No. 110 (Testimony of Dr. Mann) ("there was an entry in 1833 about getting the Sifrei Torah back, that's the Torah").

testified that the minutes "lay the groundwork for [her] opinions that the items that were used in Newport [included] . . . the silver [rimonim, which] w[ere] returned to C[ongregation] S[hearith] I[srael]."   Trial Tr. vol. 7, 111-12, ECF No. 110 (Testimony of Dr. Mann).[64]  That is not a reasonable reading of the record.

Shearith Israel's February 10, 1833 minutes do not advance its claim to the Rimonim; quite the opposite.  This record plainly references four Torah scrolls arriving in New York from Newport, to be returned when needed by Newport's Jews.  This is credible evidence that Shearith Israel served as the bailee for certain religious items, including the Rimonim, belonging to the Jews of Newport.  Shearith Israel's other expert, Dr. Fisher, admitted, "the historical evidence, both primary and secondary, is that . . . every Torah, [when possible], is adorned by a set of rimonim."  Trial Tr. vol. 8, 165, ECF No. 111 (Testimony of Dr. Fisher).  In its opening, Shearith Israel said of the Rimonim: "Their job is to stay with the Torah." Trial Tr. vol. 1, 69, ECF No. 104 (Shearith Israel's Opening Argument).

Although Shearith Israel's 1833 minutes do not specifically reference the Rimonim, they raise the inference — that this Court adopts as a finding of fact — that the Rimonim traveled with the Torah scrolls from Newport, and that Shearith Israel took hold of these items under the instruction to return them.  This

---

[64] Dr. Mann bolstered her opinion by referencing another document from that time, which allegedly memorialized Shearith Israel receiving silver back from Newport.  Trial Tr. vol. 7, 121-24, ECF No. 110 (Testimony of Dr. Mann).  The problem with that document is that Dr. Mann is the only person who remembers ever having seen it, and that it is now nowhere to be found.  *Id.* at 122 (Question: "Now, that document [ ] seems to have disappeared; correct?"  Dr. Mann's Answer: "That is correct.").

interpretation also best explains Shearith Israel's later actions, specifically branding the Rimonim with the words "Newport" to differentiate them from its own pair, and returning them to the congregation thereafter worshiping in Newport.  In other words, Shearith Israel's handling of the Rimonim is fully consistent with the terms of bailment described in the 1833 minutes, not ownership by Shearith Israel, and the Court so finds.

The next record that Shearith Israel offered to prove its ownership claim was an 1869 inventory conducted by its own officials.  Inventory (Exhibits D34 and D34A).  Shearith Israel's president asked Rabbi J.J. Lyons to undertake an inventory of the Congregation's possessions on May 23, 1869, and less than three months later, he had completed the project.  Shearith Israel's minutes (Exhibits D33 and D33A) (requesting that Rabbi Lyons prepare an inventory).  The Myer Myers Rimonim appear toward the end of the inventory, which describes them as "marked Myers New Port" and lists their weight.  Inventory at 34 (Exhibits D34 and D34A at 36).  This inventory is noteworthy because it is the first direct reference to the Rimonim in the record, but it is not helpful to Shearith Israel's assertion of ownership.  The relevant portion of the inventory is reproduced below:

*[Handwritten inventory record reproduced — partial transcription:]*

> Pair of Do known as Ephraim Hart's bells, property of [synagogue?] ... Keeping of Shamas $80
>
> 1 Pair of Do marked "Myers (the maker)" ... 40
>
> 1 Pair of Do marked "Myers Nov'k Bat" ... 45
>
> 1 Pair of Do Same pattern as above without mark ... 48
>
> 1 Pair of Do Same pattern as those known & have belonged to Ephraim Hart ... 3[?]
>
> 3 pairs of Do made for consecration of 1818 [?] ... 165
>
> *[margin note: These 4 pairs of [tops?] are broken and must be repaired]*
>
> 1 pair of Do like above ... 56
>
> Property of J. Cohen — 1 pair of Do ... 6[?]
>
> " P. Friedman — 1 pair of Do ... 54
>
> " M. Barnett — 1 pair of Do ... 2[?]
>
> 817 1/4   816 1/4

*Id.* (boxes added).

The only appropriate inference the Court draws from this record is that the Rimonim were in Shearith Israel's possession in 1869. This record does not advance Shearith Israel's claim to better title, because its possession in the mid-19th century is fully consistent with Shearith Israel's role as bailee for the Rimonim. The parties do make arguments based on the position of the ditto marks and other aspects of this inventory to support their ownership claims, but these arguments are so tenuous they are most properly relegated to a footnote.[65] This inventory does not advance Shearith Israel's claim to better title.[66]

---

[65] Above the listing of the Rimonim is the note, "property of Kahal [written in Hebrew, meaning Congregation] in keeping of Shamas [the sexton]," and ditto marks apply this note to all of the rimonim below. Inventory at 34 (Exhibits D34 and D34A at 36). Shearith Israel focuses the Court on the first part of this phrase to argue that the Rimonim were marked as property of their Congregation, while

>        c.   *1894 Deeds Do Not Reinforce Shearith Israel's Ownership*
>             *Claim*

Shearith Israel argues that whether it originally held title to the Rimonim or if it obtained title in the 1820s, "the heirs and descendants of the colonial Newport congregation confirmed Shearith Israel's rights in the . . . [Rimonim] in 1894 when they executed deeds conveying the synagogue and personalty to Shearith Israel." Shearith Israel's Post-Trial Mem., ECF No. 90 at 54.  Shearith Israel further argues that the 1903 lease of the Synagogue, and the 1908 renewal of the lease, confirmed that position. *Id.* at 42-49.

---

Jeshuat Israel focuses on the second part to argue that they were in the safekeeping of the Congregation's sexton, but not the Congregation's property.  The document does not allow an inference one way or the other, especially in light of the inventory's title page, which is labeled: "Inventory of all Property & Effects belonging to *or in keeping of* [the Congregation]." *Id.* at 1 (emphasis added).

Shearith Israel also points to the last three rimonim listed on this document, all of which have separate notations to the left attributing them as property of specific persons. *Id.* at 34; Trial Tr. vol. 6, 164, ECF No. 109 (Testimony of Dr. Mann).  Dr. Mann argues that because the Myers Rimonim do not have an analogous notation attributing them to Yeshuat Israel, they must have always belonged to Shearith Israel.  There are two problems with this argument.  First, Yeshuat Israel had disbanded by this time, so it would not have been apparent to Rabbi Lyons how to attribute its Rimonim.  Second, even the rimonim that are marked as property of specific persons, nonetheless have ditto marks apparently attributing the phrase "property of [the Congregation] in keeping of [the Sexton]" to them as well, which undercuts Shearith Israel's theory that those rimonim belong to the persons listed on the left.

Finally, the most that this document could indicate, which the Court holds it does not, is that Rabbi Lyons, who had conducted the inventory, *believed* that the Rimonim belonged to Congregation Shearith Israel as of 1869.  It could not prove that Myer Myers originally made the Rimonim for Shearith Israel.

[66] Dr. Mann made one more argument for Shearith Israel's original ownership: the fact that someone from Shearith Israel sent two allegedly mismatched rimonim to Touro Synagogue suggested to her that this person viewed all four finials as being the property of Shearith Israel. Trial Tr. vol. 6, 144, ECF No. 109 (Testimony of Dr. Mann).  This argument is unsupported, pure speculation, and too tenuous to be credible.

Shearith Israel points to language in the 1894 Deeds, which purport to convey the Synagogue "[t]ogether, with the appurtenances and all the estate" to its Congregation. Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 52 (citing 1894 Deeds at 2 (Exhibit D78)).[67] Then on January 30, 1903, following litigation between the parties, Shearith Israel and Jeshuat Israel signed a settlement agreement, where Congregation Jeshuat Israel agreed, "to admit and recognize without qualification the title and ownership of L. Napoleon Levy and other Trustees to the synagogue building, premises, and fixtures." Settlement Agreement (Exhibit P68).   Three days later, on February 2, 1903, Jeshuat Israel and Shearith Israel signed a lease agreement for Touro Synagogue, which encompassed "the appurtenances and paraphernalia belonging thereto." 1903 Lease (Exhibit D148 at 2).  The same words were included in the renewed lease in 1908.  1908 Lease (Exhibit D174 at 1).  Shearith Israel's expert, Dr. Fisher, testified that "these various terms . . . appurtenances, paraphernalia, fixtures, furnishings . . . . all refer to the same ritual items that are within a synagogue that are desirable and necessary to conduct services for a congregation."  Trial Tr. vol. 8, 26, ECF No. 111 (Testimony of Dr. Fisher).

---

[67] Shearith Israel states there are "at least nine separate deeds[, which] were executed by 57 heirs of Jacob R. Rivera, Isaac Hart, and Moses Levy."  Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 52.  It does not allege that every descendent was tracked down and executed a deed.  Shearith Israel admits that three of the deeds, signed by 22 heirs, purport to convey the property *in trust.*   *Id.* at 53.   Only one of the deeds purports to convey "appurtenances of worship." *Id.* (citing 1894 Deed at 20 (Exhibit D78)).

Shearith Israel's argument that the 1894 Deeds reinforce its claim to the Rimonim fails from the outset, because the Court found that Shearith Israel never held or obtained title to the Rimonim. Instead, the Court found that in the 1820s, Shearith Israel became a trustee for the Synagogue and the bailee for some of its possessions; it did not usurp ownership over everything that previously belonged to the Newport Jewish community. It never owned the Rimonim. Shearith Israel does not argue that the Deeds gave them title, and it follows that the Deeds could not "reinforce" a claim to title that was never valid. Furthermore, the Court concluded *supra* that the Deeds were legal nullities, and therefore could not have any effect on the parties' rights.

Likewise, the 1903 and 1908 leases could not create title to the Rimonim in Shearith Israel. Even if Shearith Israel purported to include the Rimonim within those leases, this action could not alter title to the Rimonim.[68] In any event, the leases do not clearly refer to the Rimonim, and are therefore not nearly sufficient to overcome Jeshuat Israel's strong presumption of ownership.

