IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

❖

CONGREGATION JESHUAT ISRAEL,

*Plaintiff-Appellee,*

—v.—

CONGREGATION SHEARITH ISRAEL,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

## BRIEF OF PLAINTIFF-APPELLEE
## CONGREGATION JESHUAT ISRAEL

STEVEN E. SNOW
PARTRIDGE SNOW & HAHN LLP
40 Westminster Street, Suite 1100
Providence, Rhode Island 02903
(401) 861-8200

GARY P. NAFTALIS
JONATHAN M. WAGNER
TOBIAS B. JACOBY
DANIEL P. SCHUMEISTER
KRAMER LEVIN NAFTALIS
   & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 & 28(a)(1), Plaintiff-Appellee Congregation Jeshuat Israel states that it has no parent corporation and that no publicly-traded corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................v

STATEMENT ON ORAL ARGUMENT ............................................. xi

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE................................................................2

I.      INTRODUCTION .....................................................................2

II.     STATEMENT OF FACTS .........................................................4

        A.      Touro Synagogue ...........................................................4

        B.      The parties' relationship to Touro Synagogue ...................7

        C.      The Rimonim...................................................................8

III.    PARTICIPATION OF THE ATTORNEY GENERAL.................11

STANDARD OF REVIEW .................................................................12

SUMMARY OF ARGUMENT ............................................................14

ARGUMENT .....................................................................................16

I.      CJI OWNS THE RIMONIM .....................................................16

        A.      The District Court correctly found that CSI never owned the
                Rimonim and only held them in "safekeeping" for CJI......16

                1.      The Rimonim are not held in the charitable trust ...........18

                2.      CSI did not obtain ownership when Yeshuat Israel
                        disbanded ...........................................................20

                3.      The rule against perpetuities did not invalidate the
                        bailment...............................................................21

                4.      CJI was the "congregation hereafter worshipping"
                        at Touro ...............................................................23

          5.      CJI is Yeshuat Israel's successor ..............................................23

     B.     The District Court correctly found that CSI  failed to overcome the "strong presumption" that CJI owns the Rimonim ......................24

          1.      The parties' conduct since 1903 confirms that CJI owns the Rimonim ...................................................................25

          2.      CSI's fact-based arguments do not overcome the presumption created by CJI's 100+ years of possession.................................................................................28

               a.      "Appurtenances" and "paraphernalia" did not refer to the Rimonim ..........................................28

               b.      CJI never "surrendered" the Rimonim to CSI ..................................................................30

               c.      Other isolated documents do not defeat the  District Court's findings of fact .............................................................................31

               d.      CSI's relatively brief possession is irrelevant ......................................................................33

II.     CJI'S OWNERSHIP OF THE RIMONIM IS UNRESTRICTED...............35

     A.     The Court should affirm on non-constitutional grounds.....................35

     B.     The First Amendment prohibits interpreting and applying Jewish law to resolve the parties' dispute...........................................37

     C.     The District Court did not abuse its discretion by excluding the testimony of Rabbi Soloveichik ...........................................................39

     D.     The District Court did not abuse its discretion by holding that laches bars forcing CJI to revert to long discarded by-laws ..............40

     E.     The trust does not require specific rituals .........................................41

     F.     The Court should disregard the Becket brief .....................................41

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
REPLACING CSI WITH CJI AS TRUSTEE ................................................43

    A. The 1903 Opinion does not bar CJI's trust-related claims..................43

        1. Changed circumstances defeat *res judicata* ............................43

        2. CSI's arguments are meritless ...................................................45

    B. The 1903 Settlement and Lease do not bar CJI's trust-related
claims.....................................................................................................48

    C. The Attorney General's decision to intervene as *amicus* instead
of as a party did not nullify the judgment ..........................................49

    D. The District Court did not abuse its discretion by removing CSI
as trustee ..............................................................................................51

        1. Repudiation of the trust..............................................................52

        2. Friction .......................................................................................55

        3. Changed circumstances...............................................................58

    E. The District Court did not abuse its discretion by appointing
CJI as successor trustee .......................................................................60

CONCLUSION .......................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta-Mestre v. Hilton Intern. of Puerto Rico, Inc.*,
156 F.3d 49 (1st Cir. 1998)...................................................................39

*Am. Civil Liberties Union of Mass. v. U.S. Conference
of Catholic Bishops*,
705 F.3d 44 (1st Cir. 2013)..................................................................35

*Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*,
239 F.3d 66 (1st Cir. 2001)..................................................................42

*Aptix Corp. v. Quickturn Design Sys., Inc.*,
269 F.3d 1369 (Fed. Cir. 2001) ..........................................................46

*Arena v. Providence*,
919 A.2d 379 (R.I. 2007)..............................................................21, 40

*Audette v. Poulin*,
127 A.3d 908 (R.I. 2015)......................................................................50

*Bradshaw v. Ashley*,
180 U.S. 59 (1901)................................................................................34

*Brault v. Bigham*,
493 S.W.2d 576 (Tex. Civ. App. 1973)..........................................52, 53

*Chabot v. Paulhus*,
79 A. 1103 (R.I. 1911)..........................................................................29

*Corp. of Presiding Bishop of Church of Jesus Christ of
Latter-Day Saints v. Hodel*,
830 F.2d 374 (D.C. Cir. 1987) .............................................................47

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
18 F.3d 1 (1st Cir. 1994)..................................................................3, 12

*Dennis v. R.I. Hosp. Trust Nat. Bank*,
744 F.2d 893 (1st Cir. 1984)..........................................................12, 58

*Desnoyers v. Metro. Life Ins. Co.*,
  272 A.2d 683 (R.I. 1971) ................................................................19

*Doe v. Anrig*,
  728 F.2d 30 (1st Cir. 1984) ...........................................................13

*Fifth Third Mortg. Co. v. Chicago Title Ins.*,
  692 F.3d 507 (6th Cir. 2012) ............................................................3

*Fleet Nat'l Bank v. Colt*,
  529 A.2d 122 (R.I. 1987) ................................................................22

*Gould v. Evansville & C. R.R.*,
  91 U.S. 526 (1875) ............................................................... 45 & n.6

*Hamilton v. Colt*,
  14 R.I. 209 (1883) ..................................................................24, 34

*Hammond v. Halsey*,
  336 S.E.2d 495 (S.C. Ct. App. 1985) ................................................34

*Haviland v. Simmons*,
  45 A.3d 1246 (R.I. 2012) ................................................................30

*Hazard v. E. Hills, Inc.*,
  45 A.3d 1262, 1271 (R.I. 2012) .......................................................41

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
  559 U.S. 573 (2010) ......................................................................54

*Johnson v. N.C. Dep't of Cultural Res.*,
  735 S.E.2d 595 (N.C. Ct. App. 2012) ...............................................20

*Laplace-Bayard v. Batlle*,
  295 F.3d 157 (1st Cir. 2002) ...........................................................39

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955) ......................................................................44

*Life Ins. Co. of N. Am. v. Waldrop*,
  1996 WL 661184 (5th Cir. Oct. 22, 1996) .......................................53

*Lopez v. City of Lawrence*,
    823 F.3d 102 (1st Cir. 2016)..................................................................4

*Mahoney v. Mahoney*,
    370 N.E.2d 1011 (Ct. App. Mass. 1977) ......................................52, 53

*Maine v. Adams*,
    672 S.E.2d 862 (Va. 2009) ................................................................34

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
    196 F.3d 409 (2d Cir. 1999) ........................................................ 38-39

*In re Matthew W.T. Goodness Trust*,
    2009 WL 3328364 (R.I. Super. May 14, 2009)..........................52, 53

*McCrillis v. Cole*,
    55 A. 196 (R.I. 1903).........................................................................29

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*,
    775 F.3d 109 (1st Cir. 2014)..............................................................12

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94 (2d Cir. 2002) ................................................................38

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*,
    175 F.3d 1221 (10th Cir. 1999) .........................................................61

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health
    Benefits Fund*,
    582 F.3d 30 (1st Cir. 2009)..........................................................49, 51

*Newport Illuminating Co. v. Tax Assessors of Newport*,
    36 A. 426 (R.I. 1896).........................................................................28

*Northern Pacific Railway v. Slaght*,
    205 U.S. 122 (1907).................................................................45 n.6, 47

*Northern Trust Co. v. Zoning Bd.*,
    899 A.2d 517 (R.I. 2006)............................................................21, 40

*Nugent ex rel. Lingard v. Harris*,
    184 A.2d 783 (R.I. 1962) ...................................................................55

*Ould v. Washington Hosp. for Foundlings*,
    95 U.S. 303 (1877)...........................................................................20

*Pahlavi v. Palandjian*,
    809 F.2d 938 (1st Cir. 1987)............................................................30

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009)............................................................12

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue*
    *Hull Mem'l Presbyterian Church*,
    393 U.S. 440 (1969)...........................................................................37

*Providence Gas Co. v. Thurber*,
    2 R.I. 15 (1851) .........................................................................33 n.5

*R.I. Hosp. Trust Co. v. Williams*,
    148 A. 189 (R.I. 1929)................................................................22 n.1

*Sch. Union No. 37 v. Ms. C*,
    518 F.3d 31 (1st Cir. 2008).............................................................12

*Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*,
    145 F.3d 463 (1st Cir. 1998)............................................................12

*Smith v. F.W. Morse & Co.*,
    76 F.3d 413 (1st Cir. 1996)..............................................................12

*Spradling v. Tulsa*,
    198 F.3d 1219 (10th Cir. 2000) ......................................................44

*State v. Collins*
    28 R.I. 439 (1907)...........................................................................29

*In re Statter*,
    275 A.2d 272 (R.I. 1971)...........................................................55, 58

*Texaco Puerto Rico, Inc. v. Dep't Consumer Affairs*,
   60 F.3d 867 (1st Cir. 1995)..................................................................46 n.7

*Tillinghast v. Council at Narragansett Pier, Boy Scouts of Am.*,
   133 A. 662 (R.I. 1926)....................................................................56 n.8

*Vineberg v. Bissonnette*,
   548 F.3d 50 (1st Cir. 2008)....................................................................40

*Walsh v. Bristol & Warren Waterworks*,
   97 A. 798 (R.I. 1916)....................................................................29

*Webster v. Wiggin*,
   31 A. 824 (R.I. 1895) ....................................................................56 n.8

*Wedel v. Am. Elec. Power Serv. Corp.*,
   839 N.E.2d 1236 (Ind. Ct. App. 2005) .............................................22

*Willcox v. Stroup*,
   467 F.3d 409 (4th Cir. 2006) .............................................. 24, 34-35

## Statutes and Rules

Fed. R. Civ. P. 19 ....................................................................49

Fed. R. Civ. P. 59(a)(2) ....................................................................61

R.I. Gen. Laws § 18-2-1............................................................60, 61, 62

R.I. Gen. Laws § 18-2-4 ....................................................................36

R.I. Gen. Laws § 18-9-5 ....................................................................49, 50

R.I. Gen. Laws § 34-11-38....................................................................22

**Other Authorities**

Am. Jur. 2d Bailments (2016) ...................................................22

George G. Bogert, et al.,
  Bogert's Trusts and Trustees (2016) ................................. 12, 52, 53, 56 n.8, 62

C.J.S. Equity (2016)...............................................................46

Moore's Federal Practice (3d ed. 2016) .........................................45, 61

Restatement (Second) Judgments (1980) ...............................................44

Restatement (Third) Trusts (2012)..............................................52

Tiffany Real Property (3d ed. 2016) ......................................22

Williston on Contracts (4th ed. 2015)..................................................25

## STATEMENT ON ORAL ARGUMENT

Oral argument may assist the Court in streamlining the many arguments presented by Appellant Congregation Shearith Israel ("CSI"). However, Appellee Congregation Jeshuat Israel ("CJI") disagrees with CSI that the Court should hear argument on the supposed ground that this case has import beyond its particular facts. The issues presented in this case are *sui generis*. The case turns on detailed and exhaustive findings concerning a 200+ year factual record unique to this action. The case does not raise viable First Amendment issues. And the grounds upon which the District Court removed CSI as charitable trustee are neither novel nor against public policy.

