No. 16-1756

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Congregation Jeshuat Israel,

*Plaintiff-Appellee*,

v.

Congregation Shearith Israel,

*Defendant-Appellant.*

_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**REPLY BRIEF OF DEFENDANT-APPELLANT
CONGREGATION SHEARITH ISRAEL**

Louis M. Solomon
Colin A. Underwood
Nancy L. Savitt
GREENBERG TRAURIG, LLP
The MetLife Building
200 Park Avenue
New York, NY 10166
(212) 801-6500

Deming E. Sherman
LOCKE LORD LLP
2800  Financial Plaza
Providence, RI 02903
(401) 276-6443

John F. Farraher, Jr.
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110
(617) 310-3029

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION and SUMMARY OF ARGUMENT ........................................... 1

CJI MISSTATES THE STANDARD OF REVIEW AND THIS COURT'S
    POWER TO REACH SHEARITH ISRAEL'S ARGUMENTS ...................... 9

ARGUMENT ...................................................................... 11

I.    THE DISTRICT COURT ERRED IN RULING THAT CJI "OWNS
    THE RIMONIM AND IS FREE TO DO WITH THEM AS IT
    WISHES" (AD65)............................................................ 11

        A.   Selling the Rimonim Violates CJI's Binding Contractual
            Obligations to Abide by Shearith Israel's Actual Practices
            and Sunders Any Touro Trust........................................ 11

        B.   Even if CJI Owned the Rimonim, CJI Surrendered Any
            Right to Sever the Rimonim's Connection to Touro .................... 13

        C.   The District Court Erred in Creating a Bailment ..................... 19

        D.   CJI Did Not Obtain Title From Its Possession of the
            Rimonim............................................................ 22

II.   THE DISTRICT COURT ERRED IN ITS TRUST RULINGS..................... 22

        A.   The District Court Erred in Granting CJI Standing to
            Prosecute Trustee Removal/Appointment Issues Without the
            Attorney General................................................... 23

        B.   The District Court Appointed CJI in Further Violation of
            Rhode Island Law and the Dictates of Due Process .................... 25

        C.   CJI Lacks Standing to Pursue its Trustee-Related Claims
            Due to Settlement and Res Judicata................................. 28

        D.   The District Court Legally Erred in Removing Shearith
            Israel as Trustee, Particularly Without Warning or Any
            Opportunity to Cure ................................................ 30

CONCLUSION .................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Aroostook Band of Micmacs v. Ryan,*
    484 F.3d 41 (1st Cir. 2007) ...................................................................12

*Audette v. Poulin,*
    127 A.3d 908 (R.I. 2015) ......................................................................24

*Chabot v. Paulhus,*
    32 R.I. 471, 79 A. 1103 (1911) ......................................................16, 18

*Elena Carcieri Trust-1988 v.*
    *Enterprise Rent-A-Car Co. of Rhode Island,*
    871 A.2d 944 (R.I. 2005) ................................................................ 13-14

*F.D. McKendall Lumber Co. v. Kalian,*
    425 A.2d 515 (R.I. 1981) ......................................................................17

*Furtado v. Goncalves,*
    63 A.3d 533 (R.I. 2013) ........................................................................29

*Haffenreffer v. Haffenreffer,*
    994 A.2d 1226 (R.I. 2010) ....................................................................14

*Howe v. City of Akron,*
    801 F.3d 718 (6th Cir. 2015) ...............................................................26

*Israel v. Nat'l Bd. of Young Men's Christian Ass'n,*
    117 R.I. 614, 369 A.2d 646 (1977) ......................................................24

*Leo v. Armington,*
    74 R.I. 124, 59 A.2d 371 (1948) ..........................................................24

*MacDonald v. Manning,*
    103 R.I. 538, 239 A.2d 640 (1968) ......................................................20

*Mack v. Laser Inst. of Med. Esthetics, Inc.,*
    No. PB 03-1722, 2005 WL 1713077 (R.I. Super. July 20, 2005) ......19

*Mahoney v. Mahoney,*
    5 Mass. App. Ct. 720, 370 N.E.2d 1011 (Mass. Ct. App. 1977) ........31

*In re McBurney Law Servs., Inc.,*
    798 A.2d 877 (R.I. 2002) ......................................................................29

*Millar v. Allen,*
    10 R.I. 49 (1871) ..................................................................................19

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*,
    175 F.3d 1221 (10th Cir. 1999) ........................................................................26

*New Life Baptist Church Acad. v. Town of East Longmeadow*,
    885 F.2d 940 (1st Cir. 1989).............................................................................10

*Ould v. Wash. Hosp. for Foundlings*,
    95 U.S. 303 (1877)...................................................................................20, 21

*Pahlavi v. Palandjian*,
    809 F.2d 938 (1st Cir. 1987)........................................................................ 17-18

*Real Estate Bar Ass'n For Mass., Inc. v.
    Nat'l Real Estate Info. Servs.*,
    608 F.3d 110 (1st Cir. 2010) .....................................................................10, 12

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000)................................................................................28

*Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*,
    145 F.3d 463 (1st Cir. 1998)........................................................................9, 21

*State v. Collins*,
    28 R.I. 439, 67 A. 796 (1907).........................................................................18

*United States v. 15 Bosworth St.*,
    236 F.3d 50 (1st Cir. 2001).............................................................................10

## Statutes

R.I. Gen. Laws § 18-2-1....................................................................................9, 25

R.I. Gen. Laws § 18-9-5......................................................................................24

## INTRODUCTION and SUMMARY OF ARGUMENT

The District Court's promotion of short-term local interests threatens a patrimony reflecting both the authentic history and present day vitality of Judaism in America.  The decision below rewrites 250 years of history such that even the Rhode Island Attorney General registers its disagreement (AGBR 8, recognizing that Touro must "follow[] the Western Sephardic Jewish traditions as practiced by the original colonial Newport congregation and currently observed by CSI [Shearith Israel]").  The decision below disregards or distorts unequivocal ancient, formal documents and public conduct.  And without basic due process, fairness, or any opportunity to cure, it punished Shearith Israel (and indirectly all Jews and other people of faith now and in perpetuity) for Shearith Israel's exercising the same ritual oversight role that it has played for 200 years without objection.