### 5.    *Shearith Israel Cannot Block the Sale of the Rimonim*

Failing in its bid to claim ownership of the Rimonim, Shearith Israel seeks to block their sale by relying on Jeshuat Israel's 1897 By-Laws. Exhibit D95. The By-

---

[68] Shearith Israel may have believed that it owned all of the property previously belonging to Yeshuat Israel at the signing of the 1903 lease. *See, e.g.*, 1893 letter (Exhibit D67 at 2) (identifying Shearith Israel as "Trustees and owners of the [Touro] Synagogue and personal property therein"); Shearith Israel correspondence (Exhibit D151) (instructing Shearith Israel's representatives in Newport to include the phrase "with the paraphernalia" into the 1903 lease). This belief gives short shrift to Shearith Israel's obligations as bailee, and its duties to Newport's new Jewish population as trustee for the Touro Synagogue.

Laws vest the government of Jeshuat Israel "in the President, Vice President and three Trustees elected by this Congregation [Jeshuat Israel] and four Trustees appointed by the Spanish and Portuguese Congregation Shearith Israel . . . ." 1897 By-Laws at 1 (Exhibit D95 at 2). There is no evidence of Shearith Israel appointing trustees to govern Jeshuat Israel since 1899. *Compare* Shearith Israel's July 1, 1897 minutes (Exhibits D99 and D99A at 1); July 1, 1898 minutes (Exhibits D105 and D105A at 2); and June 30, 1899 minutes (Exhibits D114 and D114A at 2) (appointing trustees to Jeshuat Israel's board) *with* Shearith Israel's July 2, 1900 minutes (Exhibit D128 and D128A) (resolving to close Touro Synagogue and failing to appoint trustees). Shearith Israel does not allege that it has appointed trustees to govern Jeshuat Israel in over 110 years.

The By-Laws also restrict the sale of property owned by Jeshuat Israel "unless by unanimous vote of the members present and represented by proxy at a Special Meeting convened for that purpose." 1897 By-Laws at 8 (Exhibit D95 at 10). The By-Laws prohibit amendment to these sale restrictions and to the status of Shearith Israel's four Trustees "unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed . . . amendment." Nonetheless, on January 28, 1945, Jeshuat Israel adopted a new set of By-Laws, which prohibited Shearith Israel's Trustees from voting by proxy. 1945 By-Laws at 18 (Exhibit P85 at 689). The 1945 By-Laws also eliminated restrictions on the sale of Jeshuat Israel's personal property, and the requirement that Shearith Israel's Trustees must affirmatively vote to change their status. *Id.* at 22, 37-38 (Exhibit

P85 at 691, 698-99).   Jeshuat Israel provided these amended by-laws to Shearith Israel, with no record of an objection from Shearith Israel.   *See* Jeshuat Israel's minutes from October 28, 1945 (Exhibit P90 at 101).   Finally, in 1983, Jeshuat Israel amended its By-Laws again to remove any reference to Shearith Israel. Jeshuat Israel's 1983 By-Laws (Exhibit P129).

Over 110 years after last exercising power to appoint trustees, over 70 years after its power was restricted, and over 30 years after its power was rejected, Shearith Israel is now too late to challenge Jeshuat Israel's governance. *See Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir. 1987) ("The law ministers to the vigilant not to those who sleep upon perceptible rights.")   Jeshuat Israel has adapted to Shearith Israel's abdication by running its own operations at its own discretion, and Shearith Israel's attempted takeover of Jeshuat Israel's governance at this late date would cause it prejudice.   Laches bars Shearith Israel's attempt at upending Jeshuat Israel's corporate governance in this way.   *See Hazard v. E. Hills, Inc.*, 45 A.3d 1262, 1271 (R.I. 2012) (applying laches and finding prejudice when party delayed an extremely long time in bringing suit); *Arena v. City of Providence*, 919 A.2d 379, 395-96 (R.I. 2007) (applying laches in declaratory action).   The Court finds that Shearith Israel cannot rely on the 1897 By-Laws to intervene in Jeshuat Israel's governance or affairs.

### 6.   *Jeshuat Israel Has Title to the Rimonim*

The Court found that Congregation Yeshuat Israel was the original owner and possessor of the Rimonim.   When Yeshuat Israel disbanded, it left the Rimonim

in the care of Shearith Israel, charging it with the duty to return the Rimonim to "the Congregation [thereafter] worshipping" in Newport. Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3). While Shearith Israel may have believed that it became the owner of Touro Synagogue and its contents in the 1820s, it nonetheless executed its obligations to Yeshuat Israel and returned the Rimonim to the congregation then worshiping in Newport — Jeshuat Israel. At that time, Jeshuat Israel became the lawful owner of the Rimonim, in accordance with the wishes of the original owners of the Rimonim — Yeshuat Israel.[69]

Since that time, Jeshuat Israel has possessed and controlled the Rimonim for over 100 years. It has used them in its public worship, insured and repaired them, and sent them on various exhibitions all across the country. Even if Yeshuat Israel had not dedicated the Rimonim to the congregation thereafter worshiping in Newport, Jeshuat Israel's long-standing possession of the Rimonim entitles it to a strong presumption of ownership, which Shearith Israel has failed to overcome. *Hamilton v. Colt*, 14 R.I. 209, 212 (1883) (treating possession of property as prima facie evidence of ownership). On the record before us, and in the absence of other challenges to Jeshuat Israel's title, the Court finds, as a matter of fact and law, that Jeshuat Israel is the true and lawful owner of the Rimonim. There are no outstanding challenges before this Court that would prevent Jeshuat Israel from dealing with its personal property in any manner that it deems appropriate.

---

[69] Jeshuat Israel also argues that it is the legal successor to Yeshuat Israel. The Court does not need to reach this argument in making its decision.

C.    **SHEARITH ISRAEL IS REMOVED AS TRUSTEE**

Jeshuat Israel seeks to remove Shearith Israel from its position as trustee over the Touro Synagogue and lands. Shearith Israel argues first that Jeshuat Israel does not have standing to call for removal, and second that grounds for removal do not exist. The Court concludes that Jeshuat Israel has standing as an interested third party, and that the overwhelming weight of the evidence compels this Court to remove Shearith Israel as trustee.

### 1.    *Jeshuat Israel Has Standing to Bring an Action Removing the Trustee*

Who has standing to remove a charitable trustee can be a thorny question and requires some further background about trust law. In private trusts, beneficiaries are the equitable owners of a trust's corpus and the natural parties to police trustees. Charitable trusts are different, because everybody — the public — benefits from their existence. By definition, charitable trusts must have a charitable purpose that benefits society, rather than just one person or group. *See generally Bogert* § 362-63 at 19-36. For that reason, states' attorneys general, as the representatives of the public, have traditionally shouldered the responsibility of enforcing charitable trusts. *Id.* § 411 at 11-12.

Although a charitable trust must benefit the public at large, oftentimes "the settlor directs that his bounty be distributed among a class or group," which serves as the "conduit through which the settlor desires the public benefits to flow." *Id.* § 365 at 45. In other words, charitable trusts often work through a conduit, who uses the trust's assets to further the trust's purpose. Sometimes, courts colloquially refer

to these conduits as "'beneficiaries', although it is more accurate to say that the real beneficiary is the public or community and the persons involved are merely instrumentalities through which the community benefits flow." *Id.* § 363 at 28. In Rhode Island, the party that directly benefits from a charitable trust is considered the holder of the beneficial interest in the trust, and is colloquially referred to as the "beneficiary." *See Webster v. Wiggin*, 31 A. 824, 827-28 (R.I. 1895) ("[T]he beneficiaries [of charitable trusts] are a succession of persons, in each of whom the beneficial interest vests from time to time, in the future, to remote ages."); *Bogert* § 411 at 3.

When the conduit of a charitable trust is a religious organization,[70] courts have often allowed it to enforce the terms of the trust, without invoking the attorney general:

> If a trust exists . . . to advance the cause of religion through support of [a] local church, the members and pewholders of that church have a rather certain and definite interest in the enforcement of the trust. Though the benefits will go to all in the community who elect to take advantage of the services, and also to the general public, it is nearly certain that all the members of the church will obtain some advantage. Therefore, a number of courts have allowed a church member or pewholder in such a case to sue to enforce the trust's charitable purpose.

*Bogert* § 414 at 56.

This is an altogether sensible approach that alleviates the burden on the attorney general and involves the actual parties in interest, all without opening up the floodgates of vexatious litigation. *See The Queen, the Attorney General, and*

---

[70] This doctrine is not limited to religious organizations.

91

*the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform,* 11 U. Fla. J.L. & Pub. Pol'y 131, 162-63 (2000). It is also endorsed by the Restatement, which grants standing "for the enforcement of a charitable trust" to any "person who has a special interest in the enforcement of the trust." Restatement (Third) of Trusts § 94(2) (2012). Simply said, when there is a ready party that has a distinguishable interest in enforcing a charitable trust, there is no justification for also requiring the attorney general to join as plaintiff. *See Cannon v. Stephens,* 159 A. 234, 237 (Del. Ch. 1932).

This is true under Rhode Island law as well. Rhode Island does not vest exclusive enforcement power over charitable trusts in the attorney general. Instead, the law requires that "[t]he attorney general shall be notified of all judicial proceedings . . . in any manner dealing with[ ] a trustee who holds in trust within the state property . . . for charitable[ ] or religious purposes . . . and [the attorney general] shall be deemed to be an interested party to the judicial proceedings." R.I. Gen. Laws § 18-9-5. This provision would be illogical if the attorney general were required to be a plaintiff in all such proceedings, because that would obviate the need to deem the attorney general an interested party.[71] By requiring notification

---

[71] In this action, the Rhode Island Attorney General intervened as amicus curiae and filed a post-trial memorandum expressing the opinions that Touro Synagogue is part of the corpus of a charitable trust, and that Shearith Israel is the current trustee. The Attorney General expressed no position on the issues of removal of the current trustee or on the ownership of the Rimonim. *See* Mot. for Leave to Intervene as Amicus Curiae, ECF No. 61; Text Order dated Apr. 22, 2015 granting Attorney's General motion to intervene ("The Court grants the motion with the understanding that the state's Attorney General, as amicus curiae, will fully assist the Court with legal and factual analysis because of its statutory and common law

of the Attorney General, Rhode Island law presupposes that third parties may commence suit, and proceed without the attorney general as a plaintiff.[72]   In fact, Rhode Island state courts have entertained numerous challenges brought by interested third parties against charitable trustees, without the attorney general joining as a plaintiff.  *See, e.g., Darcy v. Brown Univ. & Pine*, C.A. No. KC 94-774, 1997 WL 839894 (R.I. Super. Feb. 20, 1997) (plaintiff is potential recipient of a charitable fund for needy students); *Meyer v. Jewish Home for the Aged of R.I.*, C.A. No. 93-5374, 1994 WL 930887 (R.I. Super. Jan. 19, 1994) (plaintiffs are residents of charitable home).