## STATEMENT OF THE ISSUES

(1) Did the District Court clearly err in holding, based on numerous factual findings on an exhaustive review of a voluminous record, that CJI owns, free of any restrictions, colonial-era silver bells ("Rimonim") that it has possessed and controlled for well over 100 years?

(2) Did the District Court abuse its discretion by removing CSI as trustee of the charitable trust holding Touro Synagogue, given that CSI (i) denied the existence of the trust, (ii) denied that it bore any responsibilities as trustee, and (iii) sought to evict the beneficiary from the trust property?

(3) Did the District Court abuse its discretion by appointing CJI as trustee, given that CJI has faithfully fulfilled the purpose of the trust for over 100 years?

**STATEMENT OF THE CASE**

## I.  INTRODUCTION

Newport's Touro Synagogue ("Touro") is the oldest synagogue in the United States and a beacon of religious liberty.  In a famous letter to the congregation, George Washington declared in 1790 that the United States would extend equal citizenship to members of all religions and that the Government would give "to bigotry no sanction" — words that resonate today as loudly as ever.

For 100+ years, CJI is and has been the only Jewish congregation worshipping in Touro.  Although CSI, a New York congregation, technically had been the trustee holding Touro in charitable trust, it is CJI that has faithfully fulfilled the purpose of the trust by ensuring public Jewish worship there.

So devoted is CJI to Touro that when it became concerned about the future of Jewish worship in the Synagogue, CJI determined after long and difficult deliberations to sell one of two pairs of colonial-era silver bells called "rimonim" that CJI owns, and use the proceeds to create an irrevocable endowment securing the future of the Synagogue as an active place of worship.

When CSI learned that CJI was going to sell the Rimonim to the Boston Museum of Fine Arts for several million dollars, CSI for the first time ever claimed to own them.  CSI then sought to destroy the charitable trust by claiming outright ownership of Touro and seeking to evict CJI.

The District Court conducted an eight-day bench trial to resolve the parties' dispute. After an "exhaustive" and "lengthy" review of the "voluminous record" — testimony from seven live witnesses, twelve depositions, and approximately 900 exhibits stretching back hundreds of years — the court below issued a 105-page decision finding that (1) Touro is owned in a charitable trust for the purpose of public Jewish worship, (2) CSI should be removed as trustee and CJI named its successor, and (3) CJI owns the Rimonim outright and may sell them. (AD1-4; AD105).

CSI now raises many, many grounds to reverse the District Court's comprehensive opinion. As a sister Court of Appeals has noted, "When a party comes to us with nine grounds for reversing the district court, that usually means there are none." *Fifth Third Mortg. Co. v. Chicago Title Ins.*, 692 F.3d 507, 509 (6th Cir. 2012). So it is here.

On this appeal, CSI offers several arguments not presented below and thus waived. CSI likewise misconstrues and misapplies the law. But CSI's principal mistake is "dressing quintessentially factual matters in the garb of 'legal error.'" *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir. 1994). "[F]actual issues are demonstrably different than legal issues, and no amount of slick costumery can transform the one into the other." *Id.*

The factual nature of the District Court's opinion cannot be overstated. Virtually every aspect of the decision below turned on multiple findings of fact, factual inferences, and credibility determinations from a record recounting 200+ years of events. The District Court's findings are well-supported and certainly not clearly erroneous.

## II.   STATEMENT OF FACTS

CSI's brief bears almost no relation to the District Court's factual findings. Even though on appeal of a bench verdict the facts must be viewed "in the light most favorable to the verdict-winner, consistent with record support," *Lopez v. City of Lawrence*, 823 F.3d 102, 108 (1st Cir. 2016), CSI avoids all evidence not in its favor — the key record evidence. Below, CJI briefly summarizes the facts.

### A.   Touro Synagogue

Built in the 1760s by CJI's predecessor Congregation Yeshuat Israel, Touro is and always has been held in a charitable trust for the purpose of public Jewish worship in Newport. (AD5). This fact was established by overwhelming evidence. (AD14-16; AD24-25; AD49-58). Going back to the 18th century, the will of Newport's Jacob Rivera stated that he and two other original trustees held ownership of Touro "in trust Only, to and for the sole Use, benefit, and behoof of

the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever." (AD24-25).

Regular services at Touro ended around 1793 and the last Jew left Newport in 1822. (AD5). When no Jews remained in Newport, CSI became the trustee of the Synagogue at some point, holding legal title only. (AD6; AD30; AD59).

In the late 19th century, Jews emigrating from Eastern Europe settled in Newport and formed a congregation praying in Touro that came to be called Congregation Jeshuat Israel ("CJI"). (AD6-7; AD35-36). Faced with a re-established Newport Jewish community, in 1894 CSI attempted to bolster its legal relationship to Touro by purporting to obtain deeds to the Synagogue building "IN TRUST" from some but not all alleged descendants of the original three trustees. (AD38; AD53-54). While the court below found that the deeds were legal nullities, the deeds represent one of many instances when CSI acknowledged the trust. (AD54; AD59&n.47).

In the early 1900s, CSI locked Touro and refused to permit any worship. (AD40). After Jews broke in to pray, certain individuals and CJI brought suit against CSI in a case styled *David v. Levy*. (AD40). In a 1903 opinion the District Court aptly called "cryptic" (AD40), Judge Arthur Brown sustained CSI's demurrer on technical pleading grounds, which "brought the parties back to the

position they were in before litigation began." (AD40; A1879-82 ("1903 Opinion")). The parties then "continued" pre-existing settlement negotiations (A3239-40) and reached a "compromise" that "mutually resolved" the dispute. (AD7; AD41-42).

On January 30, 1903, CJI and CSI "trustees" of Touro entered into a settlement recognizing CSI's legal title "to the synagogue building, premises and fixtures" and requiring that CSI lease the building to CJI. (A1888). To effectuate the Settlement, CJI passed a resolution on February 2, 1903 directing surrender of "the Synagogue building, premises and paraphernalia belonging thereto" to the CSI "trustees," and authorizing CJI to enter into a lease of Touro at the "nominal" amount of one dollar annually. (AD42; A1889).

Later that month, CSI in its capacity "as Trustees" of the charitable trust, leased the trust property, Touro, to CJI. (AD7; AD42; AD54; AD95-96; A1890-94 ("Lease")). The Lease identified its subject as the Synagogue "[w]ith appurtenances and paraphernalia belonging thereto." (A1891). As the District Court found, there is no evidence that CJI intended that "paraphernalia" cover personal property. (AD42n.38). The Lease had a five-year term and was renewed for another five years in 1908 and never again. (AD42). Neither lease makes reference to personalty or the Rimonim.

In 1945, CSI reaffirmed the trust in an agreement among the United States Government, CJI and CSI concerning to the Synagogue's designation as a national historic site. (AD43; AD55-56; A2028-34; A2996-A3002 ("1945 Agreement")). The 1945 Agreement required that both CJI and CSI "preserve, protect, maintain, and, when necessary, restore" Touro. (A2997).

## B. The parties' relationship to Touro Synagogue

For 100+ years, CJI has been the only congregation worshipping in Touro. (AD7-8; AD95n.73; AD104). The connection between CJI and Touro is so deep that it is codified in Rhode Island law (A4210-15; A4224-31), and CJI is frequently referenced as "Touro Synagogue." (A518-19; A724-25; A3648; A4173). As the court below found, CJI has "continually worshipped at Touro Synagogue" and "maintained, preserved, and protected the Synagogue as a place of public worship for over 100 years." (AD7-8). Thus, although not technically the trustee, CJI has effectively functioned in that capacity since at least 1903. (AD8; AD104).

CSI, meanwhile, has been largely absent. During the last 20 years, CSI has not taken any "meaningful" action as trustee. (AD8; AD43-44). When CJI sought CSI's help in the 1990s to restore Touro, badly in need of repairs, CSI told CJI "you're on your own" and "we're not taking care of *your* synagogue." (AD99-100) (all emphases added unless otherwise noted).

In this lawsuit CSI has attempted to destroy the trust. Despite overwhelming evidence that Touro is held in trust — including Rivera's will, Rhode Island law publicly affirming the trust, and CSI's numerous acknowledgments of the trust in deeds, leases, its own minutes, the 1945 Agreement, and verbal communications (AD38; AD51-56 & nn.40&45) — below CSI repudiated the trust, sought absolute ownership of the trust corpus, Touro, and asked the court to evict CJI. (AD94; AD97-98). Evicting CJI would defeat the trust's purpose, since CJI is the only Jewish congregation in Newport and no other congregation is "standing ready to take its place." (AD100; A238; A401).

C. **The Rimonim**

On this appeal, it is undisputed that Yeshuat Israel, CJI's predecessor, originally owned the Rimonim, crafted by colonial silversmith Myer Myers. (AD5; AD20-22; AD65-68).

In 1833, when there was no longer a Jewish community in Newport, members of Yeshuat Israel deposited the Rimonim with CSI "for safekeeping" in a bailment with instructions to "redeliver" them to the "Congregation hereafter worshipping" in Touro. (AD6; AD28-29; AD68; AD80-82). The court below found that CSI later engraved "Newport" on the bases of the Rimonim "to distinguish them from [CSI's] own similar pair" and because CSI "regarded the Rimonim as belonging to Newport's congregation." (AD6; AD66; AD82).

Around the time the Newport Jewish community was reconstituted in the late 19th century, CSI redelivered the Rimonim to CJI, as CSI had been instructed under the bailment. (AD7; AD36-37; AD68; AD80). Even if CJI were not the legal successor of Yeshuat Israel — an issue the court below found unnecessary to reach — CJI became the owner of the Rimonim at this time in accordance with the wishes of the original owners. (AD89). By contrast, CSI "never owned" the Rimonim at any point, including during the relatively brief period it possessed them. (AD6; A86). As the District Court found, when CSI redelivered the Rimonim any relationship between CSI and the Rimonim ended. (AD68).

Notwithstanding CSI's mis-focus on a narrow period in the life of the Rimonim — the 1890s and early 1900s — no documents from that time reference the particular Rimonim at issue. And, no document from any period states that CSI owns the Rimonim or was leasing or loaning them to CJI.

Since CSI redelivered the Rimonim 100+ years ago, as the District Court found, CJI has possessed, controlled, maintained and ultimately owned them "without challenge." (AD7; AD89). CJI has exercised "responsibilities of ownership" by using the Rimonim in services, paying to restore them, paying insurance premiums, arranging for appraisals to ensure adequate insurance, loaning them to exhibitions, where the Rimonim were attributed to "Touro Synagogue" or

"Congregation Jeshuat Israel" — including to the Museum of Fine Arts, where they have been on loan since 2010 — and storing them in CJI's safety deposit box. (AD69n.56).

By contrast, CSI's conduct has been inconsistent with ownership. CJI repeatedly loaned the Rimonim for long periods without asking for or receiving CSI's permission. Although aware of the loans, CSI never objected. (A244-46; A250-51; A301-02; A520-24; A755-60; A1114; A3079-82; A3111-21; A3131-47; A3196-3206; A3532; A3551; A3913).