CJI's opposition raises predictable arguments that Shearith Israel failed to preserve arguments on appeal, is seeking a second bite at the facts, and that circumstances have changed.  None of this is accurate, as we will show.  CJI's own brief does however reveal the core reasons why the errors below must be reversed.

According to the District Court, the rimonim have been integral parts of the worship at Touro Synagogue for 250 years.  The *only* exceptions have been during 70-80 years of the Nineteenth Century, when Touro was closed under the legal control of Shearith Israel, and as part of short-term loans of the objects to other

religious or cultural institutions.  For 250 years the rimonim, in the words of the federal government, have been central to the very "balance, fabric and genus loci" of Touro, inseparable parts of the combination of space and associated religious articles constituting one of the greatest living tributes to Jews, and indirectly all people of faith, being a vibrant part of the American experience since the beginning (A2113, A2116).  Indeed, so inextricably bound to Touro have been the rimonim that the District Court read into Shearith Israel Board minutes from 1833, which make no reference to rimonim or to silver of any kind, an undertaking to return the rimonim to Touro for use in worship there.

**Summary of Rimonim Errors.**  The first grave error the District Court made is the legal one of concluding that CJI obtained ownership of the rimonim ***because*** CJI was worshipping at Touro – at Shearith Israel's permission – and then immediately destroyed that centuries-old interrelationship between place and object by holding that CJI could remove the rimonim and do with them "as it wishes" (AD65), severing them from their use in worship.  CJI and the court below erroneously place the rimonim and Touro on independent tracks when history, the law, and logic demand just the opposite.  The inconsistency is so palpably, legally wrong that even CJI, trying to find some legitimacy in having any say in separating the rimonim from the synagogue, fabricates a connection between it and Colonial Yeshuat Israel (CJIBR 23) – a connection the District Court explicitly refused to

make (AD89 n.69).  CJI has had a single role in history:  it has served as caretaker for the "safe keeping" of Touro and its ritual articles of worship by encumbering Touro and its ritual articles under a formal, recorded Indenture with Lease and by promising to "**protect and conserve**" them.  As noble and important as that role is, "caretaker" or "lessee" is not the final ritual authority or decision-maker.  A "protector" and "conservator" is not the equivalent of an owner.

CJI's brief fails to acknowledge the core writings and conduct that the District Court erroneously ignored:

- In 1883, Shearith Israel formally reconsecrated Touro as a functioning synagogue, with Torah scrolls and rimonim (A2453-61, A1598-1602).  That occurred more than 10 years **before** CJI came into existence, thus destroying any notion that CJI was a legitimate recipient of bailed goods, even assuming there was a legally cognizable bailment (which there wasn't).  Every document from that period confirms that the sacred religious objects such as rimonim were to be **used as part of** the service at Touro, to be returned to Shearith Israel when requested, and therefore not subject to anyone's personal use or subsequent disposition (BR 11) (Point I.C).

- When CJI came into existence **ten years later**, the same conditions obtained.  Crucially, CJI formally petitioned Shearith Israel for "the

*loan* of ***such property as has formerly been in use in the services***";

and, responding directly to Shearith Israel's claim that it was "***trustee***

***and owner of the Synagogue and personal property***", CJI admitted

repeatedly in writing, "***we do not claim ownership of the property or***

***appurtenances***" and at most saw itself as "***tak[ing] charge*** *for safe*

*keeping* ***all the property contained in said Synagogue", including***

***"the Silver Bells***" (AD117-18, A1632-33, A1620-27; BR12-14) (all

emphases added unless otherwise noted) (Point I.B). Not a single

writing supports CJI's ownership, and the District Court cites none.

- CJI specially modified its constitution to create a Permanent

  Constitution, forswearing any authority to sell even its own personal

  property that was used as part of the Touro service and prohibiting

  any modification of that Permanent Constitution without Shearith

  Israel's approval (BR14) (Point I.B).

- In a public ceremony in 1903 – after CJI lost the 1902-03 litigation

  and formally undertook "***absolute[ly]***" to surrender the real property

  and paraphernalia (AD119-20) – CJI handed back to Shearith Israel

  the keys to Touro ***with the rimonim inside,*** making it clear to all the

  world that CJI had no ownership claim to either.  That ceremony was

-4-

duly recorded by the parties and reported contemporaneously by the press (BR 16-17) (Point I.B).

- The 1903 Indenture (renewed in 1908) formalized the arrangement, for therein the parties knowingly employed language used by the courts, the public, and the parties to refer to ritual objects such as the rimonim – paraphernalia and appurtenances of worship – expressly encumbering those objects and confirming that CJI had no right to sell or dispose of them (BR18-19, AD124-28, A1916-20). The District Court recognized that the 1903 litigation settlement explicitly granted Shearith Israel the right to draft the Indenture as it wanted (AD41, citing AD119) and found that Shearith Israel, in fashioning the Indenture, wanted to ensure that the ritual objects stayed with the synagogue (AD42 n.38). The conclusion, that the Indenture precludes CJI from dismembering Touro by selling the rimonim, follows inescapably – though the court below ignores this (Point I.B).

- For over a century since 1903, CJI reaffirmed the continued vitality of the Indenture – paying rent, appointing only approved Rabbis, expressly acknowledging it on its own website (BR 9, 19-21), and acting entirely consistently with the promise that both the ritual objects and the space were inseparable. CJI admits that Shearith

-5-

Israel has "[l]egal oversight of the building [**and**] its contents" (A2590, AD140), and that CJI is caring for the "magnificent" Myer Myers rimonim "found in the Touro Synagogue" (A2595) among the other appurtenances and paraphernalia of worship there. In over 100 years nothing has changed to transform CJI's caretaker role into ownership (Point I.D).