Having decided in Rhode Island that third parties may enforce charitable trusts without joining the attorney general as a plaintiff, the Court has little difficulty concluding that Congregation Jeshuat Israel has standing to do so in this case.  Any concerns about vexatious litigation arising in such enforcement suits are incorporated into a standard standing inquiry.  *See Chu v. Legion of Christ, Inc.*, 2 F. Supp. 3d 160, 171 (D.R.I. 2014) (applying standing inquiry to determine who can sue a religious charity in a different context).  The standing inquiry prevents "kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wrestling control of litigation from the people directly affected."  *Id.* at 170 (citing *Valley*

---

special interest in this matter, untethered by any restrictions on its advocacy."); and Br. of R.I. Attorney General, ECF No. 95.

[72] This interpretation is consistent with the canon against surplusage, or "*verba cum effectu sunt accipienda*," because this entire statute would be superfluous if the attorney general were required to be a plaintiff in enforcement and removal proceedings.  *See, e.g., Sturges v. Crowninshield*, 17 U.S. 122, 202 (1819) (Marshall, J.); *New Process Steel, L.P. v. N.L.R.B.*, 560 U.S. 674, 680 (2010) (applying this canon).

*Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). These same considerations animate the inquiry into third party standing to remove a charitable trustee. Jeshuat Israel satisfies the constitutional and prudential standing requirements to bring this suit for removal because it has been the only congregation praying at Touro Synagogue for over 100 years and is now facing eviction.

### a.    Constitutional Standing

To satisfy the constitutional minimum standing requirements, a plaintiff must allege an injury in fact caused by the defendant, which could be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Jeshuat Israel easily satisfies this floor. Among other harms, Jeshuat Israel is facing eviction at the hands of Shearith Israel, the trustee. Am. Answer and Countercl., ECF No. 8 at 23 (asking this Court to "order the eviction of the Plaintiff [Jeshuat Israel] from the Touro Synagogue and related real property.") Potential eviction from its place of worship certainly qualifies as an injury in fact, caused by the defendant, which could be redressed by the requested relief of removing Shearith Israel as trustee.

### b.    Prudential Standing

The standing inquiry also incorporates three prudential considerations: "(1) whether a plaintiff's complaint falls within the zone of interests protected by the law invoked; (2) whether the plaintiff is asserting [its] own rights and interests, and not those of third parties; and (3) that the plaintiff is not asking the court to

**AD95**

adjudicate abstract questions of public significance." *Chu*, 2 F. Supp. 3d at 171. Jeshuat Israel again easily satisfies all three. The zone of interests protected by the process of removing a charitable trustee includes protecting the interests of third parties who serve as conduits of the trust's benefits. Here, Jeshuat Israel is asserting its own rights and interests because it has been worshiping at Touro Synagogue since the late 1800s, and it has developed strong ties to the building and lands.[73] Finally, as Shearith Israel admits, there is "a live dispute and controversy . . . over the ownership, rights, status, and legal relations relating to the building, real estate, and any and all personalty used by or for Touro Synagogue." Am. Answer and Countercl., ECF No. 8 at 20. If any third party has standing to enforce this charitable trust, that party is Congregation Jeshuat Israel.

### 2.  *Shearith Israel's Conduct Requires its Removal as Trustee*

Shearith Israel's single role as charitable trustee is to ensure the preservation of Touro Synagogue for public Jewish worship. When Jews returned to Newport, Shearith Israel executed its duties by facilitating the use of the Synagogue by the new community. In 1903, after some unfortunate legal spats, Shearith Israel again executed its duties as trustee by leasing the Synagogue to

---

[73] Jeshuat Israel is the only congregation that presently prays at Touro Synagogue, and some of its members' families have been praying there for four generations. Trial Tr. vol. 1, 104, 112, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel has also purchased land abutting the Synagogue, and built a visitor center there, from where it runs tours from Memorial Day through Columbus Day. *Id.* at 118-19.

Furthermore, Jeshuat Israel is the only Jewish congregation in the city of Newport. *Id.* at 128. Of the 1,000 Jews or 300 Jewish families living in the six towns of Newport, Middletown, Portsmouth, Jamestown, Tiverton, and Little Compton, approximately 100 families belong to Touro Synagogue. *Id.* at 128-29.

Jeshuat Israel for only a nominal fee. By this action, Shearith Israel recognized that Jeshuat Israel is the representative of the Jews of Newport. Since that time, Jeshuat Israel has been the only congregation worshiping at Touro Synagogue.

"Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate." *Petition of Statter*, 275 A.2d 272, 276 (R.I. 1971). In this case, Yeshuat Israel created the trust estate for the benefit of public Jewish worship, which can only be accomplished if Jews have access to the Synagogue. Under Rhode Island law, the present beneficial interest in the charitable trust is held by Jeshuat Israel. *See Webster*, 31 A. at 827-28 (holding that beneficial interest in a charitable trust vests in the party receiving its benefits). Shearith Israel's single obligation is to act for the benefit of Jeshuat Israel, unless doing so no longer ensures public worship at Touro Synagogue.

Removal of Shearith Israel as trustee is appropriate because it has strayed from that obligation. *See Petition of Statter*, 275 A.2d at 276 ("In deciding [removal] cases, the court's paramount duty is to see that the trust is properly executed and that beneficiaries are protected.") Specific grounds for removal can include a serious breach of trust, a lack of cooperation between the trustee and beneficiary, or even a substantial change of circumstances. *See generally* Unif. Trust Code § 706(b) (Removal of Trustee). Here, Shearith Israel repudiated the existence of the trust and sought to evict Newport's only Jewish congregation from the trust estate. Furthermore, the conditions that required Shearith Israel to step in as acting trustee no longer exist. In these circumstances, the Court finds it

necessary to remove Shearith Israel from its position as trustee, for the reasons stated below.

### a.    *Serious Breach of Trust*

No breach of trust is more egregious than when a trustee claims to own the trust property outright, and refuses to admit the trust's very existence. "[R]epudiation of the trust is a clear ground of removal even though the trust property has not yet been devoted to personal uses." *Bogert* § 527 at 87; *see also In re Matthew W.T. Goodness Trust*, No. PM/08-7349, 2009 WL 3328364, at *6-7 (R.I. Super. May 4, 2009), 5-8 (discussing appropriation of trust property by trustees as grounds for removal).

In this action, Shearith Israel claims to own the trust property — Touro Synagogue — outright, and refuses to acknowledge that a trust exists.  Shearith Israel claims in its pleadings that "[f]or over 100 years Shearith Israel has owned the Touro Synagogue, including its land, building, and religious objects," and seeks "a declaration of Shearith Israel's ownership of legal and equitable rights in the Rimonim along with the land, building, and other personalty used by Touro Synagogue . . . ." Am. Answer and Countercl., 7, 9, ECF No. 8.  Shearith Israel denies that Jacob Rodrigues Rivera's Will and Testament provided sufficient evidence of a trust, and repudiates any acknowledgement of a trust that could be gleaned from the 1894 deeds, the 1945 Agreement with the federal government, or any other sources.  Shearith Israel's Post-Trial Mem., ECF No. 90 at 60-68.  At

closing argument, when the Court directly asked Shearith Israel about this issue, it provided the following response:

> Our position . . . is that *Shearith Israel owns equitable and legal title*, and the title is subject to a condition. . . . And when we obtained title, it was with the understanding that there was going to be a public place of Jewish worship in accordance with the specific kind of ritual forever. That is how we hold it. We will have breached — *I'm not sure who can enforce it at that point* — but will have breached it if we ever tried, if we turned it into a bowling alley or a bingo alley. So there is plenty that we have the right to do.

Trial Tr. vol. 9, 156-57, ECF No. 112 (Shearith Israel's Closing Argument) (emphasis added). In its briefing, Shearith Israel doubled down on its position, arguing "the Shearith Israel trustees . . . hold [the Touro Synagogue] property *for the benefit of Shearith Israel.*" Shearith Israel's Post-Trial Rebuttal Mem., ECF No. 97 at 80 (emphasis added).

Shearith Israel's claim to own legal and equitable title to Touro Synagogue renders it unsuitable to act as trustee. By claiming to own the Synagogue outright, Shearith Israel committed a serious breach of trust. Such a renunciation of one's role requires a trustee's removal.

### b.    *Lack of Cooperation*

"When friction between the trustee and beneficiary . . . impairs the proper administration of the trust . . . or if the trustees' continuing to act as such would be detrimental to the interest of the beneficiary, the trustee may be removed." *Petition of Statter*, 275 A.2d at 276. Charitable trustees are subject to the same standard. *See Nugent ex rel. Lingard v. Harris*, 184 A.2d 783, 785 (R.I. 1962) (stating that a charitable trustee's "lack of sympathy for the objects of the trust" is grounds for

removal).[74]   The animosity between the parties is evaluated by a subjective standard from the point of view of the holder of the equitable interest.   *See Petition of Statter*, 275 A.2d at 276 ("When the ill feeling has reached the point that it interferes with the administration of the trust, the trustee may be removed even though the charges of his misconduct are either not made out or greatly exaggerated." (internal citations omitted)).

Congregation Jeshuat Israel is currently the holder of the equitable interest in the Touro charitable trust.   It has used the Synagogue for public Jewish worship for over 100 years.   As discussed *infra,* the trustee, Shearith Israel, has not had any relationship with the trust property or with Jeshuat Israel for at least the past 20 years.   Furthermore, Shearith Israel's positions in the current litigation have engendered such animosity in the relationship, that its continued service as trustee would be detrimental to the trust's purpose.

Jeshuat Israel had absolutely no relationship with Shearith Israel when David Bazarsky became president of Jeshuat Israel in 1993.[75]   Trial Tr. vol. 1, 162, ECF No. 104 (Testimony of David Bazarsky).   Mr. Bazarsky testified that during his

---

[74] Rhode Island law recognizes that the conduits of charitable trusts often occupy the same position as the beneficiaries of private trusts, and are entitled to similar rights and protections.   *See Webster*, 31 A. at 827-28; *see also* R.I. Gen. Laws § 18-9-16 ("A charitable trust . . . may be terminated at any time . . . with the consent of . . . [*inter alia*] the beneficiary or beneficiaries by delivery of the assets to the beneficiary or beneficiaries."); *see also* R.I. Gen. Laws § 18-9-9 (beneficiary, among other parties, must comply with attorney general's investigation into administration of charitable trust); § 18-9-10 (similar); § 18-9-11 (similar); § 18-9-13(a) (charitable trustee shall make annual written report that includes names and addresses of trust's beneficiaries).