CJI and others have also held CJI out as the owner without CSI objection. (A518-21; A2610; A3890-93; A3913; A3778-80; A4028-30; A1301-03; A248; A3551; A3557; A3081; A3112; A3137; A3203; A1333; A1352-53; A1362-64; A1367-68; A1371-78). On the other hand, no document attributes ownership of the Rimonim to CSI. Until this lawsuit even CSI did not believe it owned the Rimonim. As CSI's vice president testified, as of June 2012 "We weren't sure who owned them at that point." (A747).

By 2008, Touro was struggling financially. (AD44). After difficult deliberations, CJI decided to sell the Rimonim and place the proceeds in an irrevocable endowment to secure the future of Touro as a place of public Jewish worship. (AD45-46; A285-89; A2276-77; A4028-30). A June 2009 news article (A3778-83) — read by CSI officials (A526-28; A1225; A1318-20) — reported

CJI's need to sell the Rimonim.  Upon the recommendation of an honorary trustee of *CSI* (A1301-03; A4028-30; A4176), CJI engaged Christie's to seek a buyer. (AD45).  In 2012, Christie's negotiated a $7.4 million offer from the Museum of Fine Arts.  (AD45).  CSI only then issued a cease-and-desist letter, claiming outright ownership of the Rimonim.  (AD46).  This lawsuit followed.

## III.  PARTICIPATION OF THE ATTORNEY GENERAL

CSI omits pertinent procedural history concerning participation of the Rhode Island Attorney General.  At the very start, CJI provided the Attorney General notice of this action and an opportunity to intervene.  (A33¶3).  In April 2015, the Attorney General moved to intervene as *amicus curiae*.  CSI attempted to restrict the Attorney General's involvement.  (ECF63).  Rebuffing CSI, the District Court granted the Attorney General's motion, stating that the Attorney General "will fully assist the Court with legal and factual analysis because of its statutory and common law special interest in this matter, untethered by any restrictions on its advocacy."  (A18).  The Attorney General appeared at trial, heard the testimony and reviewed the evidence.  (ECF104 at 11-12; ECF105 at 5; ECF106 at 5; ECF107 at 5; ECF111 at 5) (pagination is to ECF not document pagination).  After trial, the Attorney General submitted a brief urging the District Court to find that (i) Touro is held in a charitable trust, (ii) CJI is the current beneficiary of the trust, and (iii) the Rimonim are not part of the trust.  (A190-A202).

## STANDARD OF REVIEW

Following a bench trial, this Court reviews the District Court's fact determinations for clear error. *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420, 422 (1st Cir. 1996). The Court "may not disturb the district court's record-rooted findings of fact unless on the whole of the evidence we reach the irresistible conclusion that a mistake has been made." *Id*.

The Court likewise reviews for clear error (i) contract interpretation when derived from extrinsic evidence, *Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463, 469, 476 (1st Cir. 1998), (ii) determinations as to contract formation, *Crellin*, 18 F.3d at 7, and, generally, (iii) mixed questions of law and fact. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 184 (1st Cir. 2009).

Trustee removal and appointment and the application of laches are reviewed for abuse of discretion. *Dennis v. R.I. Hosp. Trust Nat. Bank*, 744 F.2d 893, 901 (1st Cir. 1984), *abrogated on other grounds by Salve Regina College v. Russell*, 499 U.S. 221 (1991); Bogert's Trusts and Trustees §532 (2016); *Sch. Union No. 37 v. Ms. C,* 518 F.3d 31, 35 (1st Cir. 2008).

A party "may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate." *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 126 (1st Cir.

2014).  However, the Court may "affirm a district court's decision on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below." *Doe v. Anrig*, 728 F.2d 30, 32 (1st Cir. 1984).

# SUMMARY OF ARGUMENT

The District Court based its conclusion that CJI owns the Rimonim on numerous factual determinations. Despite CSI's efforts to re-try the case on appeal, the District Court's findings are well-supported by the record and not clearly erroneous.

Acknowledging the weakness of its position, CSI says that even if CJI owns the Rimonim, under CSI's interpretation of Jewish law CJI is nevertheless restricted from selling its own property. While CSI urges the Court to address First Amendment issues, there are several non-constitutional reasons to find that CJI's ownership of the Rimonim is unrestricted — including that not a single document restricts CJI's right to use or dispose of its own property. To the extent the Court reaches First Amendment issues, CSI ignores that under the Establishment Clause the District Court is prohibited from interpreting and applying religious law to bar CJI's proposed sale or otherwise.

The District Court likewise did not abuse its discretion by finding that laches barred CSI from attempting to force CJI to revert to by-laws that were superseded — with CSI's knowledge — generations ago.

The Court should also affirm the District Court's trust-related holdings. CSI's *res judicata* argument predicated on the 1903 Opinion is

meritless, principally because the grounds for removing CSI and appointing CJI as trustee arose 100+ years after that decision.

Equally meritless is CSI's waived claim that the Attorney General's decision to intervene as *amicus* instead of as a formal party nullified the District Court's trust rulings. The law requires only that the Attorney General be given notice and opportunity to intervene when and how he sees fit. Moreover, CSI cannot show the result would have been different had the Attorney General formally intervened as a party rather than as *amicus*.

Finally, the court below acted well within its discretion by (i) removing CSI as trustee of a trust CSI abandoned and then sought to destroy and (ii) appointing CJI the new trustee given that CJI has faithfully furthered the purpose of the trust, acting as *de facto* trustee for 100+ years.

# ARGUMENT

## I. CJI OWNS THE RIMONIM

The District Court found that CJI owns the Rimonim because CSI held the Rimonim for safekeeping in a bailment, redelivering the Rimonim to CJI in accordance with the bailment's terms. As a separate and independent ground, the court found that CJI owns the Rimonim because CSI failed to overcome the "strong presumption" of ownership arising from CJI's undisputed possession and control of the Rimonim for 100+ years. (AD65). Both conclusions are factual, deeply rooted in the record, and not clearly erroneous.

### A. The District Court correctly found that CSI never owned the Rimonim and only held them in "safekeeping" for CJI

The District Court found that CSI "never owned" the Rimonim but held them only for "safekeeping" in a bailment with instructions to "redeliver" them to the "Congregation hereafter worshipping" in Touro. (AD6; AD28-29; AD68; AD80-82). CSI complied with those instructions by giving the Rimonim to CJI in the 19th century, thus terminating CSI's relationship with the Rimonim. (AD68).

CSI's 1832 minutes stated that "Sepharim" or Torah scrolls "belonging to the New Port Synagogue" were "to be placed for *safe keeping* in our place of Worship until they should be required for the use of the New Port Shool." (AD28, quoting A1435).

CSI's 1833 minutes memorialized that CSI had received Torahs from Yeshuat Israel. The minutes also include a copy of a receipt, stating:

> Received from the family of the late Mr. Moses Seixas of New Port Rhode Island, Four Sepharim ***Belonging to the Congregation of that place***, and Which are now to be deposited in the Synagogue in New York of the Congregation 'Shearith Israel' Under the charge of the Trustees of said Congregation ***to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island***.

(AD80, quoting A1439-41).

The District Court adopted "as a finding of fact" that pursuant to these documents CSI took hold of not only Torahs but also the Rimonim — which sat on top of the Torahs — for "safekeeping" only, and "under the instruction to return them" pursuant to the 1833 receipt. (AD81). This factual conclusion finds overwhelming record support. CSI's expert testified that "every Torah, [when possible], is adorned by a set of rimonim." (AD81). CSI's counsel and president acknowledged that the object of rimonim is to "stay with the Torah." (AD29n.29; AD81). Both CSI's ritual director (and Rule 30(b)(6) witness) and vice president admitted that under these documents CSI obtained the Rimonim along with the Torahs for "safekeeping." The foremost scholar on Myers came to the same conclusion. (AD28-29).

The District Court further found that its factual conclusion — that CSI "never owned" the Rimonim but only held them in "safekeeping" — "best explains Shearith Israel's later actions." (AD81-82). Specifically, CSI "branded" the Rimonim with the word "Newport" on their bases "to distinguish them from Shearith Israel's own similar pair." (AD6; AD66; AD82). Based on its reading of the entire record, the court concluded that "[t]he most natural interpretation of this act is that Shearith Israel regarded the Rimonim as belonging to Newport's congregation." (AD66). As the court found, CSI then returned the Rimonim to the congregation at Newport, as it had been instructed to do under the bailment. (AD7; AD37; AD68; AD80).

Against the District Court's thorough factual findings, CSI essentially seeks to re-try the case on appeal — based on meritless arguments that cannot be reconciled with the record.

### 1. The Rimonim are not held in the charitable trust

CSI contends it possessed the Rimonim in the 19th century not as bailee but as trustee of the charitable trust holding Touro. (BR39-42). CSI waived the arguments it now presents by not raising them below. For example, CSI now maintains that the 1833 minutes show the Rimonim are part of the trust. However, CSI argued to the District Court that the 1833 minutes do not concern the Rimonim at all. (ECF112 at 61).

Moreover, unless this Court reverses the District Court's removal of CSI as trustee, CSI lacks standing to litigate the scope of the Rhode Island charitable trust.

Even overlooking the waiver and standing points, CSI cannot show with the requisite "clear and convincing evidence" that the trust includes the Rimonim. (AD46, citing *Desnoyers v. Metro. Life Ins. Co.*, 272 A.2d 683, 688-91 (R.I. 1971)). The Rimonim are not mentioned in Rivera's will or in any of the other evidence establishing the trust holding Touro. (AD14-16; AD24-25; AD49-50; AD53-56). Ignoring this record evidence, CSI points to the term "use" in the 1833 receipt (BR39-40), but ignores that the receipt is missing key language from Rivera's will — "in trust only" — or any other language implicating a trust. CSI also ignores that the receipt stated that the Rimonim "belong[ed]" to and were to be "redelivered" to the Newport congregation.

CSI goes on to contend that because the District Court supposedly found rimonim were "necessities" for worship and worship is the purpose of the trust, the particular Rimonim at issue must be part of the trust. (BR40-41). CJI has several pairs of rimonim, including another pair of Myer Myers rimonim, and need not use the particular Rimonim at issue to worship in Touro. (A2828-29). Indeed, the Rimonim usually are on long-term loan to museums and other cultural institutions or secured away in a safe deposit box. (AD69n.56).

Finally, CSI's position that the Rimonim are part of a trust to facilitate worship at Touro cannot be squared with CSI's request in its pleading that the District Court order the "immediate return" of the Rimonim to CSI "in New York." (A67¶4; A1216-17).

## 2. CSI did not obtain ownership when Yeshuat Israel disbanded

CSI argues that "under the District Court's analysis," no one retained title to the Rimonim after Yeshuat Israel disbanded, and because the Rimonim could not be owner-less, CSI was the "only possible bailor/owner" when it possessed the Rimonim in the 19th century. (BR41-43). Although aware of CJI's bailment point before trial (ECF69 at 30), CSI never raised this argument below and therefore waived it.

In any event, CSI's position — that it was impossible for no one to hold title to the Rimonim — is not correct. *See Ould v. Washington Hosp. for Foundlings*, 95 U.S. 303, 313-16 (1877) (title to property granted to charitable corporation not yet in existence may be held in "abeyance" until grantee exists). Beyond that, a bailee — here, CSI — is not converted into an owner simply because the bailor ceases to exist. *Cf. Johnson v. N.C. Dep't of Cultural Res.*, 735 S.E.2d 595, 597-98 (N.C. Ct. App. 2012) (bailment not converted to gift upon bailor's death).