- The District Court clearly erroneously found that Shearith Israel was absent from Touro. In the ***ritual*** oversight role it played, it was ever-present (BR 21-22) – but essentially benign, since until CJI tried surreptitiously to sell the rimonim in 2012, the parties had honored the Indenture's stipulations, as CJI has repeatedly admitted (BR 19-20). On appeal, CJI does not even try to justify its conduct on purported fiscal grounds, which were legally insufficient in any case (BR 23-25).

**Summary of Trust Errors.** The second grave legal error made by the District Court relates to the ritual control over Touro and its associated appurtenances of worship. The legal errors largely ignored by CJI include:

- Interpreting an Eighteenth Century Will that has absolutely no connection to CJI (AD7), the District Court astonishingly stated that "the form of Jewish worship was never a requirement of the original

-6-

trust" and that Shearith Israel's insistence that, though open to all Jews, Touro continue to observe the ritual practiced by its colonial founders "posed legal problems that linger to this day" (AD36; AD54 n.44). The District Court's unilateral excision of any ritual context or content of Touro's use ignores the words of the Will and indeed ignores *every* subsequent, formal writing reaffirming precisely such a requirement on the use of Touro (A1401, AD126, A1917, A2038; BR33). Even the AG thinks the District Court is wrong, asserting that, far from there being no ritual content to the trust holding Touro, that trust must follow "the Western Sephardic Jewish traditions as practiced by the original colonial Newport congregation and currently observed by CSI" (AGBR 8). This error by the District Court alone requires reversal (Points II.B, I.A).

- The District Court compounded this error by refusing Shearith Israel's proffer of factual evidence that selling the rimonim would violate precisely the traditions that the AG admits are integral to the Touro charitable trust (BR 32; AD113-14) (Points II.B, I.A).

- In abruptly terminating Shearith Israel's 200-year ritual oversight role over Touro and its historic ritual articles, the District Court leaves Touro with no ritual oversight except by the hands of its relatively

recent caretaker, CJI, whom even the AG says is merely *a* (not *the*) beneficiary (AGBR 8 n.2, 9). In the circumstances here, the District Court is destroying the very essence of a trust (Point II.B).

- The decision below is flatly contrary to a binding federal court decision directly on point, which precludes CJI from challenging Shearith Israel's ownership or (ritual) control over Touro (A1879-72; BR 48-52). The AG may have the right to raise issues concerning Shearith Israel's ritual oversight of Touro, but it hasn't. CJI on the other hand has no such right – and ***nothing*** has changed in 100 years to give it that right (Point II.C).

- The District Court's ouster of Shearith Israel did not even comply with basic due process or Rhode Island law. **Neither the AG nor CJI has cited even one case appointing or removing a charitable trustee without the AG's being a party.** Here, it was even clearer, since the AG told the District Court that it "did not have the right to engage in discovery, examine witnesses or call his own witnesses at trial" and that "[**f]or these reasons**, the Attorney General takes no position with respect to removing CSI as Trustee or assisting this Court in selecting a new trustee if that is ultimately decided" (A190 n.2) (Point II.A).

-8-

- R.I. Gen. Laws § 18-2-1 expressly requires "due notice" before any trustee appointment.  None was given here, thereby disregarding the interests of at least five categories of key constituencies.  Even the AG is silent in trying to justify this error by the District Court (Point II.B).

- The District Court – unlawfully, without precedent, or any opportunity to explain or cure – punished Shearith Israel for trying in this litigation (where it was sued) to keep intact the priceless legacy of American Jewry represented by Touro and its historic ritual objects – a role Shearith Israel has played for 200 years without objection (Point II.D).

These errors are of monumental dimension and must be reversed.

## CJI MISSTATES THE STANDARD OF REVIEW AND THIS COURT'S POWER TO REACH SHEARITH ISRAEL'S ARGUMENTS

CJI misstates the applicable standard of review.  CJI omitted language showing clear error review only applies to contract interpretations where findings are "derived from extrinsic evidence **as to the parties' intent with regard to an uncertain contract provision**".  *Servicios Comerciales Andinos*, *S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463, 469 (1st Cir. 1998); *id*. at 472 ("provisions are ambiguous") (CJIBR 12).  The District Court did not find the Indenture or any other writing ambiguous; plenary review therefore governs (BR 27).

-9-

This Court need not defer to a "finding" that is actually a legal conclusion, *United States v. 15 Bosworth St.*, 236 F.3d 50, 54 (1st Cir. 2001). Nor is there deference for findings based on "an inaccurate appraisal of controlling legal principles", *id.*, or underlying First Amendment issues, *New Life Baptist Church Acad. v. Town of East Longmeadow*, 885 F.2d 940, 941-42 (1st Cir. 1989).

This Court may reach the issues CJI claims were waived. Shearith Israel raised the challenged arguments below (*e.g., infra* pp. 12, 18, 19, 23), including in rebuttal briefs that, as prescribed, functioned as full opposition papers to the simultaneously submitted initial post-trial papers (A22 (6/10/15 Order); Dkt. 90-91, 93-94, 96-98). Moreover, this Court will hear even new issues where, as here, appellant "gained no advantage in failing to raise these issues" and the issue "did not deprive this court of any useful factfinding, nor does it prejudice [appellee]". *Real Estate Bar Ass'n For Mass., Inc. v. Nat'l Real Estate Info. Servs.,* 608 F.3d 110, 125 (1st Cir. 2010). Given the stakes here, "failure to reach" Shearith Israel's arguments "would threaten a miscarriage of justice". *Id.* at 125.

CJI cites no authority for its argument that Shearith Israel lacks standing on appeal to challenge the District Court's determinations (CJIBR 19, 36, 61). No such authority exists.

# ARGUMENT

I.   **THE DISTRICT COURT ERRED IN RULING THAT CJI "OWNS THE RIMONIM AND IS FREE TO DO WITH THEM AS IT WISHES" (AD65)**

CJI cannot sell the rimonim whether or not it owns them.