[75] The Court found Mr. Bazarsky to be a credible witness, and his testimony was compelling.

tenure as president, he unsuccessfully attempted to reestablish a connection with Shearith Israel. In 1996, he organized a trip to New York to meet with members of Shearith Israel, in part to discuss fundraising efforts to restore Touro Synagogue. *Id.* at 163-64. He summarized Shearith Israel's response as, "[w]e're not paying; [w]e're not giving you any money; [y]ou're on your own. . . . We have our own synagogue to take care of; [w]e're not taking care of your synagogue." *Id.* at 165. He testified that Shearith Israel even refused to provide Jeshuat Israel's delegation with its membership list, because they did not want Jeshuat Israel syphoning off its members' resources. *Id.* Mr. Bazarsky reported that Jeshuat Israel's delegation left that meeting with the impression that Shearith Israel had "no interest in us." *Id.* at 166. Mr. Bazarsky's impression was confirmed by another fruitless meeting between the two Congregations about restoring Touro Synagogue in 2004. *Id.* at 166-69. The record is entirely devoid of any meaningful interaction or cooperation between the two Congregations for the past several decades. This shows a lack of sympathy by trustee Shearith Israel toward the object of the charitable trust.

Through this litigation, Shearith Israel is seeking to evict Jeshuat Israel from Touro Synagogue, without any other congregation standing ready to take its place. This act would undermine the very reason for the trust's existence — public Jewish worship in Newport. Witnesses for Jeshuat Israel have testified with one voice that the eviction threatened by Shearith Israel "would be devastating . . . [because] it would be the destruction of . . . the congregation." Trial Tr. vol. 1, 126-27, ECF No. 104 (Testimony of David Bazarsky).

Bertha Ross, the current co-President of Jeshuat Israel, described the relationship between the two Congregations as follows: "I would say there is a lot of friction, a lot of tension between the organizations. I think Shearith Israel has been disloyal to us." Trial Tr. vol. 4, 56, ECF No. 107.[76] Ms. Ross concluded that Jeshuat Israel could no longer work with the leadership of Shearith Israel. *Id.* Shearith Israel offered no evidence to refute this testimony of an acrimonious relationship between the two Congregations.

Shearith Israel's bid to evict the only organized Jewish congregation in Newport from Touro Synagogue does not bode well for its continuing capacity to maintain the Synagogue for public Jewish worship. The contentious course of this litigation also renders unlikely "the smooth functioning of the [t]rust" with Shearith Israel as trustee. *See Dennis v. Rhode Island Hosp. Trust Nat. Bank*, 571 F. Supp. 623, 639 (D.R.I. 1983) *aff'd as modified* 744 F.2d 893 (1st Cir. 1984) (citing parties' litigation positions, rather than any conduct by trustee, as independent reason for removal). In sum, the Court finds that the lack of cooperation between Jeshuat Israel and Shearith Israel over at least the past 20 years, and the recent animosity between the parties engendered by this litigation, require the removal of Shearith Israel from its role as trustee.

c.    *Substantial Change of Circumstances*

Shearith Israel was a valuable trustee for Touro Synagogue from the 1820s through the 1880s, when no Jews were permanently settled in Newport. Several

---

[76] The Court found Ms. Ross to be a credible witness, and her testimony was compelling.

times during those lean decades, Shearith Israel sent its own religious representatives to officiate lifetime events in Newport. *See supra*. While the Synagogue was maintained and restored with funds from the Touro brothers, Shearith Israel stepped in to provide a religious lifeline to the Newport Jewish tradition.

Likewise, Shearith Israel was instrumental in restarting organized Jewish worship at Touro Synagogue by sending its own officials to hold regular services there in the late 1800s. It then arranged for the father of its own rabbi to relocate from London to Newport and serve as Touro Synagogue's first permanent rabbi for Newport's new Jewish community. In sum, despite some discord at the turn of the 20th century, Shearith Israel contributed positively to Newport's Jewish revival.

These events all took place well over 100 years ago. In the meantime, Shearith Israel's involvement with public Jewish worship in Newport waned. By 1993, there was no longer any communication between Shearith Israel and Jeshuat Israel. It is natural that Shearith Israel's involvement with Touro Synagogue receded over the last several decades, while Jeshuat Israel has assumed responsibility for the building and lands. Speaking plainly, Shearith Israel has long ago ceased to function as the trustee.

Shearith Israel's attempt to disturb that desuetude by seeking to evict Jeshuat Israel from Touro Synagogue in this legal action is contrary to its duties. It did not need to do so to prosecute its claim for the Rimonim.

By disavowing the trust and seeking to evict Jeshuat Israel from its place of worship, Shearith Israel has shown itself unfit to continue to serve as trustee. The law and the evidence in this case support removing Shearith Israel from its position as trustee over the Touro Synagogue and lands, and the Court does so now. As a result, Shearith Israel no longer holds legal title to Touro Synagogue.

D.    THE COURT APPOINTS JESHUAT ISRAEL AS THE NEW TRUSTEE

Having removed Shearith Israel, this Court must next address the question of who shall serve as the new trustee. The documents the Court relied upon to find that the trust exists, do not name a residuary trustee. In this circumstance, the trial court is authorized to appoint an appropriate successor trustee. *Lux v. Lux*, 288 A.2d 701, 705 (R.I. 1972) (citing R.I. Gen. Laws § 18-2-1) ("the Superior Court . . . is authorized to appoint a trustee whenever an instrument creating a trust fails to name the residuary fiduciary"). Because this Court, when sitting in diversity, has the same role as the state superior court, and because it is familiar with the parties and issues animating this charitable trust, this Court will exercise its power to appoint a new trustee in order to avoid an interruption in the operations of Touro Synagogue.

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate." *Cuzzone v. Plourde*, No. 03-0524, 2005 WL 2716749, at *3 (R.I. Super. Oct. 17, 2005) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928)

(Cardozo, C.J.)).  The new trustee must serve with "the punctilio of an honor the most sensitive" in the furtherance of the trust's original purpose, passed down from Yeshuat Israel through Jacob Rodrigues Rivera's Will, by preserving the Touro Synagogue and lands for public Jewish worship.  *Id.*

For over 100 years, Congregation Jeshuat Israel has done exactly that. Jeshuat Israel "maintains the synagogue [and] pays the utilities . . . mow[s] the lawn . . . [and] make[s] repairs on the synagogue."  Trial Tr. vol. 4, 17, ECF No. 107 (Testimony of Bertha Ross).  But more than just taking care of the building, Jeshuat Israel has ensured that Touro Synagogue is available for public Jewish worship.  It holds services at Touro Synagogue at least twice a week, which are open to any member of the public.  Trial Tr. vol. 1, 104, 112, ECF No. 104 (Testimony of David Bazarsky).  In the summer, the Congregation opens up the Synagogue seven days a week to accommodate visitors from all over the world.  *Id.* at 117, 119.  The Congregation also offers free membership to naval officers serving at the nearby Naval War College.  *Id.* at 118.  Significantly, Jeshuat Israel is the only Jewish congregation in the city of Newport.  *Id.* at 128.

This litigation has clarified that Jeshuat Israel is the party responsible for public Jewish worship in Newport.  Even without the Court's appointment, Jeshuat Israel has been executing all of the duties of a trustee for many years.  Evicting it from Touro Synagogue is unthinkable.  Appointing it as the legal owner and trustee for the Synagogue only recognizes in law, that which is already obvious in fact.

IV.    CONCLUSION

A.    **PLAINTIFF'S CLAIMS**

I.    The Court finds for Plaintiff, Congregation Jeshuat Israel as to Count I and DECLARES, pursuant to the Uniform Declaratory Judgments Act, R.I. Gen. Laws §§ 9-30-1, *et seq.*, that Congregation Jeshuat Israel is the true and lawful owner of the Rimonim, with full power to sell and convey them, and to deposit the proceeds of such sale into an irrevocable endowment; and

II.    The Courts finds that Count II is moot in light of its finding on Count I and therefore DISMISSES Count II; and

III.    The Courts finds that Count III is moot in light of its finding on Count I and therefore DISMISSES Count III; and

IV.    The Court finds for Plaintiff, Congregation Jeshuat Israel as to Count IV and DECLARES that the Touro Synagogue and its lands are owned in a charitable trust for the purpose of public Jewish worship.  The Court orders the removal of Congregation Shearith Israel as trustee over that Touro Synagogue charitable trust.  The Court appoints Congregation Jeshuat Israel as trustee of the Touro Synagogue and its lands; and

V.    The Court dismisses Count V because the declaration sought is overly broad and therefore not justiciable.

B.    **DEFENDANT'S COUNTERCLAIMS**

The Court DISMISSES all of Congregation Shearith Israel's counterclaims.

Both parties' requests for attorneys' fees and costs are DENIED.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

May 16, 2016

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **Congregation Jeshuat Israel** ) | |
| ) | |
| **Vs.** ) | **CA No. 12-822-M** |
| ) | |
| **Congregation Shearith Israel** ) | |
| ) | |

## <u>JUDGMENT</u>

[  ]  Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[x]  Decision by the Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED:**

**Judgment is hereby entered for the Plaintiff, Congregation Jeshuat Israel, against the Defendant, Congregation Shearith Israel,  pursuant to the Memorandum, Findings of Fact, Conclusions of Law and Order issued on May 16, 2016.**

**The Court finds for the Plaintiff as to Counts I and IV and dismisses Counts II III and V and all of defendant's counterclaims.**

**The request for attorneys' fees and costs is DENIED as to both parties.**

                                        **Enter:**

                                         **/s/ Ryan Jackson**
                                        **Deputy Clerk**

**DATED: May 16, 2016**

**AD108**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CONGREGATION JESHUAT ISRAEL, )<br> Plaintiff, )<br> )<br>v. )<br> )<br>CONGREGATION SHEARITH ISRAEL, )<br> Defendant. ) | C.A. No. 12-CV-822-M-LDA |

<u>ERRATA SHEET</u>

This Court's Memorandum, Findings of Fact, Conclusions of Law, and Order issued on May 16, 2016, is amended as follows:

On page 12, footnote 13, "Jacob Rodrigues Rivera lived for some time in the Caribbean island country of Curacao, where he married, before moving to New York.  He was naturalized as a U.S. citizen in 1746 and moved his family to Newport in 1748." is changed to "Jacob Rodrigues Rivera lived for some time in the Caribbean island of Curacao, where he married, before moving to New York.  He was naturalized in 1746 and moved his family to Newport in 1748."