Even if title could not be held in abeyance, CSI ignores that, factually, the District Court concluded that whoever owned the Rimonim in this period, *it was not CSI*. The court below held that CSI took the Rimonim with the clear understanding that CSI was *not* the owner. The court further found that CSI acted consistently with this understanding by engraving the Rimonim with "Newport" and by "redelivering" the Rimonim to CJI (AD6; AD82) — critical evidence in CJI's favor. CSI is not permitted to re-litigate these facts on appeal.

### 3.   <u>The rule against perpetuities did not invalidate the bailment</u>

CSI goes on to assert that the bailment failed under the rule against perpetuities ("RAP") (BR42). CSI's resort to the RAP is emblematic of its approach on appeal, offering all kinds of makeweight arguments that have no legal or factual basis. If this were a serious argument, it is hard to understand why CSI, which knew about CJI's bailment argument long before trial, raised RAP below only briefly in its *rebuttal* post-trial brief and nowhere else.

In any event, laches bars CSI from claiming the bailment was invalid under RAP. It is far too late for CSI to argue that the bailment contract CSI entered into and performed over 180 and 100 years ago, respectively, was invalid *ab initio*. *Arena v. Providence*, 919 A.2d 379, 396 n.13 (R.I. 2007) (presuming prejudice from five-year delay); *Northern Trust Co. v. Zoning Bd.*, 899 A.2d 517, 519-20 (R.I. 2006) (presuming prejudice from two decade delay).

In addition, CSI lacks standing to challenge the validity of the bailment under RAP.  If the 1833 bailment were found invalid, then CSI would not have an interest in the Rimonim in the first place; CSI possessed the Rimonim only because of a bailment CSI belatedly contends was illegal under RAP.  *Cf. Wedel v. Am. Elec. Power Serv. Corp.*, 839 N.E.2d 1236, 1248 & nn.13&14 (Ind. Ct. App. 2005) (defendants lacked standing to raise invalidity, based on RAP, of contract that was only basis for rights they obtained).

Furthermore, RAP does not apply to gifts to a charitable association not yet formed; if the association is never formed the donor's charitable purpose may be carried out by *cy pres*.  2 Tiffany Real Property §409 (3d ed. 2016); *Fleet Nat'l Bank v. Colt*, 529 A.2d 122, 129 (R.I. 1987) (Rhode Island applied *cy pres* to prevent gifts from failing under RAP).[1]  And invalidity of a bailment does not "work a forfeiture" or "make the party who received [the property] any less a bailee."  8A Am. Jur. 2d Bailments §34.

Finally, Rhode Island abolished RAP in 1999.  R.I. Gen. L. §34-11-38.  While this statute may not apply retroactively, the legislature's action is a clear signal that the law does not favor RAP.

---

[1] To be clear, the Rimonim were never held in a charitable trust.  Rather, to the extent CJI is not the successor to Yeshuat Israel, they were an absolute gift to a religious organization — the "Congregation hereafter worshipping" in Touro.  *R.I. Hosp. Trust Co. v. Williams*, 148 A. 189 (R.I. 1929) (*cy pres* applicable to absolute gift to charitable organization).

### 4. CJI was the "congregation hereafter worshipping" at Touro

Next, CSI contends that CJI was not the "congregation hereafter worshipping" at Touro referenced in the 1833 bailment because CJI did not formally incorporate until after the Rimonim were returned. (BR42). However, the District Court's factual finding that the "Jewish community" worshipping at Touro before formal incorporation "became Congregation Jeshuat Israel" is well-grounded in the record. (AD6-7; AD35-36; AD68; A1254; A1691; A2362; A2453-75; A2751-54). Moreover, the District Court acknowledged that the exact date CSI returned the Rimonim is not known and may have occurred after CJI was formally incorporated. (AD7; AD37&n.36).[2]

### 5. CJI is Yeshuat Israel's successor

Alternatively, the Court may affirm by finding that CJI is the successor to Yeshuat Israel, which — as is now undisputed — was the original owner of the Rimonim. Although the court below found it unnecessary to reach this issue (AD89n.69), this finding is supported by the District Court's conclusions concerning CJI's charter (AD38-39) and the record at large. (A221-25; A232-34; A784-85; A2045; A3155-57; A4173; A2945; A3648; A3670; A376; A4183;

---

[2] CSI contends that the statement on CJI's website that CSI had "legal oversight" over the contents of Touro in the 19th century shows CSI owns the Rimonim. (BR9). The website is consistent with CSI holding the Rimonim in safekeeping and the building in trust; the website does not make any reference to CSI "ownership." (AD140).

A248-49; A3551; A3265; A3289; A2473; A2752-53; A1691; A4210-12; A4224-32).

### B. The District Court correctly found that CSI failed to overcome the "strong presumption" that CJI owns the Rimonim

The record demonstrated — and at trial CSI did not dispute — that CJI has continuously possessed and controlled the Rimonim for 100+ years. (AD37; AD69; AD89). CJI's lengthy possession gave rise to a "strong presumption of ownership." (AD69, citing *Hamilton v. Colt*, 14 R.I. 209, 212 (1883)). *See also Willcox v. Stroup*, 467 F.3d 409, 417 (4th Cir. 2006) (lengthy possession of historic documents created "strong presumption" of ownership). The record demonstrated CJI's possession and control not for one, two or ten years, but for 100+ years.

To rebut this strong presumption, CSI could not rely on any purported insufficiency of CJI's title. Rather, CSI had the burden of proving its own superior title. (AD69-71, citing *Hamilton*, 14 R.I. at 212). *See also Willcox*, 467 F.3d at 414-15. Based on a detailed analysis of the 100+ year factual record, the court below found — correctly — that CSI "did not come close to overcoming" the presumption that CJI owns the Rimonim. (AD65).

Abandoning the principal arguments CSI raised below (AD71-86), CSI now advances every *other* conceivable argument. Virtually every CSI argument is predicated on the proposition that the District Court weighed the evidence incorrectly by holding that CSI did not lease or loan the Rimonim to CJI.

CSI's arguments fail at the outset because CSI could not lease what it did not own, and the District Court found as a matter of fact that CSI "never owned" the Rimonim. Thus, "[e]ven if [CSI] purported to include the Rimonim within [the] Leases, this action could not alter title to the Rimonim." (AD86; *see also* AD42n.38).

CSI's arguments fail for an entirely separate reason: the Lease — which was a lease of trust property only — did not cover the Rimonim in the first place. (AD42n.38; AD86). That is established by the parties' post-1903 conduct and the other record evidence.

### 1. The parties' conduct since 1903 confirms that CJI owns the Rimonim

CSI largely focuses on a short period in the life of the Rimonim in the late 19th and early 20th centuries. Even putting aside the evidence pre-dating that period and relied on by the court below, the parties' conduct from 1903 forward powerfully demonstrates that CJI owns the Rimonim, and that CSI neither leased nor loaned them to CJI. 11 Williston on Contracts §32:14 (4th ed. 2015) (parties' conduct is "nearly conclusive evidence" of contractual intent).

The District Court found that since the late 1800s or early 1900s, CJI "has owned, controlled and maintained the Rimonim without challenge, until this lawsuit over 100 years later." (AD7). For 100+ years, CJI has "used them in public worship, insured and repaired them, and sent them on various exhibitions all across the country." (AD89; AD69n.56). Nothing raised by CSI remotely overcomes this 100+ year history or establishes that the District Court's findings are clearly erroneous.

CSI disputes the District Court's interpretation of the evidence, contending that the parties' conduct was consistent with the Lease and no different from CJI's use of Touro. (BR45-46). That distorts the factual record. CJI acted as owner, and the parties' conduct cannot be squared with CSI's claim to the Rimonim.

For example, CJI repeatedly loaned the Rimonim to third parties for long periods without CSI's permission — yet CSI never objected. (*See* page 10 above). CSI would not have acted this way were it the owner. Indeed, when CSI loans out its own, separate rimonim, it obtains a vote from its board; yet CSI's board never voted to allow the loans CJI made of the Rimonim at issue. (A755-60; A3572). CJI also restored the Rimonim without CSI's permission. (A253-58). A true owner would have wanted a lessee to ask permission before restoring valuable and fragile colonial silver.

At exhibitions and elsewhere, CJI was held out as owner, yet CSI never objected. (*See* page 10 above). Relying on its discredited expert (AD76n.61), CSI claims that attribution of the Rimonim at exhibitions did not indicate ownership. (BR46). However, at least one catalogue — seen by CSI — explicitly stated that CJI "owns" the Rimonim. (A3557; A3551; A759-60; A1362-64). Furthermore, testimony cited by CSI suggests museums *were* in fact attributing ownership to CJI because they accepted CJI's representation to that effect. (A853; A976). CJI identified itself as "owner" on loan forms. (A3890-91; A3913; A518-19). And the exhibitions were not the only times CJI held itself as owner. (A1301-03; A3778-80). In sharp contrast, there is not a single document, public or otherwise, attributing ownership of the Rimonim to CSI.[3]

In this regard, the parties treated Touro and the Rimonim very differently. The occasions when CJI sought approval from CSI concerning the Touro building (BR21-22) contrast starkly with the numerous times, described

---

[3] CSI's efforts to explain away CJI's procurement of insurance of the Rimonim (BR45) are factually incorrect. No document required that CJI insure the Rimonim. CSI appeared as an "additional insured" on certain policies only as its "interests may appear," because CJI was insuring some property to which CSI has no conceivable claim. (A2152-54; A2173-76; A2283; A2306; A2309; A2330). The 1998 and 2000 policies do not cover the Rimonim at all; CJI had separate policies covering Touro and the Rimonim at that time. (A3484-A3529; A2142). While CSI appeared as an "additional insured" on the 2013-2015 policies covering Touro and the Rimonim (BR45), that occurred because when CJI combined its Synagogue and fine arts policies CJI was informed that CSI could not be named as an additional insured for the building only. (A415-16; A449-50).

above, when CJI exercised dominion over the Rimonim without asking CSI's permission.

### 2. CSI's fact-based arguments do not overcome the presumption created by CJI's 100+ years of possession

Against this overwhelming evidence, CSI mis-cites narrow slivers of the record in an effort to overcome the District Court's detailed findings of fact. Again, CSI may not re-litigate the facts on appeal.

#### a. "Appurtenances" and "paraphernalia" did not refer to the Rimonim

At trial, CSI relied heavily on extrinsic evidence to argue the terms "appurtenances" and "paraphernalia belonging thereto" in the Lease referenced the Rimonim. (*E.g.*, ECF90 at 42-47). The District Court rejected CSI's position, holding, based on a thorough review of the contracts and the extrinsic evidence, that "the leases do not clearly refer to the Rimonim." (AD85-86; *see also* AD42n.38). This finding is well-supported in the record.

At the time, "appurtenances" was a term "employed in leases for the purpose of including any easements or servitudes used or enjoyed with the demised premises." *Newport Illuminating Co. v. Tax Assessors of Newport*, 36 A. 426, 429 (R.I. 1896). "Appurtenances in a lease" did "not include personal property." (A4366). The term was boilerplate from a pre-printed form of real property lease. (A2788).

As for the term "paraphernalia," CSI now argues for the first time that this word is an "unambiguous" reference to the Rimonim. (BR34). At trial, however, CSI relied extensively on extrinsic evidence in urging its interpretation of this undefined term. (*E.g.*, ECF90 at 42-47). CSI therefore waived the argument that "paraphernalia" is unambiguous.