### A. Selling the Rimonim Violates CJI's Binding Contractual Obligations to Abide by Shearith Israel's Actual Practices and Sunders Any Touro Trust

Even if CJI owns the rimonim, the Indenture and the 1945 Tri-Party Agreement with the United States require CJI to comply with Shearith Israel's ritual, rites, and customs (BR 31-34, AD126, A1917, A2038). Those contracts remain binding on CJI regardless of who is the trustee. **Shearith Israel adduced unrebutted evidence that Shearith Israel's practices prohibited CJI's contemplated sale** (BR 23). Nor was it "strange" (CJIBR 36) for CJI to agree to restrict the sale of its own religious articles – CJI's "Permanent Constitution" did just that as a means of gaining access to Touro and its ritual objects (BR 14). The District Court refused to consider the evidence of Shearith Israel's practices or to permit additional evidence of those practices from its Rabbi, who would have testified factually to precisely the "traditions" and "practices" that the AG asserts must inform Touro's use (BR 32).

CJI argues that this Court should avoid religiously-entangling First Amendment issues (CJIBR 35-39). Resolving the issue whether severing rimonim from Touro breaches actually-practiced traditions does not entail undue exploration of religious doctrine but simply would determine Shearith Israel's actual practices concerning the treatment of sacred objects. By refusing to enforce Shearith Israel's solemn contracts with CJI and the federal government, the District Court treated Shearith Israel as lacking capacity to contract, itself a First Amendment violation (BR 32-33). The Becket Fund's amicus brief expounds on Shearith Israel's arguments (also made below (Dkt. 90 at 55-56)), demonstrating the depth of the District Court's errors in denying Shearith Israel the benefit of its bargains. Even were the arguments new (they were not), this Court excuses waived First Amendment arguments, *Real Estate Bar Ass'n*, 608 F.3d at 125-26, and may also consider other (quite related) arguments made by amici, *Aroostook Band of Micmacs v. Ryan*, 484 F.3d 41, 51 n.11 (1st Cir. 2007).

Severing the rimonim from Touro violates not only the contractual "ritual" provisions; it irretrievably diminishes any Touro trust. CJI admits that the rimonim are part of "Touro Synagogue" (CJIBR 9). The District Court's findings establish the rimonim are part of the "articles of worship essential to [Touro's] religious ceremonies" (AD19-20). The federal government has found the same. For example, in evaluating Touro's National Register of Historic Places placement in

1986-88, the federal government specifically included *in the property's*

*description* "[t]he rimonim-silver belltops which adorn the [Torah's] rollers,

[which] are the work of the famous pre-revolutionary silversmith Myer Myers"

(A2113); and stated that Shearith Israel, which "still owned" the property, together

with the Secretary of the Interior, CJI, and TSF "*continue to preserve the balance,*

*fabric and genus loci of the site*" (A2116).  Similarly, in its 2001 contract with the

federal National Trust for Historic Preservation, CJI, as lessee of this "*active place*

*of worship*" (AD133), covenanted "*to protect and conserve" Touro's "related*

*collections*" (AD135), which CJI admitted included the rimonim (A330:22-331:9).

Newport's colonial Jews were survivors of persecution, unable to worship

openly until they came to America and Rhode Island (AD9-11; BR 34).  The

rimonim are symbols of Touro's authentic colonial heritage, a living testament to

the enduring Jewish presence because they are ***used*** in Touro's religious services.

Relegating them to mere museum pieces in another state is radically inconsistent

with any Touro trust.

### B.  Even if CJI Owned the Rimonim, CJI Surrendered Any Right to Sever the Rimonim's Connection to Touro

CJI claims that it can "establish[]" that the Indenture "did not cover the

Rimonim in the first place" by looking at "the parties' post-1903 conduct" (CJIBR

25-27).  Such evidence is only cognizable "if an ambiguity exists", *Elena Carcieri*

-13-

*Trust-1988 v. Enterprise Rent-A-Car Co. of Rhode Island*, 871 A.2d 944, 947 (R.I. 2005). Moreover, Shearith Israel has demonstrated that CJI's conduct was consistent with the Indenture and CJI's caretaker role (BR 45-46). But the relevant time is that of the Indenture's making in 1903, when CJI was locked out, owning and controlling nothing. It is precisely the "*situation of the parties and the accompanying circumstances at the time the contract was entered into*" that Rhode Island courts use to inform "the interpretive process and to assist in determining [an unambiguous contract's] meaning." *Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010) (original emphasis).

Even if CJI owned the rimonim, it gave up any right to dispose of them when 1) it specifically revised and executed its Permanent Constitution (***never*** to be modified without Shearith Israel's approval) precluding it from selling the ritual objects used at Touro, whoever owned them; 2) it formally, in its board minutes and publicly, "surrendered" to Shearith Israel the Synagogue and the "paraphernalia belonging thereto", literally locking the doors with the rimonim inside and handing the keys to Shearith Israel; and 3) it duly executed and performed the Indenture, which gave it the right to use the premises and articles of worship only on the conditions in that recorded instrument (AD119-20, AD124-29; BR 17, 37-38). The court below ignored the dispositive point that these documents

-14-

and acts preclude CJI from severing the rimonim from Touro even assuming CJI owns them.

The same conclusion follows from reviewing the parties' correspondence that the District Court and CJI ignore. CJI does not dispute that it received the rimonim from Shearith Israel (*see* CJIBR 23). Nor can it dispute that every document referencing the interchangeably-used appurtenances of worship, paraphernalia, and personalty – from the time Shearith Israel reopened, reconsecrated, and furnished Touro for worship in 1881 through 1903 – expressly evidences the ***loan*** of ritual objects from Shearith Israel to Touro ***for the use*** of those objects in services there (BR11-13). CJI expressly disclaimed "**ownership of the property or appurtenances**" (AD118), and saw itself at most as "**tak[ing] charge for safe keeping all the property contained in said Synagogue**", including "**the Silver Bells**" (A1620-27; A1638-39 (Shearith Israel discusses releasing "sefer-bells" to CJI "for their safe keeping <u>and their return whenever desired by us</u>")).