IT SO ORDERED:


 /s/ John J. McConnell, Jr.
John J. McConnell, Jr.
United States District Judge

May 24, 2016

**AD110**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CONGREGATION JESHUAT ISRAEL, )<br>Plaintiff, )<br> )<br>v. )<br> )<br>CONGREGATION SHEARITH ISRAEL, )<br>Defendant. )<br> ) | C.A. No. 12-CV-822-M |

### ORDER

Plaintiff filed a Motion in Limine (ECF No. 68) to exclude Defendant's witness, Rabbi Dr. Meir Y. Soloveichik, current Rabbi of the Defendant Congregation Shearith Israel, from testifying at the trial of this matter. Plaintiff, Congregation Jeshuat Israel, claims that the Court should exclude Rabbi Soloveichik's testimony because (1) he has no relevant personal knowledge, (2) it would conflict with the Establishment Clause, and (3) the Defendant listed him as a witness too late. The Defendant responds (ECF No. 75) by asserting that Rabbi Soloveichik's testimony would (1) elucidate relevant facts including religious issues, (2) comply with the United States Constitution, and (3) pose no prejudice to the Plaintiff because of the delayed listing.

The Court has reviewed the proposed testimony of Rabbi Soloveichik's as outlined in the Rule 44.1 statement,[1] and finds it irrelevant to the issues this Court must decide and therefore excludes it under Fed. R. Evid. 401. This Court will apply only the substantive laws of the State

---

[1] The Court is hard pressed to understand in this context how "Jewish law" would be considered foreign law for purposes of Rule 44.1 of the Federal Rules of Civil Procedure.

## AD111

Case 1:12-cv-00822-M-LDA   Document 77   Filed 05/22/15   Page 2 of 2 PageID #: 2457

of Rhode Island and the United States to this case. The Court will not apply any "foreign law" or "religious law," neither of which is relevant to this case.[2]

While it is conceivable that certain facts about Jewish tradition or habits may be relevant to a determination of facts in this case, there is nothing as outlined in the Defendant's Rule 44.1 notice that this Court, at this time, deems relevant to any issue that it must decide (e.g., a Beit Din (court of Jewish law), Tashmishei Kedusha, or Maimonidean writings). Moreover, the Rabbi's proposed factual testimony about the meaning or interpretation of the 1903 and 1908 leases has no relevance to any issue the Court must decide.

Plaintiff's Motion in Limine (ECF No. 68) to exclude the proposed testimony of Rabbi Dr. Meir Y. Soloveichik's is GRANTED.

IT IS SO ORDERED:

John J. McConnell, Jr.
United States District Judge

May 22, 2015

---

[2] The Court need not address the question of whether the Establishment Clause of the First Amendment would prohibit admission of this testimony because the Court has found it to be irrelevant and therefore not admissible.

2

**AD112**

1

TRIAL DAY 4

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

NO.:  12-822-M(LDA)

--------------------------------x

CONGREGATION JESHUAT ISRAEL,

               Plaintiff

V.

CONGREGATION SHEARITH ISRAEL,

               Defendant.

---------------------------------x


TRIAL DAY 4,

Friday, June 5, 2015, 9:30 a.m.

Before:    Judge John McConnell

United States District Court

One Exchange Street, Providence, Rhode Island




Reported by:

Tara L. Wosny, CSR

**AD113**

142

1   they are here to testify, and, indeed,

2   their 30(b)6 witness, Mr. Lustig, the one

3   they put forward on why they blocked the

4   sale, and issued C&D, this is the -- what

5   do you call, the cease and desist, he

6   didn't say anything about governing

7   rituals.

8            He said, "We blocked it because

9   we owned it."  That was the testimony.

10   "That is why we blocked the sale, because

11   we own it."

12            It's not really fair, and I

13   say --

14            THE COURT:  I'm ready to rule.

15            I'm not going to allow the rabbi

16   to testify.  I think as I previously said,

17   the qualifications that have been offered

18   in the proffer, and the earlier motions

19   for the rabbi is either, A, not competent,

20   and I don't mean that as personal affront

21   at all, but as a fact witness, he is not

22   competent to testify to the matters that

23   have been proposed.  That's one.

24            Two, as a fact witness, The Court

25   finds that he would not have any relevant

```
 1    fact information on any issue that's

 2    before the trier of the fact.

 3              And thirdly, that allowing him to

 4    testify at this stage under these

 5    circumstances would, in fact, open a

 6    Pandora's box, that The Court is not

 7    willing to allow to open.

 8              MR. NAFTALIS:  Thank you.

 9              MR. SOLOMON:  Thank you.

10              THE COURT:  Call the next

11    witness.

12              MR. WAGNER:  Your Honor, Jeshuat

13    Israel calls Laura Pedrick.
         --------------------------
14         LAURA PEDRICK, SWORN.
         --------------------------
15              THE CLERK:  Please state your

16    name and spell the last name for the

17    record.

18              THE WITNESS:  Laura Freedman,

19    F-R-E-E-D-M-A-N.

20              THE CLERK:  Thank you.  You may

21    be seated.

22              THE COURT:  The first question is

23    to clarify the name issue, right.

24              MR. WAGNER:  I was going to ask,

25    who is this Laura Freedman?
```

Case:Case:756-17561756cumDorutn0e01t7D658Page:Page: 189ate Date:File05/20176/201Entry ID:600389138

# TITLE 18
# Fiduciaries

## CHAPTER 18-2
## Appointment of Fiduciaries

### SECTION 18-2-1

**§ 18-2-1  Appointment of trustees by superior court. –** If no trustee is named in any instrument creating a trust, or the trustee named in the instrument renounces or declines to accept the trust, or whenever a trustee, either original or substituted, and whether appointed by a court or otherwise, is dead, or desires to be discharged from the trust or powers reposed in or conferred on the trustee, or refuses to act or is incapable of acting as trustee, then any person interested under the trust, or the surviving or continuing trustees or trustee for the time being, or the personal representatives of the last surviving or continuing trustee, may apply to the superior court and the court may at that time, after due notice to the parties in interest, or to any of them that the court shall adjudge to be necessary parties, appoint some suitable person or persons to be trustee or trustees, or new trustee or trustees, as the case may be, under the trust.

History of Section.
(G.L. 1896, ch. 208, § 1; P.L. 1896, ch. 346, § 1; P.L. 1899, ch. 680, § 1; C.P.A. 1905, § 1143; G.L. 1909, ch. 259, § 1; G.L. 1923, ch. 303, § 1; G.L. 1938, ch. 486, § 1; G.L. 1956, § 18-2-1.)

**AD116**

<u>MEETING OF MAY 28, 1893</u>

The following were present:

| | |
|---|---|
| I. Levy | E. Schrier |
| L. Hess | H. Hess |
| J. Engell | I. J. Josephson |
| N. Rosen | J. Servadio |
| M. Levy | |

Motion was made and passed that E. Schrier be chairman and Max Levy, secretary. The following preamble was submitted, accepted and signed by those whose names appear thereto:

PREAMBLE

"We, the undersigned Jewish residents of the City of Newport, State of Rhode Island, assembled in conference on the 28th day of May, 1893, do make known that we have formed and by these presents declare, that we have formed a Jewish Congregation, the name and title of which shall be known as the "Congregation Yeshuath Israel." That we pledge ourselves to conform to the strict laws, rules and ritual of Orthodox Jewish faith. That we apply to the Legislature of this State to grant us a charter, so that we may transact the business of this Congregation in legal form. That we will abide by all laws and regulations which may hereafter be passed by this Congregation.

That as a duly organized Congregation we claim for its government and advancement the benefits accruing from the Abraham Touro and Judah Touro Funds, and as specified in said Abraham and Judah Touro wills."

We pledge ourselves to work in harmony to advance the interest of this Congregation and the teachings of G-d's holy law, and to exemplify to our Co-religionists the great teachings of those who helped build this ancient house of worship to the glory of G-d. That peace may abide in our midst and charity reign supreme.

To all of which we subscribe our names this 13th day in Sivan 5853, May 28th, 1893.

Signed:

| | | |
|---|---|---|
| Isaac Levy | Louis Hess | Henry Hess |
| J. Servadio | J. Engell | Israel J. Josephson |
| Eugene Schrier | Max Levy | Samuel Levy |
| I. Bergman | | |

The following officers were elected on a motion that was made and duly passed:

Isaac Levy - President
Eugene Schrier - Vice-President
Max Levy - Secretary and Treasurer
Louis Hess
J. Engell
J. Servadio

(1)

CJI 001166

**D0058-001**

**AD117**

<u>Meeting of May 28, 1893 (Cont'd)</u>

The following resolutions were passed:

"Resolved - That the secretary of the Congregation be authorized to procure such stationary, books and all necessities which may be required for the transaction of all business appertaining to this Congregation."

"Resolved - That this Congregation shall hold a meeting every two weeks for the next two months, and that a committee be appointed by the President to establish By-Laws, and submit the same for action to this Congregation at as early a date as possible."

"Resolved - That the President be empowered to draw up a contract for this Congregation that any minister who may officiate to this Congregation shall abide by the rules and regulations of this Congregation."

It was voted that Rev. David Baruch of New York, N. Y. be recommended to the City Council of this City as the minister who shall officiate for this Congregation and that his term shall be from the 7th day of June 1893 to the 7th day of June 1894.

It was voted that the secretary be a committee to wait upon the City Council at its next monthly meeting to refer to them the accepted candidacy of Rev. David Baruch of New York as the minister of this Congregation.

"Resolved - That Rev. David Baruch of New York, N. Y. be notified that he has been elected as Hassan (sic) of this Congregation for one year dating from the 7th day of June 1893 to the 7th day of June 1894, subject to the rules and regulations of this Congregation and the action of the City Council of the City of Newport, R. I."

"Resolved - That the 19th Street Synagogue of the City of New York be informed of the formation of the Congregation and its properly elected officers and its application to the General Assembly of this State for a charter. That we request of them the further assistance which they have in the past rendered in the loan of such property as has formerly been in use in the services. That we have elected Rev. D. Baruch as our Minister for one year; he to abide by such regulations as this Congregation may from day to day pass."

Having been duly signed, it was moved, seconded and passed that the following petition, signed by the President and Secretary as representing this Congregation be presented to the City Council at its next monthly meeting.

PETITION

Newport, R. I. May 30/93.

To the Honorable.