"Paraphernalia" would indeed be ambiguous and thus a disputed issue of fact if only because the term could mean fixtures, and Rimonim are personal property, not fixtures. *Chabot v. Paulhus*, 79 A. 1103, 1104 (R.I. 1911) ("As to the furniture, fixtures, and other paraphernalia"). This ambiguity is underscored by cases CSI itself cites. For example, CSI reads *State v. Collins* 28 R.I. 439 (1907) as using "paraphernalia" to refer to "a sink" (BR35), but that merely demonstrates that "paraphernalia" could mean fixtures. *Walsh v. Bristol & Warren Waterworks*, 97 A. 798, 799 (R.I. 1916) ("sink" described as "fixture"). Notably, CSI and its expert offered to the District Court that "paraphernalia" and "fixtures" were "interchangeable terms," although CSI wrongly contended that the Rimonim were fixtures. (ECF70 at 42; ECF91 ¶¶348, 355, 359; AD85). Under Rhode Island law, a fixture had to be physically affixed to real property. *McCrillis v. Cole*, 55 A. 196, 198 (R.I. 1903). The Rimonim never were.

Furthermore, since CSI extolls its role as drafter of the Lease (BR36), any ambiguity in the term "paraphernalia" should be construed against CSI.

*Haviland v. Simmons*, 45 A.3d 1246, 1259-60 (R.I. 2012) ("ambiguities in a contract must be construed against the drafter of the document").

Other extrinsic evidence likewise shows why the Lease would have covered fixtures but not personalty. The Lease concerned real property. (A1890-94; A2788-91). And in CJI's Resolution effectuating the Settlement, CJI used "paraphernalia" interchangeably with "fixtures." (A1888-89). While the District Court noted that **CSI** may have understood "paraphernalia" to reference "personal property," the court found that "[t]here is no evidence that [CJI] understood the term to have that meaning." (AD42n.38). Given this factual finding, CSI's unexpressed and subjective understanding without any meeting of the minds is irrelevant. *Pahlavi v. Palandjian,* 809 F.2d 938, 945 (1st Cir. 1987) ("Contracting parties are bound by objective manifestations and expressions, not subjective expectations").

Finally, even had there been a meeting of the minds and CJI agreed to lease personal property, there is no record evidence identifying the specific personalty included in the Lease — which again does not reference the Rimonim.

### b. CJI never "surrendered" the Rimonim to CSI

CSI asserts that CJI "surrender[ed]" the Rimonim to CSI in 1903, and therefore either acknowledged CSI's ownership or transferred ownership to CSI. (BR38). That is factually incorrect.

CSI relies on the 1903 Settlement, but that document references "fixtures," not movables like the Rimonim.  (AD119).  CSI also cites CJI's 1903 Resolution, yet that document likewise does not reference the Rimonim.  (AD120).  CSI cites internal CSI correspondence (A1908-10), but that does not prove a meeting of the minds.  And while CSI internally indicated it wanted a list of personalty signed by CJI (A1909), there is no evidence such a list was ever prepared or that it would have included the Rimonim.

Nor is there any evidence that CJI in fact surrendered personal property to CSI.  CJI surrendered keys to the building, but that is consistent with the trust.  (A1910).  CSI's only "evidence" that CJI surrendered the keys to the ark holding the Torahs is the testimony of its expert, who was not alive in 1903 and whose testimony was not credited by the court.  (A1011-12).[4]

### c. Other isolated documents do not defeat the District Court's findings of fact

As the District Court correctly concluded, other documents cited by CSI, all from one decade, the 1890s, likewise do not overcome the presumption created by CJI's lengthy possession of the Rimonim.

---

[4] CSI contends it "sent a mixed pair of rimonim to Newport" (BR37), mixing up the bases of the Newport Rimonim with CSI's rimonim bases — apparently reiterating the position of its expert that CSI "viewed all four finials as being the property of [CSI]."  (AD84n66).  The District Court found that this argument — from an expert the court below called "a zealot rather than an objective expert witness" whose testimony was "not credible" — was "unsupported, pure speculation, and too tenuous to be credible."  (AD76n61; AD84n66).

First, CSI contends that, factually, CJI disclaimed ownership of the Rimonim in 1893. (BR43; BR44). Yet none of the documents upon which CSI relies specifically reference rimonim or the particular Rimonim at issue, and as CSI's expert recognized unless there is a specific reference to the Rimonim one cannot know what objects are being discussed. (A846-47; A874; A1052-53). A June 15, 1893 letter cited by CSI indicated that "Silver" in a bank should be delivered to CJI and that CJI will be "tak[ing] charge for safe keeping all the property contained" in Touro. (A1624-27). The record does not indicate what property was located at Touro at this time; from the document cited by CSI, it appears the "Silver" was not. A June 25, 1893 letter cited by CSI referenced only *real* "property" and "appurtenances." (AD118). A July 6, 1893 letter cited by CSI noted only that the Newport City Council never conceded that CSI was guardian of the personalty in Touro. (A1630).

Second, CSI argues it "loan[ed]" the Rimonim to CJI subject to so-called "limited use authorizations." (BR37; BR42; BR44). According to CSI, "*every document*" shows CSI "limiting the use and possession" of the Rimonim. (BR37). Again, the District Court's contrary factual findings are not clearly erroneous. There is not a single document stating that CSI owns the Rimonim or loaned them to CJI. Most documents cited by CSI do not refer to bells at all. Again, as CSI's experts conceded, none of the documents that mention bells

specifically reference the Rimonim at issue here and, absent such specific reference, one cannot know what objects are being referenced. Significantly, by 1895 there were at least four pairs of rimonim at Touro, and in 1903 CSI claimed to own only one pair. (A2821; A3256). That pair — ***not*** the Rimonim at issue — was later returned to CSI by 1913. (A3256; A2372; A2827-2829).[5]

d. <u>CSI's relatively brief possession is irrelevant</u>

CSI obliquely argues that the presumption that CJI owns the Rimonim either does not apply or was rebutted because (1) CJI possesses the Rimonim subject to the Lease or other purported loan documents, and (2) CSI possessed the Rimonim before CJI did. (BR43-47). CSI's first argument fails, and the cases CSI cites are meaningless (BR44), because as noted above the District Court found that CSI did not lease or loan the Rimonim to CJI, and that finding is not clearly erroneous.

---

[5] In support of its position that it leased the Rimonim to CJI in 1903, CSI also cites a letter it wrote in 1893 asking the Newport City Council not to give CJI keys to Touro unless CJI "sign[ed]" certain stipulations. (BR37; A2716-19). CSI wrote this letter 10 years before the Lease, and there is no evidence CJI ever signed the stipulations; indeed, CJI resisted doing so. (A1628-29). In any event, the stipulation that any "ornament" not be removed from "the Synagogue or adjacent building" without CSI's consent referenced fixtures. *Providence Gas Co. v. Thurber*, 2 R.I. 15, 22 (1851) (chattel physically attached to realty is "fixture" even though annexation is "for ornament"). The stipulation that if CJI disbands Touro, "movables," and "all property of the Congregation" should be "returned" to CSI does not clearly reference the Rimonim, which may or may not have been in Touro at the time — and in all events suggests the "movables" were owned by CJI.

CSI's second argument fails because CSI's prior possession, by itself, does not meet its burden. For example, in *Hammond v. Halsey*, 336 S.E.2d 495 (S.C. Ct. App. 1985), the court held that Hammond's prior possession of a cannon did not prove that he "retained title after he transferred possession." *Id.* at 497-98. Here, CSI transferred possession of the Rimonim to CJI. In this regard, *Bradshaw v. Ashley*, 180 U.S. 59, 63-64 (1901), a real property case cited by CSI (BR46-47), is inapposite because the Court held only that the presumption of ownership does not attach to an intruder's possession obtained by "pure tort."

Moreover, to the extent prior possession may meet a non-possessor's burden, it must be "***recent*** prior possession." *Willcox*, 467 F.3d at 414-15. CSI has not possessed the Rimonim for 120 years. *See Maine v. Adams*, 672 S.E.2d 862, 867, 869 (Va. 2009) (possession 200 years ago did not prove superior title).

To the extent CSI suggests that CJI and not CSI bore the burden of proving ownership, CSI is simply wrong. (BR44, citing *Hamilton*, 14 R.I. at 212 ("title by possession [is] sufficient until [non-possessor] can show a better title").

\* \* \*

As the court below noted in describing *Willcox*, a case with "key similarities to our own," the presumption of ownership created by possession exists precisely for a case like ours, to resolve "insoluble historical puzzles" without

having the court "presid[e] over a historical goose chase." AD71; 467 F.3d at 413-14. The presumption alone defeats CSI's appeal.

## II. CJI'S OWNERSHIP OF THE RIMONIM IS UNRESTRICTED

CSI urges that even if CJI owns the Rimonim, religious clauses in the Leases and 1945 Agreement restrict CJI from selling them. (BR29). According to CSI, "[b]ecause [CJI] was bound to follow Shearith Israel's practice which forbids selling the rimonim, this Court can reverse without reaching the ownership issues." (BR29). This ground for appeal — that a supposed Jewish religious restriction bars CJI from selling its own property — could not be more far-fetched.

To reverse the District Court on this ground, CSI acknowledges that the Court would have to determine whether applying these clauses to resolve the parties' dispute comports with the First Amendment. (BR32-33). This Court follows the "doctrine of constitutional avoidance, under which federal courts are not to reach constitutional issues where alternative grounds for resolution are available." *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013). There are several non-constitutional grounds upon which the Court may and should affirm the decision below.

### A. The Court should affirm on non-constitutional grounds

First, the religious clauses cited by CSI concern only the type of religious *services* that are to be conducted *in* Touro Synagogue. They do not

restrict CJI from selling its own personal property. The Lease provided that CJI would cause Touro Synagogue to be

> ***used and occupied*** for the maintenance ***therein*** of the usual and stated religious ***services*** according to the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel.

(AD126; *see also* AD41-42). The 1945 Agreement contains similar language, referencing adherence to certain rituals for "services." (A2999(f)). The agreements say nothing about restricting the ability of CJI to sell its own personalty. It would be strange indeed for CJI to agree to such a restriction.

Second, CSI lacks standing to argue that the Leases and 1945 Agreement restrict CJI's ability to sell its own property. The District Court correctly found that CSI entered into the Leases and the 1945 Agreement in its capacity as trustee of the charitable trust holding Touro. (AD7; AD41-43; AD54-55; AD95). Having been removed as trustee, CSI has no right to enforce those contracts. *See* R.I. Gen. Laws §18-2-4 (title to trust property automatically vests in successor trustee); A2997 (1945 Agreement applies to "respective successors").

Third, CSI knew for 100+ years that CJI was not following CSI's religious practices. CSI never objected — until this lawsuit. (A225-26; A1101-02; A1190-92; A1201-07; A1228-30; A3179-80; A4069). Laches bars from CSI from now trying to change how CJI has functioned for over a century.

**B.** **The First Amendment prohibits interpreting and applying Jewish law to resolve the parties' dispute**

Even were this Court to address the Constitutional issues raised by CSI, the Court should find that enforcing the religious provisions in question as requested by CSI violates the Establishment Clause. *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 451 (1969) (courts may not interpret and weigh religious doctrine).

CSI contends no unconstitutional entanglement exists because CSI's practice is a matter of "unrebutted" "fact" and not religion. (BR32). However, CSI is asking a federal court to apply *religious* doctrine and not neutral principles in deciding the parties' dispute. That is plain from both the clauses themselves (AD126; A2999(f)), as well as CSI's statements in the course of this litigation. (*E.g.*, ECF70 at 57 (CSI pre-trial brief: "Sephardic Rites And Rituals Also Precludes CJI's Attempted Sale" and "the Court will hear that Jewish law and tradition dictate . . . when [rimonim] can be sold"); ECF91 ¶504 (CSI post-trial proposed findings:  sale of ritual items "violate[s] Jewish rituals, rights, and customs")).