CJI wrongly asserts that documents need to "specifically reference" the Myer Myers rimonim (CJIBR 30, 32-33 & n.5). The District Court itself rejected the need for a document to "specifically reference the Rimonim" (AD81). There is no basis to exclude the rimonim from inclusive references to "the property contained in the Synagogue", "the paraphernalia belonging" to Touro, the

-15-

"appurtenances of worship", and the like – all those documents embrace Touro's ritual objects, including the rimonim.

CJI (CJIBR 30-31), like the District Court, ignores the ceremonial aspects of the "surrender" of the keys (BR 16-17, 38-39). CJI's own citation – reciting that "plaintiff and a constable" surrendered the "key" (singular) to a saloon, tendering back the ownership of "the saloon and contents", *Chabot v. Paulhus*, 79 A. 1103, 1104 (R.I. 1911) (CJIBR 29) – demonstrates that contemporaneous courts and parties were familiar with the formality of surrender (taking along a constable), as well as its scope. Similarly here, Shearith Israel ensured the press covered the public surrender ceremony whereby CJI surrendered the "keys" (plural) to Shearith Israel, in return for the Indenture (BR 16-17). ***CJI itself described the "surrender [of] the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said [Shearith Israel] Trustees, owners of the property***" (AD120). CJI ignores its admissions that the rimonim were in Touro at the time of the surrender and the Indenture's execution (BR17). (It also wrongly asserts that the District Court ruled that Shearith Israel did not send a mixed pair of rimonim to Touro (*see* AD29 n.30).)

In return for CJI's "absolute surrender" (AD119), Shearith Israel permitted CJI to worship in Touro under the Indenture's specific restrictions. The Indenture did not simply cover the physical property; it also covered "appurtenances" and the

expressly added "paraphernalia belonging thereto" (AD125).  CJI ignores that both parties used those words to refer to religious personalty including the rimonim (A1612-13, AD118, A1733-34, AD120).

Shearith Israel demonstrated the District Court's legal errors concerning the meaning of "the paraphernalia belonging thereto" in the Indenture, including relegating it to surplusage, and showed that it covers the rimonim and other personalty (BR 34-39). The District Court's statement that there was "no evidence" of CJI's understanding of the Indenture's specifically added term "paraphernalia" (AD42 n.38) is clearly erroneous and also legally irrelevant:  First, the plain meaning of "paraphernalia", as used contemporaneously by courts and the public, was personal property, including that used in religious services (BR 35); second, CJI and Shearith Israel had for over a decade manifested their understanding that "appurtenances" and "paraphernalia" specifically included the personalty used in services, which CJI requested Shearith Israel to *loan* to Touro (AD120; BR 12-16); and third, CJI bound itself to Shearith Israel's "form" of Indenture (AD119), so Shearith Israel's understanding of "paraphernalia" as "personal property" (AD42 n.38) controls.  *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I. 1981) ("party who signs an instrument manifests his assent to it and cannot later complain … that he did not understand its contents").  CJI's case about "unexpressed" intent is irrelevant. *Pahlavi v. Palandjian*, 809 F.2d 938, 945 (1st

-17-

Cir. 1987) (unspoken condition on contract performance) (CJIBR 30).  Here, the

District Court ignored express contractual language with an ascertainable meaning.

CJI's counter-arguments fail (CJIBR 29-30).  First, Rhode Island law –

which Shearith Israel cited below (Dkt. 90 at 29) – permits the review of extrinsic

evidence for <u>unambiguous</u> contracts (BR37).  Second, CJI's argument that

"paraphernalia" is ambiguous would require a remand if accepted, but the term is

not ambiguous.

CJI claims that "fixture" means something physically attached to property,

argues that "paraphernalia" is ambiguous because it could mean the same, but cites

no authority that uses "paraphernalia" that way.  Shearith Israel's citation used

"paraphernalia" to refer to personalty:  "in the rear of the drug store … there were

liquor glasses, a sink, an icebox, **and** paraphernalia appropriate to a barroom, but

not to a drug store".  *State v. Collins*, 67 A. 796, 801 (1907) (BR 35; CJIBR 29).

CJI's citation likewise is inapposite:  after discussing "liquors" that a minor

returned to a saloon, the court then discussed "the furniture, fixtures, and other

paraphernalia of the saloon" – making "other paraphernalia" a synonym for

personalty such as liquors (or "fixtures" a synonym for "furniture").  *Chabot*, 79 A.

at 1104.  Finally, Shearith Israel's expert used "fixtures" to mean ritual items, not

physically attached property, as CJI concedes (AD85; CJIBR 29).  "Paraphernalia"

is unambiguous.  The Indenture covered Touro's religious personalty – the

paraphernalia belonging to a synagogue – including the rimonim (BR 34-39). *See*

*Millar v. Allen*, 10 R.I. 49, 52 (1871) (lessee can't sell leased property "during the

term of his lease").

### C. The District Court Erred in Creating a Bailment

In concluding there was a bailment, the District Court interpreted an 1833

document indicating the delivery of Torah scrolls from Yeshuat Israel to Shearith

Israel. The Court drew an inference – not challenged on appeal (although

unwarranted) – that this document *sub silencio* included rimonim, and specifically

the rimonim at issue (AD81). It is the District Court's <u>legal</u> interpretation of this

document as a bailment of those rimonim that is subject to *de novo* review by this

Court. *See supra* 9-10, BR 27; *Mack v. Laser Inst. of Med. Esthetics, Inc.,* 2005

WL 1713077, *3 (R.I. Super. 2005) ("the Court, in its *de novo* review of the law,

concludes that the relationship between [the parties] is one of bailor and bailee").