The Mayor and Common Council

(2)

CJI 001167

Newport, R. I., Tamuz 11th., 5653, (June 25, 1893)

Mr. Isaac Brandon, Esq.

President Spanish and Portugese Congregation,

New York City.

Dear sir:/

I am authorized by our Congregation to inform you that no official communication ~~yyy~~ came to hand from your body in relation to a Committee you intended to send to meet us for consultaion in matters pertaining to Synagogue matters here. Your Committee having arrived here unexpected we could only learn of their doings while here from the personal views exchanged between them and our President and Vice-President. The matter refered to came before our full meeting to-day and after due consideration we have come to the conclusion that we cannot accept the stipulations which you have forwarded to us for your Congregation , for various reasons, chiefly, the signing of which would be an acknowledgement on our part of a right which we do not, as yet, know that you possess, and which we cannot legally recognize.

We have adopted as our own, some of the stipulations, but cannot adopt them as a whole as we are not in possession of any facts which give your Congregation a right and power in the matter of making conditions. If you have such rights they should be placed before us in a legal form and to our satisfaction, and if proven, rest assured all differences can be adjusted.

We claim that as a duly organized Congregation we alone should establish laws to govern and guide us in our actions. So far we have been guided somewhat by what you have suggested ,but we do not consider any suggestion as obligatory.

The establishment of a clear title to the property should be your aim. Certainly we do not claim any ownership in the property. We look upon the City Council of this City as the guardians of the Synagogue in conformatory with a law passed by the General Assembly of this State.

The heirs-at-law, alone, can move in the matter, and we hope you will see the justice of our position. Although we do not claim ownership in the propertyor appurtenances, rest assured we will guard the same zealously for our pride in this ancient house of worship is dear to us and in connectin

therewith we have a great admiration for those who helped built it.

Respectfully yours

Congregation Jeshuath Israel
per Max Levy Sec

CJI 000042

The Congregation, Jeshuat Isreal, agrees to admit and re-
cognize without qualification the title and ownership of the ~~Con-
gregation Shearith Isreal~~ to the synagogue building, premises and
fixtures.

The ~~Congregation, Shearith Isreal~~, upon receiving the abso-
lute surrender of said premises agrees to make a lease thereof to
the Congregation Jeshuat Isreal for five years from February 1,
1903, at the nominal rent of one dollar yearly; said lease shall be
in form satisfactory to the landlord and shall contain such clauses
as will obviate the necessity of any legal proceedings, so far as
possible, by either party to enforce its rights thereunder.

The pending litigation between the parties shall be discon-
tinued without costs to either as against the other.

The undersigned having been appointed a committee with power
to adjust all matters in difference agree to the foregoing and will
insist upon the acceptance of this settlement by all members of the
Congregation and their loyal acceptance of the adjustment of dif-
ferences.

January 30, 1903.

*[signatures]*

CSI4533

**D0146-001**

**AD120**

22

*Newport R.O.*
*Feb. 2. 1913.*

At a Special Meeting of the Board of Trustees of the Congregation Jeshuat Israel held at Newport, Rhode Island, on the 2nd day of February, 1903, the following was unanimously passed:

WHEREAS, All matters in difference between this Congregation and L. Napoleon Levy and others, Trustees, owners of the Synagogue building at Newport, have been amicably settled and adjusted by Messrs. Engel, Josephson and Frant, a Committee authorized to confer with the said Trustees; and

WHEREAS, The said Committee having reported the terms of said adjustment, it is now

RESOLVED, That the *Julius Engel, J.J. Josephson* and *David Frant* of this Congregation be and they hereby are authorized and directed to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said Trustees, owners of the property, and to agree upon the terms and provisions of a lease from said Trustees to this Congregation for the term of five years from February 1, 1903, at the nominal rent of one dollar yearly, in form satisfactory to the landlord.

*Barney Wilner*
*Secy*

CJI 000371

**D0147-001**

**AD121**

JEFFERSON M. LEVY,
L. NAPOLEON LEVY,
20 BROAD ST.,

TELEPHONE { 713 } CORTLANDT.
{ 714 }

NEW YORK, *February 10th 903.*

Dear Doctor:—

I send herewith the two leases with a note which you can hand to Mr. Sheffield.

The matters to be settled are:—

First:— I insert in the lease (if possible) the words "with the paraphernalia"

Secondly, ascertain if the Committee signed the Lease individually, if not, they should.

Thirdly:— They should acknowledge the lease before a notary —or Justice, that they executed the lease under authority of the Board of Trustees, and that the seal was affixed by like authority

Fourthly:— Record the lease and have it returned to me.

CSI5408

**AD122**

JEFFERSON M. LEVY,
L. NAPOLEON LEVY,
20 BROAD ST.,

TELEPHONE {713 / 714} CORTLANDT.

NEW YORK,_____ 1

- 2 -

Fifthly:- Obtain surrender of the building,
and personal property.

Sixthly:- Deliver lease to President *or vice President*
of the Congregation

Seventhly:- Obtain a list of the
personal property signed by the
officer of the Congregation and return
to us of our Defer.

The surrender of possession is a
matter of importance and should be
made publicly before witnesses as I
have doubts of the regularity of the
meeting authorizing the lease.

I suggest you attract the attention
of the Press to the surrender, that the
act may obtain some notoriety.

Yours truly,

L. N. Levy

over

CSI5409

**D0151-002**

mode of procedure

The keys of the building and gates should
be delivered to you by an authorized
officer of the Congregation who shall
declare the property, viz: _____ is thereby surrendered
to you representing the owners, of the
property — It might be well that one or
all of our names be announced so
that no question can be raised to
whom the property was delivered.
thereupon you or Mr Sheffield will de-
liver to said officer a copy of the
Leases and return the keys,

**AD124**



CJI 000472

**D0148-001**

**AD125**

THIS INDENTURE, made the 2nd day of February, one thousand nine hundred and three BETWEEN L. NAPOLEON LEVY, DAVID de MEZA, ALBERT J. ELIAS, ALFRED LYONS, HENRY M. BELAIS, EDGAR J. NATHAN, and SAMUEL L. HYMAN, as Trustees, and N. TAYLOR PHILLIPS, *as Trustee*, all of the City of New York, parties of the first part, and the CONGREGATION JESHUAT ISRAEL, of the City of Newport, Rhode Island, party of the second part

W I T N E S S E T H,

That the said parties of the first part have letten, and by these presents do grant, demise, and to farm let, unto the said party of the second part, ALL that certain tract of land, with the building thereon, situate lying and being in the City of Newport, State of Rhode Island whereon the Jewish Synagogue now stands, bounded and described as follows:  SOUTHERLY on Touro Street, Ninety two and Forty-six One Hundreths Feet;  EASTERLY on land of the Newport Historical Society, One Hundred and Nine and Right tenths Feet;  NORTHERLY on Barney Street, Ninety and Sixty-five One Hundreths Feet;  and WESTERLY on land of George P. Lawton; be said dimensions more or less.  With the appurtenances, for the term of five years from the first day of February one thousand nine hundred and three at the annual rent or sum of One Dollar to be paid in equal yearly payments in advance on the 1st day of February in each year.

AND it is agreed that if any rent shall be due and unpaid, or if default shall be made in any of the covenants herein contained, then it shall be lawful for the said parties of the first part to re-enter the said premises and the same to have again, repossess and enjoy.

AND the said party of the second part does covenant to pay to the said parties of the first part the

# AD126

-3.-

said yearly rent as herein specified.

AND the said party of the second part further covenants that it will not assign this lease, nor let or underlet the whole or any part of the said premises, nor make any alterations therein without the written consent of the said parties of the first part under the penalty of forfeiture and damages; and that it will not occupy or use the said premises, nor permit the same to be occupied or used for any purpose other than herein stated, without the like consent under the like penalty.

This lease and the term hereby granted is made upon the express covenant and condition that the party of the second part will cause the same to be used and occupied for the maintenance therein of the usual and stated religious services according to the ritual rites and customs of the Orthodox Spanish and Portugese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel, in the City of New York.

It is further agreed that before any Minister can officiate in said Synagogue, his appointment to the position must first be approved of in writing by a majority of the parties of the first part, or of their successors.

AND at the expiration of the said term the said party of the second part will quit and surrender the premises hereby demised, in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted.

It is further agreed by and between the parties hereto, that should any of the covenants, conditions or agreements herein stated, be violated by the party of the second part, then and in that event the term hereby granted shall cease and determine and this Lease shall become null and void and the parties of the first part shall re-enter

CJI 000474

D0148-003

**AD127**

into possession of said premises and may oust the party
of the second part therefrom or may recover possession of
the same in any appropriate action as against a tenant
holding over his term.

And the said parties of the first part do cove-
nant that the said party of the second part, on paying
the said yearly rent, and performing the covenants afore-
said, shall and may peaceably and quietly have, hold and
enjoy the said demised premises for the term aforesaid.

AND IT IS FURTHER UNDERSTOOD AND AGREED, that
the covenants and agreements contained in the within
Lease are binding on the parties hereto and their legal
representatives.

Sealed and delivered
in the presence of

*[signatures]*

Congregation *[Josh...]* School
By Julius *[Berger]*
*[J. J. Josephson]*
*[G. Trust]*

Committee

CJI 000475

**D0148-004**

**AD128**

STATE OF NEW YORK)
CITY OF NEW YORK)SS.
COUNTY OF NEW YORK)

On the *Tenth* day of February in the year nineteen
hundred and three before me personally came L. Napoleon Levy,
David de Meza, Albert J. Milne, Alfred Lyons, Henry B. Baldis,
Edgar J. Nathan, Samuel A. Hyman and M. Taylor Phillips to me
known and known to me to be the individuals described in and
who executed the foregoing instrument and who acknowledged
that they executed the same.

*Louisa A. Littleton*

*Notary Public*

*N.Y. City Certificate*

State of Rhode Island
Newport Sc.

At Newport on this 18th Day of
February A.D. 1903 personally appeared the
above named Julius Lych, Seal J. Josephson
and David Trust, and acknowledged the fore
going instrument to be their free act and deed
after said Corporation Instrument Seal and
their own free act and deed, as a Committee

Before me

*Wm P Sheffield*

*Notary Public*

CJI 000476

**D0148-005**

**AD129**

-4-

into possession of said premises and may oust the party

of the second part therefrom or may recover possession of

the same in any appropriate action as against a tenant

holding over his term.

   And the said parties of the first part do cove-

nant that the said party of the second part, on paying

the said yearly rent, and performing the covenants afore-

said, shall and may peaceably and quietly have, hold and

enjoy the said demised premises for the term aforesaid.