CSI also ignores that CJI contested whether Spanish and Portuguese Jewish ritual, rites and customs prevent the sale. (ECF68 at 11-12; ECF84 at 2). Had the District Court not decided to avoid "resolving a religious dispute" (ECF104 at 7), and had CSI timely disclosed an expert, CJI would have obtained

its own expert and presented evidence that CSI's interpretation of Jewish law is incorrect. (ECF107 at 140). There would have been a trial within the trial on this religious issue.

Moreover, CSI has admitted there are exceptions to its supposed religious prohibition on selling rimonim. (A133 (rimonim may be sold for "something of greater ritual holiness"); A2280 (rimonim may be sold to purchase Torah or printed version of Torah); Edinger Dep. Tr. 63-64 (CSI Rule 30(b)(6) witness and ritual director testified that sale of Rimonim "possible" if CJI's survival at stake). CSI argued that these exceptions do not apply here. (A133; A213; ECF70 at 57; ECF112 at 174). To evaluate and apply the religious clauses, the District Court would have had to determine whether CJI's purpose in selling the Rimonim — to endow Touro and ensure it stays open as a public place of worship — falls within an exception. That analysis would entangle the District Court in questions of religious doctrine.

Ultimately, CSI seeks to have a federal court apply religious doctrine to decide the parties' dispute, which is constitutionally forbidden. Such circumstances were not present in the cases cited by CSI. (BR32). *See Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99 (2d Cir. 2002) (rejecting argument that on account of rabbinical ruling court lacked authority to decide copyright dispute under federal law); *Martinelli v. Bridgeport*

*Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999) (jury assessed subjective trust and confidence between parties and not whether party's interpretation of church doctrine was correct or required certain actions).

### C. The District Court did not abuse its discretion by excluding the testimony of Rabbi Soloveichik

CSI claims the District Court erred by excluding the testimony of its Rabbi, Meir Soloveichik, on the ground that his testimony would "open a Pandora's box" of First Amendment issues. (BR32). As is plain from the record, the court below excluded Rabbi Soloveichik's testimony for a different reason: he was an undisclosed expert, identified well past the close of expert discovery. (ECF107 at 117-43). That is why the court ruled that "allowing him to testify ***at this stage***" would "open a Pandora's box." (ECF107 at 143; *see also* ECF30; ECF43). *Laplace-Bayard v. Batlle*, 295 F.3d 157, 161-62 (1st Cir. 2002) (court did not abuse its discretion in excluding undisclosed expert). Separately, the District Court excluded Rabbi Soloveichik to the extent offered as a fact witness because his testimony was not relevant and he lacked personal knowledge. (ECF77; ECF107 at 142-43). *Acosta-Mestre v. Hilton Intern. of Puerto Rico, Inc.*, 156 F.3d 49, 57 (1st Cir. 1998) (no abuse of discretion excluding testimony of witness lacking personal knowledge).

**D.** **The District Court did not abuse its discretion by holding that laches bars forcing CJI to revert to long discarded by-laws**

The District Court did not abuse its discretion by holding that laches barred CSI's attempt to force CJI to abide by long-superseded by-laws.  (BR28-29; BR37; BR39).  *Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008) (laches is a "fact-sensitive inquiry").

Under its 1897 by-laws, CJI could not sell its personalty without unanimous vote of its members, including four CSI-appointed trustees.  However, the District Court correctly found that CJI amended its by-laws in 1945 to eliminate this and other provisions, and CJI "provided these amended by-laws to [CSI], with no record of an objection from [CSI]."  (AD86-88; A3004; A2977).  By 1983, CJI amended its by-laws to remove any reference to CSI.  (AD88; A3297-3317).  As the District Court held, "[o]ver 110 years after last exercising power to appoint trustees, over 70 years after its power was restricted, and over 30 years after its power was rejected, [CSI] is now too late to challenge [CJI's] governance."  (AD88).  Prejudice to CJI is presumed from CSI's lengthy delay.  *Arena*, 919 A.2d at 396 n.13; *Northern Trust*, 899 A.2d at 519-20.  But the court below nevertheless concluded that forcing CJI to revert to its 1897 by-laws would cause CJI "prejudice" because, in the years CSI sat on its hands, CJI has "adapted

to [CSI's] abdication by running its own operations at its own discretion." (AD88).

Over the past 100+ years, CJI has made countless decisions without CSI, including loaning the Rimonim and amending its by-laws. (*See* page 10 above; A2964; A3297; A3385; A3948). Thus, "[l]aches bars [CSI's] attempt at upending [CJI's] corporate governance." (AD88, citing *Hazard v. E. Hills, Inc.*, 45 A.3d 1262, 1271 (R.I. 2012) (prejudice "depend[s] upon the circumstances of each particular case")).

### E. The trust does not require specific rituals

CSI contends that the Spanish and Portuguese rituals are a condition of the charitable trust holding Touro. (BR33). Whether the trust requires that certain rites be practiced in Touro is irrelevant to whether CJI may sell its own personal property that is not part of the trust. Also irrelevant is whether a "religious trustee has leeway to effectuate [a] donor's intention," since CSI has been removed as trustee. (BR33). In any event, the District Court's holding that the rites are not part of the trust rests on solid ground. (AD36; AD59).

### F. The Court should disregard the Becket brief

*Amicus* Becket contends that the District Court violated the First Amendment by relying on "internal church documents," such as CSI's 1833 minutes and bailment receipt, and erred in examining evidence extrinsic to the

Leases. (Becket Br. 9). The Court should disregard these arguments because CSI did not raise them either below or on appeal. *Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 239 F.3d 66, 69 n.1 (1st Cir. 2001) ("Because these issues were raised for the first time on appeal by an amicus, not by a party, we do not consider them."). Quite the opposite, CSI below relied heavily on extrinsic evidence, including CSI and CJI minutes. (*E.g.*, ECF91 (CSI proposed findings citing CSI or CJI minutes in 110+ paragraphs)). CSI itself introduced at trial the 1833 minutes and receipt — the very documents Becket contends the court below should have ignored. (AD28).

In any event, none of the supposed "internal church documents" at issue required that the District Court make religious determinations. These documents reference a bailment, not religious doctrine. And much of the evidence on which the District Court relied — most notably, CSI's engraving of "Newport" on the Rimonim bases, a critical piece of evidence for the District Court — is not "internal church documents."

As for Becket's position that the Settlement, Leases, and 1945 Agreement unambiguously favor CSI's position, Becket overlooks the detailed record described by the court below. Becket's contention that the decision below must have "ignor[ed]" those documents because the court ruled against CSI reveals Becket as more a friend of CSI than of this Court. (Becket Br. 19). While Becket

notes that "a rabbi employed by [CSI]" sits on its board of directors, Becket omits that the director in question, Rabbi Soloveichik, is chief rabbi at CSI and the very CSI witness whose exclusion from trial CSI cites as a ground for reversal. (*Id.* at 1 n.1).

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY REPLACING CSI WITH CJI AS TRUSTEE

Before the District Court, CSI denied the existence of the charitable trust and sought to obtain outright ownership of Touro. On appeal, CSI does not challenge the clear and convincing evidence establishing the trust. Rather, CSI asserts that CJI should have been barred from raising trust-related claims and CSI should not be removed as trustee of a trust it sought to destroy. CSI's arguments do not advance its appeal.

### A. The 1903 Opinion does not bar CJI's trust-related claims

#### 1. Changed circumstances defeat *res judicata*

CSI principally asserts that the 1903 Opinion in *David v. Levy* precluded CJI from raising any trust-related claims. (BR48-52). At the same time CSI asks this Court to "enter judgment that Shearith Israel, **as charitable trustee**, owns Touro Synagogue." (BR61). CSI therefore not only admits that Touro is held in a charitable trust but also asks this Court to affirm that trust, a determination which necessarily entails determining the trust corpus, trustee,

purpose and beneficiary. If, as CSI now contends, this Court may determine the existence and nature of the charitable trust, then so could the District Court.

CSI's *res judicata* argument, therefore, may be directed only at CJI's claims concerning the appointment of the trustee going forward. Those claims are not barred, because the grounds for removing CSI and appointing CJI as trustee did not arise until well after 1903. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955) (first suit cannot preclude claims that "did not even then exist"). This point completely disposes of CSI's *res judicata* argument.

In any event, due to changed circumstances *David v. Levy* could not preclude *any* trust-related claims. *Spradling v. Tulsa*, 198 F.3d 1219, 1223 (10th Cir. 2000) (*res judicata* applies "only in cases where controlling facts and law remain unchanged"); Restatement (Second) Judgments §24 cmt. f (1980) (changed circumstances may render *res judicata* inapplicable). As the Attorney General noted, the District Court was "not met with the same circumstances as existed" in 1903. (A200-201). For example, the District Court correctly found that since 1903, CSI reaffirmed the trust in the Leases, its own minutes, verbal communications, and, critically, in the 1945 Agreement. (AD38, 53-56 & n.45). The Rhode Island legislature also "public[ly] affirm[ed] the trust's existence and purpose" in legislation passed in 1932. (AD55; A4215). And CJI, the only Jewish congregation in Newport, has been the only congregation worshiping in Touro for

100+ years, a connection that has since been written into Rhode Island law. (A4212; A4227; A4229-31).

## 2. CSI's arguments are meritless

Even putting aside that developments since 1903 defeat *res judicata* here, the 1903 Opinion still would not preclude CJI's claims. The District Court correctly held that the 1903 Opinion is not entitled *res judicata* effect because "it would not be equitable to apply preclusive effect to a decision that did not carry such effect when it was made." (AD61). Under the law at the time, demurrers sustained due to pleading defects — the ruling in the 1903 Opinion — lacked preclusive effect because they were not judgments "upon the merits." (AD60-61). *See Gould v. Evansville & C. R.R.*, 91 U.S. 526, 534 (1875), in which the Supreme Court held it "well settled" that a judgment on demurrer resulting "from the omission of an essential allegation" was "no bar" to a second suit because "the merits of the cause" were "not heard and decided in the first action." *See also* Moore's Federal Practice §131.30[3][e] (same).[6]

---

[6] Instead of addressing the authorities cited by the District Court, CSI relies on *Northern Pacific Railway v. Slaght*, 205 U.S. 122 (1907), a case decided *after* the 1903 Opinion. *Slaght* nevertheless is consistent with *Gould* because the *Slaght* Court held the prior judgment was *res judicata* only because "[t]he record shows that the demurrer was not upon merely formal or technical defects, but went to the merits." *Id.* at 132.

The 1903 Opinion was not a decision on the merits. As the Attorney General noted, "[t]he court never reached the substantive issue of whether Touro Synagogue is held in trust and for whom." (A200). Rather, Judge Brown dismissed the case because (i) plaintiffs had neglected to plead they were Jews, (ii) the "individual" plaintiffs did not allege sufficient facts giving them equitable or legal interest in the Synagogue (the court never addressed whether CJI as an entity had an equitable interest), (iii) plaintiffs pled they were Jews of Newport instead of the Jewish "Society" of Newport (the court never addressed whether CJI was said "Society"), and (iv) plaintiffs possessed Touro through unclean hands. (AD61n.48).