Shearith Israel set forth the errors in this legal conclusion (BR 39-43) and

responds briefly herein to CJI's attempted rebuttal.

Shearith Israel argued below that there was no bailment and, as the AG

noted, "both parties allege as a secondary argument that the rimonim are held in

trust" (A202; Dkt. 91 ¶¶ 500, 513; Dkt. 90 at 48-49, 74-75; Dkt. 97 at 24-27, 48,

52-55). **Shearith Israel's argument to this Court does not mandate a**

-19-

**conclusion that the rimonim are held in the same trust as the realty, merely that they are held for a similar purpose: the rimonim "for the use" of those "hereafter worshipping" in Touro** (BR39)**; the edifice "for the sole Use … of the Jewish Society in Newport … as a Place of Public Worship forever"** (A1401).  The District Court's artificial construct of holding the premises in trust as a functioning synagogue but divorcing the rimonim from any restrictions is unprecedented in the life of Touro and its colonial ritual objects.  It was an expedient the District Court employed to let CJI hold Touro in trust (and eliminate Shearith Israel's ritual oversight) but simultaneously permit CJI to sell integral parts of Touro.

CJI asserts that a bailment can exist even when no one holds title (CJIBR 20), but tellingly, the case CJI cites involves *a charitable trust* – exactly what the District Court should have found here.  *See Ould v. Wash. Hosp. for Foundlings*, 95 U.S. 303, 312-13 (1877) (conveyance to "trustees" to "pass the title" for "[c]haritable uses").

CJI erroneously claims that language such as "in trust" is needed to form a trust (CJIBR19).  *MacDonald v. Manning*, 239 A.2d 640, 644 (R.I. 1968) ("technical words such as trust, trustee or charity are not essential to the creation of a charitable trust").  Here, the rimonim were not simply to be "redelivered" to a new congregation with no strings (CJIBR 19) – they were intended solely for the

-20-

charitable purpose of being *used* in worship at Touro.  If anything was created, it was a trust.

The rule against perpetuities does not apply to charitable trusts because "[i]t is intended that what is given shall be perpetually devoted to the purpose of the giver".  *Ould*, 95 U.S. at 312.  But the rule does apply to bailments, and CJI cites no bailment case rejecting that bar (CJIBR 22).  CJI's citation of trust and *cy pres* cases instead show the District Court's bailment holding was erroneous; CJI's case law applies to charitable trusts and would force CJI to justify under exacting standards the need to remove the rimonim forever from their religious use and sell them for money (BR43).  Finally, laches is not a defense here (CJIBR21-22), because there was no unreasonable delay.

This Court should ignore CJI's improper invitation to find that CJI is Yeshuat Israel's successor (CJIBR 23), which the District Court explicitly did not find (AD89 n.69).  *Servicios Comerciales*, 145 F.3d at 477 ("it is not our province to make findings of fact").  Moreover, the record below demonstrates that CJI had (and continues to have) no cultural, spiritual, legal, or other connection to Yeshuat Israel, an unincorporated association whose heirs became members of Shearith Israel (*see* Dkt. 91 ¶¶ 226-232; Dkt. 90 at 21-24; Dkt. 97 at 27-29; Dkt. 98 ¶ R2).

### D. CJI Did Not Obtain Title From Its Possession of the Rimonim

Contrary to CJI's argument (CJIBR 24), no Rhode Island case imposes a "strong" presumption of ownership from possession, particularly given CJI's lack of paper title and the other facts here, and the District Court committed legal error in applying this standard (BR 44-46).  Moreover, the scope of what the Indenture covered is a legal question concerning the construction of, e.g., "paraphernalia belonging thereto", and Shearith Israel has shown that the rimonim were included (Point I.B).  CJI's argument that Shearith Israel's immediately prior possession of the rimonim was "brief" and "irrelevant" (CJIBR 33-34) is wrong:  Shearith Israel possessed the rimonim for well over a half-century (and retains a "Newport" one).  Shearith Israel had title to the rimonim then, and no one else existed with title to challenge Shearith Israel's ownership.  CJI admits that Shearith Israel's "[l]egal oversight of" Touro's "contents", gained after Yeshuat Israel disbanded, *remains unchanged* (BR 9, AD140).  Thus, CJI did not obtain title when Shearith Israel relinquished possession by sending the rimonim to Touro *for use in worship there*.

## II.     THE DISTRICT COURT ERRED IN ITS TRUST RULINGS

CJI and the AG ignore and do not refute Shearith Israel's arguments that **CJI** is barred from seeking to remove Shearith Israel or to appoint a new trustee.  The AG may have prosecuted such actions as a party and is arguably not subject to

the settlement and res judicata bars precluding CJI. The key point, however, is that the AG did not participate in the trustee removal/appointment "proceedings" because it was not a party and thereby disclaimed any information sufficient to form a view. As a result, the public interest as well as other key interests (including beneficiaries present and future like the hundreds of Jewish families living in Newport that are not CJI members (A238:16-239:3)) were not represented. Nor did the District Court give the expressly required notice prior to appointment. Thus those decisions should be reversed, as should the error in punishing Shearith Israel.

### A. The District Court Erred in Granting CJI Standing to Prosecute Trustee Removal/Appointment Issues Without the Attorney General

As Shearith Israel argued below (Dkt. 97 at 43-44, 48-49; Dkt. 98 ¶¶ R.9-10), CJI lacked standing to prosecute trustee removal/appointment issues without the Attorney General. (CJI misinterprets Shearith Israel's appeal argument as one concerning Fed. R. Civ. P. 19, rather than the standing ground Shearith Israel argued and the District Court decided (AD90-93).) The District Court committed legal error in finding that the AG did not have to be a party before those monumental acts could be taken (BR 53-54).