   AND IT IS FURTHER UNDERSTOOD AND AGREED, that

the covenants and agreements contained in the within

lease are binding on the parties hereto and their legal

representatives.
   Sealed and delivered
   in the presence of

The words and paraphernalia belonging
thereto; interlined before signing
   W. P. Sheffield
   as [illegible –one word]

Congregation Jeshuat Israel
by Julius Engel
I.J. Josephson
 D. Frant
    Committee.
 Henry Belais
 Napoleon Levy
 Albert J. Elias          [TRUSTEES]
 N. Taylor Phillips
 Edgar J. Nathan
 Alfred Lyons
 David de Meza
 Samuel J. Hyman

CSI0029

**D0150A-003**

**AD130**

# URSILLO, TEITZ & RITCH, LTD.
## Counsellors At Law

Michael A. Ursillo
Andrew M. Teitz
Scott A. Ritch*
*Also admitted in Mass.

2 Williams Street
(at South Main Street)
Providence, Rhode Island 02903-2918

Tel. (401) 331-2222
Fax (401) 751-5257
Cable: LINCOLN



November 5, 2001

Alvin Deutsch, Esq.
McLaughlin & Stern
260 Madison Avenue
New York, NY 10016

Re: Touro Synagogue - National Trust for Historic Preservation - Operating Agreement

Dear Alvin:

As per our conversation, enclosed please find a copy of the Operating Agreement between the National Trust for Historic Preservation, Congregation Jeshuat Israel, and the Society of Friends of Touro Synagogue National Historic Site, Inc. Although this agreement was signed in front of thousands of people, I have been assured by the other organizations, and can assure you on behalf of the Society, that we will amend it if there are any problems on the part of Congregation Shearith Israel.

Without depriving you of the pleasure of reading the agreement, I will point out the following elements which I believe you will look favorably upon. First, it is an "Operating" Agreement related only to the operation and not the ownership of the site. Secondly, as indicated in the third "whereas" clause, the lease with Congregation Shearith Israel is explicitly acknowledged. Furthermore, at the end of Paragraph 3, it is specifically acknowledged and agreed "that the primary use of Touro Synagogue is as a place of worship, and that the public visitation is a secondary use of the property."

As to the rest of the agreement, you will note that it essentially focuses on the ability of the organizations to assist one another, and to do joint fund raising and publicity initiatives. "Consultation" is the thrust of this agreement. As to any changes in the Synagogue, our only requirement is to submit them to the National Trust for Historic Preservation for review, and then to consider their comments. They have no control over it. Finally, although the term is for fifty years, it can be terminated upon one hundred and eighty days notice of any party for any reason, and we have a liquidated damages clause of only $100.00.

TSF000722

**D0364-001**

Alvin Deutsch, Esq.
November 5, 2001
Page 2

     In summation, we think that this will be a wonderful opportunity for Touro Synagogue, both to help us in our capital campaign which will preserve the Synagogue for another two hundred years, and to present this cherished treasure to a nationwide audience of historic preservationists.

     After you have had a chance to review the document, would you please contact me with any comments that you may have.

          Sincerely yours,

          **URSILLO, TEITZ & RITCH, LTD.**

          Andrew M. Teitz

AMT/cs

cc:    Jane Sprague, Executive Director
      David Bazarsky, Co-President, Congregation Jeshuat Israel
      Laura Pedrick, Co-President, Congregation Jeshuat Israel

E:\DOCS\ANDY\Touro 2001\Deutsch,Alvin - 110501.wpd

TSF000723

**AD132**



HISTORIC SITE OPERATING AGREEMENT

TOURO SYNAGOGUE

This Agreement made this 17th day of October 2001, by and between the

CONGREGATION JESHUAT ISRAEL OF NEWPORT, a religious non-profit corporation

created under the laws of the State of Rhode Island, with principal offices at 85 Touro Street,

Newport, RI 02840 (hereinafter called the Congregation Jeshuat Israel or the Congregation),

THE SOCIETY OF FRIENDS OF TOURO SYNAGOGUE, NATIONAL HISTORIC SITE,

INC., a non-profit, non-sectarian charitable and educational corporation organized under the laws

of the State of Rhode Island, with principal offices at 85 Touro Street, Newport, RI 02840

(hereinafter called the Society),  the NATIONAL TRUST FOR HISTORIC PRESERVATION

IN THE UNITED STATES, a charitable, educational, nonprofit corporation created by the

Congress of the United States, with principal offices at 1785 Massachusetts Avenue, N.W.,

Washington, D.C. (hereinafter called the "National Trust").


WHEREAS, Touro Synagogue, located on Touro Street, Newport, Rhode Island 02840,

is historically and architecturally significant as the earliest surviving American synagogue

building, as a place representing the development of the principle of religious freedom in

America, and as an outstanding example of the work of eighteenth century architect Peter

Harrison;


WHEREAS, Touro Synagogue was designated a National Historic Site pursuant to an

TSF000724

**D0364-003**

**AD133**

Order of March 5, 1946 and was listed in the National Register of Historic Places on October 15, 1966;

WHEREAS, the Touro Synagogue is an active place of worship of the Congregation Jeshuat Israel, which has possession of the site through a lease with Congregation Shearith Israel as owner;

WHEREAS, the Touro Synagogue is interpreted to the public by the Society as a national historic site concerning the history of the Synagogue, the city of Newport, and the development of religious freedom as an inherent and guaranteed civil right.

WHEREAS, in the maintenance and interpretation of the Touro Synagogue, the Congregation Jeshuat Israel is assisted by the Society of Friends of Touro Synagogue, Inc.

WHEREAS, the Congregation Jeshuat Israel, the Society and the National Trust mutually desire and intend to enter into a relationship respecting the Touro Synagogue pursuant to which they will support and benefit each other, such a relationship to be governed by this Agreement;

WHEREAS, the National Trust is willing to provide to the Congregation Jeshuat Israel and the Society the benefits respecting the Touro Synagogue and the Congregation Jeshuat Israel and the Society are willing to undertake the obligations respecting the premises, as set forth in this Agreement;

2

TSF000725

**D0364-004**

**AD134**

NOW, THEREFORE, for and in consideration of their mutual covenants, agreements and undertakings hereinafter set forth, the Congregation Jeshuat Israel, the Society and the National Trust hereby agree as follows with relation to the Touro Synagogue:

1.  <u>National Trust Historic Site</u>. The National Trust, the Congregation Jeshuat Israel and the Society agree that, for a term of fifty (50) calendar years beginning as of October 1, 2001, unless terminated prior thereto pursuant to Paragraphs 20 or 22 of this Agreement, the Touro Synagogue on Touro Street, Newport, Rhode Island, shall be presented to the public and treated by the parties as a National Trust Historic Site, as indicated herein.

2.  <u>Consideration</u>. The consideration for this agreement is the mutual covenants and promises made herein. No monetary compensation is contemplated by the terms of this agreement except as expressly stated herein or as may be mutually agreed between the parties.

3.  <u>Cooperation</u>. The National Trust, Congregation and the Society agree to cooperate fully with each other in the treatment of the Touro Synagogue as a National Trust Historic Site, including the preservation, interpretation, visitation and marketing of the property, and the properties associated with the Synagogue, including the Levi Gale House, the historic Jewish Cemetery, Patriots Park and the proposed visitor's center (hereinafter the Associated Properties). It is acknowledged and agreed that, in the performance of this agreement, any obligation of the Congregation Jeshuat Israel specified herein may be performed by the Society on behalf of the Congregation. It is further acknowledged and agreed that the primary use of

3

TSF000726

**D0364-005**

**AD135**

Touro Synagogue is as a place of worship, and that the public visitation is a secondary use of the property.

4.  Preservation.  Congregation agrees to continue to maintain, preserve and administer Touro Synagogue and the Associated Properties so as to protect and preserve the historical integrity of their features, materials, appearance, workmanship, and environment, in accordance with the Secretary of the Interior's Standards for the Treatment of Historic Properties, as amended from time to time.  The Congregation Jeshuat Israel further agrees to develop and utilize a Maintenance Manual for the site that is consistent with the Model Maintenance Manual for National Trust Historic Sites, as it may be amended, modified or supplemented from time to time.

5.  Conservation.  Touro Synagogue will continue to reflect appropriate standards for conservation of its museum collection.  The Congregation Jeshuat Israel agrees that it will continue to maintain, preserve and administer Touro Synagogue so as to protect and conserve the related collections in its ownership, possession or control, in a manner substantially similar to the National Trust Collections Care Manual, the Objects Policy, and the Housekeeping Manual, as they may be amended, modified or supplemented from time to time.

6.  Interpretation and Education.  Congregation Jeshuat Israel agrees that it will continue to interpret Touro Synagogue to a broad and diverse audience, so as to accurately and honestly interpret the history of the site in the context of larger themes of American history and culture.

4

TSF000727

**D0364-006**

**AD136**

7. <u>Other Standards</u>. Touro Synagogue will continue to reflect appropriate standards of archaeology and use. The Congregation agrees that it will continue to take into consideration the Secretary of the Interior's Standards for the Treatment of Historic, as they may be amended, supplemented or modified from time to time.

8. <u>Review by the National Trust</u>. The Congregation agrees that it will advise the National Trust of plans to substantially develop and modify the operation or maintenance of Touro Synagogue or the Associated Properties, including substantial changes to the physical fabric of the properties, to the collection, to the interpretive and educational program or other programs related to the preservation and interpretation of the properties. Prior to implementing any substantial change or plan, the Congregation agrees, except in emergencies, to give the National Trust an opportunity to participate in the planning process and to review plans and specifications for projects. In the event that the National Park Service is reviewing plans pursuant to an agreement between the Congregation and the National Park Service, the National Trust will not duplicate the review of the National Park Service. The National Trust agrees to submit to the Congregation (or to the Society as appropriate), as soon as possible, but in no event later than thirty (30) days following receipt of any such plans, such advice and recommendations as the National Trust may deem appropriate. The Congregation agrees, in finalizing plans, to give serious consideration to all advice and recommendations of the National Trust but the ultimate decision with respect to all proposals shall be made in the sole discretion of the Congregation (or the Society as appropriate). All costs of such implementation will be the responsibility of the Congregation or the Society except for any costs incurred by the National

5

TSF000728

**D0364-007**

**AD137**

Trust in participating in the planning and reviewing such plans, and rendering advice and

recommendations, which costs shall be the responsibility of and borne by the National Trust.

9.    <u>Visitation</u>.