As the District Court concluded, the first three grounds were pleading deficiencies that did not go to the merits. The fourth, unclean hands, likewise did not result in claim preclusion. (*Id.*). *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1376 (Fed. Cir. 2001) ("unclean hands generally does not prejudice the offending party in subsequent cases, but only provides a bar to relief in the case at hand"); 30A C.J.S. Equity §123 (2016) (same). This is especially so given that the court in 1903 appears to have based its unclean hands determination on plaintiffs' pleading failures "so far as appears from the bill." (A1882).[7]

---

[7] CSI mistakenly contends that dismissal for unclean hands always has *res judicata* effect. (BR51-52). *Texaco Puerto Rico, Inc. v. Dep't Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995) did not concern claim preclusion; that unclean hands must

CSI nevertheless contends that the 1903 Opinion was on the merits because CJI supposedly "telegraphed the Court that it consented to the dismissal order's entry, without requesting leave to replead." (BR51). CSI relies on *Slaght*, but that case did not concern a dismissal upon "formal or technical defects." 205 U.S. at 132. Moreover, CJI's counsel sent the referenced telegram the same day CJI and CSI entered into the Settlement, stating that "[t]he pending litigation between the parties shall be discontinued without costs to either as against the other." (A1883; A1888). There was thus no need for CJI to replead.

CSI goes on to assert that Judge Brown "held that there was no 'trust for the Jews of Newport.'" (BR51). Such a ruling is not clearly discernable from the 1903 Opinion and in any event would be *dicta*. The court did muse that Rivera's will suggested a trust for the Jewish "Society" of Newport, but did not address whether CJI was that "Society." (A1881).

Finally, the District Court properly held that if the demurrer had been sustained on grounds other than those it could identify, those grounds were too ambiguous to bar the current litigation. (AD61n.48, citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 380 (D.C. Cir. 1987) (affirming refusal to apply *res judicata* because decision "was

---

"relate" to the subject of the suit does not make a dismissal based on that doctrine a judgment on the merits for purposes of *res judicata*.

ambiguous on its face")).  This conclusion bars reliance on the 1903 Opinion for any purpose.

**B.**   **The 1903 Settlement and Lease do not bar CJI's trust-related claims**

CSI next contends that CJI "could not prosecute trusteeship claims" because CJI acknowledged in the 1903 Settlement and Lease that CSI owned Touro, thus supposedly "g[iving] up any right to challenge Shearith Israel's *outright ownership*."  (BR52).  Again, CSI's argument is at odds with its request that this Court "enter judgment" that CSI is the "charitable trustee" of Touro. (BR61).  CSI also waived this argument by not raising it before the District Court.

Beyond those dipositive points, it would be nonsensical to hold that CJI in a lease and settlement in 1903 waived the right to remove CSI for misconduct that occurred 100+ years later.  Yet that is CSI's argument here.

Even overlooking CSI's failures in this regard, the District Court found that the Lease was a lease of trust property from the trustee, as legal owner, to the beneficiary, as holder of the equitable interest, in furtherance of the trust's purpose.  (AD7; AD41-42; AD54; AD95).  Based on these findings, which are not clearly erroneous, CJI did not waive its right to enforce the trust and seek CSI's removal.

## C. The Attorney General's decision to intervene as *amicus* instead of as a party did not nullify the judgment

On appeal, CSI abandons the position urged below that only the Attorney General has standing to enforce charitable trusts. Instead, CSI now contends that the District Court's trust-related decisions are void because the Attorney General was not made a formal party. (BR53-54). CSI forfeited this hyper-technical argument, cited only in its post-trial rebuttal brief, by never moving to dismiss CJI's trust claims under Fed. R. Civ. P. 19 concerning indispensable parties. "Rule 19 dismissals are rarely appropriate when the objection is first made at the end of the case." *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 43 (1st Cir. 2009).

Not only did CSI fail adequately to raise this point below, at the time CSI actually sought to limit the Attorney General's involvement in the proceeding. (ECF63; A18). CSI cannot be heard now to complain that the District Court's decision is invalid because the Attorney General did not have an adequate opportunity to represent the public.

Beyond CSI's waiver, CSI is not correct on the law. CSI relies on case-law that predates the statutory scheme enacted in 1950 governing the Attorney General's involvement in proceedings concerning charitable trusts. The current law, R.I. Gen. Law §18-9-5, requires only that the Attorney General "shall be notified of all judicial proceedings affecting" a charitable trust and "shall be

deemed to be an interested party to the judicial proceedings." If the statute

mandated that the Attorney General be a party, the statute would have said so. *See*

*Audette v. Poulin*, 127 A.3d 908 (R.I. 2015), a case in which the beneficiary of a

charitable trust sued to remove the trustee and appoint a new one. The Rhode

Island Supreme Court noted that the Attorney General had been named in the suit

as an "interested party" and held only that §18-9-5 "requires notice to [the

Attorney General's] office of all judicial proceedings affecting charitable trusts."

*Id.* at 910 n.1.

The Attorney General's actions in this case further highlight that

Rhode Island law does not require the Attorney General to be a party. When filing

its complaint in November 2012, CJI provided the Attorney General with notice

and an opportunity to intervene. (A33¶3). If desired, the Attorney General could

have sought to intervene as a full party. Instead, the Attorney General moved to

intervene as *amicus*. The Attorney General is charged with "representing the

public interests with respect to charitable trusts" (A190) and administering Rhode

Island's laws governing such trusts. The Attorney General never argued that the

trust-related proceedings were invalid because he was not a formal party. On the

contrary, his post-trial brief urged the District Court to adopt certain trust-related

positions, which presupposes the District Court was able to reach those issues.

(A190-202).

The Attorney General, "representing the public interests," determined to wait until after discovery to move to intervene as *amicus*. The District Court granted the Attorney General's motion, noting in its decision that the Attorney General "will fully assist the Court with legal and factual analysis because of its statutory and common law special interest in this matter, untethered by any restrictions on its advocacy." (A18). The Attorney General (i) attended the trial, (ii) reviewed the documentary evidence, and (iii) submitted a post-trial brief setting out positions he urged the District Court to adopt. Under the circumstances, any argument that the Attorney General did not have an adequate opportunity to represent the public elevates form over substance. *See Nat'l Assoc.*, 582 F.3d at 43-44 (failure to join party not ground for reversal when party's interests were addressed by those present and considered by district court).

Finally, CSI cannot show that the decision below would have been any different had the Attorney General chosen to intervene as a formal party instead of as *amicus*.

### D. The District Court did not abuse its discretion by removing CSI as trustee

The District Court did not abuse its discretion in removing CSI as trustee — on three independent grounds, each supported by "overwhelming" evidence. (AD90).

### 1. <u>Repudiation of the trust</u>

The District Court found that CSI committed a "serious breach of trust" by denying the trust's existence, attempting to obtain absolute ownership of the trust corpus, and claiming that CSI trustees hold Touro "for the benefit of Shearith Israel." (AD97-98). As the court below correctly held, CSI is "unsuitable to act as trustee" because CSI repudiated the trust, which is "'a clear ground of removal.'" (*Id.*, quoting Bogert §527). Nothing could be more disqualifying than a trustee who denies the existence of the trust and, on top of that, disowns its duties.

CSI does not deny its efforts to destroy the trust. Instead, CSI contends that its repudiation of the trust and attempt to obtain absolute ownership of Touro were good faith litigation positions, and "[d]isqualifying Shearith Israel for its litigation positions is grossly unfair." (BR58). A breach of trust, however, may be found "even though the trustee acted reasonably and in good faith." Restatement (Third) Trusts §93 (2012). Even if done in good faith, "a person who sues to recover property for his own right repudiates a trust relation to such property" and for that reason alone may be removed as trustee. *Brault v. Bigham*, 493 S.W.2d 576, 579 (Tex. Civ. App. 1973), cited approvingly in *In re Matthew W.T. Goodness Trust*, 2009 WL 3328364, at *5 (R.I. Super. May 14, 2009).

*Mahoney v. Mahoney*, 370 N.E.2d 1011 (Ct. App. Mass. 1977), an action to establish the existence of a trust, is instructive. There, defendant

attempted to justify distributing trust assets to herself by arguing that any obligation imposed on her by "the 'trust' mentioned in the will" was "moral rather than legal in nature." *Id.* at 1014. The appellate court had no trouble affirming the lower court's refusal to appoint defendant as trustee. *Id.* at 1015. Like the defendant in *Mahoney*, CSI below attempted to explain away the overwhelming evidence of the trust by claiming CSI had only moral obligations concerning Touro. (ECF90 at 68; ECF112 at 156-57). That position, regardless of whether or not taken in good faith, warrants removal.

In short, CSI's "repudiation of the trust is a clear ground for removal," *Goodness Trust*, 2009 WL 3328364, at *5, regardless of whether its appropriation of trust property was achieved or merely attempted, Bogert §527, and regardless of whether its denial of the trust and attempt to become absolute owner were litigation positions taken in good faith. *Life Ins. Co. of N. Am. v. Waldrop*, 1996 WL 661184, at *1 (5th Cir. Oct. 22, 1996) (citing *Brault*, 493 S.W.2d at 579); *Mahoney* 370 N.E.2d at 1015. And CSI cannot escape this case-law on the ground it arose in the context of private trusts. "[T]he causes which are held to justify removal are the same in all trusts, both charitable and private." Bogert §398.

CSI further claims it cannot be held responsible for denying the trust because until trial no court had ruled the trust exists and CSI did not anticipate that the District Court would so rule. (BR58). Trusts come into existence when

created by a settlor; no court order is needed. The "trust's existence and purpose" was in any event "public[ly] affirm[ed]" by statute in a 1932 Rhode Island law. (AD55; A4215). Certainly in light of this statute, no court decision was required, for "[i]gnorance of the law will not excuse any person." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010).

Even were CSI's subjective beliefs relevant, CSI could not credibly claim it was unaware of the trust. (BR58). The District Court found:

> The Rivera Will is not a newly discovered archival relic. It is a much-quoted founding document in Touro Synagogue's lore, long familiar to both parties in this dispute. The existence of the trust, apparent from the face of that document, could not come as a surprise to Shearith Israel. It has been reaffirmed many times over by various documents from later in the Synagogue's history, many of which Shearith Israel signed on to.

(AD51n.40). These factual findings are well-supported. Beyond Rivera's will, CSI acknowledged the trust in the 1894 deeds, the 1903 and 1908 Leases, its own minutes, the 1945 Agreement, and orally. (AD38; AD53-56; AD56n.45).

As a related argument, CSI contends it had "no opportunity to defend itself under the new trust regime the District Court established." (BR55). This position wrongly assumes the trust did not exist until acknowledged by the District Court. Moreover, CSI was afforded due process. CSI had ample notice of CJI's claims, conducted discovery, and vigorously defended itself at trial.

2.    **Friction**

The District Court removed CSI as trustee also due to friction between CSI and CJI and CSI's lack of sympathy for the objects of the charitable trust. (AD8; AD99-101, citing *In re Statter*, 275 A.2d 272, 276 (R.I. 1971) (friction between trustee and beneficiary impairing administration of trust is grounds for removal) and *Nugent ex rel. Lingard v. Harris*, 184 A.2d 783, 785 (R.I. 1962) (lack of sympathy for objects of charitable trust is grounds for removal)).  This ruling is independently supported by three factual findings, none of which is clearly erroneous.

- CSI sought to "evict [CJI] from Touro Synagogue, without any other congregation standing ready to take its place." (AD100).  The District Court found that would "undermine the very reason for the trust's existence — public Jewish worship in Newport." (AD100).