Under applicable case law, the AG "should be made a party" whenever "the administration of a [charitable] trust is involved" as "the representative of the interests of the public". *Leo v. Armington*, 59 A.2d 371, 371 (R.I. 1948). **That precedent is still cited by the Rhode Island Supreme Court**, *Israel v. Nat'l Bd. of Young Men's Christian Ass'n*, 369 A.2d 646, 649 (R.I. 1977), even after the passage of the statute CJI cites. That statute applies to a broader swath of cases, namely "all judicial proceedings affecting, or in any manner dealing with, a charitable trust". R.I. Gen. Law § 18-9-5. The instant case goes to the heart of charitable trust administration – termination and appointment of a trustee – and requires that the AG be a party.

**Neither CJI nor the AG cites a single case in which a Rhode Island court considered trustee removal without the AG as a party**. The one case CJI references makes no mention of trustee removal – indeed, all claims against the trustee were released. *Audette v. Poulin*, 127 A.3d 908, 910 & n.2 (R.I. 2015) (CJIBR 50).

That the court below took this unprecedented action is particularly egregious; here the non-party AG expressly told the District Court that it could not address trustee removal/appointment issues (A190 n.2):

> It was not until trial that the [AG] learned that CJI sought assistance from the [AG] with respect to removing CSI as trustee and/or selecting a new trustee. To be clear, the

[AG] intervened only as *amicus curiae* and did not have the right to engage in discovery, examine witnesses or call his own witnesses at trial. **For these reasons, the [AG] takes no position with respect to removing CSI as Trustee or assisting this Court in selecting a new trustee if that is ultimately decided.**

The AG's role is to "represent[] the public interests" (CJIBR 50 (citing A190)).  The AG's amicus brief – which merely "recognizes that the District Court made factual findings supported by the record" (AGBR 10) – makes clear that it did not, as the District Court required, "fully assist the [District] Court with legal and factual analysis because of its statutory and common law special interest in this matter" (A18).  (Shearith Israel never sought to limit the AG's involvement below (*cf.* CJIBR 11), but simply stated its understanding of the AG's then-current positions (Dkt. 63).)  There is no authority for CJI's argument (CJIBR 51) that a harmless error standard applies to threshold standing issues, particularly those affecting the public interest.  Nevertheless, Shearith Israel highlighted those portions of the AG's post-trial brief indicating that Shearith Israel had met its obligations as trustee (BR 54 (citing A199, A201); *see also* A198).

### B.  The District Court Appointed CJI in Further Violation of Rhode Island Law and the Dictates of Due Process

The District Court committed a further due process error by failing to comply with the "due notice" requirement of R.I. Gen. Laws § 18-2-1 (AD115).

CJI did not seek trustee appointment in its pre-trial brief (Dkt. 69 at 47) and in its post-trial brief told the District Court that any new trustee should be appointed only after "consultation with the Attorney General" (Dkt. 92 at 62). The District Court disregarded that elemental due process requirement.

The AG is tellingly silent concerning the District Court's failure to give the required notice. CJI cites no authority – and we have found none – robbing this Court of its power to reach such an issue after a bench trial. Motions for a new trial "are not required", *Howe v. City of Akron*, 801 F.3d 718, 750 (6th Cir. 2015), except where challenges to jury verdicts require the creation of a reviewable record, *see Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1255 n.45 (10th Cir. 1999) (CJIBR 61).

This due process violation is particularly inimical here; in one fell swoop the District Court removed any ritual requirement of the trust (which the AG rightly contests); removed the entity (Shearith Israel) most capable of protecting trust interests; and replaced Shearith Israel with a party bent on dismembering Touro. At a minimum, the following constituencies were entitled to notice and an opportunity to be heard:

First, the AG, concerning the trust's ritual requirements, as well as other public interests;

Second, representatives of the Jewish Society of Newport, including the hundreds of non-CJI Jewish families in the area (A238:16-A239:3), those there in the summer, descendants of the original congregants, representatives of future generations, and others who are part of the charitable class. All of these constituencies could object to a trustee ready to sell "part of the heritage of the Jews of Newport" (AD19-20) and destroy the "balance, fabric and genus loci" of Touro (A2113, A2116), rather than keeping the rimonim for current and future use in Touro's services;

Third, Shearith Israel, which – along with other interested parties – would have proffered replacement trustees to shoulder its ritual oversight role and to prove CJI's unfitness to be trustee due to its flouting – by its improper sale of the rimonim – of its commitment and obligation to abide by the applicable Western Sephardic rituals as practiced by Shearith Israel (*see* AGBR 8);

Fourth, the TSF, its members, and others interested in Touro's preservation as an active house of worship, including rabbis and scholars;

Fifth, the Federal Government, as party to the 1945 Tri-Party Agreement and the 2001 National Trust contract concerning the ***preservation and conservation*** not only of the building "as an active synagogue for religious services" (AD137) "in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by [Shearith Israel]" (A2038), but also

its "collections" (AD135-36), including the rimonim (A330:22-331:9). Even aside

from CJI's repeated violations of its contractual obligations to the Federal

Government – defacing Touro with an unauthorized plaque in contravention of the

1945 Agreement; entertaining the sale of the rimonim without regard to its

obligations to the National Trust (AD136; A332:9-12; BR 60) – the Federal

Government was entitled to notice that, if CJI were the sole trustee, there will be

no independent third party replacing Shearith Israel to ensure CJI complies with its

obligations.

### C. CJI Lacks Standing to Pursue its Trustee-Related Claims Due to Settlement and Res Judicata

The 1903 settlement resolved the parties' litigations and underlying disputes

involving access and CJI's trust-related claims. CJI "*agree[d] to admit and*

*recognize <u>without qualification</u> the title and ownership of [Shearith Israel's*

*trustees] to the synagogue building, premises and fixtures*" (AD119; AD120

(including "paraphernalia belonging thereto")). In return, CJI obtained the

Indenture permitting it conditioned access to Touro and its contents. That

settlement is as binding today as it was when it was signed, as the "central goal of

a settlement agreement is to fashion a final and permanent resolution of a dispute".