A.    <u>Open to Public</u>.  The Congregation agrees to keep Touro Synagogue open for

public visitation during reasonable hours not less than 200 days each year.  It is understood that

the hours of visitation may be substantially reduced during the off-season.  The parties

acknowledge that the primary use of Touro Synagogue is as an active synagogue for religious

services and that public visitation will not be permitted when the property is being used for

religious purposes.

B.    <u>Visitation Rights of the National Trust</u>.  The National Trust's Trustees, officers,

employees and members shall, during the public visitation hours provided for above, have the

right of visitation to Touro Synagogue upon presentation of a current membership card, without

payment of admission fee or any other charge or expense, except for events or programs for

which a special fee may be charged.

C.    <u>Membership Initiatives</u>.  The Congregation agrees to make National Trust

membership brochures available and to sell National Trust memberships at the Synagogue or

visitors center.  In addition, the Society and the National Trust agree to consider joint

membership initiatives including the design of a National Trust display at the site, subject to the

mutual agreement of both parties.  The National Trust agrees to display the brochures for the

Synagogue and membership applications to the Society in its National Office.

10.    <u>Publicity</u>.  Promptly following execution of this Agreement, the Congregation and

6

TSF000729

**D0364-008**

**AD138**

IN WITNESS WHEREOF, the parties have hereunto set their hands and affixed their respective seals, the day and year first written above.

CONGREGATION JESHUAT ISRAEL OF NEWPORT

By: _Laura F. Pedrick_     Date: _Oct 17, '01_

SEAL

SOCIETY OF FRIENDS OF TOURO SYNAGOGUE, INC.

By: _[signature]_     Date: _Oct 17, 2001_

SEAL

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES

By: _Will B Hart_     Date: _10/17/01_

SEAL

DRAFT #4a, 10/4/01

15

TSF000738

**D0364-017**

Touro Synagogue History        http://tourosynagogue.org/history-learning/synagogue-history

**Touro 2.5 joomla**

# TOURO SYNAGOGUE
### NATIONAL HISTORIC SITE

*America's Oldest Synagogue*
*Loeb Visitors Center*
*Colonial Burial Ground*

| Home | Visit | Congregation Jeshuat Israel | History & Learning | Photo Galleries | Contact Us |



## Origins

**First Jews in Newport.** The small but growing colony of Newport, Rhode Island received its first Jewish residentsin the 17th century, possibly as early as 1658. Fifteen people arrived from Barbados, where a Jewish community had existed since the 1620s. They were of Spanish and Portuguese origin; their families had migrated from Amsterdam and London to Brazil and then the islands of Suriname, Barbados, Curaçao and Jamaica. Upon their arrival they formalized a new congregation in Newport (the second oldest Jewish congregation in the United States) calling themselves 'Yeshuat Israel'. By 1677, the community realized the need to acquire land for a Jewish cemetery. Two of the original immigrants, Mordechai Campanal and Moses Israel Pacheco purchased the lot at the corner of what is now Kay and Touro Streets for this purpose.

Leaders of the first 15 Jews to settle in Newport included Mordechai Campanal, Moses Israel Pacheco, Simon Mendez, and Abraham Burgos. In the 1680s they tested the British Navigation laws which prohibited aliens from engaging in mercantile trades. In 1684 The General Assembly of Rhode Island resolved that the group were able to conduct business, and that they were entitled to the full protection of the law as "resident strangers".

## Building the Synagogue

Through the early and middle 1700s, Newport rose in prominence and importance, taking a leading role in the shipping and mercantile trades of the American Colonies. By 1758, the Jewish population had grown sufficiently that there was need for a larger, permanent gathering place and a house of worship. The Congregation accepted the offer of Newport resident Peter Harrison, who volunteered to design a new building to house the synagogue. Harrison, a British American merchant and sea captain, was self-tutored in architecture, studying mostly from books and drawings. He had already completed the building of Newport's Redwood Library and King's Chapel in Boston. Construction began on the "Jews Synagogue" in 1759. At the same time, Harrison was also building Christ Church in Cambridge, Massachusetts and the Brick Market in Newport.

A number of theories have been put forth as to how Harrison, having no direct experience of the needs and requirements of a Jewish house of worship, could execute the elegant design of New England's first synagogue. He had a limited choice of earlier models to draw on in the Western Hemisphere. He might have seen the Mikvé Israel Synagogue on the island of Curaçao. Their first building was constructed in 1703 and their second building had been dedicated in 1732. Congregation Shearith Israel in New York had also already built their first Mill Street Synagogue (dedicated in 1730). Jewish communities throughout America's mid-Atlantic region and in the Caribbean were closely tied to Newport's Jewish citizens through family and business interests. Generous financial support also came for the new building in Rhode Island from both of these congregations and from the Jewish communities in London, Jamaica, and Surinam.



For the building's exterior Harrison drew on his knowledge of and enthusiasm for Palladian architecture. He is credited with being one of the first to bring this popular European architectural style to the American colonies. For the interior, his best references came directly from the members of the congregation, notably, the *Hazzan* [prayer leader], Isaac Touro, who had only recently arrived from Amsterdam. The Newport building was completed in 1763 and was dedicated during the Chanukah festival celebrations on December 2nd of that year. The dedication ceremony was a regional celebration attended not only by the congregation, but also by clergy and other dignitaries from around the colony including Congregationalist Minister Ezra Stiles who later became the president of Yale University. His diaries have proven a treasure trove of information on Newport, the Rhode Island colony, and the Jewish community of the mid-eighteenth century.

## From the Revolution to the First Amendment

At the onset of the American Revolution, the British occupied Newport and many of the Jewish residents of the city fled, removing their families and businesses to Massachusetts, Connecticut, and New York. Remaining behind was Isaac Touro, who kept watch over the synagogue as it became a hospital for the British military and a public assembly hall. During the occupation, the British troops, desperate for wood during the long, cold winters tore down and burned a number of local residences and buildings. The synagogue's usefulness as a hospital

CSI14641

D0549-001

### AD140

Touro Synagogue History                                                    http://tourosynagogue.org/history-learning/synagogue-history

ward and meeting house kept it from the same fate. In October 1779 the King's troops evacuated Newport and within a year or two many of the Jewish families returned to town and took up their businesses again.

In August 1790, three months after Rhode Island had joined the United States by ratifying the Constitution, George Washington chose to visit Newport for a public appearance to rally support for the new Bill of Rights. As part of the welcoming ceremonies for the President of the United States, Moses Mendes Seixas, then president of Congregation Yeshuat Israel , was one of the community leaders given the honor of addressing Washington. In his letter of welcome, Seixas chose to raise the issues of religious liberties and the separation of church and state. Washington's response, quoting Seixas' thoughts, has come down to us as a key policy statement of the new government in support of First Amendment rights.

## The Quiet Years

The War for Independence and the occupation by the British took their toll on the region's economy. The rival ports of New York, Philadelphia, Charleston, Savannah, and Boston quickly overshadowed Newport's hold on the mercantile trades. Many of the Jewish merchants of Newport already had business interests in these cities. By the time the War of 1812 ended, most of the Jewish families had moved to newly forming synagogue communities in the rival cities. The Newport synagogue was being used infrequently, opened only during holy days and for funerals. Eventually, the remaining congregants decided to lock the doors. Stephen Gould, a member of a local Quaker family and good friend to many of the former Jewish residents of Newport, was engaged as caretaker. Legal oversight of the building, its contents, and its deed was handed to Congregation Shearith Israel of New York. From the Synagogue's beginning there had been a close relationship between Congregation Yeshuat Israel of Newport and the older Spanish-Portuguese community in New York, just over one day of sailing distant. In fact, many of the founding families of Newport had come originally from Congregation Shearith Israel and it was from the New York community that they had obtained several ritual objects for their services.

## Naming the Synagogue

Through the first half of the nineteenth century, even as the Jews of Newport dispersed, they did not relinquish their sense of responsibility to their synagogue or to their burial ground. As members died, their bodies were returned to Yeshuat Israel for interment. Newport natives Abraham and Judah Touro, sons of Isaac Touro, both provided bequests to see to the perpetual care and maintenance of the Congregation's properties.

In 1820, Abraham Touro had a brick wall built around the cemetery, and when he died in 1822 he bequeathed $10,000 to the State of Rhode Island for the support and maintenance of the "Old Jewish Synagogue" in Newport. He made an additional bequest of $5,000 for the maintenance of the street which runs from the cemetery down the hill to the synagogue building. As a result of his generosity, the street was named "Touro Street." When the state legislature accepted Abraham's gift, they were the first to publicly refer to the synagogue as "Touro (or Touro's) Synagogue."

Abraham's brother, Judah Touro died in 1854. Prior to his death he had seen to the replacement of the wall his brother Abraham had built thirty years prior, which was in disrepair. The brick wall was replaced with a granite and wrought iron enclosure. When Judah died, his will, which was published in several languages around the world, left bequests to both Jewish and non-Jewish charitable organizations in the United States and abroad. To Newport he gave $10,000 towards the ministry and maintenance of the synagogue, $3,000 towards building repairs and book purchases for the Redwood Library, and $10,000 for the Old Stone Mill, with the property to become a public park. Both brothers, Abraham and Judah Touro, are hailed amongst the first great American philanthropists.

## New Beginnings



The end of the nineteenth century ushered in new life for the Touro Synagogue with the arrival of the eastern European Jews to the United States. In 1881, the "new" Jewish community of Newport petitioned Congregation Shearith Israel to reopen the town's synagogue for services and to appoint a permanent rabbi. Abraham Pereira Mendes of London was called to Newport, arriving in 1883 and served as the Rabbi to Congregation Yeshuat Israel for ten years. During and following this period, Congregation Shearith Israel in New York retained rights to the building but an independent Congregation Jeshuat Israel [sic] was re-established, choosing to affiliate as an Orthodox community following Spanish Portuguese ritual traditions. A lease amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith Israel for use of the building and grounds, which are still owned by the New York group.

Then in 1946, Touro Synagogue, as it is now known, was designated a National Historic Site. The Friends of Touro Synagogue (now the Touro Synagogue Foundation) was established two years later to aid in the maintenance and upkeep of the buildings and grounds as well as to raise funds for and to publicize the history of the Touro Synagogue. Each year, the Touro Foundation sponsors an educational lecture series and holds a public reading of the George Washington letter as a celebration and pronouncement of religious freedom. The synagogue remains an active house of worship and is also toured by thousands of visitors every year.

Search this site ...    Go

## D0549-002

CSI14642