- CSI's actions "have engendered such animosity in the relationship that its continued service as trustee would be detrimental to the trust's purpose." (AD99).  The District Court found "compelling" and "credible" the unrebutted testimony of CJI's Bertha Ross that there is "friction" between the parties and CJI can no longer work with CSI.  (AD101).

- CSI has not meaningfully cooperated with CJI for at least 20 years. (AD99-101).  By 1993, CSI had no relationship with CJI.  (AD99).  David

Bazarsky, a CJI witness the court found "credible" and "compelling" (AD99n.75), tried "unsuccessfully" to reestablish the connection but CSI refused to help CJI keep Touro open as a place of worship, telling CJI "you're on your own" and "we're not taking care of *your* synagogue." (AD100).

In the teeth of these dispositive facts, CSI argues that the District Court erred by focusing on the relationship between the trustee and an "identifiable entity." According to CSI, only hostility towards the *purpose* of the trust warrants removal. (BR59). Such hostility is precisely what the District Court found. CSI expressed hostility towards the trust's purpose — continued Jewish worship in Touro — by seeking to evict CJI without any congregation "standing ready to take its place" and by refusing to help CJI keep Touro in good repair. Moreover, CJI is the "conduit" through which the trust achieves its purpose (AD90-91) and so hostility towards CJI is hostility towards the trust's purpose.[8]

---

[8] To the extent CSI argues that CJI is not the "beneficiary" of the trust because a charitable trust "has no identifiable beneficiary" (BR54), the District Court properly held that, "[i]n Rhode Island, the party that directly benefits from a charitable trust is the holder of the beneficial interest in the trust and is referred to as the 'beneficiary.'" (AD91, citing *Webster v. Wiggin*, 31 A. 824, 827-28 (R.I. 1895) and Bogert §411). *See also Tillinghast v. Council at Narragansett Pier, Boy Scouts of Am.*, 133 A. 662, 663 (R.I. 1926) (corporation held beneficiary under charitable trust). The District Court's finding that CJI holds the "present beneficial interest" in the charitable trust (AD96), a ruling urged by the Attorney General (A199), is well-supported: CJI has been the only congregation at Touro for over 100 years, during which time CJI has maintained and protected the Synagogue. (AD7-8; AD95 & n.73).

On this score, CSI also takes the unusual position that by seeking outright ownership of the trust property and the eviction of the only congregation worshipping in Touro, CSI believed it was furthering the trust's purpose. (BR56-58). For example, CSI says it considered these steps necessary to sustain the trust and prevent CJI from selling the Rimonim. (BR58). In no world can attempting to destroy a trust and evicting the beneficiary be consistent with furthering the trust's purpose.

Attempting to explain away its offending conduct, CSI resorts to sophistry, contending that it sought to evict the "congregation" and not the "congregants." (BR59-60; A89¶63; A91¶5). Obviously, a congregation is composed of congregants. (A763). CSI's position also ignores that for 100+ years CJI has been the only congregation worshipping in Touro. CJI has taken care of Touro and ensured public worship there. And CJI is the only Jewish congregation in Newport. (AD100; A221-25; A238; A401; A504-05; A791). Even more telling, in CSI's post-trial amended counterclaims CSI pleaded for eviction not only of CJI but also of "individual congregants" who, in CSI's view, do not pray the right way. (A186¶63).

As with its repudiation of the trust, CSI asserts that it cannot be faulted for its conduct during the litigation. (BR58). This Court has held that "ill feeling" arising from the "course of the litigation in this case itself" is grounds for

removal. *Dennis*, 744 F.2d at 901.  And as the District Court found, CSI "did not need to" seek CJI's eviction to "prosecute its claim for the Rimonim."  (AD102). The District Court properly focused on the *future* administration of the trust. (AD101).  *Statter*, 275 A.2d at 276.  It does not matter whether the ill feeling arose in litigation or otherwise.

### 3.    <u>Changed circumstances</u>

As a third ground for removal, the District Court found that CSI "long ago" abandoned to CJI its role as trustee.  (AD101-03).  Contrary to CSI's claims (BR59), this finding is not clearly erroneous.  For more than 100 years CJI has been the party responsible for Jewish worship in Touro.  "As Jeshuat Israel's responsibilities for Touro Synagogue have expanded, Shearith Israel's have receded.  For at least the past 20 years, Shearith Israel has not taken any meaningful action in its capacity as trustee for the Touro Synagogue and lands." (AD8).  CJI amended its "governing documents" several times such that by 1983 the by-laws did not include any CSI-appointed trustees.  (AD44).  CSI either did not notice or did not care.  CSI's vice president testified that whether CJI, the congregation maintaining Touro and holding public services there, held board meetings "just was not something I gave thought to."  (A682-84).

Although CSI claims that it has not abandoned its role as trustee (BR21-23), the clear record demonstrates that CSI has had little or nothing to do

with Touro and CJI for a long time.  CSI cites its appointment of "liaisons" to CJI (BR22), but the record shows that CSI's liaisons rarely visited Touro or communicated with CJI.  (A651-52; A677-A680; A682-84).  CSI also contends it "assisted" in fundraising.  (BR22).  Yet *other* entities, not CSI, put in the effort to fundraise for Touro.  CSI merely approved grant proposals — necessary because CSI was legal owner.  When pressed to provide examples of tangible assistance, CSI's counsel on summation could note only that CSI conducted a fundraiser for CJI's Hebrew school in 1926 — *ninety years ago*.  (ECF112 at 173-74).  Similarly unpersuasive is CSI's assertion that rabbis from CSI and CJI communicated — *20 years ago*.  (BR22).

Ultimately, CSI cannot escape the record evidence relied on by the District Court showing that for years CSI has had little to do with Touro and CJI.  CSI's witnesses admitted they believed CSI had **no** obligation to preserve or maintain Touro.  (A688;  A1140).  This could explain why in 1996 CSI refused to help, telling CJI "you're on your own" and "we're not taking care of **your** synagogue."  (AD99-100; *see also*  A380-81; A441; A537).[9]

---

[9] CSI asserts that the District Court's "signal error" was finding that CSI had to act for the benefit of CJI.  (BR47; AD96).  As set forth above, the grounds cited by the District Court for removal do not turn on whether CJI is the trust beneficiary.

### E. The District Court did not abuse its discretion by appointing CJI as successor trustee

The District Court found that CJI "has maintained, preserved, and protected Touro Synagogue as a place for public Jewish worship for over 100 years." (AD8; AD104). By diligently ensuring for 100+ years that Touro remains open for public Jewish worship, CJI "has been discharging all of the responsibilities of a trustee for the past century." (*Id.*). In light of these factual findings, amply supported by the record (A221-A222; A226-A231; A238; A286; A437-38; A545; A4147-48), the court below acted well within its discretion in appointing CJI the successor trustee. CJI is the "most appropriate new trustee" because CJI has demonstrated a firm commitment to furthering the purpose of the trust and need only continue doing what it has already done for generations. (AD8; AD104).

Despite this overwhelming record, CSI maintains CJI is not a "suitable" trustee because CJI does not follow CSI's religious rituals. (BR61). The District Court found the trust does not require those rituals. (AD7; AD36; AD54n44). Moreover, as noted at page 36 above, CSI has known for decades that CJI does not follow CSI's rituals, yet until this litigation never objected.

CSI also maintains that the District Court did not comply with R.I. Gen. Laws §18-2-1 by failing to give "due notice" to the "parties in interest" before appointing a new trustee. (BR60). This hyper-technical argument fails for

several reasons. *First*, CSI forfeited it by not raising the argument before the District Court. CJI pled in its complaint that CJI should be appointed the new trustee. (A44¶¶34-37; AD3). CSI acknowledged in its pre-trial brief that this issue was to be tried before the District Court. (ECF70 at 74-75). Yet CSI never raised its "due notice" argument below.

Even had the District Court appointed CJI "*sua sponte*," as CSI incorrectly claims, CSI still would have forfeited its argument because CSI was required to but did not seek relief from the trial court after that court issued its decision. *See* Fed. R. Civ. P. 59(a)(2); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1256 n.45 (10th Cir. 1999) (when a ground "can by definition arise only after a verdict," a party "must therefore preserve that ground by moving for a new trial after the verdict"); Moore's Federal Practice §59.55 ("Grounds for new trial that arise solely in the context of post-trial proceedings must be presented to the trial court for consideration by a motion for new trial, and the failure to do so deprives the appellate court from any record that is reviewable for error").

*Second*, CSI lacks standing. CSI has been removed as trustee and thus itself is not an "interested party" under §18-2-1.

*Third*, there was clear compliance with §18-2-1. Even if CSI is an "interested party," CSI was provided notice that CJI's appointment was an issue to

be tried.  The Attorney General likewise was on notice — and never argued that the District Court failed to comply with §18-2-1.

CSI suggests but does not credibly explain why the Federal Government might have been an "interested party."  (BR60).  In any event, the Government already acknowledged in the 1945 and 2001 agreements upon which CSI relies that CJI would act in a role akin to trustee.  (A2194-A2209; A2996-3001).

Finally, any supposed error in not notifying supposed interested parties was harmless.  Given the overwhelming evidence establishing that CJI has acted as the trustee for 100+ years, CSI cannot show that notifying any other parties would have resulted in appointment of a different trustee.  Ultimately, the District Court did not abuse its "wide discretion."  Bogert §532.

## CONCLUSION

The decision below should be affirmed.[10]

Dated:  December 7, 2016                    Respectfully submitted,

                                            PLAINTIFF-APPELLEE
                                            CONGREGATION JESHUAT ISRAEL

                                            By its attorneys,

                                            /s/ Gary P. Naftalis

                                            Gary P. Naftalis
                                            Jonathan M. Wagner
                                            Tobias B. Jacoby
                                            Daniel P. Schumeister
                                            KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                            1177 Avenue of the Americas
                                            New York, New York  10036
                                            (212) 715-9100
                                            gnaftalis@kramerlevin.com
                                            jwagner@kramerlevin.com
                                            tjacoby@kramerlevin.com
                                            dschumeister@kramerlevin.com

                                            Steven E. Snow
                                            PARTRIDGE SNOW & HAHN LLP
                                            40 Westminster Street, Suite 1100
                                            Providence, Rhode Island 02903
                                            (401) 861-8200
                                            ses@psh.com

---

[10] According to CSI, the District Judge violated Code of Conduct Canon 3A(6) by making a presentation to the Rhode Island Jewish Historical Association.  (BRviii; BR61).  However, the Canon provides that "[t]he prohibition on public comment on the merits does not extend," as here, to "scholarly presentations made for purposes of legal education."

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as that rule existed before December 1, 2016, because it contains 13,929 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point typeface.

Effective December 1, 2016, Fed. R. App. P. 32(a)(7)(B) was amended to provide that principal briefs may contain no more than 13,000 words. The Supreme Court has stated that the amendment applies to proceedings already pending on December 1, 2016 "insofar as just and practicable." As set forth in Appellee's **pending motion** for leave to file a brief containing no more than 14,000 words, it would not be "just and practicable" for the 13,000 word limit to apply to Appellee's brief because, among other reasons, (i) Appellant's brief was 13,982 words, and (ii) Appellee's brief would have been due before December 1, 2016, prior to the effective date of the amendment, but for an extension needed to accommodate Jewish holidays and to address the numerous issues raised by Appellant and an *amicus* brief.

Dated: December 7, 2016

/s/ Gary P. Naftalis
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Plaintiff-Appellee*
*Congregation Jeshuat Israel*

# CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2016, I electronically filed the foregoing Brief of Appellant with the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the appeal are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Gary P. Naftalis
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Plaintiff-Appellee*
*Congregation Jeshuat Israel*