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 11 (1st Cir. 2000) (R.I.

settlement has effect indefinitely). CJI believes it to be "nonsensical" that the 1903

settlement could apply to events 100 years later (CJIBR 48). But a "party may not escape its obligations simply because one of the parties may not consider the agreement to be as palatable to them as when they entered into it". *In re McBurney Law Servs., Inc.*, 798 A.2d 877, 882 (R.I. 2002) (stipulation); *Furtado v. Goncalves*, 63 A.3d 533, 538 (R.I. 2013) (settlements "bind[] the parties to the terms of their bargain"). CJI's benefit under the settlement – access to the property and religious objects, $1/year rent (AD119) – continued unabated. Its obligations did too. CJI's recognition without qualification of Shearith Israel's title and ownership – admissions it has made repeatedly since 1903 (BR 19-20) – deprives it of any right to seek the removal of Shearith Israel as trustee.

CJI's res judicata response basically relies on the AG's amicus brief below and the District Court's opinion (CJIBR 43-47), ignoring that this Court's determination is *de novo* (BR 48). CJI's changed circumstances argument ignores that CJI persuaded the District Court here to find a trust – and remove Shearith Israel for violating that trust – based on the ***very same documents*** CJI lost on in 1903. Moreover, CJI's premise that Shearith Israel acknowledged the trust by its reference to "trustees" is wrong – the 20th century references to Shearith Israel's trustees as owners simply acknowledges that Shearith Israel held property through its own trustees and not directly (BR 58-59, A205-10). That the Rhode Island legislature mentioned a trust relationship (CJIBR 54, 44) is not a public affirmation

-29-

by either the settlor or trustee; indeed, **the same legislature expressly protected Shearith Israel's rights by prohibiting the "interrupt[ion of] the possession, control and management with which the <u>proprietors</u> of said synagogue and premises … may be vested**" (A4212). *David v. Levy*, and the preclusive effect resulting therefrom, deprive CJI – albeit arguably not other litigants – of any standing to challenge Shearith Israel's status (BR 48-52).

### D. The District Court Legally Erred in Removing Shearith Israel as Trustee, Particularly Without Warning or Any Opportunity to Cure

The District Court's decision rewrote history and upended the relationship between the parties.  Prior to May 2016, the only court decision on the matter determined that there was no trust.  Shearith Israel was not ignoring an established trust but rather acting in conformity with the *David v. Levy* decision as implemented by the parties in their settlement, the Indenture, and their course of dealing over more than a century.

Even without a formal trust, however, Shearith Israel ***never*** claimed that its ownership of Touro and its contents was unfettered (*cf*. CJIBR 2, 8, 43) – to the contrary, Shearith Israel observed its sacred duty to ensure that Touro's property was used for and in accordance with traditional Jewish public worship (BR 56-58).

-30-

Shearith Israel's ritual oversight did not warrant removal even under the District Court's trust rubric.  The District Court found a religious charitable trust, with Shearith Israel as trustee charged with the duty to ensure that Touro be used for public Jewish worship.  The District Court found that Shearith Israel implemented that trust by executing the Indenture (AD95-96).  The Indenture contained clauses expressly designed to implement Touro's religious use, including those restricting the selection of rabbis and requiring compliance with Shearith Israel's ritual, rites, and customs (AD126).

Shearith Israel's actions in connection with the current dispute were in compliance with and in furtherance of any such trusteeship.  Its actions were unlike those in *Mahoney v. Mahoney*, 370 N.E.2d 1011 (Mass. Ct. App. 1977) (CJIBR 52-53), where the trustee was removed because she "'lacks the knowledge and competence' … coupled with her diversion of trust assets", *id*. 1015.

It was highly improper for the District Court to punish Shearith Israel for its good faith litigation positions, taken in furtherance of its understanding of its ritual oversight role in protecting Touro and its religious articles, including the rimonim (BR 56-60).  Shearith Israel did not neglect any purported duty to maintain Touro: the 1945 Agreement CJI cites (CJIBR 7) expressly notes that, as between Shearith Israel and CJI, their obligations ***are governed by the Indenture*** (A2999 Art. II), and CJI has the maintenance duty under the triple-net Indenture (BR 19, 61).

-31-

The District Court did not find any self-dealing or any other action that harmed the corpus of the trust.  Yet it gave Shearith Israel no opportunity to address or cure any perceived deficiency under the trust rubric that the District Court's decision created or to prove with proffered but rejected evidence why its actions were in furtherance of the applicable rituals and practices.  This was egregious legal error.

## **CONCLUSION**

This Court should reverse the District Court's decision as set forth in Shearith Israel's opening brief (BR 61) and herein.

Date:  January 6, 2017

Respectfully submitted,

**DEFENDANT-APPELLANT,**

By its attorneys,

 /s/ Louis M. Solomon
      Louis M. Solomon
      lsolomon@gtlaw.com
      Colin A. Underwood
      underwoodc@gtlaw.com
      Nancy L. Savitt
      savittn@gtlaw.com

GREENBERG TRAURIG, LLP
The MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-6500
Facsimile:  (212) 801-6400

John F. Farraher, Jr.
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Telephone: (617) 310-3029
Facsimile: (617) 279-8429
farraherj@gtlaw.com

Deming E. Sherman
LOCKE LORD LLP
One Financial Plaza, Suite 2800
Providence, RI 02903
Telephone: (401) 276-6443
Facsimile: (401) 276-6611
deming.sherman@lockelord.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's December 9, 2016 Order permitting Shearith Israel to file a "reply brief containing not more than 7,000 words", because this brief contains 6,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point typeface.

Dated: January 6, 2017

 /s/ Louis M. Solomon
GREENBERG TRAURIG, LLP
*Attorneys for Defendant-Appellant*
*Congregation Shearith Israel*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2017, I electronically filed the foregoing Reply Brief of Appellant with the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  All participants in the appeal are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

 /s/ Louis M. Solomon
GREENBERG TRAURIG, LLP
*Attorneys for Defendant-Appellant*
*Congregation Shearith Israel*

-34-